IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Jacob Kuriyan, | § | |
| | § | |
| STATE OF NEW MEXICO | § | |
| *ex rel.* Jacob Kuriyan, | § | |
| | § | CIVIL NO. 16-1148-JAP-KK |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| HCSC INSURANCE SERVICES CO. et al., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF/RELATOR JACOB KURIYAN'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff/Relator Jacob Kuriyan, Ph.D. (hereinafter "Relator" or "Kuriyan"), files this consolidated response to the motions to dismiss filed by Defendants HCSC Insurance Services Co. d/b/a Blue Cross & Blue Shield of New Mexico ("HCSC"), Molina Healthcare of New Mexico, Inc. ("Molina"), Presbyterian Health Plan, Inc. ("Presbyterian"), and  UnitedHealthcare of New Mexico, Inc. ("United") (ECF Nos. 115, 116, 119, and 114, respectively).  Relator obtained permission from Defendants and this Court to file a consolidated response to all four pending motions to dismiss.  *See* Order (Mar. 24, 2020) (ECF No. 129).

### I.   INTRODUCTION

1.      As a preliminary matter, Relator does not intend to seek civil penalties or further damages against Defendants once his alternate remedy dispute with the United States and State of New Mexico (collectively, "the Government") has been resolved.  Relator has not dismissed Defendants, however, out of an abundance of caution so that he can preserve his right to an

1

alternate remedy award.  This strategy is in line with caselaw holding that a *qui tam* suit in which all claims have been voluntarily dismissed is not "valid" and therefore not entitled to an alternate remedy award.  *See U.S. ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010) (because the relator's False Claims Act claims "failed" and were dismissed, "he has no right to participate in any recovery by the government."); *see also New York ex rel. Khurana v. Spherion Corp.*, 246 F. Supp. 3d 995, 1001 (S.D.N.Y. 2017) (under New York state False Claims Act, which is parallel to the federal Act, because the relator's *qui tam* claims were dismissed, he could no longer recover proceeds from an alternate remedy).  Although neither the Tenth Circuit nor this Court have taken this position, Relator has proceeded without dismissing his claims against Defendants simply out of caution, acknowledging the possibility that this Court and Circuit may agree with the aforementioned caselaw in the near future.

2.      Relator has adequately pleaded Article III standing, and his causes of action under the federal and New Mexico False Claims Acts state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).  Contrary to Defendants' contentions, Relator has properly complied with the federal False Claims Act's seal and service provisions, and Relator's allegations are not based on publicly disclosed information.  As a result, the Court should deny Defendants' motions to dismiss. In the alternative, Relator requests leave to amend his second amended complaint.

## II.    RELEVANT FACTS

3.      Relator will not make a complete recitation of facts here, but will instead summarize the facts most pertinent to Defendants' pending motions.  Relator points out that his second amended complaint describes and distinguishes Medical Loss Ratio/Medical Expense

Ratio, Underwriting Gain ("UG"), and Risk Corridor ("RC"), so Relator will not reiterate this entire background here.  *See* Relator's 2d Am. Compl. ("SAC") (ECF No. 100) ¶¶ 25–26, 33–43.

## A.    Procedural History and Case Outline

4.    All four Defendants in this action are Managed Care Organizations ("MCOs") which entered into near-identical Medicaid Managed Care contracts with the State of New Mexico ("the State") during the time period at issue.

5.    While analyzing non-public 2014 data provided to him by the State's Medicaid agency, the Human Services Department ("HSD"), Relator discovered Defendants' alleged fraudulent scheme.   Relator determined that Defendants had been overpaid and violated contractual terms, after analyzing and comparing Defendants' MCOs' expenditures on healthcare costs to the amounts that Medicaid paid Defendants.   Relator discovered this when his analysis found that Defendants' MCOs' expenditures on healthcare costs fell below the 85% minimum Medical Loss Ratio ("MLR")[1] required under the MCOs' contracts and by Federal regulations. *See* ECF No. 100-2 ¶¶ 7.1, 7.2.7, 7.5; 42 C.F.R. § 438.6(c) (2014).  Relator examined a version of the MCOs' contracts with HSD and public finance reports, and concluded that Defendants were fraudulently retaining overpayments, and that HSD had neither recognized nor recouped those overpayments.

6.    Relator applied the MLR formula in the contracts at issue to non-public data he obtained from HSD.  Relator's analysis included comparing encounter data against fee-for-service costs, in order to determine whether HSD was paying more for the services than it would under a

---

[1] Also known as Medical Expense Ratio ("MER").

fee-for-service model, which is prohibited by both federal regulations[2] and Defendants' contracts.[3] Relator's analysis has shown that Defendants' MCOs did not meet the "85:15" MLR set out in their contracts with HSD, and were overpaid.

7.      In other words, when the MLR calculation yields a number lower than 0.85, Defendants' administrative expenses—including their profits—are too high, meaning that Defendants were overpaid.  The table below illustrates Relator's findings.

| Defendant MCO | Net Capitation Revenue | Medical Costs | Pharmacy Costs | Care Coordination Costs | MLR |
|---|---|---|---|---|---|
| HCSC | $640,212,430 | $447,655,582 | $55,810,725 | $18,482,702 | 0.815 |
| United | $823,508,909 | $604,547,366 | $37,532,059 | $23,774,405 | 0.809 |
| Molina | $1,043,773,805 | $696,840,155 | $88,056,738 | $30,133,374 | 0.781 |
| Presbyterian | $956,351,344 | $586,400,099 | $79,042,746 | $27,609,519 | 0.725 |
| **Total** | **$3,463,846,488** | **$2,335,443,202** | **$260,442,268** | **$100,000,000** | **0.778** |

8.      Relator's calculations show that the MLR for every Defendant—and in total—is far below 0.85, meaning that Defendants were overpaid.  Defendants did not return these overpayments promptly.  Relator has alleged that Defendants' profits increased by hundreds of millions of dollars, and Defendants knew, or recklessly disregarded, that this was due to Medicaid overpayments.

9.      Relator has alleged that Defendants accomplished their fraudulent scheme by knowingly or with reckless disregard failing to correct inaccurate MLR audits drafted by an actuary

---

[2] See 42 C.F.R. §§ 438.6(c), 447.362 (2014).
[3] See 42 C.F.R. §§ 438.6(c)(2)(i), (c)(5)(ii) (formerly 42 C.F.R. § 447.361) (2014); MCO Contract Example (ECF No. 100-2) ¶¶ 7.1, 7.2.7, 7.5 (requiring compliance with all laws and regulations, and 42 C.F.R. §§ 447.361–447.362 specifically, and requiring compliance with 85:15 MLR).

retained by HSD.  By doing so, Relator alleges, Defendants pocketed undetected overpayments as profit.

10.     After discovering Defendants' fraudulent scheme, Relator disclosed it to the State in a presentation to HSD on May 25, 2016.[4]  The State initially denied that any overpayments existed, based on the conclusions of a June 2015 actuarial MLR audit of Defendants' MCOs' claims and premiums paid to Defendants' MCOs.  The State specifically referenced "MLR" when informing Relator that there were no overpayments.  It appeared that Defendants had made no effort to inform HSD of overpayments, which confirmed Defendants' fraudulent scheme in Relator's mind.

11.     After waiting several months and receiving no response from HSD or the State, Relator retained counsel and sent his *qui tam* disclosure statement to the United States and State of New Mexico on October 13, 2016.  Relator subsequently filed his original complaint in this matter on October 18, 2016, and filed an amended complaint on November 17, 2016.

12.     Relator and his counsel learned on September 7, 2018 from Assistant United States Attorney Ruth Keegan that the State had issued a formal demand to Defendants for overpayments. AUSA Keegan noted that the payment demand postdated the filing of Relator's *qui tam* case.  The Government's ultimate recovery of those overpayments occurred in June of 2017.  Relator and his counsel were also told that the State's recoupment was calculated based on the RC and UG measures in Defendants' contracts with HSD.  However, in this case, UG, RC, and MLR are all different ways of calculating overpayments or excess profits, as Relator explains further *infra*.[5]

---

[4] HSD is an agency of the State of New Mexico, and also receives Federal funding.
[5] *See* Section III(A)(1)(c) *infra*.

13.     The Government declined intervention on December 4, 2018, and this case was subsequently unsealed.  *See* Order to Unseal Case (ECF No. 18).

14.     Relator offered, and Defendants Molina, HCSC, and Presbyterian accepted, extensions of time to answer Relator's first amended complaint.  United declined the extension and answered Relator's first amended complaint by filing a motion to dismiss (ECF No. 77) on May 30, 2019.  The Court denied that motion as moot after granting Relator leave to file a second amended complaint ("SAC"), finding that the proposed SAC met the requirements of Federal Rule of Civil Procedure 9(b).  *See* Order (Oct. 25, 2019) (ECF No. 99) at 9.  Relator filed that SAC on October 28, 2019 (ECF No. 100), and it is now his operative pleading.

15.     Additionally, Relator and the Government are currently embroiled in an alternate remedy share dispute.  The Government contends that its June 2017 recoupment is not an alternate remedy, and Relator argues that it is.  Relator's renewed motion for award from alternate remedy (ECF No. 106), which seeks to resolve this dispute, is currently pending.

### III.   ARGUMENT & AUTHORITIES

16.     The Court should deny Defendants' motions to dismiss because:  (1) Relator has adequately pleaded a reverse false claim cause of action under 31 U.S.C. § 3729(a)(1)(G), identifying a non-contingent payment "obligation" owed to the Government arising from laws, regulations, and the contract at issue; (2) Relator has adequately pleaded a claim under 31 U.S.C. § 3729(a)(1)(A) based on false certifications; (3) Relator has adequately pleaded causes of action under New Mexico's False Claims Acts; (4) Relator has adequately alleged scienter; (5) Relator has shown that he has Article III standing; (6) no public disclosure warrants dismissal; (7) Relator

properly complied with the seal and service provisions of 31 U.S.C. § 3730(b)(2); and (8) Defendants' factual arguments are inapposite and premature at the motion to dismiss stage.

**A.      Relator States a Claim for Relief under the Federal and New Mexico False Claims Acts, Pursuant to Federal Rule of Civil Procedure 12(b)(6).**

**1.   Federal False Claims Act.**

17.      Relator has stated claims under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, contrary to Defendants' contentions.

**a.   Reverse False Claims (31 U.S.C. § 3729(a)(1)(G))**

18.      First, Relator has adequately pleaded a "reverse false claim" under 31 U.S.C. § 3729(a)(1)(G). Relator identified the "false record or statement" at issue: erroneous audit reports that Defendants, upon information and belief, failed to correct, "causing" the Government to make or use "a false record or statement material to an obligation to pay or transmit money to the government." 31 U.S.C. § 3729(a)(1)(G); *see* ECF No. 100 ¶¶ 55–59, 71–75, 83–88. Defendants' alleged failure to correct the audit reports resulted in the Government receiving and relying upon an audit that falsely showed that no overpayments had been made. This effectively concealed Defendants' obligation to repay overpayments, as required by the contracts at issue and federal regulations. *See* 42 U.S.C. § 1320a-7k(d) (prohibiting retention of overpayments in excess of sixty days or past due date of cost report); ECF No. 100 ¶¶ 44, 49 (contract requires reporting and investigating all suspected fraud and compliance with all federal and state statutes and regulations).

19.      Relator also adequately pleaded a reverse false claim under the second criterion in Section 3729(a)(1)(G) by alleging how Defendants "knowingly conceal[ed] or knowingly and

improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see* ECF No. 100 ¶¶ 45–49, 52–57, 59, 71–75, 84–88.

20.     Defendants' arguments to the contrary are:  (1) Relator's MLR allegations do not show an "obligation" sufficient to plead a reverse false claim cause of action; (2) Relator has not alleged an obligation that arose after "applicable reconciliation"; (3) Relator has not alleged an existing rather than a contingent obligation.  None are convincing or correct.

### i. Relator adequately alleges a payment "obligation" owed to the Government.

21.     The reverse false claim provision of the FCA provides liability for anyone who

knowingly makes, uses, or causes to be made or used, a false record or statement material to *an obligation to pay or transmit money or property to the Government*, or knowingly conceals or knowingly and improperly avoids or decreases *an obligation to pay or transmit money or property to the Government*[.]

31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Relator's SAC adequately sets out the "obligation" owed under the contract at issue and federal laws and regulations.  *See* SAC (ECF No. 100) ¶¶ 46–59, 71–73, 84–85.

22.     Defendants allege, in contradiction of the plain language therein, that noncompliance with the 0.85 MLR set out in the contract[6] does not create an "obligation" under 31 U.S.C. § 3729(a)(1)(G).  Regardless of the contract language, impermissible retention of overpayments is an "obligation" under federal laws and regulations.  *See* 42 U.S.C. § 1320a-7k(d) (prohibiting overpayment retention in excess of permitted time period); 42 C.F.R. §§ 438.6(c), 447.362 (2014); MCO Contract Example (ECF No. 100-2) at 36–37; Section III(A)(1)(c) *infra* (explaining how Relator's MLR calculations automatically show overpayments).  Additionally,

---

[6] ECF No. 100-2 ¶ 7.2.7.

the contract at issue is clear:  Defendants "*shall* spend no less than eighty-five percent (85%) of net Medicaid line of business Net Capitation Revenue . . . on direct medical expenses . . . on an annual basis."  ECF No. 100-2 at 37 (emphasis added).  This is a requirement.[7]

23.     There is no government choice involved as to whether these requirements apply. The law is clear, in fact, that retaining an overpayment in violation of 42 U.S.C. § 1320a-7k(d) automatically incurs an "obligation" under 31 U.S.C. § 3729(a)(1)(G)—resulting in potential reverse false claim liability.  *See* 42 U.S.C. § 1320a-7k(d)(3).  While the contract may provide options for the State of New Mexico in some situations, compliance with federal laws and regulations is not discretionary.

### ii. The obligation at issue accrued after "applicable reconciliation."

24.     An overpayment cannot constitute an "obligation" under the reverse false claim provision of the FCA until "after applicable reconciliation."  31 U.S.C. §§ 3729(a)(1)(G), (b)(3); 42 U.S.C. § 1320a-7k(d)(4)(B).  Defendants argue that Relator has not shown an "obligation" because the Government's MLR, RC, and UG calculations and recoupment of overpayments from Defendants are "applicable reconciliation" under 42 U.S.C. § 1320a-7k(d)(4)(B).

25.     This argument fails because Relator has successfully alleged a fraudulent scheme. The legislative history of 2009 amendments to the False Claims Act is clear: "any action or scheme

---

[7] Although Defendants and the Government may claim otherwise, other legal publications have also read the contract language at issue as *requiring* meeting the 85:15 MLR and *requiring* MCOs to pay refunds to the Government if they exceed that ratio—consistent with the contract's plain meaning.  *See* Ex. 1, American Health Care Association Report excerpts.  Other sources (including HSD's own auditor, Mercer) also note that New Mexico *requires* compliance with its 85:15 MLR. *See* Ex. 2, Kaiser Family Foundation Report, at 4 (New Mexico requires compliance with its MLR); Ex. 3, Mercer Report, at 3; ECF No. 106-4 at 4 (New Mexico Legislative Finance Committee report noting that 85:15 MLR is required).

created to intentionally defraud the government by receiving overpayments, *even if within the statutory or regulatory window for reconciliation,* is not intended to be protected" by the definition of "obligation" set out in 31 U.S.C. § 3729(b)(3).  S. Rep. No. 111-10, 2009 U.S.C.C.A.N. 430, 442 (Mar. 23, 2009) (emphasis added); *see also U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 172–73 (E.D. Pa. 2012) (relator's reverse false claim theory met Rule 12(b)(6) by alleging that defendants' submission of reconciliation documents to government that did not reveal submission of false data "were relied upon by CMS when reconciling the claims and served to decrease the amount Defendants owed *at reconciliation*.") (emphasis added).[8]

### iii. Relator adequately alleges a non-contingent obligation.

26.     Defendants United, Molina, and Presbyterian claim that the contracts do not contemplate recovery of overpayments by the Government until HSD informs Defendants of an overpayment and requires them to return it, asserting that any obligation owed is therefore contingent and insufficient for a reverse false claim.[9]

27.     As noted before, there is a statutory and regulatory obligation independent of the contract to refund overpayments to the Government.  However, even under the process set out in the contract, HSD cannot detect overpayments if Defendants do not correctly verify the accuracy of MLR audits and other required reporting to HSD, as required by federal regulations and the contract.  *See* 42 C.F.R. §§ 438.604, 438.606 (2014); ECF No. 100 ¶¶ 27, 31, 59; ECF No. 100-2

---

[8] Although this case dealt with Medicare Part D and not Medicaid Managed Care, it provides a helpful analog.
[9] *See* ECF No. 114 at 13–14; ECF No. 117 (adopting arguments); ECF No. 119 (adopting arguments).

at 30–31, 45.  Relator has alleged that Defendants did not do this properly, so the contractual recovery process is irrelevant.  *See* ECF No. 100 ¶¶ 55–59.

28.    Compliance with contractual obligations is not optional or something that only matters when HSD says so—these are non-contingent "existing debts" that can lead to reverse false claim liability.  *E.g.*, *U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, No. 04-cv-01224-REB-CBS, 2009 WL 3161828, at *6 (D. Colo. Sept. 30, 2009); *see also U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) (reverse FCA claim not precluded by "the need for some further governmental action or some further process to liquidate an obligation.").  Regardless of what the contract at issue says about recoupment methods, material breaches of contract can give rise to a payment "obligation" under Section 3730(a)(1)(G), as this Court has acknowledged.  Order (Oct. 25, 2019) at 9 n.22 (citing *Bahrani*, 465 F.3d at 1204) ("The FCA includes duties arising from contractual relationships in its definition of an 'obligation'" and "the Tenth Circuit has held that breach of contract can give rise to a [reverse false claim obligation.")

29.    Relator's SAC alleges breaches of the contracts at issue.  *See* ECF No. 100 ¶¶ 44, 51, 58.  These breaches are "material," as pleaded in Paragraphs 80 and 93 of the SAC, because the Government would not have continued to pay Defendants under the contracts at issue if it knew the full extent of the alleged fraud.

30.    Additionally, ample case law shows that failing to maintain a compliance program which detects fraud, failing to identify and investigate overpayments, or reckless disregard of inaccurate reporting to the Government can lead to reverse false claim liability.  *See, e.g.*, *U.S. ex rel. Hernandez-Gil v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1245 (D.N.M. 2018) (reasonable jury could conclude that defendant's failure to identify, "investigate, quantify, report,

11

or return" overpayment could constitute reverse false claim); *see also Graves v. Plaza Med. Ctrs., Corp.*, 281 F. Supp. 3d 1260, 1269–70 (S.D. Fla. 2017).  This is consistent with the contracts at issue as well, which not only require compliance with all applicable Government "requirements regarding Fraud,"[10] but also require maintenance of a comprehensive fraud and abuse prevention and compliance program, and investigation and reporting of suspected fraud and suspicious events. *See* ECF No. 100 ¶ 44; ECF No. 100-2 at 22–27, 30, 32, 45, 49.

*       *       *

31.     Relator has adequately pleaded a reverse false claim:  Defendants' alleged failure to correct MLR audit reports resulted in submission of reports to the government which falsely indicated no overpayments, fraudulently reducing or eliminating Defendants' obligation to return overpayments to the government.  Defendants improperly avoided an obligation to return those overpayments.

### b.  False Certifications (31 U.S.C. § 3729(a)(1)(A))

32.     Relator has also adequately pleaded a false certification claim under 31 U.S.C. § 3729(a)(1)(A).  As noted above, Relator has pleaded that the Defendants certified compliance with applicable laws and regulations in the contract at issue.  *See* ECF No. 100 ¶¶ 44, 62 (outlining compliance certification provisions of contract at issue).  When Defendants violated regulations requiring prompt return of overpayments and verification and submission of accurate MLR reports, this certification was rendered false.  *See* 31 U.S.C. § 3729(a)(1)(G); 42 U.S.C. § 1320a-7k(d) (prohibiting retention of overpayments in excess of permitted time period); 42 C.F.R § 438.6(c)

---

[10] ECF No. 100-2 ¶ 4.17.1.3.

(prohibiting MCOs from charging more than what Medicaid would have paid on a fee-for-service basis); 42 C.F.R. §§ 438.604, 438.606 (MCOs' submission of data and documents to State requires certification of the data and documents' accuracy, completeness, and truthfulness); *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743–44 (10th Cir. 2018) (false certification claim was adequately pleaded when *qui tam* complaint alleged that hospitals certified compliance with laws and regulations in cost report, but submitted claims for unnecessary medical treatment in violation of such laws and regulations, rendering that certification false).

33.     Defendants argue that Relator's false certification allegations are based on regulations that were ineffective during the time period at issue.  While it is true that some of the regulations were enacted subsequent to 2014, some have no effective date and are retroactive. Additionally, all of the cited post-2014 regulations are generally equivalent to requirements in the contract at issue or to 2014 regulations, as shown in the chart below.

| Regulations Cited | Equivalent(s) |
|---|---|
| 42 C.F.R. § 438.4(b)(9) (state capitation rates must be developed so that MCOs achieve a 0.85 MLR). | Contract (ECF No. 100-2) ¶¶ 7.1, 7.2.7 (85:15 MLR required); 42 C.F.R. § 438.6(c) (2014) (capitation rate standards). |
| 42 C.F.R. § 438.8(d) (how to calculate MLR) | Contract (ECF No. 100-2) ¶¶ 7.2.2, 7.2.7 |
| 42 C.F.R. § 438.8(e) (how to calculate MLR numerator) | Contract (ECF No. 100-2) ¶¶ 7.2.2, 7.2.7 |
| 42 C.F.R. § 438.8(f) (how to calculate MLR denominator) | Contract (ECF No. 100-2) ¶¶ 7.2.2, 7.2.7 |
| 42 C.F.R. § 438.8(k)(3) (final calculation issued 180 days after end of year) | Contract (ECF No. 100-2) ¶ 7.2.10 |
| 42 C.F.R. §§ 438.8(k)(3), (n) (MLR audit results sent to MCOs so they can calculate and validate the accuracy) | 42 C.F.R. §§ 438.604–438.606 (2014) (MCOs must certify accuracy, completeness, and truthfulness of all documents and data submitted); Contract (ECF No. 100-2) ¶¶ 4.21.1.7, 4.21.1.9, 7.1, 7.2.7, 7.27.10 (requiring compliance with MLR and accurate reporting). |

JB-KK

Document

Filed

//Page

of

The remainder of Relator's cited laws and regulations—including those which prohibit retention

of overpayments—were all effective in 2014.

34.Defendant HCSC argues that Relator has not pleaded a false certification cause of

action because he has not identified the "'who, what, when, where, and how' of the alleged

claims." ECF No. 115 at 18.  This standard is used to assess whether FCA allegations meet Federal

Rule of Civil Procedure 9(b)—not whether Relator's allegations survive a Rule 12(b)(6) motion

to dismiss.  *See Polukoff*, 895 F.3d at 745; Order (Oct. 25, 2019) (ECF No. 99) at 4.  And

furthermore, it is the law of the case that Relator has already satisifed Rule 9(b) under this very

standard.  *See* Order (Oct. 25, 2019) (ECF No. 99) at 9 ("Relator pleads with enough specificity

the who, what, where, when, and how that forms the basis of his claims.").

### c. The Contracts at Issue Need Not Contemplate Recoupment Based on MLR for Relator to State a Claim.

35.     Contrary to Defendants' arguments,[11] whether or not Defendants' contracts with

HSD specifically describe recoupment of overpayments based on MLR is immaterial, as Relator's

MLR calculations automatically indicate the existence of overpayments.  It is also immaterial

whether the Government recouped funds based on RC, UG, or MLR.  RC and MLR are calculated

from the same data and can both reveal overpayments (in the form of excess costs, which include

profits).  The key difference is that RC is exclusive to the Medicaid "Obamacare" expansion

population and MLR is not.  UG applies only to the Medicaid non-expansion population and relates

to "excess profits"—another kind of overpayment.

---

[11] *See* ECF No. 114 at 4–5, 13–14; ECF No. 115 at 15–16; ECF No. 118 (adopting arguments of
ECF No. 114); ECF No. 119 (adopting arguments of ECF Nos. 114–116).

36.     A report of overpayments calculated based on MLR necessarily covers overpayments calculated with RC and "excess profits" under UG.  Failing to meet an 85:15 MLR necessarily means that an MCO has administrative costs (including profits) in excess of those permitted by the contracts at issue and by federal regulations.  Because this would be an overpayment with regard to the entire New Mexico Medicaid population, it would also be an overpayment with regard to the non-expansion *and* expansion populations.

37.     In short, even if Defendants' contracts only contemplate recoupments based on RC and/or UG, those recoupments would automatically be based on an overpayment to an MCO. Without overpayments, there would be no recoupment for the State through MLR, RC, or UG.

38.     Additionally, Defendants' contracts require compliance not only with all applicable regulations (including those prohibiting retention of overpayments past the permissible deadline), but specifically with 42 C.F.R. §§ 447.361 and 447.362.  ECF No. 100-2 ¶¶ 7.1, 7.5.  When the contracts at issue were written, Section 447.361 had been repealed and replaced with Section 438.6, which reads as follows:

> If risk corridor arrangements result in payments that exceed the approved capitation rates, these excess payments will not be considered actuarially sound [as required by 42 C.F.R. § 438.6(c)(2)(i)] to the extent that they result in total payments that exceed the amount Medicaid would have paid, on a fee-for-service basis, for the State plan services actually furnished to enrolled individuals, plus an amount for MCO . . . administrative costs directly related to the provision of these services.

42 C.F.R. § 438.6(c)(5)(ii) (2014). 42 C.F.R. § 447.362 (2014) is a corollary provision for nonrisk contracts which prohibits payments to the MCO from exceeding the fee-for-service amount for the service plus administrative cost savings.

15

39.     When Relator conducted his MLR analysis, he compared the MCOs' encounter data against their reported fee-for-service costs, in order to determine whether HSD was paying more for the services than it would under a fee-for-service model, which is prohibited by the above regulations.   The element of medical services plus directly-related administrative costs is the numerator of MLR—the "85" of the 85:15 ratio.  *See* ECF No. 100 ¶ 36; ECF No. 100-2 at 36–37.

40.     In short, Relator's MLR analysis revealed that the alleged fraud caused regulatory noncompliance and a material contractual violation, such that it is immaterial whether the contracts at issue contemplate recoupment of MLR overpayments.  Furthermore, as noted previously, an 85:15 MLR is a requirement of Defendants' contracts, and material contractual breaches are a clear basis for an FCA violation.

## 2. New Mexico False Claims Acts

41.     Relator has also stated a claim under the New Mexico Medicaid False Claims Act ("NMFCA"), N.M. Stat. Ann. §§ 27-14-1 *et seq.*, and the New Mexico Fraud Against Taxpayers Act ("FATA"), N.M. Stat. Ann. §§ 44-9-1 *et seq.*.  Relator's previous arguments with regard to the FCA also apply to his NMFCA and FATA claims.  *See Dental Dreams*, 307 F. Supp. 3d at 1240 (FATA generally tracks the federal FCA and New Mexico courts apply FCA caselaw to interpret the NMFCA).

42.     Relator's live complaint clearly identifies the alleged "record or statement"[12] at issue, and the method by which Defendants concealed or avoided their payment obligation:

---

[12] N.M. Stat. Ann. §§ 27-14-4(E); 44-9-3(A)(8).

erroneous audit reports that Defendants knowingly, or with reckless disregard, failed to correct. *See* ECF No. 100 ¶¶ 55–57, 85, 100, 109–10.  Relator's SAC meets the requirements of both NMFCA and FATA, and has adequately stated a claim for relief under those statutes.

### 3.  Scienter under FCA, NMFCA, and FATA

43.     Contrary to Defendants HCSC, Presbyterian, and Molina's arguments, Relator has adequately pleaded scienter at this stage.  Proof of specific intent to defraud is not required under FATA, NMFCA, or the federal FCA.  *See* 31 U.S.C. § 3729(b)(1)(B); N.M. Stat. Ann. § 44-9-3(B); *Dental Dreams*, 307 F. Supp. 3d at 1240.  A relator need only allege scienter generally at the motion to dismiss stage.  *E.g.*, *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 837 (6th Cir. 2018) (citing Fed. R. Civ. P. 9(b)).  Accordingly, this Court need only determine whether Relator's factual allegations plausibly suggest the required scienter.  *U.S. ex rel. Gogineni v. Fargo Pac. Inc.*, No. 17-00096, 2020 WL 1958627, at *5 (D. Guam Apr. 23, 2020).

44.     Relator has adequately alleged facts supporting that Defendants acted with the scienter required by the FCA—knowingly, with deliberate ignorance, or with reckless disregard[13]—which is sufficient at this stage:

> Defendants' profits increased by hundreds of millions of dollars, and Defendants knew, or recklessly disregarded, that this was due to Medicaid overpayments. . . .
> Defendants—as a result of their internal bookkeeping—knew or recklessly disregarded a five-percent-plus 'jump' in profits from the previous year . . . [and] knew or recklessly disregarded that such a 'jump' could only be due to overpayments. . . .  Defendants, upon information and belief, knowingly or with reckless disregard approved [] MLR audits 'as-is' with regard to the finding of no overpayments, pocketing the overpayments as profit.

---

[13] 31 U.S.C. §§ 3729(a)(1), (b)(1)(A).

17

ECF No. 100 ¶¶ 54, 56.

**B.    Relator has Standing.**

45.    Relator has met the basic elements of standing, alleging an "injury in fact" (the United States was deprived of overpayments), "causation" (Defendants' alleged fraudulent scheme caused the injury), and "redressability" (this action would recover civil penalties, on top of what the Government has already recovered, to redress the alleged harm). *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). A *qui tam* relator need not show monetary damages to the United States in order to show an "injury" for standing purposes—alleging violations of the FCA or seeking civil penalties is enough. *See, e.g.*, *U.S. ex rel. Bly-Magee v. Cal.*, 236 F.3d 1014, 1017 (9th Cir. 2001); *U.S. v. J-M Mfg. Co.*, No. EDCV 06-55-GW(JPWX), 2018 WL 1801258, at *10 (C.D. Cal. Apr. 12, 2018) (citations omitted); *U.S. ex rel. El-Amin v. George Washington Univ.*, No. Civ. A. 95-2000 (JGP), 2005 WL 485971, at *3 (D.D.C. Feb. 25, 2005).

46.    Defendants allege, however, that Relator has not shown the "injury" component of standing because the Government has already recovered the overpayments at issue. This argument defies logic. The Government has recovered overpayments here, which is proof that an "injury" occurred. And regardless, Relator need not prove monetary damages to the government. *Id.*

47.    Defendant Molina (joined by Defendant Presbyterian) claims that the Government's recoupment of the funds at issue should be treated as an admission of a party-opponent that there is no injury in fact, mandating dismissal for lack of standing. *See* ECF No. 116 at 11; ECF No. 119. However, the Government's recoupment does not negate the alleged fraud or past injury to the Government, just like returning a stolen item does not erase theft (or

prosecution for it).  Courts have acknowledged, furthermore, that a defendant's repayment of amounts fraudulently withheld from the United States does not warrant dismissal of an FCA action based on that fraudulent conduct.  *See U.S. v. Crumb*, No. 15-0655-WS-N, 2016 WL 4480690, at *16–*17 (S.D. Ala. Aug. 24, 2016) (defendant's late repayment of overpayments, after permissible deadline had passed, did not warrant dismissal of reverse false claim count in FCA suit).

## C.   **No Public Disclosure Warrants Dismissal.**

48.   As Relator has noted before, his action is not based upon publicly-disclosed allegations.  And furthermore, even if there was a public disclosure issue, Relator is an original source, and this action therefore need not be dismissed.

49.   Defendants argue that a June 24, 2015 HSD Report to the New Mexico Legislative Finance Committee ("LFC Report") (previously filed as ECF No. 106-4) constitutes a public disclosure.[14]  For the LFC Report to be a public disclosure, it must contain "'substantially the same allegations'" as those in Relator's live complaint.  *E.g.*, *U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 742 (10th Cir. 2019) (quoting 31 U.S.C. § 3730(e)(4)(A)); *see also* N.M. Stat. Ann. § 27-14-10(C).   Courts examine whether the purported public disclosure would "set the government on the trail of the alleged fraud without the relator's assistance."  *Reed*, 923 F.3d at 744 (citation and internal quotation marks omitted).  As explained below, the LFC Report does not meet this standard.

50.   First, the LFC Report reveals a belief by the Legislative Finance Committee that Defendant Molina *may have* failed to meet MLR requirements (and, thus, *may have* been overpaid)

---

[14] *See* ECF No. 116 at 2; ECF No. 114 at 10 n.4; ECF No. 115 at 20; ECF No. 119.

with regard to behavioral health (BH) in 2014, but conceded that data was not yet final.  *See* ECF No. 106-4 at 4.  Furthermore, the Report claims that Molina's overall MLR complied with the 85:15 ratio (contrary to Relator's allegations), again noting that data was not yet finalized.  *Id.*

51.     Relator's complaint and disclosure alleged *fraudulent* and *illegal* retention of overpayments, and noncompliance with an *overall* MLR of 0.85, unlike the LFC Report.  The fact that a *possible* overpayment to Molina for *one segment* of healthcare was discovered by the Government here does not even come close to setting the Government "on the trail of the alleged fraud."  *Reed*, 923 F.3d at 744 (citation and internal quotation marks omitted).  In fact, it does the opposite, concluding that Molina's *overall* MLR appeared to be compliant.  *See* ECF No. 106-4 at 4 ("Molina Healthcare's overall MLR for [20]14 was 87 percent").

52.     Second, the LFC Report notes that "Pre-Centennial Care", data from 2010–14 "shows consistent under spending of the MLR requirement."  ECF No. 106-4 at 5.  This does not apply to the contracts at issue, which are "Centennial Care" contracts.  *See* HSD, *Medical Assistance Division Contracts*[15] (listing all contracts at issue under "MCOs - Centennial Care"); Ex. 3, Mercer Report.  Furthermore, the LFC Report's "Pre-Centennial Care" Table only shows that Molina fell below an 85:15 MLR in 2014 for "Physical Health" and "SCI" only—not as a total.  ECF No. 106-4 at 5.

53.     Relator also notes that even if the LFC Report operated as a public disclosure with regard to Molina—which it does not—it does not even hint at MLR noncompliance or overpayment retention by the other three Defendants.  *See* ECF No. 106-4 at 4–5 (showing that

---

[15] https://www.hsd.state.nm.us/lookingforinformation/medical-assistance-division.aspx

United, Blue Cross (HCSC), and Presbyterian either did not provide MLR data or exceeded the 0.85 minimum MLR).

54.    Additionally, even if the LFC Report is a public disclosure with regard to Defendant Molina, Relator is an original source, and his FCA and NMFCA claims against Molina should not be dismissed.  *See* 31 U.S.C. § 3730(e)(4)(A);  N.M. Stat. Ann. § 27-14-10(C).  Relator's independent analysis of non-public 2014 Medicaid data and his *qui tam* complaint and disclosure "materially add[] to" the LFC Report, revealing the alleged fraudulent scheme.  31 U.S.C. § 3730(e)(4)(B); *see also* N.M. Stat. Ann. § 27-14-10(C).

**D.    Relator Complied with Seal and Service Requirements.**

55.    Relator complied with the FCA's seal and service requirements (set out in 31 U.S.C. § 3730(b)(2)) when he filed his original and first amended complaints.  The provisions do not apply to Relator's second amended complaint ("SAC") because the case has been unsealed, the government has declined, and the SAC did not add any new fraud allegations which would mandate a new seal.

56.    Defendants assert that this action should be dismissed because Relator's second amended complaint was not filed under seal or served on the government in accordance with 31 U.S.C. § 3730(b)(2).[16]  However, many courts have considered near-identical arguments and rejected them.  *See, e.g.*, *U.S. ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 197–98 (S.D.N.Y. 2016); *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d

---

[16] *See* ECF No. 115 at 18 n.7; ECF No. 116 at 18–20; ECF No. 119 (adopting arguments); ECF No. 114 at 10 n.4 (adopting arguments).

1317, 1324–26 (N.D. Ga. 2013); *U.S. ex rel. Davis v. Prince*, 766 F. Supp. 2d 679, 683–84 (E.D. Va. 2011).

57.     Most courts agree that when a relator has complied with the FCA's seal and service requirements and the government has had an opportunity to investigate them and decide whether to intervene or not, a subsequent amendment need not be filed under seal unless the government needs another opportunity to investigate and make that decision. *See, e.g.*, *Saldivar*, 972 F. Supp. 2d at 1325; *U.S. ex rel. Hagerty v. Cyberonics, Inc.*, 95 F. Supp. 3d 240, 263 (D. Mass. 2015), *aff'd* 844 F.3d 26 (1st Cir. 2016). Thus, when the amendment adds no new allegations of any substance, there is no seal requirement. *See, e.g.*, *Kolchinsky*, 162 F. Supp. 3d at 198; *Hagerty*, 95 F. Supp. 3d at 263; *Davis*, 766 F. Supp. 2d at 683–84. This is especially true when the government has declined intervention or the case has been unsealed. *See Kolchinsky*, 162 F. Supp. 3d at 191, 198; *Hagerty*, 95 F. Supp. 3d at 253, 263; *U.S. ex rel. Ubl v. IIF Data Sols.*, No. 1:06-cv-641, 2009 WL 1254704, at *4 (E.D. Va. May 5, 2009) (citation omitted). Furthermore, some other courts hold that there are *no* seal requirements for amended complaints. *See U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No. 4:12-CV-543, 2015 WL 4039929, at *3 (E.D. Tex. July 1, 2015) (collecting cases); *Saldivar*, 972 F. Supp. 2d at 1325–26 (collecting cases).

58.     Relator's second amended complaint is substantially similar to his first amended complaint. *See* Relator's Mot. for Leave to Amend (ECF No. 87) at 2–3. Relator's amendments simply added detail and clarification, as this Court acknowledged. *See* ECF No. 87 at 3–4; ECF No. 92 at 11; ECF No. 99 at 7; ECF No. 100. Relator added an additional count under Section 3729(a)(1)(A) of the federal False Claims Act, but again, this only amplified and expanded Relator's existing allegations. *See* ECF No. 87 at 3.

59.     Here, as in several of the cases previously cited, the Government investigated Relator Kuriyan's allegations and declined, and this case has been unsealed.  Because Relator's second amended complaint only amplified and clarified his existing allegations, the Government did not need a second opportunity to investigate and make an intervention decision.  As a result, there was no need for Relator to follow typical *qui tam* seal and service requirements.  *See Kolchinsky*, 162 F. Supp. 3d at 191, 198; *Hagerty*, 95 F. Supp. 3d at 253, 263; *Ubl*, 2009 WL 1254704, at *4.  For this reason, Relator did not respond to the Government's requests for a disclosure and relator interview after he filed his second amended complaint.

60.     Furthermore, as the Supreme Court has held, violation of the FCA's seal requirement does not require automatic dismissal with prejudice.  *See State Farm Fire & Cas. Ins. Co. v. U.S. ex rel. Rigsby*, 137 S. Ct. 436, 442 (2016).  This is true even for blatant seal violations like sending a sealed filing to news media.  *See id.* at 441, 444.  Assuming *arguendo* that filing the second amended complaint did violate FCA seal rules, such a "technical or minor" violation would not require "automatic dismissal" either.  *U.S. ex rel. Windsor v. Dyncorp, Inc.*, 895 F. Supp. 844, 848 (E.D. Va. 1995); *see also State Farm*, 137 S. Ct. at 442.

**E.     Factual Disputes Raised by Defendants are Inapposite.**

61.     Factual disputes are generally inappropriate for resolution at the motion to dismiss stage.  *See, e.g.*, *Iselin v. Bama Cos., Inc.*, 690 F. App'x 593, 596 (10th Cir. 2017); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (Rule 12(b)(6) motions do not "resolve contests surrounding the facts" or "the merits of a claim"); *Ramirez v. Trujillo*, No. 10-448 WJ/ACT, 2010 WL 11618914, at *3 (D.N.M. Dec. 3, 2010).

62.     Defendants have requested that this Court take judicial notice of a self-serving declaration (ECF No. 111-2) filed by the Government in its response to Relator's pending motion for award from alternate remedy.  Relator has disputed the facts contained therein, *see* ECF No. 120 ¶ 16, several of which are contradicted by the SAC and by the contracts at issue.  The Court should not take judicial notice of the declaration because that would inequitably resolve a disputed fact issue before discovery and is inappropriate at the motion to dismiss stage.  *See* Fed. R. Evid. 201(b) (judicial notice only appropriate as to facts "not subject to reasonable dispute"); *Lozano v. Ashcroft*, 258 F.3d 1160, 1165 (10th Cir. 2001) (judicial notice inappropriate where there was a genuine dispute over the facts at issue); *Republican Party*, 980 F.2d at 952; *Medley Material Handling Co. v. GAF Leatherback Corp.*, No. CIV 01-454 LFC/WWD, 2001 WL 37124840, at *1 (D.N.M. Sept. 5, 2001) (citations omitted) ("extrinsic evidence may not be used to contradict an unambiguous contract term.").

63.     Alternatively, if the Court elects to take judicial notice of ECF No. 111-2, Relator requests limited discovery so that he has a fair chance to counter the self-serving and unsupported allegations in the Government's declaration.

### F.     CONCLUSION

64.     For the reasons noted above, Relator asks that the Court deny Defendants' motions to dismiss (ECF Nos. 114, 115, 116, and 119).[17]  In the alternative, Relator requests leave to amend his second amended complaint.

---

[17] United's unfounded endeavor, by citing an inapplicable FCA statutory provision, to shift responsibility for its fraudulent behavior, and attempt to sanction the relator for his good faith efforts in alerting and assisting the government in recovering $200 million should also fail.

Dated:  May 26, 2020

Respectfully submitted,

    /s/ Rebecca L. Gibson                              /s/ Sam Bregman
Joel Androphy                                      Sam Bregman
TX State Bar No. 01254700                          State Bar No. 6564
DNM Bar No. 15-189                                 The Bregman Law Firm, P.C.
Rebecca L. Gibson                                  901 3rd Street NW, Suite A
DNM Bar No. 19-55                                  Albuquerque, NM  87102
Berg & Androphy                                    Email: sb@bregmanlawfirm.com
3704 Travis Street                                 Telephone: (505) 761-5700
Houston, Texas 77002
Telephone (713) 529-5622                           /s/ Bryan Davis
Facsimile (713) 529-3785                           Bryan Davis
Email: jandrophy@bafirm.com                        State Bar No. 19562
Email: rgibson@bafirm.com                          Davis & Gilchrist, P.C.
                                                   1005 Marquette Ave NW
                                                   Albuquerque, NM  87102
/s/ Robert L. Lieff                                Email: bryan@dglnm.com
Robert L. Lieff                                    Telephone: (505) 435-9908
State Bar No. 037568                               Facsimile: (505) 435-9909
275 Battery St., 29th Floor
San Francisco, CA  94111
Email: rlieff@lchb.com
Telephone: (415) 956-1000

*Counsel for Plaintiff/Relator Jacob Kuriyan*

## CERTIFICATE OF SERVICE

On May 26, 2020, a true and correct copy of the foregoing document was served on counsel electronically through the Court's CM/ECF system.

*/s/ Rebecca L. Gibson*

25