## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES ex rel. JACOB KURIYAN,
and on behalf of the STATE OF NEW MEXICO,
Plaintiff,

vs.

Civ. No. 16-1148 JAP/KK

HEALTH CARE SERVICES CORP.,
D/B/A BLUE CROSS & BLUE SHIELD OF
NEW MEXICO, MOLINA HEALTHCARE OF
NEW MEXICO, INC., PRESBYTERIAN HEALTH
PLAN, INC., and UNITEDHEALTHCARE OF
NEW MEXICO, INC.,
Defendants.

## MEMORANDUM OPINION AND ORDER

On October 28, 2019, Relator Jacob Kuriyan (Relator) filed an Amended Complaint qui tam under

the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq. (FCA), the New Mexico Fraud Against Taxpayers

Act, N.M. Stat. Ann. § 44-9-1 (NMFATA), and the New Mexico Medicaid False Claims Act, N.M. Stat.

Ann. § 27-14-1 (NMFCA) (Complaint) against four Medicaid Managed Healthcare Organizations

(MCOs) in New Mexico: Defendant Health Care Services Corp., d/b/a Blue Cross & Blue Shield of New

Mexico (BCBS), Defendant Molina Healthcare of New Mexico Inc. (Molina), Defendant Presbyterian

Health Plan, Inc. (Presbyterian), and Defendant UnitedHealthcare of New Mexico, Inc. (United)

(collectively Defendants).[1] The United States and the State of New Mexico (collectively, Government)

declined intervention.

On December 10, 2019, Relator filed a motion for an alternate remedy,[2] arguing that his

---

[1] See PLAINTIFF/RELATOR JACOB KURIYAN'S SECOND AMENDED COMPLAINT (Doc. 100). On June 25, 2019, Relator sought permission from the Court to amend his pleading and on October 25, 2019, the Court granted his motion. See PLAINTIFF/RELATOR JACOB KURIYAN'S MOTION FOR LEAVE TO FILE AMENDED PLEADING (Doc. 87) and ORDER (Doc. 99).

[2] See PLAINTIFF/RELATOR'S RENEWED OPPOSED MOTION FOR AWARD FROM ALTERNATE REMEDY (Doc. 106).

information concerning Defendants and their alleged fraudulent actions led the Government to recoup significant amounts of money from them, making Relator entitled to a portion of the proceeds. The Government responded on February 13, 2020,[3] and Relator replied on March 12, 2020.[4]

On March 9, 2020, Defendants filed motions to dismiss Relator's Complaint under Federal Rule of Civil Procedure (Rule) 12(b)(1) or Rule 12(b)(6).[5] Relator responded on May 26, 2020.[6] In his Response, Relator asks the Court for leave to amend his Complaint should the Court grant Defendants' Motions. Defendants replied on June 26, 2020.[7]

After reviewing the pleadings and the briefs, the Court will grant Defendants' Motions, will deny Relator's Motion as moot, but will give Relator until October 1, 2020 to amend his Complaint.

## FACTS AND PROCEDURAL HISTORY

Defendants are insurance companies that own and operate MCOs. The MCOs have contracts with the State of New Mexico (State) to provide healthcare for State Medicaid enrollees

---

[3] *See* THE UNITED STATES OF AMERICA'S AND STATE OF NEW MEXICO'S RESPONSE IN OPPOSITION TO PLAINTIFF/RELATOR'S RENEWED MOTION FOR AWARD FROM ALTERNATE REMEDY (Doc. 111) (Resp. Alternate Remedy).

[4] *See* PLAINTIFF/RELATOR JACOB KURIYAN'S REPLY TO THE UNITED STATES' AND NEW MEXICO'S RESPONSE IN OPPOSITION TO PLAINTIFF/RELATOR'S MOTION FOR AWARD FROM ALTERNATE REMEDY (Doc. 120).

[5] *See* UNITEDHEALTHCARE OF NEW MEXICO, INC.'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT (DOC. 114); HCSC INSURANCE SERVICES COMPANY'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) AND MEMORANDUM IN SUPPORT (Doc. 115); MOLINA HEALTHCARE OF NEW MEXICO, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (DKT. NO. 100) (Doc. 116); DEFENDANT PRESBYTERIAN HEALTH PLAN, INC.'S MOTION TO DISMISS (Doc. 119) (collectively Motions).

[6] *See* PLAINTIFF/RELATOR JACOB KURIYAN'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTION TO DISMISS (Doc. 130).

[7] *See* UNITEDHEALTHCARE OF NEW MEXICO, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS (Doc. 132); MOLINA HEALTHCARE OF NEW MEXICO, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT (Doc. 134); HCSC INSURANCE SERVICES COMPANY'S REPLY IN SUPPORT OF MOTION TO DISMSS RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(B)(6) (Doc. 135); REPLY BRIEF IN SUPPORT OF DEFENDANT PRESBYTERIAN HEALTH PLAN, INC.'S MOTION TO DISMISS (Doc. 137).

in exchange for fixed capitated payments.[8] Complaint (Doc. 100) ¶ 21. Each year, the amount of the capitated payment is based on payments made the previous year. *Id.* ¶ 30.

Relator attaches as an appendix to his amended complaint a BCBS contract (Contract). Complaint, Ex. 2 (Doc. 100.2). The parties agree that this Contract is like all MCO contracts at the time these events took place.

Relator works in healthcare analytics and economics. He developed a patented dynamic model that forecasts the development of chronic disease and attendant costs within a population. *Id.* ¶ 8. Relator hoped that this model would help the New Mexico Medicaid Program to predict costs accurately and to save money. *Id.* The New Mexico Human Services Department (HSD) is an agency of the State that runs the State's Medicaid program and receives federal funding for this purpose. *Id.*

After an unsuccessful attempt to introduce his program to the HSD in early 2015, Relator met with new management in November 2015. *Id.* ¶¶ 9, 10. HSD gave Relator 2014 Medicaid data to analyze (2014 data). *Id.* ¶ 10. The data HSD gave to Relator had been given to HSD by Defendants[9] and then audited by HSD's retained actuary.[10] *Id.* ¶ 56. The audit evaluates payments

---

[8] Capitated payments are a fixed monthly flat fee per patient paid by the State to the MCO in return for providing all defined medical services to that patient for a specified year. Patients are put into defined risk groups, or cohorts. The payments vary according to the characteristics of each set group.

[9] Under section 4.21.12 of the Contract:

> By June 1 of each Agreement year, the CONTRACTOR shall submit annual Independently Audited Financial Statements, including, but not limited to, its income statement, statement of changes in financial condition or cash flow, and balance sheet that allow HSD to determine solvency and CMS compliance.

Complaint, Ex. 2 (Doc. 100-2). Section 7.5 states that CONTRACTOR agrees to comply with all applicable laws. Section 7.27.10 imposes a duty to submit correct reports "under penalty of perjury." *Id.*

[10] Section 7.2.10 of the Contract delineates in pertinent part the procedure for the final audit of the MCOs' costs/expenses of a calendar year:

> HSD shall issue its final calculation in writing within one hundred eighty (180) Calendar Days after the close of the calendar year or termination of this Agreement. To the extent that CONTRACTOR fails to meet the requirements set forth herein, HSD shall, at the time it issues its final calculation, advise CONTRACTOR of this deficiency and require CONTRACTOR to remit the overpayment to HSD, or its designee, or otherwise advise CONTRACTOR as to how the overpayment shall be treated for purposes of compliance with this Section.

Complaint, Ex. 2 (Doc. 100-2).

made to the MCOs compared to services provided by the MCOs to determine if the MCOs have been appropriately compensated or overpaid. The audit did not reveal any 2014 overpayments to the MCOs. *Id.*

The 2014 data suggested to Relator that Defendants had been overpaid because they had not spent 85 percent of capitated payments on healthcare costs as the Contract required.[11] *Id.* ¶ 11. Relator then examined a version of Defendants' contracts with HSD and public finance reports. Relator applied the MLR formula in Defendants' contracts to data he obtained from HSD and discovered that the MLR for every Defendant was below the Contract's 85 percent MLR. *Id.* ¶ 52. Relator concluded that the State had overpaid Defendants and that HSD had not discovered that Defendants had retained monies, which under the Contract, were overpayments.[12] *Id.* ¶ 11. Relator determined that Defendants knew or recklessly disregarded that they had been overpaid because their internal bookkeeping demonstrated an unusual jump of over five percent in profits. *Id.* ¶ 56.

On May 25, 2016, Relator met with and informed HSD that Defendants had retained monies to which they were not entitled because they were overpayments. *Id.* ¶ 12.

On June 24, 2015, the State published a report to New Mexico's Legislative Finance Committee disclosing the results of its initial audit of Defendants' 2014 data. Resp. Alternate

---

[11] The Contract requires the MCOs to spend a defined amount of capitated payments on direct medical services:
> The CONTRACTOR shall spend no less than eighty-five percent (85%) of the net Medicaid line of business Net Capitation Revenue, defined in Section 7.2.2. of this Agreement on an annual basis. HSD reserves the right, in accordance with and subject to the terms of this Agreement to reduce or increase the minimum allowable for direct medical services over the term of this Agreement, provided that any such change (i) shall only apply prospectively, and (ii) exclude any retroactive increase to allowable direct medical services and (iii) shall comply with federal and State law.
Complaint, Ex. 2 (Doc. 100-2) § 7.2.7. The parties refer to this as the MLR.

[12] Overpayment is defined in the Introduction as:
> [A]ny funds that a person or entity receives in excess of the Medicaid allowable amount of the CONTRACTOR's allowed amount as negotiated with the provider. Overpayments shall not include funds that have been subject to a payment suspension or that have been identified as a third-party liability as set forth in in 4.18.13.
Complaint, Ex. 2 (Doc. 100-2) § 2.

Remedy, Ex. 4 (Doc. 106-4) (LFC Report). Relying on this report, HSD denied that there were overpayments to Defendants.[13] Complaint (Doc. 100) § 12. Following the meeting, Relator sent an e-mail to HSD reiterating his conclusions. *Id.* ¶ 13. After not receiving a response from the State, Relator retained counsel and on October 13, 2016, sent his qui tam disclosure statement to the State and the United States. *Id.* ¶ 14. On October 18, 2016, he filed his initial Complaint. *Id.*

On November 17, 2016, Relator filed an amended complaint in camera and under seal.[14]

In June 2017, the State on behalf of itself and the United States recovered and collected overpayments from the Defendants.[15]

On December 4, 2018, the United States and the State of New Mexico declined intervention.[16]

On December 7, 2018, United States Magistrate Judge Kirtan Khalsa, entered an Order Regarding the Notice of Election to Decline Intervention (Doc. 17), and on December 12, 2018, Judge Khalsa entered an order unsealing the case.[17]

On March 5, 2019, Relator served Defendants BCBS and Molina. On March 4, 2019, Presbyterian waived service. United was served on March 13, 2019.[18]

On June 25, 2019, Relator filed a motion seeking to file a second amended pleading, which the Court granted on October 28, 2019.[19] Relator filed his Second Amended Complaint on that same day.

---

[13] The LFC Report advised that the data indicated that "at least one MCO did not meet the contractual MLR requirement spending fewer than 85 percent on direct medical costs," but that the figures "were still subject to reconciliation." *Id.* at 38. The report stated that data from FY10 through FY14 showed "under spending [by Defendants of] the MLR requirement." *Id.* at 39.

[14] *See* FIRST AMENDED COMPLAINT (Doc. 3) (FAC).

[15] *See* PLAINTIFF/RELATOR'S OPPOSED MOTION FOR ALTERNATE REMEDY (Doc. 26) at 2.

[16] *See* THE UNITED STATES OF AMERICA'S AND THE STATE OF NEW MEXICO'S JOINT NOTICE OF ELECTION TO DECLINE INTERVENTION (Doc. 16).

[17] *See* ORDER TO UNSEAL CASE (Doc. 18). Documents 4-15 remained sealed.

[18] *See* Motion to Dismiss (Doc. 77) at p. 20 (observing Relator served United one day after the deadline).

[19] *See* Order (Doc. 99).

In Count I, Relator alleges that from 2014 to 2015 Defendants "knowingly concealed or knowingly and improperly avoided an obligation to pay monies to the United States" in violation of 31 U.S.C. § 3729(a)(1)(G), the Reverse False Claims (RFC) provision of the FCA. Complaint (Doc. 100) ¶ 84. In Count II, Relator alleges that from 2014 to 2015 Defendants "knowingly presented or caused to be presented, false and/or fraudulent claims" and "made false certifications of legal compliance" in violation of § 3729(a)(1)(A) of the FCA. *Id.* ¶¶ 90–91. Counts III and IV make parallel allegations against Defendants under the NMFCA and the NMFTA. *See Id.* ¶¶ 99–103, 107–113.

## APPLICABLE LAW

### A.  Motion to Dismiss

A Rule 12(b)(6) motion "tests the sufficiency of the allegations within the four corners of the complaint." *Romero v. United States*, 159 F. Supp. 3d 1275, 1279 (D.N.M. 2015) *aff'd,* 658 F. App'x 376 (10th Cir. 2016) (citation omitted). When considering a Rule 12(b)(6) motion, the court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. *Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir. 2009). The allegations must "state a claim to relief that is plausible on its face." *Id.* (citation omitted). "The claim is plausible only if it contains sufficient factual allegations to allow the court to reasonably infer liability." *Moya v. Garcia,* 895 F.3d 1229, 1232 (10th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The term "plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The

factual allegations must "raise a right to relief above the speculative level". *Twombly*, 550 U.S. at 555. A mere "formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted). When analyzing the sufficiency of the allegation under 121(b)(6), a court may consider documents incorporated into the complaint by reference and that are undisputed as to authenticity. *Smith*, 561 F.3d at 1098.

### B.  False Claims Act

The FCA is a Government tool for recouping monies that it has paid for fraudulent claims. Violations permit recovery of civil penalties and treble damages. 31 U.S.C. § 3729–3733. The Supreme Court has given the statute an expansive reading, observing that it "covers all fraudulent attempts to cause the Government to pay out sums of money." *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968)); *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1172 (10th Cir. 2007) (quotation omitted).

Relator asserts counts under two provisions of the FCA: 1) false certification under § 3729(a)(1)(A) and 2) false claims under § 3729(a)(1)(G). The latter is commonly known as the Reverse False Claims Provision (RCA). The New Mexico statutes, NMFTA and the NMFCA, track the FCA,[20] so the Court will focus on federal law.

The FCA imposes liability on a defendant who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1). A "claim" includes both "direct requests to the Government for payment as well as

---

[20]*See* Order (Doc. 99); *see also United States v. Dental Dreams*, LLC, 307 F. Supp. 3d 1224, 1240 (D.N.M. 2018).

reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989, 1996 (2016). The Supreme Court has held that provision also establishes liability for "false certification." *Id.* at 1995–96.

The RFC provision in § 3729(a)(1)(G) of the FCA targets a defendant's attempts to reduce an obligation owed to the government. Liability attaches under the RFC to one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .." § 3729(a)(1)(G).

A private individual, also known as a relator, may bring an FCA qui tam civil action "in the name of the Government" against any individual. 31 U.S.C. § 3730(b); *see also See Vermont Agency of Nat. Res. v. United States ex. rel. Stevens*, 529 U.S. 765, 778 (2000) (holding that "a qui tam relator under the FCA has Article III standing"). The relator may keep a portion of any recovery obtained for the Government "[a]s a bounty for identifying and prosecuting fraud." *United States ex rel. Boothe*, 496 F.3d at 1172 (citing 31 U.S.C. § 3730(d)).

But a relator's right to bring a qui tam suit has limitations, such as the "public disclosure bar." *United States ex rel. Reed v. Keypoint Gov't. Sol.*, 923 F.3d 729, 737 (10th Cir. 2019) citing *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. ----, 137 S. Ct. 436, 440 (2016). A relator will have standing to bring a qui tam suit only if the relator "'is an original source of the information.'" *Id.* at 737 (quoting 31 U.S.C. § 3730(e)(4)(A)). "The court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . .." 31 U.S.C. § 3730(e)(4)(A). The language

"incorporates the 'substantially similar' standard." *Id.* at 743 (citation omitted). This standard requires the Court to evaluate whether "public disclosures were sufficient to set the government 'on the trail of the alleged fraud without [the relator's] assistance.'" *Id.* at 744 (quoting *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995)).

## ANALYSIS

Defendants seek dismissal of the Complaint on three bases. First, they argue that Relator does not have standing because there is no actual case or controversy. Next, Defendants argue that the Relator cannot proceed qui tam because he violated the "sealed requirement" by not filing his second amended complaint under seal. Defendants' final argument is that the public disclosure rule bars Relator's claims.

### A.  Case or Controversy

In an FCA case, a relator bringing a qui tam suit functions as a partial assignee of the Government. *Vermont Agency*, 529 U.S. at 773 (observing that the FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim [to the relator]). A relator's interest in the case is limited to the Government's legal interests. *Id.* Defendants argue that the Government does not have an FCA claim because in 2017, after the State's reconciliation, Defendants promptly repaid the Government all owed sums based on the 2014 data. According to Defendants, because they no longer owe money to the Government, there can be no injury in fact and correspondingly, Relator has no claim.

For this argument, Defendants rely, in part, on the Government's declaration that its June

2017 recoupment of funds did not arise out of a violation of the Government's rights.[21] This argument makes two presumptions about FCA claims: (1) that once a MCO has financially compensated the Government for any sums to which it is not entitled, the Government can no longer claim injury; and (2) that the Government's assertion that it uncovered no evidence of fraud means that there was no fraud. But Defendants misread the statute.

The Government's interest in an FCA claim "consist[s] of obtaining compensation for, or preventing, the violation of a legally protected right." *Vermont Agency*, 529 U.S. at 772. A MCO that violates a governmental right as delineated in the FCA may be liable not only for repaying the sums wrongfully obtained, but for significant fines. § 3729(1) (establishing "a civil penalty of not less than $5,000 and not more than $10,000 . . ., plus 3 times the amount of damages which the Government sustains because of the act of that person.). Relator does not allege that the Government's injury arose from the fact that there had been overpayments but rather from Defendants' knowing or fraudulent concealment of those overpayments. If Relator's allegations are correct as pleaded, Defendants' actions have injured the Government and Defendants may be liable for fines and penalties. Relator's Complaint alleges injuries that have not been redressed and so may be pursued in a qui tam suit.

Defendants next argue that there was no injury to the Government because Defendants did not have a duty to find or return overpayments. Defendants reason that although the Contract may have stated that Defendants were to spend 85 percent of payments on direct medical services, the obligation was not a legal one as the obligation did not arise until the Government determined that

---

[21] This statement appears in the Declaration of Jason Sanchez attached as Exhibit 2 to the Government's Response to Relator's Motion for an Alternate Remedy (Doc. 111-2). Defendants ask the Court to take judicial notice of the Declaration. Relator opposes, arguing that the Declaration is self-serving and will resolve a disputed factual issue. Although the Court will take judicial notice of the Declaration as a statement made by the Government, this is not a finding that the statement is true.

overpayments had occurred. Alternatively, Defendants argue that any failure to reveal known overpayments was simply a contractual breach that does not constitute an FCA violation.

At issue is the legal meaning of the word "obligation" as used in in the Contract. Two federal statutes provide clarity: the FCA and the Accountable Care Act (ACA). As defined by the FCA, the term "obligation" is "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." § 3729(b)(3). The Tenth Circuit has stated that "established" is a key word in the definition. *United States ex rel. Barrick v. Parker-Miliorini Int'l, LLC*, 878 F.3d 1224, 1230-31 (10th Cir. 2017). The word established means that a defendant must have "an *existing legal obligation* to pay or transmit money or property to the government" that "arise[s] from some independent legal duty." *Id*. at 1231 (emphasis in original). Potential obligations do not meet these requirements. When a government official has the discretion whether to charge the fees, an obligation is contingent, and therefore "outside the scope of the provision." *Id.*

Defendants focus on the word "established" and argue that there was no contractual obligation, and so, there could be no existing legal obligation. They base this argument on the premise that the 85 percent MLR threshold was not a fixed threshold, but a contingent one. As an initial matter, the Court observes that the Tenth Circuit has held that under the FCA an obligation must be an existing one, but it need not be a fixed one. *See U.S. ex rel. Bahrani*, 465 F.3d at 1201 (stating "We agree that there are instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined."). The Tenth Circuit observed further "to require a fixed monetary obligation as a prerequisite for a

reverse false claims action would be inconsistent with the broad remedial purpose of the False Claims Act." *Id.* at 1202 (citing *Neifert-White Co.*, 390 U.S. at 233).

Even if Defendants were correct that the FCA requires a fixed obligation, their argument that they did not have such an obligation glosses over the language of the Contract, which states: "The CONTRACTOR ***shall spend*** no less than eighty-five percent (85%) of the net Medicaid line of business Net Capitation Revenue, defined in Section 7.2.2. of this Agreement on an annual basis." Complaint, Ex. 2 (Doc. 100-2) (emphasis added). The use of "shall spend" creates a duty. Relator argues that the term indicates a mandatory duty while Defendants argue that the duty was permissive.

Interpretation of a contract is guided by state law. *Digital Ally, Inc. v. Z3 Tech., LLC*, 754 F.3d 802, 815 (10th Cir. 2014). The Contract was created and agreed to in New Mexico, so New Mexico state law applies. Courts examine contracts to "'ascertain the intentions of the contracting parties.'" *Mendoza v. Isleta Resort & Casino*, 460 P.3d 467, 473 (N.M. 2020) (quoting *Gallegos v. Pueblo of Tesuque*, 46 P.3d 668, 679 (N.M. 2002)). When a word has two or more meanings, a court must examine the usage and context of the word in the document. *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 976 P.2d 1, 12 (N.M. 1998) (holding that the "language of the entire agreement should be construed together").

Whether "shall" triggers a mandatory duty is not straightforward. Courts have found that in some contexts it is permissive, in others mandatory. *See, e.g., Town of Castle Rock, Colo v. Gonzales*, 545 U.S. 748, 760 (2005) (use of the word "shall" in Colorado statute did not create a mandatory duty); *see also* Bryan A. Garner, Shall We Abandon Shall, A.B.A. J. 26 (2012) (observing that in Black's Law Dictionary, "shall is a chameleon-hued word" that has over five

definitions).[22] In New Mexico, the use of "shall" in a statute usually triggers a mandatory duty. *Yedidag v. Roswell Clinic Corp.*, 346 P.3d 1136, 1151 (N.M. 2015) (holding that when "shall" is used in a statute the "normal inference" is that is it mandatory) (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)). Generally, New Mexico courts have also found that the use of "shall" in a contract is mandatory. *See Rivera v. Am. Gen. Fin. Servs., Inc.,* 259 P.3d 803, 814 (N.M. 2011) (finding that the use of the words "shall" and "must" in an arbitration provision made that provision mandatory).

Defendants attempt to further support their argument that the 85 percent MLR was a contingent threshold by observing that the Contract gave the State the discretion to change the percentage. The Contract does permit changes to the MLR, but the language of the Contract also restricts the State's ability to make changes. The relevant provision states: "HSD reserves the right, in accordance with and subject to the terms of this Agreement to reduce or increase the minimum allowable for direct medical services over the term of this Agreement ***provided that any such change (i) shall only apply prospectively,*** and (ii) ***exclude any retroactive increase*** to allowable direct medical services and (iii) shall comply with federal and State law." Complaint, Ex. 2 (Doc. 100-2) ¶ 7.2.7 (emphasis added). Notably, the Contract permits the State to make only prospective changes, not retroactive ones.

The contractual language also does not support Defendants' argument that the State's option to recoup overpayments or apply them toward future payments indicates a contingent obligation. While the Contract does give the State discretion to either demand the return of overpayments or apply them to future payments, that discretion does not eliminate the obligation. As delineated in the Contract, the State's discretion is not whether to collect any monies exceeding

---

[22] *See also,* Joseph Kimble, *The Many Misuses of Shall*, 3 Scribes J. Leg. Writing 61 (1992).

the 85 percent MLR, but how to collect it. Accepting as it must, all well-pleaded allegations in the Complaint, the Court concludes that Relator has plausibly claimed that the 85 percent MLR was a mandatory contractual obligation.

Second, Defendants assert that as a matter of law the absence of a mandatory contractual duty to return overpayments precludes a legal duty. This argument is rebutted by language of the ACA.[23] The Medicare and Medicaid Program Integrity Provisions of the ACA explain that "[t]he term 'overpayment' means any funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B). Any "person"[24] receiving an overpayment must "report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate" and notify them "in writing of the reason for the overpayment." § 1320a-7k(d)(1)(A)-(B). The overpayment must be returned by the later of "(A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due if applicable." *Id*. Thus, under the ACA, a MCO has a legal obligation to return known overpayments.

Defendants counter that they could not have known of any overpayments, nor could an obligation to return an overpayment exist, until the State finished its "applicable reconciliation." This argument presumes that this term refers to the State's final report. But "applicable reconciliation" is not statutorily defined. When the meaning of a statutory term is unclear, the Court may give "considerable weight" "'to an executive department's construction of a statutory scheme it is entrusted to administer. . ..'" *United States v. Mead Corp.*, 533 U.S. 218, 227-28

---

[23] The Contract obligates MCOs to "comply with all federal and State requirements regarding Fraud, waste [sic] and Abuse . . .." Complaint, Ex. 2 (100-2) ¶ 4.17.1.3.
[24] As defined by the statute, "person" includes a "medicaid managed care organization." § 1320a-7k(d)(4)(C)(i).

(2001) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). The definition of "applicable reconciliation" provided by the Centers for Medicare & Medicaid Services (CMS) in the context of Medicare Advantage Plans (MA) provides some clarity here.

As explained by CMS in a January 2014 notice of proposed rulemaking, "applicable reconciliation" refers to "an event or events after which an overpayment can exist" and occurs at "the point when organizations submit their final data for the previous payment year." Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 FR 1918-01. In that same notice, CMS reminded organizations that the proposed regulation did not create new requirements but clarified terms in 42 U.S.C. § 1320a-7k as "MA organizations . . . are subject to the statutory requirements . . . and could face potential False Claims Act liability, Civil Monetary Penalties (CMP) Law liability, and exclusion from Federal health care programs for failure to report and return an overpayment." *Id.* 79 FR 29844-01. In the publication of the final rule, CMS again reminded organizations that an overpayment occurs when an "organization . . . has submitted erroneous data to CMS that caused CMS to overpay the organization."[25] *Id.* 79 FR 29,921. While the proposed and final regulation focused on MA plans and not on MCOs, the regulation was a clarification of a statutory term that does apply to MCOs.

The Contract obligates Defendants to produce data to the Government. "By June 1 of each Agreement year, the CONTRACTOR shall submit annual Independently Audited Financial Statements, including, but not limited to, its income statement, statement of changes in financial condition or cash flow, and balance sheet that allow HSD to determine solvency and CMS compliance." Complaint, Ex. 2 (Doc. 100-2) ¶ 4.21.12.1. Defendants are also required to submit

---

[25] The final rule stated: "Applicable reconciliation occurs on the date of the annual final deadline for risk adjustment data submission described at § 422.310(g), which is announced by CMS each year. 42 C.F.R. § 422.326(a).

quarterly reports and review reports for evidence of "suspicious activity, Fraud and Abuse cases, return on investment, cost avoidance, adverse events and other information as directed by HSD." *Id.* ¶¶ 4.21.1.9, 4.21.4.1. Defendants did not allege that they failed to timely comply with these provisions, and the LFC Report indicates that the State received the relevant data by June 24, 2015.

Similarly, Defendants' argument that they could not have known of any overpayments does not align with the ACA's definition of "knowing," which incorporates the FCA definition. *See* § 1320a-7k(d)(4)(A) ("The terms 'knowing' and 'knowingly' have the meaning given those terms in section 3729(b) of Title 31"). In both the FCA and the ACA:

(1) the terms "knowing" and "knowingly" —

    (A) mean that a person, with respect to information —

        (i) has actual knowledge of the information;
        (ii) acts in deliberate ignorance of the truth or falsity of the information; or
        (iii) acts in reckless disregard of the truth or falsity of the information; and

    (B) require no proof of specific intent to defraud. . ..

§ 3729(b)(1)(A)-(B). Relator alleges that Defendants wrongfully and knowingly certified invalid data to the Government and in so doing avoided and/or hid overpayments and improperly created an incorrect baseline for future payments. Relator also alleges that Defendants either had actual knowledge of overpayments or recklessly disregarded evidence of overpayments.

Defendants attempt to establish that they did not or could not have known by referring to a declaration by a State official that the overpayments were obtained through the normal reconciliation process. But how the State classifies Defendants' repayments is not dispositive of this issue. Accepting the State's declaration as true does not answer the question of whether Defendants knew that there had been overpayments when they submitted their data. Nor does it establish that Defendants had no knowledge of any overpayments prior to the State's final report.

The Court concludes that Defendants had a legal obligation to return overpaid funds. Relator has alleged facts that support a reasonable inference that when Defendants submitted their 2014 data at or around June 2015, Defendants knew or had reason to know that the State had overpaid them under the Contract.

### B.  Sealed Requirement

Section 3730(b)(2) states that a complaint brought qui tam must be served on the Government, filed in camera, and "shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." § 3730(b)(2). Defendants argue that while Relator's initial complaint met these requirements, his amended Complaint did not because it was not filed under seal. They urge the Court to dismiss the Complaint on that basis. Relator argues that it was not necessary that he comply with the sealing requirements on filing his amended complaint. The Supreme Court directly addressed this issue and held that a failure to comply with the seal requirement is not fatal to a case and does not mandate dismissal. *State Farm Fire and Cas. Co.,* 137 S. Ct. at 444.

### C.  Public Disclosure Bar

Defendants' final argument is that Relator cannot proceed qui tam, because his Complaint is based upon public disclosure of allegations. *See*  31 U.S.C. § 3730(e)(4)(A)(2006) (public disclosure bar). The public disclosure bar[26] requires a court to dismiss an FCA claim if "substantially the same allegations or transactions as alleged in the action or claim were publicly

---

[26] Before Congress amended the FCA in 2010, if the public disclosure bar applied, a federal court did not have jurisdiction over an FCA claim. *See KeyPoint Gov't Sols.,* 923 F.3d at 737 n.1. But the 2010 amendments removed the jurisdictional language, replacing it with an instruction that a court "dismiss an action" if the public disclosure bar applies. *Id.* This textual change has led the federal courts of appeal that have considered the issue to unanimously conclude that the public disclosure bar no longer deprives a court of federal jurisdiction but provides defendants with an affirmative defense. *Id.* (collecting cases). However, when the public disclosure bar is raised as a defense in a motion to dismiss at the district court level, the distinction is immaterial. *Id.* (observing that if the defendant "had failed to raise the bar before the district court and had asserted it for the first time on appeal, we would have been obliged to consider the issue only if it was jurisdictional . . . not if it was merely an affirmative defense").

disclosed . . ..” *Id.* Information that has been publicly disclosed includes information

> (i)   in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii)  in a congressional, Government Accountability Office, or other Federal report, hearing, audit or investigation; or
> (iii) from the news media

> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

§ 3730(e)(4)(A)(i)-(iii). “[T]he operative question is whether the public disclosures were sufficient to set the government ‘on the trail of the alleged fraud without [the relator’s assistance].’” *KeyPoint Gov’t. Sol.*, 923 F.3d at 744 (quoting *U.S. ex rel. Fine*, 70 F.3d at 571) (alterations in the original).

Relator derived his claims from data obtained from the State. He compared this data with data obtained from public financial reports issued by Defendants. Finally, he examined the LFC Report and concluded that the State’s audit had not uncovered the overpayments Relator saw within the data. Because Defendants’ profit and loss statements suggested increased profits that did not track with the LFC Report, Relator concluded that Defendants had been overpaid and that they knew it. As defined by the statute, published reports and profit and loss statements fall within the FCA’s definition of types of transactions that are publicly disclosed. Although these disclosures did not allege any FCA violations or wrongdoing, Relator obtained “the material elements of the fraudulent transaction” from these reports. *See KeyPoint Gov’t. Sol.*, 923 F.3d at 745 (quoting *Fine*, 70 F.3d at 572).

But the fact that this information was publicly disclosed is not fatal to Relator’s claim if he can demonstrate that he is an “original source of the information.” An original source is:

> an individual who either (1) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

§ 3730(e)(4)(B). "Knowledge is 'direct and independent' if it is 'marked by [the] absence of an intervening agency' and 'unmediated by anything but [the relator's] own efforts.'" *In re Nat. Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) (quoting *United States ex rel. Fine v. MK-Ferguson Co.,* 99 F.3d 1538, 1547 (10th Cir. 1996) (alterations in original (internal quotations marks omitted)). Relator argues that he is an original source because the Government had not discovered the fraud before he told the Government about the overpayments. The fact that the Government had not yet discovered the fraud is irrelevant to the inquiry if the Government had enough information that could point it toward the fraud. *KeyPoint Gov. Sol.*, 923 F.3d at 744-45; *U.S. ex rel. Fine*, 70 F.3d at 572 (observing "the public disclosure of the material elements of the fraudulent transaction bars qui tam actions even if the disclosure itself does not allege any wrongdoing"). Relator is barred if his claim was derived solely from second-hand knowledge. *See MK-Ferguson Co.*, 99 F.3d at 1547.

Relator's Complaint states that he discovered the alleged overpayments after he "examined a version of the MCO's contracts with HSD and public finance reports, and concluded that Defendants were fraudulently retaining overpayments, and that HSD had neither recognized nor recouped those overpayments." Complaint (Doc. 100) ¶ 11. As pled, Relator's allegations are derivative of data given to him by HSD, the LFC Report, and Defendants' profit and loss statements. While Relator implies that his patented dynamic model gave him knowledge that was independent of and materially added to the publicly disclosed transactions, he has not supported that claim with any alleged facts about how his model independently enabled him to discover the overpayments. Nor has Relator alleged any facts that demonstrate that his personal analysis of the data contributed or materially assisted the Government in uncovering the fraud.

Because Relator's named sources are all public, and Relator has not identified why or how he materially added to the FCA, NMFATA, or NMFCA claims, the Court will dismiss Relator's Complaint without prejudice. As the Complaint will be dismissed without prejudice, Relator's Motion for an Alternate Remedy will be denied as moot.

Relator has asked the Court for leave to amend his Complaint should the Court grant Defendants' Motions. Rule 15 states that district courts "should freely give leave [to amend] when justice so requires." "The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits." *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999). Defendants object to amendment, arguing that Relator did not plead a valid claim under the Contract.

The Court has found that Relator pled a plausible claim that Defendants violated the FCA, the NMFATA, and the NMFCA. Because the Court concludes that Relator's claim is deficient only for its failure to explain how Relator's information overcomes the public disclosure bar, the Court finds that amendment will not be futile.[27] The Court will grant Relator leave to amend and will give Relator until October 1, to file an amended Complaint.

IT IS ORDERED THAT:

1.      UNITEDHEALTHCARE OF NEW MEXICO, INC.'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT (DOC. 114) is GRANTED;

2.      HCSC INSURANCE SERVICES COMPANY'S MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) AND MEMORANDUM IN SUPPORT (Doc. 115) is GRANTED;

---

[27] In a footnote, UnitedHealthcare states that if it prevails on this motion, it intends to seek attorney's fees and costs. Because the Court will permit Relator to amend his Complaint, this request is premature.

3.      MOLINA HEALTHCARE OF NEW MEXICO, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (DKT. NO. 100) (Doc. 116) is GRANTED;

4.      DEFENDANT PRESBYTERIAN HEALTH PLAN, INC.'S MOTION TO DISMISS (Doc. 119) is GRANTED;

5.      PLAINTIFF/RELATOR'S RENEWED OPPOSED MOTION FOR AWARD FROM ALTERNATE REMEDY (Doc. 106) is DENIED as moot.

6.      PLAINTIFF/RELATOR JACOB KURIYAN'S SECOND AMENDED COMPLAINT (Doc. 100) is DISMISSED without prejudice; and

7.      Plaintiff/Relator Jacob Kuriyan has until October 1, 2020 to amend his complaint qui tam against Defendant Health Care Services Corporation d/b/a Blue Cross & Blue Shield of New Mexico, Defendant Molina Healthcare of New Mexico, Defendant Presbyterian Health Plan, Inc., and Defendant UnitedHealthcare of New Mexico; if Relator fails to timely file a third amended complaint by October 1, 2020, this case will be dismissed with prejudice.


_____

SENIOR UNITED STATES DISTRICT JUDGE