## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, *ex rel.*
*Jacob Kuriyan* and STATE OF NEW MEXICO,
*ex rel. Jacob Kuriyan*,

        Plaintiffs,

vs.                                                                                      No. CIV 16-1148 JB/KK

HCSC INSURANCE SERVICES CO., *doing*
*business as* BLUE CROSS & BLUE SHIELD
OF NEW MEXICO; MOLINA HEALTHCARE
OF NEW MEXICO, INC.; PRESBYTERIAN
HEALTH PLAN, INC. and
UNITEDHEALTHCARE OF NEW MEXICO,
INC.,

        Defendants.

## <u>MEMORANDUM OPINION[1]</u>

    **THIS MATTER** comes before the Court on: (i) the United States' and New Mexico's Motion to File a Sur-Reply to Third Motion For Award From Alternative Remedy at 1, filed April 2, 201 (Doc. 198)("Surreply Motion"); and (ii) the Plaintiff/Relator's Opposed Third Motion for Award from Alternate Remedy, filed February 5, 2021 (Doc. 173)("Motion"). The Court held a hearing on September 29, 2021. <u>See</u> Clerk's Minutes, filed September 29, 2021 (Doc. 214). The primary issues are: (i) whether the Court should consider the United States and New Mexico's Sur-Reply Relating to Relator's Opposed Third Motion for Award from Alternate Remedy, filed April

---

[1] In the Court's Order, 2021 WL 5238333, filed September 30, 2021 (Doc. 213), the Court denied Plaintiff/Relator's Opposed Third Motion for Award From Alternate Remedy, filed February 5, 2021 (Doc. 173). In the Order, the Court states: "This Order disposes of the Defendant's Motion to Transfer, filed November 16, 2020 (Doc. 26). The Court will issue a Memorandum Opinion at a later date fully detailing its rationale for its decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

2, 2021 (Doc. 198-1)("Surreply"), when deciding whether to grant the Motion; (ii) whether the Court should revisit the conclusion of the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, that Dr. Kuriyan has "pled a plausible claim that Defendants violated the FCA," NMFATA, and the New Mexico Medicaid False Claims Act, N.M.S.A. §§ 27-14-1 through 27-14-15 ("NMMFCA"), Memorandum Opinion and Order at 20, 16, 2020 WL 8079811, filed September 9, 2020 (Doc. 140)(Parker, J.)("2nd MTD MOO"); and (iii) whether the State of New Mexico's recoupment of funds from Defendants HCSC Insurance Services Co., d/b/a Blue Cross & Blue Shield of New Mexico ("Blue Cross"), Molina Healthcare of New Mexico, Inc. ("Molina Healthcare"), Presbyterian Health Plan, Inc. ("Presbyterian Health"), and UnitedHealthcare of New Mexico, Inc. ("UnitedHealthcare") (collectively "Defendant MCOs"), all Medicaid Managed Healthcare Organizations ("MCOs"),[2] in June, 2017, is an "alternate remedy," as the False Claims Act, 31 U.S.C. § 3730(c)(5)("FCA"), and the New Mexico Fraud Against Taxpayer Act, N.M.S.A. § 44-9-6(H)("NMFATA"), define that term.  The crux of the second issue is whether the State of New Mexico's recoupment of funds from the Defendants was the result of Plaintiff Dr. Michael Kuriyan informing the New Mexico Human Services Department ("HSD") that the Defendants had been

---

[2]MCOs are organizations that contract with State Medicaid agencies to deliver Managed Care.  See Managed Care, www.Medicaid.gov, https://www.medicaid.gov/medicaid/managed-care/index.html (last visited November 15, 2021).  Managed Care is a "health care delivery system organized to manage cost, utilization, and quality," where the MCOs "set per member per month (capitation) payment for these services."  Managed Care, www.Medicaid.gov, https://www.medicaid.gov/medicaid/managed-care/index.html (last visited November 15, 2021).  "By contracting with various types of MCOs to deliver Medicaid program health care services to their beneficiaries, states can reduce Medicaid program costs and better manage utilization of health services. Improvement in health plan performance, health care quality, and outcomes are key objectives of Medicaid managed care."  Managed Care, www.Medicaid.gov, https://www.medicaid.gov/medicaid/managed-care/index.html (last visited November 15, 2021).

overpaid, because they had not spent eighty-five percent of capitated payments[3] on healthcare costs as their contract required, or whether HSD's recoupments were made pursuant to the terms of the contract that HSD had with the Defendants.  The Court concludes that: (i) the Court will consider the arguments in the Surreply; (ii) the Court does not have to revisit Judge Parker's conclusion, but agrees that Dr. Kuriyan plausibly pleads a claim upon which relief can be granted; and (iii) because Dr. Kuriyan's Motion in effect asks the Court to transform Judge Parker's conclusion into a finding that the Defendant MCOs acted fraudulently and that HSD would not have recouped funds but for Dr. Kuriyan alerting them of alleged fraud, the Court will deny the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, filed October 18, 2016 (Doc. 1)("Original Complaint"), Plaintiff/Relator[4] Jacob Kuriyan's Third Amended Complaint, filed October 1, 2020 (Doc. 142)("Complaint"), the Motion, the United States' and New Mexico's Opposition to Relator's Opposed Third Motion for Award from Alternate Remedy at 9, filed March 12, 2021 (Doc. 195)("Government Response"), and the Plaintiff/Relator's Reply to United States' & New Mexico's Opposition to his Third Motion for Award From Alternative Remedy, filed March 26, 2021 (Doc. 196)("Government Reply").  The Court supplies a factual background to assist the parties in knowing what facts the Court uses for this Memorandum Opinion, and not to state these

---

[3]In this context, a capitated payment is "a set per member per month" payment that a State Medicaid agency gives to an MCO to deliver managed Medicaid care.  Managed Care, www.Medicaid.gov, https://www.medicaid.gov/medicaid/managed-care/index.html (last visited November 15, 2021).

[4]In a qui tam action, the "relator" is the person who sues on "behalf of the government as [an] agent[] of the government, which is always the real party in interest."  United States ex rel. Hyatt v. Northrop Corp., 91 F.3d 1211, 1215 (9th Cir. 1996).

facts for their truth.  These facts do not bind the parties or the Court at trial.  The Court recognizes

that, because the Court draws facts from the Original Complaint and the Complaint, these facts

largely reflect Dr. Kuriyan's version of events.

      1.     **Background.**

Medicaid managed care is an "alternative to traditional fee-for-service arrangements and

is believed to manage care costs, quality of care, and utilization more effectively."  Complaint

¶ 38, at 14.  MCOs contract with State Medicaid organizations, which pay MCOs a monthly, flat-

rate "capitation" premium for each enrolled member.  Complaint ¶ 38, at 14.  State Medicaid

agencies are not able to predict precisely the cost of care that the MCOs will provide, so they base

their capitation payments on the expected cost of care, which may be greater or lesser than the

MCOs' actual costs.  See Complaint ¶ 39, at 14.  The trouble, and this case's dispute, arises from

the mismatch between the State's capitation payments and the MCOs actual costs of managing

Medicaid members' healthcare.  A series of regulations govern the relationship between the MCOs

and State Medicaid organizations to ensure that the MCOs do not gain "excessive profits when the

actual medical care costs for their beneficiaries, plus administrative costs, are much less than the

capitation payments they receive from the state Medicaid agency."  Complaint ¶ 40, at 15-16.

These regulations "also help Medicaid managed care live[] up to its purported cost-effectiveness

advantage by ensuring that Medicaid is not paying more than it would under a fee-for-service

model."  Complaint ¶ 40, at 15.

When the Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119; Pub. L. No. 111-152,

124 Stat. 1029, expanded Medicaid coverage, states had difficulty predicting costs and premiums.

See Complaint ¶ 46, at 12.  For example, states could not predict accurately the cost of covering

the previously uninsured.  See Complaint ¶ 46, at 16.  To try to ameliorate this risk, states

implemented risk corridor provisions that allow a State Medicaid agency to compensate an MCO whose costs exceed the capitation payments.  See Complaint ¶ 46, at 16-17.  Overpayment is a trickier problem, however.  If an MCO's costs are lower than the capitation payments, then either an MCO must detect and report overpayment, or a state-commissioned third-party audit would have to spot the error.  See Complaint ¶¶ 47-48, at 17.  If neither the MCO nor a third-party audit catches the overpayment, then the MCO "could fraudulently retain that overpayment by ignoring the error and simply 'signing off' on the audit as-is."  Complaint ¶ 48, at 17 (no citation for quotation).  A State Medicaid agency can, pursuant to 42 C.F.R. §§ 438.700(a), (b), and 42 C.F.R. § 438.730, impose sanctions on the MCO or initiate recoupment of excess funds.  Before a State can initiate recoupment, however, the State must know about the overpayment.  See Complaint ¶ 50, at 17.  Because one year's capitation payments are based on the previous year's capitation payments, if an MCO is overpaid, and does not return the excess, then a "vicious cycle of inflation and overpayment ensues, driving up healthcare costs at Medicaid's expense and benefitting the MCOs."  Complaint ¶ 49, at 14.

New Mexico, though its HSD, contracts with the Defendants, who operate MCOs, to "provide healthcare for New Mexico's Medicaid enrollees in exchange for fixed, capitated payments from New Mexico."  Original Complaint ¶ 13, at 6.  Consistent with 42 C.F.R. §§ 438.604-438.606, the contract requires the Defendant MCOs to submit periodic reports to the State, so the State has up-to-date data to calculate capitation payments.  See Complaint ¶¶ 52-53, at 18.  The MCOs have an opportunity to verify the State's calculations before the capitation payments are finalized.  See Complaint ¶ 54, at 19 (citing Amended and Restated Medicaid Managed Care Services Agreement Among New Mexico Human Services Department, New Mexico Behavior Health Purchasing Collaborative, and HCSC Insurance Services Company,

operating as Blue Cross and Blue Shield of New Mexico at 40, filed October 1, 2020 (Doc 142-2)("BCBS Contract")

The contract between the State and the Defendant MCOs indicates that the Defendant MCOs

> [s]hall spend no less than eighty-five percent (85%) of net Medicaid line of business Net Capitation Revenue, defined in Section [7.2.2] of this Agreement, on direct medical expenses defined in Section [7.2.2] of this Agreement on an annual basis.  [The State] reserves the right, in accordance with and subject to the terms of this Agreement to reduce or increase the minimum allowable for direct medical services over the term of this Agreement, provided that any such change (i) shall only apply prospectively, (ii) exclude any retroactive increase to allowable direct medical services and (iii) shall comply with federal and state law.

Original Complaint ¶ 14, at 6 (quoting BCBSNM Contract ¶ 186)(brackets in Original Complaint). This provision is known as a Medical Expense Ratio ("MER") provision, see Original Complaint ¶ 14, at 6, or Medical Loss Ratio ("MLR"), Motion ¶ 25, at 9.  Under the contract's terms, if one of the Defendants' MCOs does not meet the eighty-five percent MLR threshold, the MCO must remit the overpayment to New Mexico or otherwise comply with New Mexico's instructions about the overpayment.  See Original Complaint ¶ 15, at 6.  The remaining fifteen percent covers the MCO's administrative costs, including overhead, profit, and all non-medical-care costs.  See Motion ¶ 27, at 9.

The MLR is the ratio between various medical expenses and the net capitation revenue. See Original Complaint ¶ 16, at 7.  The ratio's numerator, "'Medical Expense (net of reinsurance) and care coordination expenses . . . incurred during the annual period' as well as any other specific medical costs identified in the contract," includes three components: (i) medical expenses; (ii) the cost of the Patient-Centered Medical Home Initiative; and (iii) the Care Coordination Expense. Original Complaint ¶ 17, at 7.  The contract "expressly excludes" from the numerator "over 30 categories of costs . . . by deeming them administrative costs."  Original Complaint ¶ 18, at 7.  The

contract also requires that the value of any subrogation recoveries reduce the numerator.  See Original Complaint ¶ 18, at 7-8.  The ratio's denominator is the "[p]rospective capitation premium minus Premium Tax minus NMMIP Assessments paid during the annual period."  Original Complaint ¶ 16, at 7.  Because taxes and assessments make up approximately five percent of the prospective capitation premium, the net capitation revenue is roughly ninety-five percent of the prospective capitation premium.  See Original Complaint ¶ 16, at 7.

If the MLR is less than 0.85, then the MCOs have been overpaid, because the MCOs' direct medical expenses are less than eighty-five percent of premiums.  See Complaint ¶ 58, at 20.  In other words, if the MLR is less than 0.85, then the State Medicaid agency has "paid more to the MCOs than it would have under a fee-for-service model."  Complaint ¶ 58, at 20.  The New Mexico HSD employs actuaries to calculate the MLR.  See Complaint ¶ 59, at 20.  MLR calculations are finalized by the 180th day of the year.  See Complaint ¶ 59, at 20.  "The actuary can calculate MLR using encounter/claims data alongside HSD's own capitation premium payment data."  Complaint ¶ 59, at 20.

Beginning in 2014, New Mexico implemented Risk Corridor ("RC") provisions in its MCO contracts to cover Medicaid expansion risk.  See Complaint ¶ 60, at 21.  While MLR covers the entire Medicaid population, the RC applies only to the Medicaid expansion population.  See Complaint ¶ 62, at 21.  Under the RC provision, "HSD shares in losses and profits when the actual cost of care for the expansion population either exceeds or falls below the capitation payments, yielding excess profits or losses for the MCO."  Complaint ¶ 60, at 21.  Under the contracts' terms, for the non-expansion population, when profits -- referred to here as "underwriting gain" -- exceed three percent of total payments, the MCO must share the profit equally with HSD.  Complaint ¶ 61, at 21.  The underwriting gain applies only to the non-Medicaid-expansion population.

Complaint ¶ 62, at 21.  The contracts also have "a multitude of requirements in place to ensure compliance" both with the contract, and with all applicable laws and regulations, including hiring a Contract Manager to ensure contract compliance, and maintaining a "comprehensive fraud and abuse compliance program and policy."  Complaint ¶ 63, at 22.

## 2.    **Dr. Kuriyan's Role**.

Dr. Jacob Kuriyan is a "theoretical physicist by training who has owned two healthcare analytics software companies for over thirty-five years."  Complaint ¶ 7, at 5.  Dr. Kuriyan "combined his mathematical skills and meteorological expertise to develop a first-of-its-kind patented dynamic model" that can forecast the "development of chronic disease and cancer within a population" with an eye towards better predicting future medical costs.  Complaint ¶ 11, at 6.  Dr. Kuriyan's model generates what he calls "CareMaps," which show "disease burdens in various regions, costs for treatments, and trends in both disease burdens and costs."  Complaint ¶ 12, at 6.  "CareMaps are particularly valuable for spotting areas of chronic disease challenges and identifying prevention programs that are effective."  Complaint ¶ 12, at 6-7.  While extant State Medicaid programs tend to rely only on the previous years' data to predict future costs, Dr. Kuriyan's model attempts to predict costs by accounting for chronic and cancer disease profiles and Medicaid enrollees' treatment costs.  See Complaint ¶ 13, at 7.

In 2013, Dr. Kuriyan approached HSD about the possibility of HSD adopting Dr. Kuriyan's model to predict future Medicaid costs more accurately.  See Complaint ¶ 13, at 7.  HSD gave Dr. Kuriyan "non-public, highly confidential Medicaid data" from 2010-2013 so that Dr. Kuriyan could test his model.  Complaint ¶ 13, at 7.  Dr. Kuriyan "presented his initial results regarding possible cost savings to HSD in early 2015."  Complaint ¶ 14, at 7.  HSD liked Dr. Kuriyan's analysis, so they asked Dr. Kuriyan to develop a five-year proposal, which Dr. Kuriyan submitted

in September, 2015.  See Complaint ¶ 14, at 7.  Dr. Kuriyan's first proposal was "essentially lost," because of "management turnover within HSD," but HSD later resumed communication with Dr. Kuriyan after his model "gained local media attention."  Complaint ¶ 14, at 7.

In November, 2015, Dr. Kuriyan met with HSD officials to discuss how, according to Dr. Kuriyan, the State could save "over $300 million annually" using his model.  Complaint ¶ 15, at 7.  HSD told Dr. Kuriyan that his current estimate was inaccurate, because it relies on data from before New Mexico Medicaid began using Centennial Care.  See Motion ¶ 9, at 4.  See Complaint ¶ 15, at 7-8.  HSD gave Dr. Kuriyan more current data from 2014 so he could re-run his analysis.  See Complaint ¶ 15, at 8.

When analyzing the updated data, Dr. Kuriyan discovered a discrepancy.  See Complaint ¶ 16, at 8.  One "unintended benefit" of Dr. Kuriyan's model is being able to detect "when premium payments to MCOs are higher than expected -- revealing possible hidden fraud."  Complaint ¶ 16, at 8.  By comparing the healthcare expenditures of the Defendants' MCOs to the amounts that HSD paid the Defendants, Dr. Kuriyan noticed that the MLR was below 0.85.  See Complaint ¶ 16, at 8.  In other words, Dr. Kuriyan discovered that the Defendants' MCOs were overpaid.  See Complaint ¶ 16, at 8.  Dr. Kuriyan also noticed that the premiums that HSD paid to the Defendants' MCOs -- and, by extension, contributed to the Defendants' profits -- jumped considerably between 2013 and 2014 "even though patients' medical needs remained the same."  Complaint ¶ 17, at 8.  According to Dr. Kuriyan, overpayment was the only explanation of the Defendants' increased profits, because the "newly-insured Medicaid expansion population was largely under forty years old and relatively healthy," so their "addition could not have caused the increase."  Complaint ¶ 17, at 8.  Dr. Kuriyan concluded that the Defendants were fraudulently withholding overpayments "in excess of the time period permitted by law."  Complaint ¶ 17, at 9.

On May 25, 2016, Dr. Kuriyan presented his findings to HSD. See Complaint ¶ 18, at 9. At first, HSD "denied that any overpayments existed." Complaint ¶ 18, at 9. HSD appeared to rely on its own informal calculations, as well as a June, 2015, "actuarial MLR audit of claims submitted by and premiums paid to Defendants' MCOs." Complaint ¶ 18, at 9. Dr. Kuriyan believed that, because HSD "specifically referenced 'MLR' when stating that there were no overpayments," the Defendants did not inform HSD about its overpayments. Complaint ¶ 18, at 9 (no citation for quotation). To Dr. Kuriyan, this mention confirmed that the Defendants were fraudulently retaining HSD's overpayments. See Complaint ¶ 18, at 9.

Dr. Kuriyan followed up over email with HSD about the alleged fraud the next day. See Complaint ¶ 19, at 9. Dr. Kuriyan again informed HSD that, in his opinion, the Defendants' MCOs had not met the eighty-five percent MLR threshold and were illegally retaining overpayments, which violates both federal regulations and the MCOs' contracts with HSD. See Complaint ¶ 19, at 9. HSD did not respond. See Complaint ¶ 10, at 9. After waiting several months, Dr. Kuriyan retained counsel and verified his MLR calculations by calculating it "in the exact way that HSD's auditor is required to." Complaint ¶ 20, at 9-10. According to Dr. Kuriyan, his calculation "confirmed what his model determined: Defendants had not met the required 85% MLR." Complaint ¶ 20, at 10.

On October 18, 2016, Dr. Kuriyan sent his qui tam disclosure statement[5] to the United States and to New Mexico. See Complaint ¶ 21, at 10. Dr. Kuriyan, with his counsel, met with "the Government" in October, 2016. Motion ¶ 17, at 6. Several months later, on December 19, 2016, and January 26, 2017, New Mexico "made a formal demand to Defendants for overpayment,

---

[5]The FCA requires that a prospective relator, pursuant to rule 4(d)(4) of the Federal Rules of Civil Procedure, serve "on the Government" a "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses." 31 U.S.C. § 3730(a)(2).

based on the Risk Corridor . . . measure in the State's 2014 contract with Defendants' MCOs."
Motion ¶ 18, at 6-7.  New Mexico recouped the RC amounts on January 30, 2017.  See Motion
¶ 18, at 7.  On August 9, 2017, New Mexico demanded overpayment recoupment based on the
contracts' underwriting gain measure and recouped those amounts on August 28, 2017.  See
Motion ¶ 18, at 7.  New Mexico's recoupments total "*at least*" $133,147,133.00.  Motion ¶ 18, at
6-7 (emphasis in original).  According to Dr. Kuriyan, HSD's recoupment "undoubtedly postdates"
the beginning of his qui tam suit, and HSD did not learn of the Defendants' alleged overpayment
another way.  Motion ¶ 19, at 7.

On September 7, 2018, the United States informed Dr. Kuriyan that it planned to decline
to intervene in his case, because it believes that HSD's position that it "had recovered everything
it was owed under the suit" means that there is no fraud.  Motion ¶ 20, at 7.  The United States also
told Dr. Kuriyan that he likely would fail if he made an alternate-remedy argument.[6]  See Motion
¶ 20, at 7.  Almost two months later, on December 3, 2018, New Mexico informed Kuriyan that
it, too, is not interested in intervening and that it believes that the recoupment is not an alternate
remedy.  See Motion ¶ 21, at 8.  The letter that New Mexico sent to Dr. Kuriyan also "set forth
reasons why the United States felt that it was not 'in [his] best interest to pursue'" his alternate-
remedy theory.  Motion ¶ 21, at 8 (quoting Amended and Restated Medicaid Managed Care
Services Agreement Among New Mexico Human Services Department, New Mexico Behavior
Health Purchasing Collaborative, and HCSC Insurance Services Company, operating as Blue

---

[6]Under the FCA, if the government chooses not to intervene and proceed with the fraud
claim, but instead chooses to pursue its claim though "any alternate remedy available to the
Government," then the person who initiated the action "shall have the same rights in such
proceedings as such person would have had if the action had continued under this section."  31
U.S.C. § 3730(c)(5).  Under the FCA, this means that the qui tam plaintiff is entitled to a portion
of the proceeds from the alternate remedy.  See 31 U.S.C. § 3730(d)

Cross and Blue Shield of New Mexico at 2, filed December 10, 2019 (Doc. 106-2)).  On December 12, 2018, "the Government declined to intervene" in this qui tam suit, and Judge Parker unsealed it.  See Motion ¶ 22, at 8.

## PROCEDURAL BACKGROUND

Dr. Kuriyan has four causes of action: (i) a FCA claim under 31 U.S.C. § 3249(a)(1)(G), alleging that the Defendant MCOs "knowingly concealed or knowingly and improperly avoided an obligation to pay money to the United States as part of their fraudulent scheme," Complaint ¶ 106, at 29; (ii) a FCA claim under 31 U.S.C. § 3729(a)(1)(A), alleging that the Defendant MCOs "made false certifications or legal compliance in their MCO contracts with HSD," Complaint ¶ 113, at 33; (iii) a NMMFCA claim, alleging that, from 2014 to 2015 the Defendant MCOs "knowingly made or used, and cause to be made or used, false records to conceal, avoid, or decrease obligation to repay Medicaid overpayments to the State of New Mexico," Complaint ¶ 122, at 35; and (iv) a NMFATA claim, alleging that the Defendant MCOs "knowingly avoided their repayment obligation by retaining overpayments past the permissible deadline," Complaint ¶ 132, at 37.  Judge Parker dismissed this case without prejudice on September 9, 2020.  See 2nd MTD MOO at 20-21, 2020 WL 8079811 at *12-13.  In the 2nd MTD MOO, Judge Parker gave Dr. Kuriyan until October 1, 2020, to amend his complaint.  See 2nd MTD MOO at 21, 2020 WL 8079811 at *13.  Judge Parker concludes that, although Dr. Kuriyan had "pled a plausible claim that Defendants violated the FCA, the NMFATA, and the NM[M]FCA," Dr. Kuriyan had not explained how his information "overcomes the public disclosure bar."  2nd MTD MOO at 20, 2020 WL 8079811 at *11.  In the 2nd MTD MOO, Judge Parker also denies as moot Dr. Kuriyan's Renewed Opposed Motion for Award From Alternate Remedy, filed December 10, 2019 (Doc. 106).  See 2nd MTD MOO at 21, 2020 WL 8079811 at *12.  Dr. Kuriyan filed his Third Amended

Complaint a few weeks later, on October 1, 2020.  <u>See</u> Complaint at 1.  All the Defendants again moved to dismissed Dr. Kuriyan's case.  <u>See</u> Motion by All Defendants to Dismiss Relator's Third Amended Complaint, filed November 5, 2020 (Doc. 144)("3rd MTD").  New Mexico moved separately to dismiss Dr. Kuriyan's case.  <u>See</u> State of New Mexico's Motion to Dismiss, filed December 17, 2020 (Doc. 153)("NMMTD").  Dr. Kuriyan also asked to seal permanently his disclosure statement.  <u>See</u> Plaintiff/Relator Jacob Kuriyan's Motion to Permanently Seal Disclosure Statement, filed January 15, 2021 (Doc. 159)("Motion to Seal").

Judge Parker denied the 3rd MTD and the NMMTD, because he concluded that the Complaint plausibly alleges: (i) that Dr. Kuriyan was an original source of the information on which HSD allegedly relied to recoup overpayments from the Defendants; and (ii) that the information on which Dr. Kuriyan relied was not disclosed publicly.[7]  <u>See</u> Order at 3-4, 2021 WL 5238332, at *2-3, filed January 29, 2021 (Doc. 166)(Parker, J.)("3rd MTD Order").  First, Judge Parker notes that, although Dr. Kuriyan earlier plausibly pled a claim that the Defendants violated the FCA, the NMFATA, and the NMMFCA, Dr. Kuriyan now plausibly alleges that he was an original source, because he has "'knowledge that is independent of and materially adds to the publicly disclosed allegations or transaction, and . . . has voluntarily provided the information to the Government before filing an [FCA] action.'"  3rd MTD Order at 3, 2021 WL 5238332, at *2 (quoting 31 U.S.C. § 3730(e)(4)(B)).  Second, Judge Parker concludes that Dr. Kuriyan can overcome the public-disclosure bar, because he plausibly alleges that he analyzed "non-public data provided by the State" and that the Defendants "knowingly received and/or concealed and kept

_____

[7]31 U.S.C. § 3730(e)(4)(A) instructs courts to dismiss an action or claim under the FCA, "unless opposed by the Government, if substantially the same allegations as alleged in the action or claim were publicly disclosed," unless the person bringing the action is "an original source of the information."  31 U.S.C. § 3730(e)(4)(A).

higher premium payments to which they were not entitled." 3rd MTD Order at 4, 2021 WL 5238332, at *2. Judge Parker further stated that the Defendants' argument that "scienter based on chronic condition anomalies could have been inferred from public disclosures of payments to Defendants" is "unsupported." 3rd MTD Order at 4, 2021 WL 5238332, at *2. Accordingly, Judge Parker denied the 3rd MTD and the NMMTD, stating that, "[a]t this stage, the standard for evaluating a complaint is plausibility" and that Dr. Kuriyan's "allegations meet that standard." 3rd MTD Order at 4, 2021 WL 5238332, at *2. Judge Parker also granted Dr. Kuriyan's Motion to Seal. See 3rd MTD Order at 5, 2021 WL 5238332, at *3.

1.      **The Motion.**

Judge Parker denied as moot both of Dr. Kuriyan's earlier motions for award from alternate remedy. See Order at 9, 2019 WL 11623924, filed October 25, 2019 (Doc. 99)(denying as moot Plaintiff/Relator's Opposed Motion From Alternate Remedy, filed March 12, 2019 (Doc. 26)); 2nd MTD Order at 21 (denying as Moot Dr. Kuriyan's Renewed Opposed Motion for Award From Alternate Remedy, filed December 10, 2019 (Doc. 106)). Dr. Kuriyan asks again for an award from alternate remedy under the FCA and the NMFATA. See Motion at 1. In the Motion, Dr. Kuriyan makes three arguments: (i) his Motion is timely, because resolving the alternate remedy dispute will quickly end this case, and because he has pled a valid qui tam action; (ii) New Mexico's recovery is an alternate remedy under the FCA and under the NMFATA; and (iii) he is entitled to the maximum possible share of New Mexico's recovery, here thirty percent of $133,147,133.00, which is equal to $39,944,139.90 plus interest, as well as thirty percent of any other 2014 overpayment recoupments that overlap with his allegations. See Motion at 11-27.

2.      **Blue Cross' Response.**

Blue Cross responds to the Motion, arguing that it and the other Defendant MCOs did not act fraudulently, and never violated any federal or State law.  See HCSC Insurance Services Company's Response to Relator's Third Motion for an Award From "Alternate Remedy" at 1 filed February 19, 2021 (Doc. 178)("Blue Cross Response").  Blue Cross contends that all of HSD's recoupment was performed "in the normal course of business," and had "nothing to do with MLRs" or with Dr. Kuriyan.  Blue Cross Response at 1.  In the Blue Cross Response, Blue Cross makes three arguments.  See Blue Cross Response at 1-12.  First, Blue Cross contends that Dr. Kuriyan must meet an alternate-remedy award's requirements before he is entitled to an alternate-remedy award.  See Blue Cross Response at 2-3.  Second, Blue Cross disputes the validity of Dr. Kuriyan's arguments that: (i) to be entitled to an alternate-remedy award, Dr. Kuriyan must have a valid claim, see Blue Cross Response at 4-5; (ii) Blue Cross did not commit fraud, or otherwise violate federal or State law, by retaining improperly HSD's overpayments, see Blue Cross Response at 5-9; and (iii) evidence demonstrates that the public-disclosure bar precludes Dr. Kuriyan's claims, see Blue Cross Response at 9-10.  Third, Blue Cross contends that HSD's recoupments are not an "alternate remedy," because HSD is not the "Government" as the FCA or the NMFATA defines that term.  Blue Cross Response at 10.  Blue Cross argues, therefore, that the Court should deny the Motion, and that it would be "improper" for the Court to "make any findings of fact or conclusions of law on the merits of" Dr. Kuriyan's claims.  Blue Cross Response at 12.

### 3.  UnitedHealthcare, Presbyterian Health, and Molina Healthcare's Response.

UnitedHealthcare, Presbyterian Health, and Molina Healthcare together respond to Dr. Kuriyan's Motion.  See Response of UnitedHealthcare of New Mexico, Inc., Presbyterian Health Plan, Inc., and Molina Healthcare of New Mexico, Inc. to Relator's Third Motion for Share of Alternate Remedy, filed February 19, 2021 (Doc. 179)("UPM Response").  UnitedHealthcare,

Presbyterian Health, and Molina Healthcare state that they "submit this response to ensure that the record clearly reflects their denial of Kuriyan's allegations -- regardless of the outcome of his motion for a share of alternate remedy." UPM Response at 2. Specifically, UnitedHealthcare, Presbyterian Health, and Molina Healthcare deny that they violated the FCA, the NMFATA, or the NMMFCA, deny that they "received or fraudulently retained" any Medicaid overpayments, deny that they breached their contract with HSD, and deny that they certified falsely their compliance with all applicable laws. UPM Response at 2. UnitedHealthcare, Presbyterian Health, and Molina Healthcare state that Dr. Kuriyan's "position is that surviving a motion to dismiss . . . is enough to entitle him to a share of the contractual recoupments if they constitute an 'alternate remedy' under" the FCA and the NMFATA -- in other words, that Dr. Kuriyan "does not need to prove that the Defendants violated the" FCA, NMFATA, or NMMFCA. UPM Response at 2 (no citation for quotation). UnitedHealthcare, Presbyterian Health, and Molina Healthcare contend, therefore, that it would be "entirely inappropriate" to conclude that they violated the FCA, NMFATA, or NMMFCA in deciding Dr. Kuriyan's Motion, but that they intend "forcefully" to deny any allegations that they did so if it becomes necessary to make that defense. UPM Response at 2-3.

### 4. **Molina Healthcare's Response.**

Although Molina Healthcare, with UnitedHealthcare and Presbyterian Health, filed the UPM Response, Molina Healthcare separately alerts the Court that it adopts Blue Cross' arguments in the Blue Cross Response. See Defendant Molina Healthcare of New Mexico, Inc.'s Joinder in HCSC Insurance Services Company's Response to Relator's Third Motion for an Award From "Alternate Remedy," filed February 19, 2021 (Doc. 180)("Molina Notice"). In the Molina Notice, Molina Healthcare states that it "joins in its entirety" the Blue Cross Response. Molina Notice at

1.  Molina Healthcare agrees with Blue Cross, therefore, that the Court should deny the Motion and should not make any findings of fact or conclusions of law.  See Molina Notice at 1; Blue Cross Response at 12.

**5.     The Kuriyan MCO Reply.**

Dr. Kuriyan replies to the Defendant MCOs responses.  See Plaintiff/Relator's Reply to Defendant's Responses to Third Motion From Alternate Remedy, filed March 4, 2021 (Doc. 192)("Kuriyan MCO Reply").  In the Kuriyan MCO Reply, Dr. Kuriyan makes two contentions. See Kuriyan MCO Reply at 1-6.  First, Dr. Kuriyan reiterates his argument that the Court does not need to find any facts to resolve his Motion.  See Kuriyan MCO Reply at 1-2.  According to Dr. Kuriyan, the Court need decide only: (i) whether the United States and New Mexico's recoupment is an alternate remedy; and (ii) whether he is entitled to an award from the alternate remedy, and, if Dr. Kuriyan is entitled to an award, to how much of it he is entitled.  See Kuriyan MCO Reply at 2.  Dr. Kuriyan states that "[a]nswering these questions does not require entry of findings of fact, and neither do the Federal Rules of Civil Procedure."  Kuriyan MCO Reply at 2.  Second, Dr. Kuriyan argues that HSD was capable of electing an alternate remedy, under both the FCA and the NMFATA.  See Kuriyan MCO Reply at 3-4.  Dr. Kuriyan concludes by stating that "HSD was capable of electing an alternate remedy under both the federal and New Mexico False Claims Acts, and the recoupment at issue in this matter is such an alternate remedy."  Kuriyan MCO Reply at 6.

**6.     The Government's Response.**

The United States and New Mexico respond jointly to Dr. Kuriyan's Motion, stating that they oppose Dr. Kuriyan's attempt to get a portion of the recoupment.  See Government Response at 2.  The United States and New Mexico contend that the alternate remedy provision does not

apply here and, even if it does, that the public disclosure bar bars Dr. Kuriyan's action.  <u>See</u> Government Response at 2.  In the Government Response, the United States and New Mexico make three arguments.  <u>See</u> Government Response at 9-24.  First, the United States and New Mexico argue that HSD's reconciliation was pursuant to the terms of its contracts with the Defendant MCOs, and is not an alternate remedy under the FCA or the NMFATA.  <u>See</u> Government Response at 9-16.  According to the United States and New Mexico, the recoupment was not a substitute for Dr. Kuriyan's qui tam action, the recoupment began in August, 2015, which is before Dr. Kuriyan disclosed any information to HSD, and HSD did not interfere with Dr. Kuriyan's ability to pursue his qui tam action.  <u>See</u> Government Response at 12-16.  Second, the United States and New Mexico argue that a well-pled qui tam action is a threshold requirement to his right to recover under the alternate remedy provision.  <u>See</u> Government Response at 16. Third, the United States and New Mexico assert that Dr. Kuriyan has not pled a valid qui tam action, because it is subject to the public disclosure bar and because Dr. Kuriyan is not an original source under the FCA.  <u>See</u> Government Response at 19-25.

> 7.    <u>**The Government Reply**</u>.

Dr. Kuriyan responds to the United States and New Mexico.  <u>See</u> Government Reply at 1. Dr. Kuriyan asserts that the United States and New Mexico's arguments in their Response are "procedurally improper or otherwise unconvincing," because the argument are "mainly rehashed previously-litigated issues, in a last-ditch attempt to deny [Dr. Kuriyan] the award to which he is statutorily entitled, and in contravention of the law of the case doctrine."  Government Reply at 1. In his Reply, Dr. Kuriyan makes four arguments.  <u>See</u> Government Reply at 2-10.  First, Dr. Kuriyan argues that the law-of-the-case doctrine bars the United States and New Mexico's arguments about the public-disclosure bar, whether Dr. Kuriyan is an original source, and about

whether Dr. Kuriyan satisfies rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. See Government Reply at 2-5. Second, Dr. Kuriyan contends that he has shown that he has a valid qui tam action and that he is entitled to an alternate-remedy award, because the United States and New Mexico's arguments to the contrary rely on "outdated or distinguishable caselaw." Government Reply at 6. Third, Dr. Kuriyan alleges that HSD's recoupment of the funds at issue is an alternate remedy. See Government Reply at 7. According to Dr. Kuriyan, the United States and New Mexico's arguments are unavailing, because: (i) "the timing of reconciliation does not preclude an alternate remedy"; (ii) Dr. Kuriyan shows the "overlap required by the FCA"; and (iii) the United States and New Mexico's legal arguments rely on an "outdated minority positions and conflict[] with the plain language of the FCA." Government Reply at 7. Fourth and finally, Dr. Kuriyan argues that the United States and New Mexico's assertion that granting Dr. Kuriyan's alternate-remedy Motion could be unfair to the government is "nonsensical." Government Reply at 10. Dr. Kuriyan asserts that the United States and New Mexico maintain conflicting positions by arguing both that Dr. Kuriyan must litigate his qui tam action to completion before he becomes eligible for any alternate-remedy award, and that Dr. Kuriyan's qui tam suit is not valid. See Government Reply at 10.

### 8.     The Motion to File a Surreply.

The United States and New Mexico ask the Court to consider their surreply. See Surreply Motion at 1. The United States and New Mexico argue that they have not had an opportunity to reply to Dr. Kuriyan's law-of-the-case argument, because the argument appears for the first time in the Government Reply. See Surreply Motion at 1. The United States and New Mexico ask, therefore, that, pursuant to D.N.M.LR-Civ. 7.4(b), the Court consider its attached Surreply. See Surreply Motion at 2.

In its attached Surreply, the United States and New Mexico make two arguments in response to Dr. Kuriyan. <u>See</u> United States' and New Mexico's Sur-Reply Relating to Relator's Opposed Third Motion for Award from Alternate Remedy, filed April 2, 2021 (Doc. 198-1)("Surreply"). First, the United States and New Mexico contend that the law-of-the-case doctrine does not apply, and that Dr. Kuriyan is not an original source. <u>See</u> Surreply at 1. According to the United States and New Mexico, the Court can reconsider its prior rulings until it files a final judgment. <u>See</u> Surreply at 1. Moreover, the United States and New Mexico state that the Court has "not determined as an evidentiary matter" whether Dr. Kuriyan's qui tam suit is "barred by the public disclosure bar, as [the United States and New Mexico have] now asked the Court to do." Surreply at 2. Second, the United States and New Mexico argue that the cases on which Dr. Kuriyan relies do not support his contention that he is entitled to an alternate remedy award. <u>See</u> Surreply at 4. Specifically, the United States and New Mexico highlight three cases on which Dr. Kuriyan relies, <u>see</u> <u>United States ex rel. Barajas v. Northrop Corp.</u>, 258 F.3d 1004 (9th Cir. 2001); <u>United States ex rel. Guardiola v. Renown Health</u>, 442 F. Supp. 3d 1319 (D. Nev. 2020)(Hicks, J.); and <u>United States ex rel. Battle v. Bd. of Regents of Ga.</u>, No. CIVA 100CV-1637-TWT, 2005 WL 4880633 (N.D. Ga. February 10, 2005)(Thrash, J.), <u>aff'd on other grounds</u>, 468 F.3d 755 (11th Cir. 2006), and assert that Dr. Kuriyan misunderstands their relevance here. <u>See</u> Surreply at 4-7.

### 9.   <u>The Response to the Surreply</u>.

Dr. Kuriyan asks the Court not to consider the Surreply. <u>See</u> Plaintiff/Relator's Response to United States' and New Mexico's Motion to File a Sur-Reply to Third Motion for Award From Alternate Remedy, filed April 13, 2021 (Doc. 199)("Surreply Response"). Dr. Kuriyan argues that the Court should not consider the United States' and New Mexico's arguments in their Surreply, because it is "unnecessary and a mere ceaseless endeavor as the [United States and New Mexico]

gave more hints of its position in its motion." Surreply Response at 1.  First, Dr. Kuriyan argues that "holdings at the motion to dismiss stage about original source, public disclosure, and Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) become the law of the case," so the United States and New Mexico do not need an opportunity to "respond to this 'new' argument because nothing in [their] proposed sur-reply would offer an exception warranting departure from the law of the case doctrine."  Surreply at 1-2 (no citation for quotation).  Second, Dr. Kuriyan argues that, with only one exception, he "previously cited the [United States and New Mexico's] complained-of case law in his" Motion.  Surreply at 2.  Dr. Kuriyan alleges that the United States and New Mexico should "not get another endless opportunity to prolong alternate remedy proceedings since it has already violated" the FCA's purpose, which is to "make accommodations to whistleblowers that report fraud and provide the taxpayers with relief."  Surreply at 2. Third, Dr. Kuriyan contends that the United States and New Mexico are persisting in "ignoring prior rulings of the Court" only because they are "unhappy" that they are not getting "the relief [they are] accustomed to."  Surreply at 3.

    10.    **The Reply to the Surreply Response**.

    The United States and New Mexico reply to Dr. Kuriyan's Surreply Response, maintaining that the Court should consider their Surreply.  See United States' and New Mexico's Reply in Support of Their Motion to File a Sur-Reply to Third Motion for Award From Alternate Remedy at 1, filed April 15, 2021 (Doc. 200)("Surreply Reply").  The United States and New Mexico contend that Dr. Kuriyan, in his Surreply Response, mischaracterizes their earlier argument in their Surreply.  See Surreply Reply at 1.  The United States and New Mexico assert that Dr. Kuriyan's first argument in his Surreply Response is "silly" and that his second is "factually incorrect." Surreply Reply at 1.  First, the United States and New Mexico argue that they do not ask the Court

to ignore the law-of-the-case doctrine, because the doctrine does not apply, as the Court has not entered final judgment.  See Surreply Reply at 1.  According to the United States and New Mexico, therefore, the Court is free to reconsider whether Dr. Kuriyan is an original source.  See Surreply at 2-3.  Second, the United States and New Mexico allege that Dr. Kuriyan does not raise his argument from his Surreply Response earlier in his Motion to Strike and Response in Opposition to the United States' Statement of Interest, filed January 19, 2021 (Doc. 161)("Motion to Strike").  See Surreply Reply at 3.  According to the United States and New Mexico, Dr. Kuriyan does not raise the same arguments in his Surreply and in his Motion to Strike, and the United States never had a reasonable opportunity to respond to the Motion to Strike.  See Surreply Reply at 3.  The United States and New Mexico argue, therefore, that the Court should consider its Surreply.  See Surreply Reply at 5.

###### 11.   **The Guardiola Notice**.

On May 3, 2021, the United States alerted the Court that the United States Court of Appeals for the Ninth Circuit reversed the United States District Court for the District of Nevada's decision in United States ex rel. Guardiola v. Renown Health, 442 F. Supp. 3d 1319 (D. Nev. 2020).  See Notice of Supplemental Authorities, filed May 3, 2021 (Doc. 202)("Guardiola Notice").  The United States notes that Dr. Kuriyan relies on United States ex rel. Guardiola v. Renown Health, 442 F. Supp. 3d 1319 (D. Nev. 2020)(Hicks, J.), and that the Ninth Circuit concluded that "'if the government chooses to recoup lost dollars in a proceeding before the relator files her *qui tam* complaint, that proceeding does not constitute an alternate remedy under § 3730(c)(5).'"  Guardiola Notice at 1-2 (quoting United States ex rel. Guardiola v. Renown Health, 845 F. App'x 707, 708 (9th Cir. 2021)(mem))(emphasis in United States ex rel. Guardiola v. Renown Health).  The United States attaches the Ninth Circuit's opinion for the Court's review.  See United States

ex rel. Guardiola v. Renown Health, 845 F. App'x 707, 708 (9th Cir. 2021)(mem), filed May 3, 2021 (Doc. 202-1).

### 12.      **Dr. Kuriyan's Response to the Guardiola Notice**

Dr. Kuriyan contends that the Court should ignore the United States' request that it consider the Ninth Circuit's decision in United States ex rel. Guardiola v. Renown Health, because the Ninth Circuit's conclusion is "factually distinguishable and does not support the United States' arguments."   Plaintiff/Relator's Response to the United States' Notice of Supplemental Authorities, filed May 4, 2021 (Doc. 203)("Guardiola Response").  Dr. Kuriyan states that the relator in United States ex rel. Guardiola v. Renown Health, 845 F. App'x 707, "did not file suit until almost two years after the" Medicare Recovery Audit Contractor audit had begun and "after an audit report characterized the billing practice as 'false.'"  Guardiola Response at 2 (no citation for quotation).  According to Dr. Kuriyan, the Ninth Circuit's conclusion in United States ex rel. Guardiola v. Renown Health, 845 F. App'x 707, has "no import" to the Court's consideration of his Motion.  Guardiola Response at 2.

### 13.      **Kennedy Authority.**

On August 2, 2021, the United States alerted the Court of another supplemental authority that it believes the Court should consider when deciding whether to grant Dr. Kuriyan's Motion.  See Notice of Supplemental Authorities, filed August 2, 2021 (Doc. 204)("Kennedy Notice").  The United States notes that the United States Court of Appeals for the District of Columbia decided United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th 47 (D.C. Cir. 2021).  According to the United States, the D.C. Circuit concludes that

> "the text of the alternative-remedy provision establishes that the alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit.

. . .

By the same token, if the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by subsection 3730(c)(5) because it is not 'alternate' to the [FCA] *qui tam* remedy."

Kennedy Notice at 1-2 (quoting United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th at 56 (no citation for internal quotation)).  The United States argues that the reasoning in United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th at 56, means that Dr. Kuriyan is not entitled to an alternate-remedy award.  See Kennedy Notice at 2.

**14.     Dr. Kuriyan's Response to the Kennedy Notice.**

Dr. Kuriyan responds to the Kennedy Notice, contending that the United States misinterprets the D.C. Circuit's conclusion.  See Plaintiff/Relator's Response to United States' Notice of Supplemental Authorities, filed August 6, 2021 (Doc. 205)("Kennedy Response").  Dr. Kuriyan argues that, in United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th at 56, the D.C. Circuit does "not address whether a relator could have brought the alternate remedy himself . . . but whether the alternate remedy '*redress[es] the same type* of falsity and fraud claims' as the *qui tam*."  Kennedy Response at 2 (quoting United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th at 56).  Dr. Kuriyan also asserts that United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th at 56, is factually distinguishable, because the relator "had already received a percentage of the settlement of her *qui tam* suit when she sought an alternate remedy share, and that played a role in the D.C. Circuit's analysis." Kennedy Response at 2.  Dr. Kuriyan also argues that the D.C. Circuit "left open the question of how 'government manipulation' would impact an alternate remedy, because Kennedy did not raise that issue."  Kennedy Response at 2 (no citation for quotation). Here, however, Dr. Kuriyan has "raised that issue multiple times."  Kennedy Response at 2.

15.     **The Hearing**.

The Court held a hearing on September 29, 2021. <u>See</u> Clerk's Minutes at 1. The hearing began with the Court noting that it is not especially familiar with qui tam suits and the FCA, so the parties should feel free to educate the Court "at the most basic level." Transcript of Hearing at 7:17, taken September 29, 2021, filed October 14, 2021 (Doc. 215)("Tr.")(Court). Dr. Kuriyan began by offering the case's background, explaining that he had filed his qui tam case in 2016, which Judge Parker then reviewed and ruled that Dr. Kuriyan pled a valid qui tam suit. <u>See</u> Tr. at 7:23-8:8 (Androphy). Dr. Kuriyan stated that Judge Parked did a "complete analysis in this case, factually and legally, and said that we have a valid qui tam," and that he has "no issue with anything" that Judge Parker concluded, "[n]or should anybody else." Tr. at 8:12-18 (Androphy). Dr. Kuriyan then explained that including that New Mexico contracts with MCOs and delivers capitated payments based on estimated costs, and that the MCOs must spend at least eighty-five percent "on services for the individual patents or the" Medicaid Recipients, because the other fifteen percent is set aside "for administrative costs, profits, and things of that nature." Tr. at 9:7-11 (Androphy). Dr. Kuriyan stated that Judge Parker concluded that Dr. Kuriyan has "a patented model where he could forecast chronic disease, and the development of chronic disease within a population, so there could be a more accurate determination of what cost would be for New Mexico and the federal government." Tr. at 10:15-19 (Androphy). According to Dr. Kuriyan, New Mexico pays "a little more than 20 percent" for the MCO system, and the United States "pays the difference," meaning that "the government is paying 70 percent plus." Tr. at 10-22-25 (Androphy). "[T]he predominate player here is the federal government, with the state's participation," Dr. Kuriyan asserted. Tr. at 11:2-4 (Androphy).

Dr. Kuriyan contended that, when he told New Mexico that adopting his model would save them hundreds of thousands of dollars each year, New Mexico gave him data from 2010 to 2013 to test his model -- data that is not at issue in this case. See Tr. at 11:5-12 (Androphy). Dr. Kuriyan argued that, when he ran his model with the 2010-2013 data and explained to New Mexico that he could save them money, New Mexico initially lost the information. See Tr. at 11:12-14 (Androphy). According to Dr. Kuriyan, he then asked New Mexico for more information so he could determine whether New Mexico was being "defrauded by the MCOs, in terms of the amount of care being provided." Tr. at 11:18-19 (Androphy). Dr. Kuriyan stated that New Mexico then provided him 2014 Medicaid data, which he then ran through his model, revealing that "there were overpayments made to the state, which means that they did not reach the 85 percent of the requirement under the contract to spend . . . the capitated payments." Tr. at 11:24-12:2 (Androphy). Dr. Kuriyan alleged that, when he told New Mexico about the alleged fraud, New Mexico did not agree with his results, because they had done their own audit, which shows that the MCOs were not overpaid. See Tr. at 12:3-7 (Androphy). Dr. Kuriyan contended that he told New Mexico that their own audit may have missed something, because his patented model, using information that is not within the public domain, may be more accurate. See Tr. at 12:8-12 (Androphy). Dr. Kuriyan next contended that Judge Parker "found that Mr. Kuriyan met with the state and that the state denied their overpayments," Tr. at 12:23-24 (Androphy), which prompted Dr. Kuriyan to retain counsel and file a disclosure statement with New Mexico and the United States, see Tr. at 13:1-3 (Androphy).

Dr. Kuriyan stated that a disclosure statement is "in a different format like a complaint," and that, "[b]y statute, before you file your qui tam case, you have to file a disclosure statement." Tr. at 13:4-7 (Androphy). According the Dr. Kuriyan, a disclosure statement's purpose is that it

"gives you a status of being an original source if you meet the requirements."  Tr. at 13:13-14 (Androphy).  Dr. Kuriyan argued that, under the FCA, before a prospective relator may file suit, if "you advise the government what is going on," Tr. at 13:16-17 (Androphy), which, Dr. Kuriyan asserted, he did in person, by letter, and by email after meeting with New Mexico officials, then you have the "right to later argue, in the event that there is a public disclosure of what you're reporting to the government, which means that if there is something out there right now, it gives you the opportunity to create an exception to the public disclosure rule," Tr. at 13:21-14:1 (Androphy).

Dr. Kuriyan then noted that he filed his Complaint on October 18, 2016.  See Tr. at 14:6-7 (Androphy).  Dr. Kuriyan argued that, at that point -- right after he filed his Complaint -- the "government wrote a letter" making a "demand on the state for money that Dr. Kuriyan said that you're running behind."  Tr. at 14:8-10 (Androphy).  According to Dr. Kuriyan, the letter stated that New Mexico is "owed $133 million approximately just for 2014," but that "number is much larger if you go to the 2015 data and beyond."  Tr. at 14:11-13 (Androphy).  Dr. Kuriyan alleged that the MCOs then repaid this money to the United States and to New Mexico "based upon what Dr. Kuriyan told the government."  Tr. at 14:16-17 (Androphy).

Dr. Kuriyan explained that the Defendants question whether he has pled a valid qui tam action, which they have a right to do, because they worry that, under the FCA's terms, Dr. Kuriyan might have a right to an alternate-remedy award.  See Tr. at 14:24-15:4 (Androphy).  Dr. Kuriyan stated than the logic of an alternate-remedy award is that, "if the government has a qui tam, and they don't collect on the qui tam, but they try an alternate method to collect, they shouldn't deprive the whistleblower of his percent of the money."  Tr. at 15:5-9 (Androphy).  According to Dr. Kuriyan, that alternate method of collection is what happened in this case.  See Tr. at 15;10-15

(Androphy).  Dr. Kuriyan stated that, here, the United States and New Mexico contend that, were he to receive an alternate-remedy award, he would deprive taxpayers of money.  See Tr. at 15:10-11 (Androphy).  That perspective, Dr. Kuriyan argued, "looks at this case upside down," Tr. at 15:12-13 (Androphy), because his "patented model" reveals "that they were owed money -- something they never knew about and didn't figure out," Tr. at 15:14-17 (Androphy).

Dr. Kuriyan acknowledged that the Defendants, as well as the United States and New Mexico, are allowed to question whether he has pled a valid qui tam before he can collect an alternate-remedy award, because the FCA does not allow people who "read stuff in the newspaper, or read stuff in other circles" to try to collect money from the government.  Tr. at 16:2-3 (Androphy).  Dr. Kuriyan argued, however, that, here, Judge Parker "went through it methodically," Tr. at 16:9 (Androphy), explored "every area, every nook and cranny," Tr. at 16:13-14 (Androphy), and determined that he had pled a valid qui tam, but did not overcome the public-disclosure bar.  Dr. Kuriyan stated that Judge Parker allowed him to replead and add information to attempt to overcome the public-disclosure bar.  See 16:16-17 (Androphy).

Dr. Kuriyan argued that Judge Parker concluded that the information on which he is relying is from the public domain, so he cannot use that information to plead a valid qui tam action.  See Tr. at 16:18-21 (Androphy).  Dr. Kuriyan explained that Judge Parker concluded that Dr. Kuriyan needed to offer more detailed information to show that he is an original source, so Dr. Kuriyan took that opportunity and re-filed his suit.  See 16:21-16:4 (Androphy).  Dr. Kuriyan contended that, with the new information in his updated Complaint, Judge Parker concluded that Dr. Kuriyan pled sufficiently that he is an original source.  See Tr. at 17:4-6 (Androphy).  Dr. Kuriyan alleged that he also shows that "there was not even a public disclosure," Tr. at 17:6 (Androphy), and that much of the data on which he relies was not in the public domain at all, see 17:9-12 (Androphy).

According to Dr. Kuriyan, that non-public data is what he ran through his patented model and which enabled him to uncover the Defendants' alleged fraud. See Tr. at 17:7-12 (Androphy).

Dr. Kuriyan contended that, at that point, Judge Parker concluded that Dr. Kuriyan's Third Amended Complaint met the pleading requirements to show that he is an original source, but that Judge Parker did not "determine necessarily whether there was public disclosures or not." Tr. at 17:23-24 (Androphy). Dr. Kuriyan argued, however, that Judge Parker agreed that Dr. Kuriyan relies on non-public data that he got from New Mexico. See 17:24-18:3 (Androphy). Dr. Kuriyan alleged that, although Judge Parker "bought into the argument that there was no public disclosure," Tr. at 10:2-3 (Androphy), the public-disclosure bar is "not even an issue in this case," Tr. at 18:4 (Androphy), because Judge Parker "clearly decided that Jacob Kuriyan was an original source, which means that he independently had information and materially added to what was in the public domain, which clearly qualified him as original source and entitled to recovery," Tr. at 18:5-9 (Androphy).

According to Dr. Kuriyan, Judge Parker analyzed three areas of law: (i) whether Dr. Kuriyan had standing; (ii) "whether there was a violation of sealed requirement"; and (iii) whether "there was a public disclosure that barred us." Tr. at 18:19-21 (Androphy). Dr. Kuriyan argued that, in the 2nd MTD MOO, Judge Parker concludes that Dr. Kuriyan has standing, that there was no public disclosure, and that there is no "seal issue," meaning that Dr. Kuriyan did not err by choosing not to file under seal the Second Amended Complaint filed October 28, 2019 (Doc. 100). Tr. at 18:25-19:1 (Androphy). Dr. Kuriyan then stated that Judge Parker did not conclude, "as I said a few minutes ago," that there was no public-disclosure-bar issue, because "that's what we needed to address in our third amended complaint." Tr. at 19:2-4 (Androphy). Dr. Kuriyan noted that he filed his Motion after Judge Parker filed the 2nd MTD MOO. See Tr. at 19:5-7 (Androphy).

Dr. Kuriyan argued that Judge Parker had a "clear understanding" of this case's core issues, because he understood that Dr. Kuriyan "does not allege that the government injury arose from the fact that here were overpayments," but that the injury stems from the Defendants MCOs' "fraudulent concealment of the overpayments." Tr. at 19:13-17 (Andropy). Dr. Kuriyan alleged that this structure "translates into the qui tam world being a reverse false claim," Tr. at 19:24-25 (Androphy), because, under the FCA, fraud is when "you hold onto money that belongs to the government and don't return it," Tr. at 20:1-2 (Androphy). According to Dr. Kuriyan, however, this case is about receiving money "and you owe it back and you're just not paying it back," Tr. at 20:7-8 (Androphy), or that "you're having the money and you're not returning it as you should, whether or not you're demanded or not to pay it back," Tr. at 20:11-13 (Androphy).

Dr. Kuriyan contended that this particular fact makes this a fraudulent concealment case, which means that most of the cases on which the Defendant MCOs, the United States, and New Mexico rely do not support their position. See Tr. at 20:14-21 (Androphy). As a result, Dr. Kuriyan argued, the only reason he can sue the MCOs is because he is acting on the United States and New Mexico's behalf, doing what they have "not done" and have "failed to do." Tr. at 21:2-3 (Androphy). Dr. Kuriyan alleged "[t]hat's what the qui tam law is about." Tr. at 21:3 (Androphy). Dr. Kuriyan then discussed the United States Court of Appeals for the Sixth Circuit's opinion in United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634 (6th Cir. 2003), because, Dr. Kuriyan contended, it suggests that the Court need only determine "whether or not our case is valid," that is, whether it "fits within the alternate remedy laws that the courts have decided," and "give the money back to the government and the relator should get a percentage of." Tr. at 21:18-21 (Androphy).

Dr. Kuriyan then turned back to Judge Parker's decisions, alleging that Judge Parker concluded that the Defendants "wrongfully and knowingly certified invalid data to the government, and avoided or hid overpayments, and improperly created an incorrect baseline for future payments," Tr. at 25:16-19 (Androphy), and that the Defendants "had actual knowledge of the overpayments, or recklessly disregarded evidence of overpayments," Tr. 25:19-20 (Androphy). Dr. Kuriyan argued, however, that Judge Parker made these conclusions based only on how "we've pled the case and what we feel we can prove what we're entitled to."  Tr. at 25:24-25 (Androphy). According to Dr. Kuriyan, to be entitled to an alternate-remedy award, he does not need to prove anything; all he needs to do is to plead a valid qui tam action.  See Tr. at 25:25-26:3 (Androphy). Dr. Kuriyan suggested that he does not need to prove anything, because requiring him to prove something would defeat the FCA's purpose and would run counter to Congressional intent.  See Tr. at 26:8-12 (Androphy).  Dr. Kuriyan argued: "[T]here is only one hurdle we have to overcome: That we have a valid qui tam, and it fits within the model of the statute on what alternative remedies are, and we've done that."  Tr. at 26:12-15 (Androphy).

Dr. Kuriyan then turned to some of the nuances of Judge Parker's legal analysis.  See Tr. at 26:16 (Androphy).  According to Dr. Kuriyan, Judge Parker observed that the Complaint discovered anomalies showing a noticeable increase from 2013 to 2014 in patients with chronic medical conditions.  See Tr. at 26:25-27:2 (Androphy).  Dr. Kuriyan argued that this increase shows that, because the Defendants received capitated monthly payments based on the predicted cost of care rather than on a "determination of whether the chronic conditions would continue," Tr. at 27:4-5 (Androphy), the Defendants "received or concealed and kept higher premium payments that they were not entitled to," Tr. at 27:5-7 (Androphy), despite New Mexico's audits.

Dr. Kuriyan maintained that he was able to catch fraud that New Mexico's audits could not discern, because his model is superior to New Mexico's audits.  See Tr. at 27:9-12 (Androphy).

Next, Dr. Kuriyan addressed whether this case fits the definition of an alternate remedy as the FCA defines that term.  See 27:16-18 (Androphy).  Dr. Kuriyan argued that the United States Court of Appeals for the Tenth Circuit has not addressed the issue.   See Tr. at 27:22-24 (Androphy).   Rather, Dr. Kuriyan argued, only three United States Courts of Appeals have addressed this issue: the Sixth Circuit, the Ninth Circuit, and the United States Courts of Appeals for the Eighth Circuit.  See Tr. at 28:10-29:24 (Androphy).  First, in United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d at 649, the Sixth Circuit said that "all you have to show to prove that you have an alternate remedy is to pursue any alternative to intervene." Tr. at 28:21-23 (Androphy).[8]  Second, in United States ex rel. Barajas v. United States, 258 F.3d 1004 (9th Cir. 2001), the Ninth Circuit noted that § 3730(c)(5)'s language places "'no restrictions on the alternate remedies the government may pursue,'" Tr. at 29:7-8 (Androphy)(quoting United States ex rel. Barajas v. United States, 258 F.3d at 1010, because "it's the collaboration and it's the efforts to work together, not against each other," Tr. at 29:9-10 (Androphy).  Third, Dr. Kuriyan argued that, in Rille v. PricewaterhouseCoopers, LLP, 803 F.3d 368 (8th Cir. 2001), the Eighth Circuit stated that there need only be "factual overlap between the claims that the government has resolved and" the FCA case to constitute an alternate remedy.  Tr. at 29:19-21 (Androphy).[9]  Finally, Dr. Kuriyan, citing United States ex rel. LaCorte v. Wagner, 184 F.3d 188 (4th Cir. 1999), argued that, to

---

[8]In United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., the Sixth Circuit stated that an "alternate remedy" for 31 U.S.C . § 3730(c)(5)'s purposes "'refers to the government's pursuit of any alternative to intervening in a relator's *qui tam* action.'"  342 F.3d at 647.

[9]In Rille v. PricewaterhouseCoopers, LLP, the Eighth Circuit stated that there "must be factual overlap for the relators to recover."  803 F.3d at 374.

recover an alternate-remedy award, there need not be any "finding of fraud as a result of our qui tam." Tr. at 30:6-7 (Androphy).

Dr. Kuriyan contended that the United States and New Mexico's argument that Dr. Kuriyan does not know "what the state was doing," so Dr. Kuriyan could not have "authorized this type of recovery," is unavailing. Tr. at 33:17-18 (Androphy). According to Dr. Kuriyan, courts have concluded that, if the government "knew about what happened, and they did nothing to correct it later, . . . then they would have authorized it." Tr. at 33:22-23 (Androphy). That argument, Dr. Kuriyan argued, is only a "frivolous attempt[] to come up with an excuse why [they] shouldn't have to pay the relator." Tr. at 33:23-25 (Androphy). Dr. Kuriyan then asked the Court if it had any questions and, upon learning that the Court did not have questions, Dr. Kuriyan indicated that he had nothing more to say until he heard from the Defendants. See Tr. at 34:3-11 (Androphy, Court).

The United States then responded, contending that Dr. Kuriyan's presentation was only his "allegations." Tr. at 34:25 (Keegan). The United States argued that Dr. Kuriyan is "asking this Court to award him some $40 million of taxpayer money based solely on those allegations" and that it is not aware of "any other circumstance that would allow a party to recover based solely on allegations." Tr. at 35:1-5 (Keegan). The United States argued that this case ultimately comes down to a statutory interpretation question. See Tr. at 35:19-23 (Keegan). The United States focused the Court's attention on 31 U.S.C. § 3730(c)(5) and argued that, while Dr. Kuriyan focuses on the "'any alternate remedy'" language, the Court should instead focus on the "'its claim'" language. Tr. at 38:6-11 (Keegan)(quoting 31 U.S.C. § 3730(c)(5)). According to the United States, the language "its claim" in § 3730(c)(5) refers to a fraud claim that could have been brought under the FCA. 31 U.S.C. § 3730(c)(5). See Tr. at 38:18-20 (Keegan). The United States stated

that its reading of the statute means that "the relator has the same rights in the alternate proceeding as the relator would have had in the action for its claim, the fraud claim, had [it] continued under the qui tam provisions of the" FCA.  Tr. at 39:4-8 (Keegan).

The United States argued that, in <u>United States ex rel. Kennedy v. Novo A/S</u>, 5 F.4th 47, 58 (D.C. Cir. 2021), the D.C. Circuit addressed this question as the Tenth Circuit would, namely by focusing on the statute's terms.  <u>See</u> Tr. at 39:18-40:12 (Keegan).  Responding to the Court's question about who authored the D.C. Circuit's opinion, the United States quoted the Honorable Patricia Millett, United States Circuit Judge for the D.C. Circuit, who wrote that the FCA's plain text allows qui tam plaintiffs to recover "only for claims seeking relief based on the type of fraud or falsehoods covered by the statute."  <u>United States ex rel. Kennedy v. Novo A/S</u>, 5 F.4th at 49.[10] <u>See</u> Tr. at 40:25-41:2 (Keegan).  The United States asserted that, in other words, the question hinges on the "nature of the legal claims," and whether there was a "fraudulent or false deprivation of a monetary or property interest and not the commonality of the facts that determines a relator's right to share in an alternate remedy."  Tr. at 41:18-21 (Keegan).

The Court asked the United States if its task is merely to pick among United States Court of Appeals' interpretations of the FCA.  <u>See</u> Tr. at 42:22-43:7 (Court, Keegan).  The United States responded that the Court's task is not to pick between competing FCA interpretations, because the "cases that have directly addressed the statutory language are in agreement, that . . . the

_____

[10]In <u>United States ex rel. Kennedy v. Novo A/S</u>, the D.C. Circuit concluded that the FCA does not permit "a private party who has filed an [FCA] case [to be] also entitled to a share of the monetary relief that the government obtains in its own separate enforcement action just because the underlying facts are similar to those in the earlier-field *qui tam* law lawsuit."  5 F.4th at 49 (emphasis in original).  The D.C. Circuit stated that the FCA's plain text confines qui tam plaintiffs to recoveries "only for claims seeking relief based on the type of fraud or falsehoods covered by that statute."  5 F.4th at 49.

government pursuing 'its claim' in an alternate remedy proceeding is referring to a fraud claim." Tr. at 43:9-13 (Keegan)(quoting 31 U.S.C. § 3730(c)(5)).   After responding to Dr. Kuriyan's invocation of cases from the Sixth, Ninth, Eighth, and Fourth Circuits, see Tr. at 43:20-45:5 (Keegan), the United States argued that Dr. Kuriyan is entitled to a share of the United States and New Mexico's recoupment "if -- and big if -- the government pursues a fraud claim in another proceeding," Tr. at 45:7-9 (Keegan).

The United States argued that the first question the Court must answer is "whether the government has pursued a fraud claim in a separate proceeding."   Tr. at 45:14-15 (Keegan). Drawing on a declaration of Jason Sanchez, the then-Deputy Director of the Finance and Administration, Medicaid Assistance Division, at HSD, the United States alleged that its recoupment is not a separate fraud proceeding.   See Tr. at 45:15-46:20 (Keegan).   According to the United States, its recoupment is pursuant to the contract's terms with the Defendant MCOs, and has nothing to do with Dr. Kuriyan's disclosure.   See Tr. at 46:21-47:2 (Keegan).   The United States contended that HSD began "retroactive reconciliation," which "essentially accounts for beneficiaries that enrolled retroactively," in March, 2016, before Dr. Kuriyan filed his qui tam suit in October, 2016.   Tr. at 47:6-8 (Keegan).   The United States alleged that "the final retroactive reconciliations were sent to the defendant MCOs on December 9, 2016 . . . [a]nd the adjustments were made in December 2016, [and] January 2017."   Tr. at 47:18-22 (Keegan).   The United States argued that "[a]ll of these reconciliations were made pursuant to the terms of the contract," Tr. at 48:5-7 (Keegan), there were "no recoupments based on a medical loss ratio," Tr. at 48:11-12 (Keegan), and the recoupment was "not even an administrative proceeding," because it was "not a proceeding at all," Tr. at 48:15-16 (Keegan).   In sum, the United States stated that "HSD did not accuse the defendant MCOs of fraud."   Tr. at 48:22-23 (Keegan).

Moreover, the United States rebutted Dr. Kuriyan's contention that he does not have to prove fraud.  See Tr. at 49:4-8 (Keegan).  According to the United States, the FCA's terms make plain that a relator is entitled to recover "only if the fraud claims are proven, either in an alternate proceeding or in the subject action."  Tr. at 49:17-19 (Keegan).  The United States argued that this reading is consistent with the Supreme Court of the United States of America's opinion in Vermont Agency of Nat. Res. V. United States ex rel. Stevens, 529 U.S. 765 (2000).  The United States acknowledged that the alternate-remedy provision is built to "protect a relator from the government taking the relator's claim, pursuing it in another form, and recovering," Tr. at 50:22-24 (Keegan), but that is "not what happened here," Tr. at 50:24-25 (Keegan).  The United States concluded its presentation by asserting that the Court does not need to address whether the public-disclosure bar bars Dr. Kuriyan's case, because HSD did not pursue "'its claim,' its fraud claim in an alternate proceeding."  Tr. at 52:12-13 (Keegan)(quoting 31 U.S.C. § 3730(c)(5)).

The Court then asked the United States if adopting its reading of the FCA would discourage potential relators, because they no longer would have an incentive to bring claims.  See Tr. at 52:16-23 (Court).  The United States responded by arguing that its reading of the FCA would discourage only frivolous claims, but would encourage valid claims.  See Tr. at 53:4-13 (Keegan).  The United States added that no one, including Dr. Kuriyan, should be allowed to recover without proving their complaint's allegations.  See Tr. at 54:10-23 (Keegan).

The United States then turned to the public-disclosure-bar issue.  See Tr. at 55:15 (Keegan).  The United States noted that Judge Parker concluded that Dr. Kuriyan pled sufficiently that he was an original source, but then stated that it is asking the Court to "go beyond the pleading requirements and look whether, as a matter of fact, the relator brought any original information to the government."  Tr. at 56:20-23 (Keegan).  According to the United States, Dr. Kuriyan did not

supply HSD with any original information and that the Court should make a factual determination so finding. See Tr. at 57:3-10 (Keegan).

Blue Cross then addressed the Court and noted that Dr. Kuriyan has acknowledged that he does not intend to pursue claims against the Defendant MCOs "regardless of the outcome of this motion," so that, once the Court rules on the Motion, "we fully anticipate that this case will go away with respect to the defendants." Tr. at 58:18-23 (Hamilton). Blue Cross stated that it has one remaining concern: that the Court should not determine whether there is a valid qui tam -- even if the parties have an opportunity to put on evidence -- without "tak[ing] those issues to a jury trial and/or receiv[ing] appropriate due process." Tr. at 59:6-7 (Hamilton). Blue Cross then turned to this case's background. See Tr. at 59:11-61:10 (Hamilton). Blue Cross noted specifically that MLR is "not a profit measure," Tr. at 61:16 (Hamilton), and that, under the contract, HSD is responsible for "conducting a reconciliation, providing that to the MCOs, and then the MCOs will either pay back the money, as directed by the state," Tr. at 62:5-7 (Hamilton), or "what occurred in this case is the money is offset from future capitation," Tr. at 62:7-9 (Hamilton).

Blue Cross reiterated that it disputes strongly that it or the other Defendant MCOs acted fraudulently, and that it wants to "make sure that there [are] no findings of fact legally -- or findings of fact or legal conclusions that reach that conclusion as it relates to our conduct." Tr. at 63:2-5 (Hamilton). Blue Cross expressed concern that the Court might conclude that it and the other Defendant MCOs acted fraudulently, because such a finding or conclusion would impact their business nationwide. See Tr. at 63:6-9 (Hamilton). Blue Cross stated that, if the Court concludes that Blue Cross acted fraudulently, it may "need to disclose that in other RFPs for the Medicaid program across the country in which we participate." Tr. at 63:9-12 (Hamilton).

The Court briefly halted Blue Cross's argument to ask whether the Court needs to make findings of fact to decide the Motion.  See Tr. at 63:15-19 (Court).  The Court stated that it is struggling to see how it can decide this Motion without making any findings of fact or factual conclusions, and asked Blue Cross if it had any thoughts on that point.  See Tr. at 63:19-22 (Court).  Blue Cross responded by asserting that, although it takes no position on the matter, the Court may need to make findings of fact whether Dr. Kuriyan's disclosure caused or catalyzed HSD's recoupment, but argued that it would be "improper to make findings of fact or conclusions of law as it related to the defendants' conduct that we committed some fraud or violation of federal law or state law."  Tr. at 64:2-5 (Hamilton).  Blue Cross stated that the Court must afford it and the other Defendants an opportunity to present facts to a jury whether they acted fraudulently.  See Tr. at 64:6-14 (Hamilton).

Turning back to its principal argument, Blue Cross raised a second issue.  See Tr. at 64:16 (Hamilton).  Blue Cross argued that 31 U.S.C. § 3730(c)(5) states that "the Government, capital G, may pursue an alternate remedy."  Tr. at 64:25-65:1 (Hamilton).  According to Blue Cross, the word "Government" in the FCA, 31 U.S.C. § 3730(c)(5), refers only to the United States and not New Mexico through its HSD, meaning that "under the federal statute, if a state agency pursues this remedy, that's not an alternate remedy as that term is used in" § 3730(c)(5).  Tr. at 65:10-13 (Hamilton).  Moreover, Blue Cross contended that, in the NMFATA, the phrase "political subdivision" means: "'An entity formed or maintained for the exercise of political power within certain boundaries or localities to whom electors residing therein are granted power to govern themselves.'"  Tr. at 65:21-25 (Hamilton)(quoting Tompkins v. Carlsbad Irr. Dist., 1981-NMCA-072 ¶ 11, 96 N.M. 368, 370, 630 P.2d 767, 769).  Blue Cross argued, therefore, that HSD is not a

political subdivision under the NMFATA, so, because HSD recouped money, there never was an alternate remedy.  See Tr. at 66:1-7 (Hamilton).

Next, Molina Healthcare argued that, contrary to what it had heard earlier in the hearing, Judge Parker never made findings of fact.  See Tr. at 66:23-67:10 (Ragland).  Molina Healthcare contended that a denial of a motion to dismiss does not amount to "some sort of binding finding." Tr. at 67:16-17 (Ragland).  Molina Healthcare asserted that it expects to be dismissed from this case after the Court rules on Dr. Kuriyan's Motion, because Dr. Kuriyan does not allege that Molina Healthcare or the other Defendant MCOs caused any injury-in-fact.  See Tr. at 67:22-69:18 (Ragland).  Molina Healthcare noted that it expects that "once this motion is resolved, relator will dismiss my client and the other" MCOs.  Tr. at 69:16-18 (Ragland).

Molina Healthcare asserted that, if Dr. Kuriyan does not dismiss this case after the Court's ruling on the Motion, then it will request that the Court grant it leave to renew its earlier motion to dismiss, pursuant to rule 12(b)(1) of the Federal Rules of Civil Procedure, "because we think that there is plenty in the record that will eliminate this case as to the defendants."  Tr. at 69:21-23 (Ragland).  Molina Healthcare explained that there is no motion to dismiss or motion for reconsideration currently pending, but that, because "we've been told by the relator's counsel . . . that, win or lose this motion for alternate remedy, they're not coming after the defendants," it would like leave to file a motion for reconsideration if necessary.  Tr. at 70:6-9 (Ragland).  Molina Healthcare concluded by stating that it also adopts Blue Cross' arguments.  See Tr. at 70:20-22 (Court, Hamilton).

After Presbyterian Health stated that it had nothing more to add beyond what Blue Cross and Molina Healthcare already argued, see Tr. at 71:2-10 (Purcell), UnitedHealthcare began its argument by adopting Blue Cross and Molina Healthcare's arguments, see Tr. at 71:21-23

(Hoernlein).  UnitedHealthcare argued that there is a "risk" that, if the Court adopts Dr. Kuriyan's interpretation of the FCA's alternate-remedy provision, there will be an "incentive for outsiders, relators who have no independent personal knowledge, to do the math required under the contracts, . . . send a letter to the state agency administering the Medicaid program," and attempt to recover a share of whatever the state agency recoups under the terms of its contracts.  Tr. at 72:14-73:1 (Hoernlein).  UnitedHealthcare contended that, because this incentive structure will result if the Court rules in Dr. Kuriyan's favor, the Court should deny Dr. Kuriyan's Motion.  See Tr. at 4-11 (Hoernlein).

The Court then gave Dr. Kuriyan an opportunity to respond to the United States', New Mexico's, and the Defendant MCOs' arguments.  See Tr. at 73:15-18 (Court, Androphy).  Dr. Kuriyan began by rejecting the Defendant MCOs' arguments about the FCA's incentives, because the FCA's "whole purpose" is to ensure that potential whistleblowers have an incentive to blow the whistle.  Tr. at 73:24 (Androphy).  Dr. Kuriyan returned to the case's facts, reiterating that he believes that HSD's recoupment is based on his original information and his disclosure.  See Tr. at 74:16-77:13 (Androphy).  According to Dr. Kuriyan, the FCA's alternate-remedy provision does not force relators to go to trial against defendants, because the "government should have gone after them for more money, but they didn't want to."  Tr. at 77:18-19 (Androphy).  Dr. Kuriyan contended that, "once the money gets paid under the statute, we don't have to litigate it," Tr. at 77:24-25 (Androphy), and that all he must prove is that he has "enough information to plead the specifics of a valid qui tam," which "goes on every day in the qui tam world," Tr. at 78:2-4 (Androphy).  Dr. Kuriyan asserted that, once a court determines that a relator has pled a valid qui tam, "we're off to the races," and the alternate-remedy statute applies.  Tr. at 78:13 (Androphy).  According to Dr. Kuriyan, the statute is "very clear" and states that, once a relator pleads a valid

qui tam action, the relator is entitled to a share of any alternate remedy the government pursues. Tr. at 78:15-16 (Androphy). Dr. Kuriyan again asserted that he is entitled to a share of the recoupment here, because "nothing happened here until Jacob Kuriyan came forward. That's the clear point here. He came forward, and then something happened. But for Jacob Kuriyan, there would be no $133 million back in the Government's pocket." Tr. at 80:9-13 (Androphy).

Dr. Kuriyan remarked on the United States and New Mexico's decision to cooperate, saying that it is "remarkable that the government" chose to cooperate with the Defendant MCOs rather than with him. Tr. at 81:3 (Androphy). Dr. Kuriyan suggested that the Defendant MCOs are concerned about the Court's ruling on the Motion, because "maybe they have hundreds of millions of dollars of overpayments throughout the country that they haven't paid people back." Tr. at 81:10-13 (Androphy). Dr. Kuriyan stated that he does not "care about the MCOs going forward," because that "is for the government to worry about." Tr. at 82:11-12 (Androphy). Dr. Kuriyan argued that, instead, he cares about making sure that his alternate-remedy dispute "is resolved correctly, and that we get a share of what the government collected." Tr. at 82:13-15 (Androphy).

The Court noted that UnitedHealthcare's argument hinges on a factual question -- knowing whether HSD would have pursued recoupment if Dr. Kuriyan had not come to them. See Tr. at 83:2-9 (Court). UnitedHealthcare stated that it cannot say whether Dr. Kuriyan's disclosure to HSD or his allegations "had any impact or not," because reconciliation is "baked into the contracts." Tr. at 83:23-25 (Androphy). UnitedHealthcare acknowledges that it is unusual for it to be sitting on the same side of the courtroom as the government attorneys, see Tr. at 84:4-8 (Androphy), but maintained that it would not be proper to assume fraud when it "did not do anything improper in following the contract and repaying the money when the calculations were

finalized," Tr. at 84:9-12 (Androphy).  Addressing the Court's question, Dr. Kuriyan reiterated his earlier argument that HSD had no knowledge of overpayments until he disclosed his information to New Mexico.  See Tr. at 84:18-85:22 (Androphy).

The United States again noted that it has a different view of the facts and argued that the "reconciliation process started over a year before they knew who Mr. Kuriyan was."  Tr. at 87:2-3 (Keegan).  According to the United States, there is no evidence that Dr. Kuriyan was the "but-for cause of the state collecting under the contract."  Tr. at 87:12-13 (Keegan).  The United States then turned to the Court's earlier question whether it must make findings of fact and contended that "the government should win this motion either way," because Dr. Kuriyan "should not be able to recover on pleadings" alone, and because all the available evidence suggests that HSD's recoupment was pursuant to the contract's terms.  Tr. at 87:20-22 (Keegan).  Finally, just before the hearing ended and the Court adjourned, Blue Cross noted that it adopts Molina Healthcare's argument about asking for leave to file a renewed motion for lack of jurisdiction if Dr. Kuriyan does not dismiss the Defendant MCOs after this Motion is resolved.  See Tr. at 88:11-15 (Hamilton).

## LAW REGARDING SURREPLIES

D.N.M. LR.-Civ. 7.4(b) provides: "The filing of a surreply requires leave of the Court." D.N.M. LR.-Civ. 7.4(b).  "A surreply is appropriate and should be allowed where new arguments are raised in a reply brief."  Walker v. THI of N.M. at Hobbs Center, No. CIV 09-0060 JB/KBM, 2011 WL 2728344, at *1 (D.N.M. July 6, 2011)(Browning, J.).  See Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. 201, 204 (D.N.M. 2005)(Browning, J.).  The Court has granted leave to file a surreply where a party has made arguments and presented new evidence that

did not appear in the party's moving papers.  See Pimentel & Sons Guitar Makers, Inc. v. Pimentel,

229 F.R.D. at 204.

## LAW REGARDING THE FALSE CLAIMS ACT

The FCA "imposes significant penalties on those who defraud the government," Universal

Health Servs., Inc. v. United States, 579 U.S. 176, 136 S. Ct. 1989, 1995 (2016), and imposes civil

liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval," Universal Health Servs. v. United States ex rel. Escobar, 136 S.

Ct. at 1999 (quoting 31 U.S.C. § 3729(a)).  The FCA's purpose is "encourag[ing] 'whistleblowers

to act as private attorneys-general' in bringing suits for the common good." Walburn v. Lockheed

Martin Corp., 431 F.3d 966, 970 (6th Cir. 2005)(quoting United States ex rel. Taxpayers Against

Fraud v. GE., 41 F.3d 1032, 1041-42 (6th Cir. 1994)).  The FCA acts as a "jurisdictional limit on

the court's power to hear certain duplicative qui tam suits." United States ex rel. Grynberg v. Koch

Gateway Pipeline Co., 390 F.3d 1276 (10th Cir. 2004).  The FCA also recognizes the need "to

discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators

merely feed off a previous disclosure of fraud." Walburn v. Lockheed Martin Corp., 431 F.3d at

970. See United States ex rel. Grynberg, 390 F.3d at 1278 (noting that the FCA's "qui tam

provisions are designed to encourage private citizens to expose fraud but to avoid actions by

opportunists seeking to capitalize on public information.").  See Hill v. Vanderbilt Capital

Advisors, LLC, 834 F. Supp. 2d 1228, 1242 (D.N.M. 2011)(Browning, J.).

An FCA action may be commenced in one of two ways.  First, the United States itself may

bring an action against an alleged false claimant.  See 31 U.S.C.  § 3730(a).  Second, a private

person -- known as a relator -- may bring a qui tam action against the alleged false claimant "for

the person and for the United States Government," and "in the name of the Government."   31

U.S.C. § 3730(b). "Qui tam" is short for the Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which translates to "who pursues this action on our Lord the King's behalf as well as his own." Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 769, n.1 (2000). Qui tam actions "appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions to the royal courts on both their own and the Crown's behalf." Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 774. Although the Attorney General may bring suit for § 3729 violations under § 3730, § 3730 states that a person may bring suit on the United States' behalf, and that the qui tam plaintiff is entitled to a portion of the damages if the United states declines to intervene. See 31 U.S.C. § 3730(d). Although the United States suffers the injury, a qui tam relator under the FCA has Article III standing to pursue their claim. See Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 777. Under the FCA, however, States are not subject to qui tam liability. See Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 783.

Under the FCA, a qui tam relator may not recover if the relator's action relies on public information. See 31 U.S.C. § 3730(e)(4)(A). The so-called "public disclosure bar" states that a court "shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in either: (i) a "Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "from the news media." 31 U.S.C. § 3730(e)(4)(A). The public-disclosure bar does not, however, bar actions that the Attorney General brings or actions that a private person who is "an original source of the information"

brings.  31 U.S.C. § 3730(e)(4)(A).

By its terms, the original-source exception contemplates that some qui tam actions should survive the public-disclosure bar even though their allegations are "substantially the same as publicly disclosed allegations," because they involve information that "materially add[s]" to the publicly disclosed information.  United States ex rel. Reed v. KeyPoint Gov't Sol. 923 F.3d 729, 757 (10th Cir. 2019).  To qualify as an original source, a qui tam relator must demonstrate that: (i) they have "direct and independent knowledge of the information on which the allegations are based"; and (ii) they "voluntarily provided such information to the government prior to filing suit." United States ex rel. Precision Co. v. Koch Indus., Inc. 871 C.2d 548, 553 (10th Cir. 1992).  In other words, to recover, a qui tam relator must "bring something to the table that would add value for the government."  United States ex rel. Maur v. Hage-Korban, 981 F.3d 516 (6th Cir. 2020). To meet its burden to show that it is an original source, see Kennard v. Comstock Res., Inc., 363 F.3d 1039, 1044 (10th Cir. 2004), a qui tam relator must provide more than "'unsupported, conclusory allegations,'" United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 800 (10th Cir. 2002)(quoting United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1162 (10th Cir. 1999)).

## LAW REGARDING THE NMFATA

In 2007, the New Mexico Legislature passed the NMFATA, a false claims act with a qui tam[11] provision.  See N.M.S.A. §§ 44-9-1 to -14.  The NMFATA contains a first-to-file provision,

---

[11]At common law,

> qui tam is a writ whereby private individuals who assists a prosecution can receive for themselves all or part of the damages or financial penalties recovered by the government as a result of the prosecution.  Its name is an abbreviation of the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, meaning "[he] who sues in this matter for the king as well as for himself."

stating: "When a person brings an action pursuant to this section, no person other than the attorney general on behalf of the state may intervene or bring a related action based on the facts underlying the pending action."  N.M.S.A. § 44-9-5E.  The NMFATA also contains the following non-exclusivity clause: "The remedies provided for in the Fraud Against Taxpayers Act are not exclusive and shall be in addition to any other remedies provided for in any other law or available under common law."  N.M.S.A. § 44-9-14.

The federal analog to the NMFATA is the FCA, 31 U.S.C. §§ 3729-33, which has as its purpose "encourag[ing] 'whistleblowers to act as private attorneys-general' in bringing suits for the common good."  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir. 2005)(quoting United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1041-42 (6th Cir. 1994)).  It acts as a "jurisdictional limit on the court's power to hear certain duplicative qui tam suits."  United States ex rel. Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276 (10th Cir. 2004).  The FCA also recognizes the need "to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud."  Walburn v. Lockheed Martin Corp., 431 F.3d at 970.  See United States ex rel. Grynberg, 390 F.3d at 1278 ("The False Claims Act's qui tam provisions are designed to encourage private citizens to expose fraud but to avoid actions by opportunists seeking to capitalize on public information.").  A NMFATA violator is liable for three times the actual losses that the State suffered, a civil penalty between $5,000.00 and $10,000.00, the cost to litigate the action, and reasonable attorney's fees.  See N.M.S.A. § 44-9-3C.  "Up to another thirty percent of the damage award is allocated to reward the qui tam plaintiff for exposing fraud and corruption in state

_Qui tam_, Wikipedia, https://en.wikipedia.org/wiki/Qui_tam (last visited Dec. 16, 2021)(emphasis in original).

government."  State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2015-NMSC-025 ¶ 40, 355 P.3d 1,

1 (citing N.M.S.A. § 44-9-7(B)).

## LAW REGARDING THE NEW MEXICO MEDICAID FALSE CLAIMS ACT

The NMMFCA is designed to "deter persons from causing or assisting to cause the state to

pay medicaid claims that are false and to provide remedies for obtaining treble damages and civil

recoveries for the state when money is obtained from the state by reason of a false claim."

N.M.S.A. § 27-14-2.  The NMMFCA makes it unlawful to present false or fraudulent claims for

payment under the Medicaid program to the State while knowing that the claim is false or

fraudulent.  See N.M.S.A. § 27-14-4.  The NMMFCA also prohibits using records to obtain false

or fraudulent Medicaid payments, conspiring to defraud the State of Medicaid payments, receiving

another's benefits, making false statements or misrepresenting material facts concerning a

healthcare facility's operations so that the facility can qualify for a Medicaid-program certification.

See N.M.S.A. § 27-14-4.  NMMFCA authorizes HSD to bring a civil action for NMMFCA

violations, and also authorizes a qui tam action by "an affected person" for a NMMFCA violation

on both their own and the State's behalf.  N.M.S.A. § 27-14-7.  If HSD elects to pursue an

NMMFCA action, "it shall have the exclusive responsibility for prosecuting the action and shall

not be bound by an act of the person bringing the action."  N.M.S.A. § 27-14-8.  If HSD elects to

pursue an action, the qui tam plaintiff remains eligible for a portion of any damages that a court

awards.  See N.M.S.A. § 27-14-9.  Like the FCA, NMMFCA contains a public-disclosure bar,

meaning that NMMFCA divests courts of jurisdiction over NMMFCA actions that are "based on

evidence or information known to the department when the action was brought," N.M.S.A. § 27-

14-10(A), or actions "based upon the public disclosure of allegations or actions in a criminal, civil

or administrative hearing or from the news media, unless the action is brought by the department

or the person bringing the action is an original source of the information," N.M.S.A. § 27-14-

10(C).   Unlike the FCA and NMFATA, NMMFCA does not contain an alternate-remedy

provision. The NMMFCA differs from the FCA in that, under the NMMFCA, the relator

> may continue the action only "[i]f the department determined that there is
> substantial evidence that a violation of the [MFCA] has occurred" and that "[i]f the
> department determines that there is not substantial evidence that a violation has
> occurred, the complaint shall be dismissed."

State ex rel. Balderas v. Bristol-Myers Squibb Co., 2019-NMCA-016 ¶ 6, 436 P.3d 724, 727[12]

(quoting N.M.S.A. § 27-14-10(C)).

## LAW REGARDING LAW-OF-THE-CASE DOCTRINE

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case.'"   Poche v.

Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished)[13](quoting Dobbs v. Anthem, 600

---

[12]The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's reasoning in State ex rel. Balderas v. Bristol-Myers Squibb Co., 2019-NMCA-016 ¶ 6, 436 P.3d 724, 727, because the Court of Appeals of New Mexico quotes directly from the NMMFCA.

[13]Poche v. Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court concludes that Wallace v. United States, 372 F. App'x 826 (10th Cir. 2010)(unpublished); Richeson v. United States, 849 F. App'x 726 (10th Cir. 2021)(unpublished); Pola v. Utah, 458 F. App'x. 760 (10th Cir. 2012)(unpublished); McNamara v. Brauchler, 570 F. App'x 741 (10th Cir. 2014)(unpublished); Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005)(unpublished); Douglas v. Norton,

F.3d 1275, 1279 (10th Cir. 2010)).  The Tenth Circuit recognizes that the doctrine "serves 'important' functions. 'Without something like it, an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again.'"  Fish v. Schwab, 957 F.3d 1105, 1139 (10th Cir. 2020)(quoting Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1240 (10th Cir. 2016)). The doctrine applies "both to rulings by district courts, see, e.g., Clark v. State Farm Mut. Auto. Ins. Co., 590 F.3d 1134, 1140 (10th Cir. 2009), and . . . by previous panels in prior appeals in the same litigation, see, e.g., United States v. Wardell, 591 F.3d 1279, 1300 (10th Cir. 2009)."  Bishop v. Smith, 760 F.3d 1070, 1082 (10th Cir. 2014).  The Tenth Circuit also has "acknowledged, however, that 'the rule [of law-of-the-case] is a flexible one that allows courts to depart from an erroneous prior ruling, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'"  Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007)(citing Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)).  The doctrine is inapplicable where "a ruling remains subject to reconsideration."  Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished)(quoting In re Unioil, Inc., 962 F.2d 988, 993 (10th Cir. 1992)).  This means that "district courts generally remain free to reconsider their earlier interlocutory orders."  Been v. O.K. Indus., Inc., 495 F.3d at 1255 (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so long as it retains jurisdiction

---

167 F. App'x 698 (10th Cir. 2006)(unpublished); Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009)(unpublished); Lymon v. Aramark Corp., 499 F. App'x 771 (10th Cir. 2012)(unpublished); Jones v. United States, 355 F. App'x 117 (10th Cir. 2009)(unpublished); and Lopez v. Delta Int'l Mach. Corp., 764 F. App'x 703 (10th Cir. 2019)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

over the case)).  Although "discretionary rather than mandatory," Sinfuego v. Curry Cnty. Board of Comm'rs, No. CIV 15-0563 JB\GF, 2018 WL 6047438, at *14 (D.N.M. 2018)(Browning, J.)(quoting Homans v. City of Albuquerque, 366 F.3d 900, 904 (10th Cir. 2004)), the Tenth Circuit has noted that, "it takes 'exceptionally narrow circumstances' for the court not to follow the law of the case when the doctrine applies."  Bishop v. Smith, 760 F.3d 1070, 1082 (10th Cir. 2014)(quoting United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)).

"Policies supporting the [law-of-the-case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law."  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988).  The Tenth Circuit has held that application of "[t]raditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court, including its transfer order."  Chrysler Credit Corp., 928 F.2d at 1516.  The Supreme Court has cautioned against courts engaging in a "perpetual game of jurisdictional ping-pong," resolving the issue by holding that "courts will rarely transfer cases over which they have clear jurisdiction, and close questions, by definition, never have clearly correct answers. Under law-of-the-case principles, if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end."  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 819 (1988)(citing Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981)).  The Tenth Circuit has maintained that transferee courts are allowed flexibility in reevaluating decisions made by transferor courts "when the governing law has been changed by the subsequent decision of a higher court, when new evidence becomes available, when a clear error has been committed or to prevent manifest injustice."  Chrysler Credit Corp., 928 F.2d at 1516 (citations omitted).

"Under [the Tenth Circuit]'s law of the case doctrine, '[a] legal decision made at one stage of litigation unchallenged in a subsequent appeal when the opportunity to do so existed, [generally]

becomes the law of the case.'"   Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1242

(10th Cir. 2016)(Gorsuch, J.)(quoting Concrete Works of Colo., Inc. v. Cty. Of Denver, 321 F.3d

950, 992 (10th Cir. 2003)).   Regarding transfer decisions, then,

> [t]he date the papers in the transferred case are docketed in the transferee court also
> forms the effective date that appellate jurisdiction in the transferor circuit is
> terminated; the transfer order becomes unreviewable as of that date. Because an
> appeal from a transfer order filed after the physical transfer of the record would be
> futile, the preferred approach is to delay physical transfer of the papers in the
> transferred case for a long enough time to allow the aggrieved party to file a
> mandamus petition.

Chrysler Credit Corp., 928 F.2d at 1517.

In Chrysler Credit Corp., claims were brought against a local Chrysler dealer in the

Western District of Oklahoma, who subsequently filed a number of counterclaims and third-party

complaints.  928 F.2d at 1513.  The Western District of Oklahoma concluded that the claims from

the various parties could be appropriately bifurcated under Fed. R. Civ. P. 42(b), and granted

summary judgment against the defendants on the original claim while transferring the remaining

counterclaims and third-party claims to the Eastern District of Michigan.  See Chrysler Credit

Corp., 928 F.2d at 1513.  The Eastern District of Michigan granted summary judgment against the

defendants on a number of claims and dismissed the remaining claims, in which the plaintiff asked

the court to certify the money judgment from the Western District of Oklahoma.  See Chrysler

Credit Corp., 928 F.2d at 1514.  The Eastern District of Michigan declined to certify the Oklahoma

judgment and upon appeal contended that "jurisdiction over the Oklahoma judgment remained in

Oklahoma," a conclusion with which the United States Court of Appeals for the Sixth Circuit

agreed.  Chrysler Credit Corp., 928 F.2d at 1514.

The Tenth Circuit determined that the Western District of Oklahoma had not severed the

claims correctly under rule 21 of the Federal Rules of Civil Procedure, and thus, the transfer of the

case to the Eastern District of Michigan transferred all the claims, including the claim which the Oklahoma court had decided in favor of the plaintiffs.  See Chrysler Credit Corp., 928 F.2d at 1519-20.  The transfer from Oklahoma to the Eastern District of Michigan, therefore, made the Oklahoma judgment the law of the case, from which the Sixth Circuit allowed "sufficiently flexible [discretion] to permit departure from rulings in the transferor circuit where clearly warranted." Chrysler Credit Corp., 928 F.2d at 1520 (citing Skil Corp. v. Millers Falls Co., 541 F.2d 554, 558 (6th Cir. 1976)).  The Tenth Circuit ruled that, upon docketing the case in the Eastern District of Michigan, the Western District of Oklahoma lost jurisdiction over all claims and was unable to certify the judgment at a later date.  See Chrysler Credit Corp., 928 F.2d at 1520-21.  From that point onward, the Tenth Circuit concluded, the Sixth Circuit retained "appellate review of [the Eastern District of Michigan's] application of the law of the case doctrine governed by the limited standard of clear error and manifest injustice."  Chrysler Credit Corp., 928 F.2d at 1518.

## LAW REGARDING RULE 8 AND NOTICE PLEADING

Rule 8(a) states:

(a)     Claim for Relief. A pleading that states a claim for relief must contain:

(1)     a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2)     a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3)     a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

The Tenth Circuit clarified recently that a plaintiff "does not need to provide exact details to" comply with Rule 8(a).  Richeson v. United States, 849 F. App'x 726, 728 (10th Cir.

2021)(unpublished).  "He needs only to provide allegations which are clear enough so that the opposing party and the court can discern a factual and legal basis for his claims."  Richeson v. United States, 849 F. App'x at 728.  In Richeson v. United States, the Tenth Circuit determined that the United States District Court for the District of Colorado dismissed properly a complaint containing "84 pages of attachments," which "provide a few pieces of the puzzle as to what has happened" and "demonstrate only a general allegation of wrongdoing."  849 F. App'x at 728.  The Tenth Circuit also repeatedly has rejected "shotgun" complaints that bring every conceivable claim against multiple defendants.  Glenn v. First Nat. Bank in Grand Junction, 868 F.2d 368, 371 (10th Cir. 1989)("The law recognizes a significant difference between notice pleading and 'shotgun' pleading.");  Pola v. Utah, 458 F. App'x. 760, 762 (10th Cir. 2012)(unpublished)(affirming the dismissal of a complaint that was "incoherent, rambling, and include[s] everything but the kitchen sink");  McNamara v. Brauchler, 570 F. App'x 741, 743 (10th Cir. 2014)(unpublished)(allowing shotgun pleadings to survive screening "would force the Defendants to carefully comb through [the documents] to ascertain which . . . pertinent allegations to which a response is warranted").

## LAW REGARDING RULE 9(b)'S HEIGHTENED PLEADING REQUIREMENT

Normally, a plaintiff need plead only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Fraud claims, however, must meet more stringent standards.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  See Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d 1200, 1207 (D.N.M. 2011)(Browning, J.).

With respect to rule 9(b)'s scope, a court should require parties to plead a cause of action with particularity when that cause of action contains allegations grounded in fraud.  See 2 James

Wm. Moore, Jeffrey A. Parness, & Jerry Smith, Moore's Federal Practice § 9.03(1)(d), at 9-20 (3d ed. 2008).  On the other hand, claims based on negligent or innocent misrepresentation, to the extent those claims do not require proof of fraud, may be pled in accordance with the more relaxed standards of rule 8(a).  See Moore, supra § 9.03(1)(d), at 9-21; Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003)("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").

The primary motives that animate rule 9(b) help reveal the reason for limiting the rule's reach to claims grounded in fraud.  First, the requirement of pleading with particularity protects defendants' reputations from the harm attendant to accusations of fraud or dishonest conduct.  See Guidry v. Banks of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992)("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to defendant's reputations."); United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d 908, 921 (4th Cir. 2003)("Rule 9(b) protects defendants from harm to their goodwill and reputation.")(citations omitted)(internal quotation marks omitted).  Second, the requirement to plead with particularity puts defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense.  See United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d at 921.  A related goal of 9(b) is to prevent plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes."  Banker's Trust Co., v. Old Republic Insurance Co., 959 F.2d 677, 683 (7th Cir. 1992).

The Tenth Circuit has fleshed out the components necessary to a successful rule 9(b) pleading.  In Sheldon v. Vermonty, 246 F.3d 682, 2000 WL 1774038 (10th Cir. Dec. 4, 2000)(table decision), the Tenth Circuit held that the plaintiff alleged with specific particularity a violation of

the Securities Exchange Act of 1934, 15 U.S.C. § 78a-pp.  See 2000 WL 1774038 at *4.  The

Tenth Circuit concluded that the complaint

> adequately met Rule 9(b) requirements.  First, as the district court acknowledged, the Complaint alleged misrepresentations with background information as to date, speaker, and the medium of communication. . . .  Second, certain of the alleged misrepresentations involved profitable expectations arising from an unowned and inoperable meat-packing plant, a nonexistent lumber company, and fabricated contracts.  Accepting Sheldon's allegations as true, these are patently false statements of present fact.  The district court erred in determining they were mere conclusory allegations of falsity and in characterizing them as fraud by hindsight. . . .  Third, the allegations of scienter were sufficient.  In securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support a strong inference of fraudulent intent.

2000 WL 1774038, at *5 (citations omitted)(internal quotation marks omitted).  At a minimum,

rule 9(b) requires that a plaintiff set forth the "who, what, when, where and how of the alleged

claims."  United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1172 (10th

Cir. 2010).  "To survive a motion to dismiss, an allegation of fraud must 'set forth the time, place,

and contents of the false representation, the identity of the party making the false statements and

the consequences thereof.'"  Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d 1039, 1047 (D.N.M.

2005)(Browning, J.)(quoting Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th

Cir. 1997)).  In determining whether a plaintiff satisfies rule 9(b), however, courts may "consider

whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in

the defendant's exclusive control."  George v. Urban Settlement Servs., 833 F.3d 1242, 1255 (10th

Cir. 2016).  "On the other hand, rule 9(b) does not require specific knowledge regarding the

defendant's state of mind."  Midgley v. Rayrock Mines, Inc., 374 F. Supp. 2d at 1047.  See Two

Old Hippies, LLC v. Catch the Bus, LLC, 784 F. Supp. 2d at 1207.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "'At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318

JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'"  Nowell v. Medtronic Inc., 372 F. Supp. 3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted).  The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'"

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x

698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions.  First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense – the courts handle these cases differently than other motions to dismiss.  See Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d at 1247.  Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the face of the complaint.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion

may be disposed of under this rule.").  The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish.  See Wright & Miller supra at § 1277.  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage – by refraining from pleading specific or identifiable dates.  See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.).

## RELEVANT LAW REGARDING RULE 54(B)

As rule 54(b) of the Federal Rules of Civil Procedure states, a court's order or decision

that adjudicates that adjudicates fewer than all the claims or the rights and liabilities
of fewer than all the parties does not end the action as to any of the claims or parties

and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of a judgment." Fed. R. Civ. P. 54(b). The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007). In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether. See Rivero v. Bd. of Regents of Univ. of N.M., No. 16-0318 JB\SCY, 2019 WL 1085179, at *58-62 (D.N.M. Mar. 7, 2019)(Browning, J.). Nevertheless, despite this general rule, the Court may order entry of judgment on a particular claim or claims if it "expressly determines that there is not just reason for delay." Fed. R. Civ. P. 54(b). A party can appeal the district court's order or decision if the court enters a rule 54(b) certification order, determining that its judgment is final and that no just reason for delay of its entry of judgment exists. See Stockman's Water Co., LLC v. Vaca Partners, L.P., 425 F.3d 1263, 1264 (10th Cir. 2005).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[14] Once the movant meets

---

[14]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent

this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. 184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F.

---

both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv] (3d ed. 2018).

       The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may

not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record

as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Fourth, the court cannot decide any credibility issues. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified-immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the United States Supreme Court concluded that summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir.

2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(unpublished),] explained that the blatant contradictions of the

record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp.,

728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir.

2012)(unpublished).

Parties may allege new claims in motions for summary judgment.   See Evans v.

McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991).  When a party raises a new claim in

a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

(i)     a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e);

(ii)     a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and

(iii)     a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See Price v. Philpot, 420 F.3d 1158, 1167 (10th Cir 2005); Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

1.      <u>**Motions for Reconsideration Under Rules 59(e) and 60(b).**</u>

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.   See <u>Price v. Philpot</u>, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b).   See <u>Price v. Philpot</u>, 420 F.3d at 1167 n.9.  "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved."   <u>Jones v. United States</u>, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." <u>Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.</u>, 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  <u>Phelps v. Hamilton</u>, 122 F.3d 1309, 1323-24 (10th Cir.  1997)(quoting <u>Martinez v. Sullivan</u>, 874 F.2d 751, 753 (10th Cir. 1989)).   In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and  be  subject  to  rule 59's constraints. See <u>Phelps v. Hamilton</u>, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)     mistake, inadvertence, surprise, or excusable neglect;
>
> (2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)     fraud (whether previously called intrinsic or extrinsic),

misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).   Neither a rule 59 nor a rule 60 motion for reconsideration

are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion . . . . Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.   Accord Nelson v. City of Albuquerque, 921 F.3d 925, 929 (10th Cir. 2019).   "[A]  motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."   Servants of the Paraclete v. Does, 204 F.3d at 1012.   A district court has considerable discretion in ruling on a motion to reconsider.   See Phelps v. Hamilton, 122 F.3d at 1324.

A court cannot enlarge the time for filing a rule 59(e) motion.   See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e). . . ."). "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."   James Moore et. al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted).   Nevertheless, a court will not generally treat an untimely rule 59(e)

- 71 -

motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e).'"   Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005)(quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.   See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority").   Mistakes in this context entail either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.   See Yapp v. Excel Corp., 186 F.3d at 1231.   If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.   See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake about which the movant complains is the result of an attorney's deliberate tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co.,

370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).   The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."   12 Moore's Federal Practice § 60.48[2], at 60-182, (3d ed. 1999). Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863-64 (quoting Klapprott v. United States, 335 U.S. 601, 614-15 (1949)), "while also cautioning that it should only be applied in 'extraordinary circumstances,'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 864 (quoting Ackermann v. United States, 340 U.S. 193, 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief.  See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for

negligence and inexcusable negligence.     Subsection 6 of Rule 60(b) has no application to the

situation of petitioner.").   Legal error that provides a basis for relief under rule 60(b)(6) must be

extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying
> relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720,
> 722 (10th Cir. 1975)(en banc)].  In that case, this court granted relief under 60(b)(6)
> when there had been a post-judgment change in the law "arising out of the same
> accident as that in which the plaintiffs . . . were injured."  Pierce v. Cook & Co., 518
> F.2d at 723. However, when the post-judgment change in the law did not arise in a
> related case, we have held that "[a] change in the law or in the judicial view of an
> established rule of law" does not justify relief under Rule 60(b)(6).  Collins v. City
> of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

## 2.   Motions to Reconsider Interlocutory Orders.

Considerable confusion exists regarding the proper standard for a district court to apply

when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an

order that a district court issues while the case is ongoing, as distinguished from a final judgment.

This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention

motions to reconsider, let alone set forth a specific procedure for filing them or a standard for

analyzing them.   A loose conflation in terminology in Servants of the Paraclete v. Does, which

refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as "motions to

reconsider,"[15] compounds that baseline confusion.   Fed. R. Civ. P. 59(e)(emphasis added),

---

[15]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the United States Court
of Appeals for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule
59(e) motions as "motions to reconsider" several times throughout the opinion.  See, e.g., 204 F.3d
at 1005. He uses the term "motion to reconsider" as an umbrella term that can encompass three
distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs,
save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P.
54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of
judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to
reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule
60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a

Servants of the Paraclete v. Does, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a)("'Judgment' as used in these rules includes a decree and any order from which an appeal lies.")(emphasis added).   In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts"), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.   First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).   Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).   Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's jurisdiction, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  See Fed. R. App. P. 4(a)(4)(B).   Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.  See Fed. R. App. P. 4(a)(4)(B).

Final judgments implicate two important concerns militating against giving district courts

year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

free reign to reconsider their judgments. When a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight-day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, and not the final judgment.  Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)).  Because the final judgment starts

the parties' thirty-day clock for filing a timely notice of appeal, however, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment.   See Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction-phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.   In defining the "limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, 204 F.3d 1005, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).   See United States  v. Alvarez, 142  F.3d 1243,  1247 (10th Cir. 1998)(departing from the  law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those three grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a

- 77 -

district court reconsiders one of its own interlocutory orders.  The Federal Rules do not mention

specifically motions to reconsider interlocutory orders, but rule 54(b) makes the following open-

ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim,
> counterclaim, crossclaim, or third-party claim -- or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but fewer
> than all, claims or parties only if the court expressly determines that there is no just
> reason for delay.  Otherwise, any order or other decision, however designated, that
> adjudicates fewer than all the claims or the rights and liabilities of fewer than all
> the parties does not end the action as to any of the claims or parties and may be
> revised at any time before the entry of a judgment adjudicating all the claims and
> all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  Rule 54(b) thus (i) provides that a district court can freely reconsider its

prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so,

other than that it must do so "before the entry of judgment."  Fed. R. Civ. P.  54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b)

provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders."

Been v. O.K. Indus., 495 F.3d at 1225.   In the Tenth Circuit, "law of the case doctrine has no

bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one

judge to another."   Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(citing Been

v. O.K. Indus., Inc., 495 F.3d at 1225).   In this context, "the doctrine is merely a 'presumption, one

whose strength varies with the circumstances.'"   Been v. O.K. Indus., Inc., 495 F.3d at 1225

(quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)(Posner, J.)).   In

short, a district court can select the standard of review for a motion to reconsider an interlocutory

order.  It can: (i) review the earlier ruling de novo and essentially reanalyze the earlier motion from

scratch; (ii) review the ruling de novo but limit its review; (iii) require parties to establish one of

the law-of-the-case grounds; or (iv) refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(quoting Avitia v. Metro. Club of Chicago, Inc., 49 F.3d at 1227).  First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How thoroughly the Court addressed a point depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[16] than when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion

---

[16]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "Amended or Additional Findings. On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its twenty-eight-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.  Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling that it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance that the opposing party has placed in the court's prior ruling.  See Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 4478.1, at 695-96 (2d ed. 2002)("Stability becomes increasingly important as the proceeding nears final  disposition.  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses;  and several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time. Third, the Court should consider the Servants of the Paraclete v. Does grounds.  See  Servants of the Paraclete v. Does, 204 F.3d at 1012.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the court erred.

These three factors should influence the degree to which the Court restricts its review of a

prior ruling, but they do not mean necessarily that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived the right to appeal the alleged error by not raising the appropriate argument.  See Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d 1115, 1142 (D.N.M. 2018)(Browning, J.), aff'd sub nom, Lopez v. Stanley Black & Decker, Inc., 764 F. App'x 703 (10th Cir. 2019)(unpublished).  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produced the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the

court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time that the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the court to his or her way of thinking.

## LAW REGARDING STATUTORY CONSTRUCTION

When interpreting statutes, the Court must start with the plain language.  See, e.g., Been v.

O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory construction de novo, interpret[ing] the words of the statute in light of the purposes Congress sought to serve.")(internal quotations and citations omitted).  "It is well established that when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms."  Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(internal quotations omitted).  See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "would lead to absurd results . . . or would thwart the obvious purpose of the statute")(internal quotations omitted). "Courts indulge a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it."  United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(internal quotations omitted).  See Public Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)(Seymour, C.J.)("In examining . . . [statutory] language, we assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress' [ ] legislative purpose.").

## ANALYSIS

First, the Court will consider the Surreply.  Second, the parties do not provide the Court sound reason to revisit Judge Parker's conclusion that Dr. Kuriyan plausibly pleads a claim upon which relief can be granted.  The dispute between Dr. Kuriyan, the United States, New Mexico, and the Defendant MCOs is about whether Dr. Kuriyan's disclosure triggered HSD's recoupment of funds from the Defendant MCOs, or whether HSD would have recouped the same funds in the same manner had Dr. Kuriyan never contacted HSD.  The parties attempt to frame this factual

dispute as a legal dispute about whether Dr. Kuriyan is entitled to an alternate-remedy award under the FCA's terms.  See Motion at 1-3.  Dr. Kuriyan would have the Court believe that pleading plausibly a claim upon which relief can be granted means that he is entitled to an alternate-remedy award under the FCA.  See United States ex rel. Babalola v. Sharma, 746 F.3d 157, 159-63 (5th Cir. 2014)(suggesting that an alternate-remedy award is appropriate only upon a factual determination, like in a summary judgment motion); United States ex rel. Hefner v. Hackensack Univ. Medical Ctr., 495 F.3d 103, 108 (3d Cir. 2007)(same); United States ex rel. Baker v. McGrade, No. 14-cv-467, 2016 WL 8200943, at *1-2 (E.D. Va. February 1, 2016)(O'Grady, J.)(same); United States ex rel. Baker v. McGrade, 14-cv-467, 2016 WL8200944, at *1-2 (E.D. Va. March 23, 2016)(O'Grady, J.)(same).  Neither the FCA, the NMFATA, other courts' interpretations of those statutes, or the Federal Rules of Civil Procedure, support this conclusion. Third, therefore, Dr. Kuriyan is not entitled to an alternate-remedy award without resolving the factual question whether HSD's recoupment is the type that the FCA recognizes.  Because concluding whether HSD's recoupment was pursuant to its contract with the Defendant MCOs or was the result of Dr. Kuriyan's disclosure would mean treating Judge Parker's conclusion that Dr. Kuriyan survives a rule 12(b)(6) motion as a conclusion that Dr. Kuriyan is entitled to summary judgment, the Court will deny the Motion.  See Fed. R. Civ. P. 12(b)(6); Fed. R. Civ. P. 56(a).

## I.    **THE COURT WILL CONSIDER THE SURREPLY**.

D.N.M. LR.-Civ. 7.4(b) states: "The filing of a surreply requires leave of the Court." D.N.M. LR-Civ. 7.4(b).  A court need not, therefore, consider a surreply.  A court should consider, however, a surreply when "new arguments are raised in a reply brief."  Walker v. THI of N.M. at Hobbs Center, 2011 WL 2728344, at *1.

The United States and New Mexico argue that the Court should consider its Surreply, because Dr. Kuriyan's Reply makes a law-of-the-case argument that he did not raise in his original Motion.  See Surreply Motion at 1.  In response, Dr. Kuriyan contends that the United States and New Mexico's Surreply Motion is "unnecessary and a mere ceaseless endeavor as the Government gave more than hints of its position in its motion."  Surreply Response at 1.  Dr. Kuriyan states that the United States and New Mexico do not need an opportunity to respond to his law-of-the-case argument, because their Surreply offers "an exception warranting departure from the law of the case doctrine."  Surreply Response at 2.  Dr. Kuriyan also argues that, with respect to the United States and New Mexico's argument that it should be able to respond to Dr. Kuriyan citing new authority in his Reply, the United States and New Mexico "should not get another endless opportunity to prolong alternate remedy proceedings since it has already violated the purpose of the [FCA] to make accommodations to whistleblowers that report fraud and provide taxpayers with relief."  Surreply Response at 2.  The United States and New Mexico assert that Dr. Kuriyan's first argument is "silly" and that his second is "factually incorrect."  Surreply Reply at 1.

Dr. Kuriyan's arguments against the Court considering the United States and New Mexico's Surreply are unavailing.  In his Government Reply, Dr. Kuriyan argues that the law-of-the-case doctrine bars the United States and New Mexico's arguments about the public-disclosure bar, whether Dr. Kuriyan is an original source, and about rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure.  See Reply at 2-5.  Specifically, Dr. Kuriyan alleges that "[p]ublic disclosure and original source [issues], too, were previously decided by" Judge Parker.  Reply at 3.  Dr. Kuriyan raises this argument in respect specifically to the United States and New Mexico's allegation that Dr. Kuriyan has not pled adequately a valid qui tam action.  See Reply at 5-6 ("Here, the Government improperly asks this Court to revisit the law of the case.").  Dr.

Kuriyan does not make a law-of-the-case argument in his original Motion. Because, therefore, Dr. Kuriyan raises a new argument in his Reply, and because the Court prefers to give parties a full opportunity to be heard if the rules allow it, the Court will consider the arguments in the Surreply. See Walker v. THI of N.M. at Hobbs Center, 2011 WL 2728344, at *1. The Court also gives all parties a full opportunity to make any and all arguments at hearings that it holds, so there is no reason to restrict additional written arguments; restricting the Surreply would elevate form of argument over substance. The Court, therefore, will consider the United States and New Mexico's arguments that the law-of-the-case doctrine does not apply, and that the cases on which Dr. Kuriyan relies do not support his contention that he is entitled to an alternate-remedy award. See Surreply at 1-4.

## II.     THE COURT DOES NOT HAVE TO REVIST JUDGE PARKER'S CONCLUSION THAT DR. KURIYAN STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Judge Parker concluded that Dr. Kuriyan pled plausibly a claim upon which relief can be granted. See 3rd MTD Order at 3, 2021 WL 5238332, at *2. Judge Parker denied, therefore, the 3rd MTD and the NMMTD, because Dr. Kuriyan plausibly alleges that the Defendant MCOs violated the FCA and the NMFATA, plausibly alleges that he is an original source, and plausibly alleges that he relied on non-public data. See 3rd MTD Order at 3, 2021 WL 5238332, at *2. As Judge Parker noted, at the motion-to-dismiss stage, "the standard for evaluating a complaint is plausibility," and Dr. Kuriyan's "allegations meet that standard." 3rd MTD Order at 4, 2021 WL 5238332, at *2. Although the law-of-the case doctrine does not bar the Court from reconsidering Judge Parker's conclusion, the parties do not provide sufficient justification for the Court to reexamine Judge Parker's work. Moreover, the Court agrees with Judge Parker and sees no sound reason to deviate from or disagree with his analysis.

The law-of-the-case doctrine "has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."[17]  Rimbert v. Eli Lilly & Co., 647

_____

[17]Despite the clarity with which the Tenth Circuit speaks in Rimbert v. Eli Lilly & Co., 647 F.3d at 1252, the Tenth Circuit elsewhere has muddied the waters.  Although the Tenth Circuit states that the law-of-the-case doctrine does "not bar a district court from acting unless an appellate decision has issued on the merits of the claim sought to be precluded," Kennedy v. Lubar, 273 F.3d 1293, 1299 (10th Cir. 2001), it concluded later that the law-of-the-case doctrine "preclud[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court," Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1241 (10th Cir. 2016)(citing Dobbs v. Anthem Blue Cross and Blue Shield, 600 F.3d 1275, 1281 (10th Cir. 2010)).  In Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d at 1140, the Honorable Neil Gorsuch, then-United States Circuit Judge for the Tenth Circuit, states that the law-of-the-case doctrine means that an adverse judicial decision does not become "little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again." 840 F.3d at 1140.  Then-Judge Gorsuch states that the law-of-the-case doctrine "permits a court to decline the invitation to reconsider issues already resolved earlier in the life of a litigation," adding "[i]t's a pretty important thing, too."  Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d at 1240.

This interpretation of the law-of-the-case doctrine runs headlong into rule 54(b), which permits a district court to revisit its earlier rulings, using any standard it sees fit, see Been v. O.K. Indus., Inc., 495 F.3d at 1225, until "entry of judgment," Fed. R. Civ. P. 54(b).  Elsewhere, the Tenth Circuit suggests, moreover, that the law-of-the-case doctrine applies only when an appellate court resolves an issue and remands the case.  See McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1034 (10th Cir. 2000).  Adding another layer of complexity if then-Judge Gorsuch's words are to be taken literally, the Tenth Circuit states that it recognizes only three "'exceptionally narrow' circumstances" where the law-of-the-case doctrine does not apply: (i) "when the evidence in a subsequent trial is substantially different"; (ii) "when controlling authority has subsequently made a contrary decision of the law applicable to such issues"; and (iii) "when the decision was clearly erroneous and would work a manifest injustice."  Dobbs v. Anthem Blue Cross and Blue Shield, 600 F.3d 1275, 1281 (10th Cir. 2010)(quoting McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)).  Finally, the Tenth Circuit states that the "decision whether to apply the law of the case doctrine remains a matter of judicial discretion."  Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d at 1242.

The Tenth Circuit's law-of-the-case jurisprudence is not clear.  There is tension between stating that the law-of-the-case doctrine: (i) does not bar a district court from reconsidering its earlier interlocutory orders; (ii) precludes relitigating issues resolved in the same court; (iii) applies only to appellate-court issue resolution; (iv) has only three exceptionally narrow exceptions; but (v) is wholly discretionary.  Moreover, there is little purpose to the law-of-the-case doctrine if it either contradicts or merely restates rule 54(b).  The judge-made law-of-the-case doctrine cannot displace rule 54(b), so the Tenth Circuit's statement that the law-of-the-case doctrine precludes "the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court" is on thin ground.  Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d at 1241.  The Court concludes that, in accordance with rule 54(b), it is free to reconsider its earlier interlocutory orders by any standard it chooses, but that the Court can, and usually should, under the Tenth Circuit's

F.3d at 1252 (citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).  The law-of-the-case doctrine is

"merely a 'presumption, one whose strength varies with the circumstances.'"  <u>Been v. O.K. Indus.,</u>

<u>Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir.

1995)).  The Court analyzes motions to reconsider depending on three factors: (i) the prior ruling's

thoroughness; (ii) the case's overall progress and posture, the motion's timeliness, and evidence

that the parties present; and (iii) the <u>Servants of the Paraclete v. Does</u>, 204 F.3d 1005 (10th Cir.

2000), grounds.  <u>See</u> <u>Chandhok v. Companion Life Ins. Co.</u>, -- F. Supp. 3d --, 2021 WL 3635204,

at *17 (D.N.M. 2021)(Browning, J.); Fed. R. Civ. P. 54(b).

In opposing Dr. Kuriyan's Motion, the United States and New Mexico maintain that Dr.

Kuriyan is not entitled to an alternate-remedy award, because he has not pled a "valid" qui tam

action, and because "looking beyond the pleadings" reveals that the public-disclosure bar

precludes Dr. Kuriyan's action.  Government Response at 19.  The United States and New Mexico

also maintain that Dr. Kuriyan has not pled a valid qui tam action, because Dr. Kuriyan does not

show that he was an original source under the FCA.  <u>See</u> Government Response at 19-25.

Moreover, the United States and New Mexico ask the Court to determine, "as an evidentiary

matter," whether the public-disclosure bar precludes Dr. Kuriyan's action.  Surreply at 2.  At the

---

law-of-the-case jurisprudence, decline to reconsider interlocutory orders as much as possible.  <u>See</u>
<u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1255; <u>Chandhok v. Companion Life Ins. Co.</u>, -- F. Supp. 3d
--, 2021 WL 3635204, at *17 (D.N.M. 2021)(Browning, J.); Fed. R. Civ. P. 54(b).  The Court has
also written that it should be reluctant to reconsider its interlocutory orders when: (i) the
interlocutory order addressed thoroughly the points the parties now ask the Court to reconsider;
(ii) the Court's reconsideration would not be timely, or the parties reasonably rely on the original
order; and (iii) the <u>Servants of the Paraclete v. Does</u>, 204 F.3d 1005 (10th Cir. 2000), grounds
counsel against reconsideration.  <u>See</u> <u>Chandhok v. Companion Life Ins. Co.</u>, 2021 WL 3635204,
at *17.

hearing, Blue Cross argued that the Court should not consider whether Dr. Kuriyan plausibly pleads a valid qui tam action without "tak[ing] those issues to a jury trial and/or receive appropriate due process."  Tr. at 59:6-7 (Hamilton).

The law-of-the-case doctrine does not bar the Court from reconsidering Judge Parker's conclusion that Dr. Kuriyan pleads plausibly a claim upon which relief can be granted, but the Court does not have to revisit Judge Parker's conclusion.  See Fed. R. Civ. P. 54(b); Been v. O.K. Indus., Inc., 495 F.3d at 1255.  The United States and New Mexico note correctly that the Court may revisit its earlier orders "at any time" "before the entry of judgment," Fed. R. Civ. P. 54, and that district courts "generally remain free to reconsider their earlier interlocutory orders," Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007), even if, as here, a case is reassigned to another judge in the same district, see Rimbert v. Eli Lilly and Co., 647 F.3d 1247, 1251 (10th Cir. 2011). See Surreply at 1-4.  Although the Court remains free to revisit Judge Parker's conclusion, neither the United States and New Mexico, nor the Defendant MCOs, provide a good reason for the Court to alter Judge Parker's conclusion.  The parties have provided no indication that Judge Parker's rule 12 analysis is insufficiently thorough, that there is new evidence which calls Judge Parker's conclusion into doubt, that there is new controlling authority that would change Judge Parker's conclusion, or that Judge Parker's conclusion that Dr. Kuriyan pleads plausibly a claim upon which relief can be granted is clearly erroneous.  See Chandhok v. Companion Life Ins. Co., 2021 WL 3635204, at *17.  Rather, the United States and New Mexico contend the law-of-the-case doctrine does not apply, because Judge Parker "did not consider" whether Dr. Kuriyan "satisfied his evidentiary burden of proof that he actually qualifies for the original source exception."  Surreply at 3.  Instead, the United States and New Mexico assert that it is "undisputed" that Dr. Kuriyan

"cannot show that he had knowledge that is independent or materially adds to the publicly disclosed information." Surreply at 4.

The United States and New Mexico's law-of-the-case doctrine arguments lack a sound basis in the relevant law and the applicable facts. Although the United States and New Mexico purportedly direct their arguments at providing reason to doubt that Dr. Kuriyan survives a motion to dismiss, they misunderstand Judge Parker's conclusion. The United States and New Mexico state correctly that neither the Court nor Judge Parker has determined "as an evidentiary matter whether Relator's action is barred by the public disclosure bar," but then argue that the Court should reach that conclusion by revisiting Judge Parker's conclusion that Dr. Kuriyan survives a motion to dismiss. Surreply at 2. The United States and New Mexico's arguments would be more appropriate at the summary-judgment stage, and do not provide a reason to revisit Judge Parker's work in his 3rd MTD Order, 2021 WL 5238332, at *3.

Part of the United States and New Mexico's confusion, however, appears to arise from Dr. Kuriyan's characterization of Judge Parker's conclusion. The United States and New Mexico argue that Dr. Kuriyan asks the Court to "accept his allegations as true for ruling on the original source issue and, indeed, on all matters related to his claim for an alternate remedy." Surreply at 3. Similarly, Blue Cross states correctly that Dr. Kuriyan, in his Motion, "argues that he need only allege a valid *qui tam* in order to be entitled to the award he seeks under Section 3730(c)(5) and its state equivalent." Blue Cross Response at 5 (emphasis in original). In his Motion, Dr. Kuriyan contends that he is entitled to an alternate-remedy award, because he survives a motion to dismiss. See Motion at 13. Dr. Kuriyan states that his Motion is "ripe for disposition," because he has "pleaded a valid qui tam." Motion at 13. Moreover, at the hearing, Dr. Kuriyan argued that, once a court determines that a relator has pled a valid qui tam, "we're off to the races," and the alternate-

- 90 -

remedy statute applies, Tr. at 78:13 (Androphy), and that the statute is "very clear," and states that, once a relator pleads a valid qui tam action, that they are entitled to a share of any alternate remedy the government pursues, Tr. at 78:15-16 (Androphy).  Dr. Kuriyan relies on the Fourth Circuit's opinion in <u>United States ex rel. LaCorte v. Wagner</u>, 184 F.3d at 192, asserting that the Fourth Circuit's conclusion that § 3730(c)(5) "assumes that the original qui tam action did not continue," 184 F.3d at 192, means that a relator's qui tam action "need not proceed to its conclusion when there is already an alternate remedy," Motion at 13.

Dr. Kuriyan's argument has a fatal flaw.  While Dr. Kuriyan correctly states that § 3730(c)(5) assumes that the qui tam action continues, <u>see</u> 31 U.S.C. § 3730(c)(5); <u>United States ex rel. LaCorte v. Wagner</u>, 184 F.3d at 192, there is no indication either in the FCA's text or, as far as parties have indicated or the Court can locate on its own, in any court's FCA interpretation that the phrase "if the action had continued" means that a relator can recover an alternate-remedy award even if there is no alternate remedy, 31 U.S.C. § 3730(c)(5).  Dr. Kuriyan argues that his qui tam action "need not proceed to its conclusion when there is an alternate remedy."  Motion at 13.

Here, the Court does not know if HSD's recoupment is an alternate remedy.  Dr. Kuriyan mistakenly treats Judge Parker's conclusion that he plausibly pleads a claim upon which relief can be granted as a factual determination that HSD relied on his disclosure and would not have recouped funds from the Defendants MCOs had Dr. Kuriyan not come forward.  Judge Parker concluded that Dr. Kuriyan satisfies rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. <u>See</u> 3rd MTD Order at 4, 2021 WL 5238332, at *2; Fed. R. Civ. P. 8(a), 9(b).  At the motion-to-dismiss stage, the Court "does not weigh the evidence, and 'is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" <u>Rivero</u>

v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *47 (quoting Begay v. Pub.

Serv. Co. of N.M., 710 F. Supp. 2d at 1199). Dr. Kuriyan would have the Court conclude that

Judge Parker weighed the evidence and determined that HSD's recoupment is an alternate remedy

under the FCA. Dr. Kuriyan's argument, therefore, fails to account for both the FCA's plain terms

and the meaning of rule 12(b)(6) of the Federal Rules of Civil Procedure. For the same reasons,

the Court will not, as the United States and New Mexico request, transform Judge Parker's

conclusion into a determination that the public-disclosure bar precludes Dr. Kuriyan's action. See

Surreply at 2. The parties' arguments do not, therefore, provide sound reason either to transform

or to revisit Judge Parker's conclusion. On the one hand, the United States and New Mexico ask

the Court to weigh more evidence than rule 12 permits, and conclude that Judge Parker was

mistaken. See Fed. R. Civ. P. 12; Mobley v. McCormick, 40 F.3d at 340 ("The nature of a Rule

12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint

after taking those allegations as true."). On the other hand, Dr. Kuriyan asks the Court to conclude

that Judge Parker already weighed that evidence and determined that the FCA's recoupment was

an alternate remedy under the FCA. See MCO Reply at 1-6. In other words, in different ways,

the parties ask the Court to disregard Judge Parker's conclusion, but do not provide reasons to

doubt that Judge Parker mistakenly concluded that Dr. Kuriyan plausibly pleads a claim for which

relief can be granted.

Nevertheless, while the Court is on solid ground to decline to reconsider Judge Parker's

analysis, the Court has reviewed his work and the Court agrees with Judge Parker that Dr. Kuriyan

plausibly pleads a claim upon which relief can be granted. First, Judge Parker concludes that Dr.

Kuriyan "has alleged facts that support a reasonable inference that when Defendants submitted

their 2014 data at or around June 2015, Defendants knew or had reason to know that the State had

overpaid them under the Contract."  2nd MTD MOO at 17, 2020 WL 8079811, at *9.  According

to Judge Parker, Dr. Kuriyan "pled a plausible claim that Defendants violated the FCA, the

NMFATA, and the N[M]MFCA," but did not supply sufficient allegations to overcome the public-

disclosure bar.  2nd MTD MOO at 20, 2020 WL 8079811, at *11.  After. Dr. Kuriyan amended

his Complaint to include additional allegations, Judge Parker concluded that Dr. Kuriyan plausibly

pled sufficient facts to overcome the public disclosure bar:

> According to Plaintiff's uncontroverted alleged facts, when he used his
> Patented Dynamic Model (PDM) to analyze raw non-public data provided by the
> State, Plaintiff discovered anomalies which showed a significant increase between
> 2013 and 2014 in the number of patients with chronic medical conditions.  Because
> Defendants received capitated monthly payments based on forecasted costs of care,
> Plaintiff alleged that the unusual number of patients with chronic conditions
> suggested that Defendants knowingly received and/or concealed and kept higher
> premium payments to which they were not entitled.  Plaintiff further alleged that
> his information regarding scienter is not contained in any public disclosures.
> "[K]nowledge of scienter that is not specifically contained in a qualifying public
> disclosure" may have the effect of "'expanding the scope of the fraud.'"  See United
> States ex rel. Reed v. KeyPoint Gov't Sol., 923 F.3d 729, 756, 761 (10th Cir.
> 2019)(quoting Joel D. Hesch, Restating the "Original Source Exception" to the
> False Claims Act's "Public Disclosure Bar" in Light of the 2010 Amendments, 51
> U. OF RICH L. REV. 991, 1023, 1027 (2017)).  Defendants' counter argument --
> that scienter based on chronic condition anomalies could have been inferred from
> public disclosures of payments to Defendants -- is unsupported.

3rd MTD Order at 4, 2021 WL 5238332, at *2.  The Court has tried to review Dr. Kuriyan's

allegations as thoroughly as Judge Parker, and the Court sees no sound reason to doubt the

accuracy of Judge Parker's reasoning.  Dr. Kuriyan plausibly pleads a claim upon which relief can

be granted.

## III.   DR. KURIYAN IS NOT ENTITLED TO AN ALTERNATE-REMEDY AWARD WITHOUT RESOLVING THE FACTUAL QUESTION WHETHER HSD'S RECOUPMENT IS AN ALTERNATE REMEDY THAT THE FCA RECOGNIZES.

The crux of the parties' dispute is a factual question: whether HSD's recoupment is an

"alternate remedy."  31 U.S.C. § 3730(c)(5).  If the recoupment is an alternate remedy, then Dr.

Kuriyan is entitled to a share of what HSD recovered from the Defendant MCOs. If the recoupment is not an alternate remedy, then Dr. Kuriyan is not entitled to anything under the FCA, NMFATA, or NMMFCA. Although the parties dispute whether HSD would have sought recoupment without Dr. Kuriyan's notice, they agree that "no findings of fact are required in order to resolve" Dr. Kuriyan's Motion. MCO Reply 1. Instead, they seek to shoehorn their factual dispute into a legal dispute over the meaning of alternate remedy. First, the Court concludes that HSD can pursue alternate remedies under the FCA, because HSD operates MCOs on the United States' behalf, and under the NMFATA, because HSD is a State agency. Second, the Court concludes that, before Dr. Kuriyan is entitled to an alternate-remedy award, he must prove that HSD's recoupment was for the same type of fraud that the FCA and the NMFATA recognize. See United States ex rel. Kennedy v. Novo A/S et al., 5 F.4th at 58.

## A. HSD IS THE "GOVERNMENT" AS THE FCA DEFINES THAT TERM AND A "POLITICAL SUBDIVISION" AS THE NMFATA DEFINES THAT TERM.

First, Blue Cross argues that HSD's recoupment cannot be an "alternate remedy" either under either the FCA or under the NMFATA, because HSD is neither the "Government" as the FCA defines the term, nor the "attorney general or a political subdivision" under the NMFATA. Blue Cross Response at 10. Blue Cross contends that 31 U.S.C. § 3730(c)(5) refers only to the United States and not to New Mexico through HSD, meaning that, "under the federal statute, if a state agency pursues this remedy, that's not an alternate remedy as that term is used in" § 3730(c)(5). Tr. at 65:10-13 (Hamilton). Similarly, Blue Cross argues that HSD's recoupment is not an alternate remedy under the NMFATA, because the NMFATA "states that the 'attorney general or a political subdivision' may pursue the alternate remedy." Blue Cross Response at 11 (quoting N.M.S.A. § 44-9-6(H)). Dr. Kuriyan responds that HSD is within the FCA's definition

of "Government," because, although it "generally means the United States," HSD's "Medicaid program recoupment of funds is automatically on behalf of both the state and the United States." Blue Cross Response at 3.  In addition, Dr. Kuriyan contends that the NMFATA's "political subdivision" definition includes HSD, "which is an agency of New Mexico." Blue Cross Response at 4.

HSD can conduct an alternate remedy as the FCA defines that term.  Dr. Kuriyan agrees with Blue Cross that the FCA's use of the word "Government" references the United States government.  Blue Cross Response at 10-11; MCO Reply at 3.  In other words, the parties agree that the FCA is not typically a vehicle for parties to recover if other governing entities -- a State or local agency, for example -- are being defrauded.  Moreover, the FCA's use of the word "Government" is "not ambiguous."  United States ex rel. Jones v. Horizon Healthcare Corp., 160 F.3d 326, 334 (6th Cir. 1998).  The "FCA is concerned with false claims filed against the federal government."  United States ex rel. Jones v. Horizon Healthcare Corp., 160 F.3d at 334.  Because the FCA's purpose is to "discourage fraud against the government," Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948 (5th Cir. 1994), and because it permits a person to bring a violation "for the person and for the United States Government," 31 U.S.C. § 3730(c)(5), it would make little sense for the FCA to create a cause of action against an entity being defrauded on behalf of an entity that is not being defrauded.  See Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 345-46 (4th Cir. 2010), superseded statute on other grounds, 31 U.S.C.  § 3730(h)("The FCA's scope is commensurate with its purpose.  It covers only fraudulent claims against the United States; without fraud, there can be no FCA action."); McKenzie v. BellSouth Telecomms., Inc., 219 F.3d 508, 516 (6th Cir. 2000)(noting that, to defeat summary judgment on an FCA claim, a party must "sufficiently allege activity with a nexus to a *qui tam* action, or fraud against the United States

government"); <u>United States ex rel. Rabushka v. Crane Co.</u>, 40 F.3d 1509, 1511 (8th Cir. 1994)("The Act's jurisdictional scheme is designed to promote private citizen involvement in exposing fraud against the government, while at the same time prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud."); <u>United States ex rel. Woodard v. Country View Care Ctr., Inc.</u>, 797 F.2d 888, 894 (10th Cir. 1986)(stating that there is no cause of action under the FCA "where there is no injury to the federal government").  The FCA's use of "Government," therefore, refers only to the federal government -- that is, the United States, and not to New Mexico or one of its agencies.  31 U.S.C. § 3730(c)(5).

The analysis does not end there, however.  Dr. Kuriyan maintains that HSD's recoupment, although done by a State agency, is on the United States' behalf, because it "consists of an inseparable mix of United States and New Mexico funds."  MCO Reply at 3.  According to Dr. Kuriyan, the Defendants' "overly-literal interpretation of 'the Government' here would exclude any state Medicaid agency from electing an alternate remedy, which ignores the mixed federal-state nature of all Medicaid funds and how the program works."  MCO Reply at 3 (quoting 31 U.S.C. § 3730(c)(5)).  To support his position, Dr. Kuriyan cites to 42 U.S.C. § 1396-1, which authorizes fiscal appropriations to States to assist needy family with medical care, 42 U.S.C. § 1396a, which, among other things, requires that a State "operate[] a Medicaid fraud and abuse control unit," and N.M.S.A. § 27-1-3(G), which states that HSD shall "act as the agent of the federal government in welfare matters of mutual concern in conformity with Chapter 27 NMSA 1978 and in the administration of any federal funds granted to this state, to aid in furtherance of any such functions of the state government."

If HSD recoups funds that the MCOs fraudulently retained, then HSD is operating on the United States' behalf.  <u>See</u> N.M.S.A. § 27-1-3(G); 42 U.S.C. § 1396-1; 42 U.S.C. § 1396a.  It is

acting as an agent of the federal government.  When HSD is recouping funds for Medicaid fraud, therefore, HSD falls within the FCA's definition of "Government."  31 U.S.C. § 3730(c)(5). Moreover, in <u>United States ex rel. Woodard v. Country View Care Ctr., Inc.</u>, 797 F.2d at 894, the Tenth Circuit concluded that the State of Colorado, suing as qui tam relator on the United States' behalf under the FCA, is entitled to recover "its share of the fraudulent overpayment."  797 F.2d at 894.  In <u>United States ex rel. Woodard v. Country View Care Ctr., Inc.</u>, the Tenth Circuit considered whether the State of Colorado, when trying to recoup overpayments from a private healthcare provider based on alleged Medicaid fraud, complied with 31 U.S.C. § 232(C), which, at the time, created a "jurisdictional bar designed to limit plagiarism on the part of *qui tam* relators."  <u>United States ex rel. Woodard v. Country View Care Ctr., Inc.</u>, 797 F.2d at 892 (emphasis in original).  At the time, 31 U.S.C. § 232(C) stated that a court lacks jurisdiction "whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought."  31 U.S.C. § 232(C)(1976), <u>amended by</u> 31 U.S.C. § 3730 (1982).  Colorado, through its Attorney General suing as a qui tam relator, attempted to comply with this requirement by describing the evidence on which it relied to the Attorney General of the United States.  <u>See</u> 797 F.2d at 892.  Colorado alleged that the private healthcare provider "filed twenty-five false claims and four false cost reports with the Colorado Department of Social Services seeking reimbursement under the Medicaid program," which resulted in $44,959.00 in overpayments.  <u>See</u> 797 F.2d at 890.  On appeal, the private healthcare provider argued that the qui tam relator -- the Colorado Attorney General on Colorado's behalf -- could not recover its own losses through the FCA.  <u>See</u> 797 F.2d at 893.  The Tenth Circuit concluded that Colorado's losses are recoverable under the FCA, because, although there is "no cause of action under the False Claims Act where

there is no injury to the federal government," that result is "not the case here."  United States ex
rel. Woodard v. Country View Care Ctr., Inc., 797 F.2d at 894 (citing United States ex rel. Marcus
v. Hess, 317 U.S. 537 (1943), and United States v. Kates, 419 F. Supp. 846 (E.D. Pa. 1976)(Ditter,
J.)).  According to the Tenth Circuit, FCA actions "may lie where the impact of the fraudulent
claim does not fall exclusively upon the federal treasury."  797 F.2d at 893 (citing United States
v. Azzarelli Const. Co., 647 F.2d 757 (7th Cir. 1981), and United States v. Jacobson, 647 F. Supp.
507 (S.D.N.Y. 1979)(Weinfeld, J.)).

Although the Tenth Circuit, in United States ex rel. Woodard v. Country View Care Ctr.,
Inc., 797 F.2d at 893, addressed a slightly different question than the one presented here, its logic
is instructive.  The Tenth Circuit, concluding that the Colorado Attorney General can sue as a qui
tam relator under the FCA to recover Medicaid overpayments based on alleged fraud, because the
State's injury "occurs simultaneously with the federal government's injury," took no issue with
the fact that the Colorado Department of Social Services, a State agency, was attempting to recover
Medicaid overpayments under the FCA.  797 F.2d at 894.  The Court sees no sound reason to draw
a distinction between allowing a State agency to recover Medicaid overpayments based on alleged
fraud if it uses its Attorney General as a qui tam relator and a State agency engaged in an alternate
remedy for the same purpose.  That the United States unquestionably can engage in an alternate
remedy under the FCA, because it suffers an injury when it is defrauded, and the State, when
recouping Medicaid overpayments, is recovering funds from a jointly operated State-federal
program, bolsters this conclusion.  The Court concludes, therefore, that HSD, when recouping
Medicaid overpayments, is operating as an agent of the "Government" as the FCA defines that
term.  31 U.S.C. § 3730(c)(5).

In addition, Blue Cross argues that HSD cannot elect to pursue an alternate remedy under the NMFATA, because a "political subdivision" is an "entity 'formed or maintained for the exercise of political power within certain boundaries or localities to whom electors residing therein are granted power to govern themselves.'"  Tr. at 65:21-25 (Hamilton)(quoting Tompkins v. Carlsbad Irr. Dist., 1981-NMCA-072 ¶ 11, 96 N.M. 368, 370, 630 P.2d 767, 769).  According to Blue Cross, HSD is not, therefore, a political subdivision, because it is not "a local body politic." Blue Cross Response at 11.  Dr. Kuriyan responds that HSD is a political subdivision under the NMFATA, because it is "an agency of New Mexico."  MCO Reply at 4.  Dr. Kuriyan contends that Blue Cross's "proposed strict reading of this provision of NMFATA defies common sense," and "defies logic and the way that the Medicaid system works."  MCO Reply at 5.

HSD also can seek an alternate remedy as the NMFATA defines the term.  See N.M.S.A. § 44-9-6(H).  The NMFATA's alternate-remedy provision states that only "the attorney general or political subdivision may elect to pursue the state's or political subdivision's claim through any alternate remedy available, including an administrative proceeding to determine a civil money penalty."  N.M.S.A. § 44-9-6(H).  The NMFATA defines "political subdivision" as "a political subdivision of the state or a charter school."  N.M.S.A. § 44-9-2(E).  Further, the NMFATA defines "state" as "the State of New Mexico or any of its branches, agencies, departments, board, commissions, officers, institutions or instrumentalities, including the New Mexico finance authority, the New Mexico mortgage finance authority and the New Mexico lottery authority." N.M.S.A. § 44-9-2(F).  HSD is a State agency.  See N.M.S.A. § 9-8-4 (A)(establishing the Human Services Department within the State executive branch); Waters-Haskins v. New Mexico Human Servs. Dept., Income Support Div., 2009-NMSC-031 ¶ 9, 146 N.M. 391, 395, 210 P.3d 817, 821

(noting that "state agencies, like the Department, administer the [federal Food Stamp Program] and pay the cost of distributing the benefits").

Blue Cross' citation to <u>Tompkins v. Carlsbad Irr. Dist.</u>, 1981-NMCA-072 ¶ 11, 96 N.M. 368, 370, 630 P.2d 767, 769, misses the mark.  In <u>Tompkins v. Carlsbad Irr. Dist.</u>, 1981-NMCA-072 ¶ 11, 96 N.M. 368, 370, 630 P.2d 767, 769, the Court of Appeals of New Mexico stated that a political subdivision is "'formed or maintained for the more effectual or convenient exercise of political power within certain boundaries or localities, to whom the electors residing therein are, to some extent, granted power to locally self-govern themselves.'"[18]   1981-NMCA-072 ¶ 11, 96

_____

[18]The Court has held that if a district court applying State law cannot find a State Supreme Court "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the [State] Supreme Court . . . would [rule]." <u>Guidance Endodontics, LLC v. Dentsply Int'l., Inc.</u>, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).   In performing its duty to predict what a State supreme court would do if faced with a case, <u>see</u> <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456, 466 (1967), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, <u>see</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate a prediction that conflicts with State court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old State supreme court precedent usually binds State trial courts.  The factors to which a federal court should look before making an <u>Erie</u> prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  <u>See</u> <u>Peña v. Greffet</u>, 110 F. Supp. 3d 1103, 1132 n.17 (D.N.M. 2015)(Browning, J.).  In short, a State supreme court case that a federal court predicts the State court would overrule is likely to be very old, neglected in subsequent State court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong. Here, the Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's conclusion in <u>Tompkins v. Carlsbad Irr. Dist.</u>, 1981-NMCA-072 ¶ 11, 96 N.M. 368, 370, 630 P.2d 767, 769, because the Court of Appeals of New

N.M. 368, 370, 630 P.2d 767, 769 (quoting Gibbany v. Ford, 1924-NMSC-038 ¶ 7, 29 N.M. 621, 225 P. 577, 579 (1927)).  In Gibbany v. Ford, 1924-NMSC-038 ¶ 7, 29 N.M. 621, 225 P. 577, 579 (1927), the Supreme Court of New Mexico interprets the phrase "political subdivision" in the New Mexico Constitution, N.M. Const. art. V, § 13, and not the NMFATA's definition of "political subdivision," N.M.S.A. § 44-9-2.  The Court of Appeals of New Mexico concludes, for example, that an irrigation district is a political subdivision.  See Tompkins v. Carlsbad Irr. Dist., 1981-NMCA-072 ¶ 12, 96 N.M. 368, 370, 630 P.2d 767, 769.

Blue Cross' contention is, therefore, that HSD, the State agency that deals with Medicaid funds and contracts with the MCOs, cannot engage in an alternate remedy under the NMFATA, but an irrigation district, for example, can elect to pursue an alternate remedy under the NMFATA to recoup Medicaid overpayments.  Moreover, because the NMFATA defines a "political subdivision" as a "political subdivision of" the State of New Mexico or any of its branches, agencies, departments, board, commission, officers, institutions, or instrumentalities, Blue Cross appears to argue that HSD, an agency, cannot elect to pursue an alternate remedy, but HSD's irrigation districts -- if there were such a thing -- could pursue an alternate remedy under NMFATA.  N.M.S.A. § 44-9-2.  The Court recognizes that the two definitions are not consistent, but can think of no reason to substitute the Supreme Court of New Mexico's definition of a different provision for the NMFATA's definition of "political subdivision," N.M.S.A. § 44-9-2, especially when Blue Cross' proposed interpretation both would strain the NMFATA's own definitions and would lead to absurd results, see Holy Trinity Church v. United States, 143 U.S. 457, 460 (stating that laws should not be interpreted to product "an absurd consequence").  The

Mexico quotes directly from the Supreme Court of New Mexico's decision in Gibbany v. Ford, 1924-NMSC-038 ¶ 7, 29 N.M. 621, 225 P. 577, 579 (1927).

Court concludes, therefore, that, because HSD is a State agency, it is a "political subdivision" as NMFATA, N.M.S.A. § 44-9-2, defines the term, and can elect to pursue an "alternate remedy" under NMFATA, N.M.S.A. § 44-9-6(H).

> **B.    BEFORE DR. KURIYAN IS ENTITLED TO AN ALTERNATE-REMEDY AWARD, HE MUST SHOW THAT HSD'S RECOUPMENT WAS FOR FRAUD THAT THE FCA AND THE NMFATA RECOGNIZE.**

Second, Dr. Kuriyan contends that he is entitled to an alternate-remedy award, because Judge Parker concludes that he plausibly pled a claim upon which relief can be granted.  See Motion at 12-27.  Moreover, Dr. Kuriyan argues that, "where the relief sought by the government's chosen remedy and the facts on which it is based overlap with relator's *qui tam* suit, then that remedy is an alternate remedy within the meaning of the" FCA and the NMFATA.  Motion at 15. In other words, Dr. Kuriyan assumes that, because HSD recouped funds -- even if it would have done so had Dr. Kuriyan never come to them -- his disclosure caused it.  The United States and New Mexico contend, however, that HSD's recoupment process "began in August 2015, before Relator's *qui tam* action was filed or any purported discloser to the Government."  Government Response at 11.  According to the United States and New Mexico, "the reconciliation and recoupment were made in accordance with the Contract terms."  Government Response at 13.

The False Claims Act states, in relevant part:

> Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.  If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.  Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section.  For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

31 U.S.C. § 3730(c)(5).  For 31 U.S.C. § 3730(c)(5)'s purposes, an "alternate remedy" is "the government's pursuit of any alternative to intervening in a relator's *qui tam* action."  United States ex rel. Bledsoe v. Cmty Health Sys., Inc., 342 F.3d at 647.  The Ninth Circuit adopts a similarly broad interpretation of "alternate remedy," noting that it is "entirely consistent" with the FCA's purpose to read any "alternate remedy" to "mean what is says."  United States ex rel. Barajas v. United States, 258 F.3d 1004, 1012 (9th Cir. 2001).  The Ninth Circuit states that it would be

> inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from a qui tam defendant a remedy that could have been obtained in an already-filed FCA action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower because the remedy was not an "alternate remedy" within the meaning of the FCA.

United States ex rel. Barajas v. United States, 258 F.3d at 1012.  On its own, however, "factual overlap" between a relator's claim and the Government's later remedy is not enough.  United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58.  The D.C. Circuit states that, although factual similarity "can be important," it is "not enough to seal the deal."  United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58.  "Subsection 3730(c)(5) limits a relator's recovery from an alternative remedy pursued by the government to those types of false or fraudulent claims that the False Claims Act recognizes and for which a *qui tam* action could have been litigated."  United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58.  For a relator to recover through the alternate remedy provision, the qui tam suit must be filed before the Government pursues an alternate remedy.  See United States ex rel. Babalola v. Sharma, 746 F.3d at 162.

Here, the parties dispute whether HSD's recoupment is an "alternate remedy."  31 U.S.C. § 3730(c)(5); N.M.S.A. § 44-9-6(H).  If the recoupment is an alternate remedy, then Dr. Kuriyan is entitled to a share of what HSD recovered from the Defendant MCOs.  If the recoupment is not

is an alternate remedy, then Dr. Kuriyan is not entitled to anything under the FCA.  Although the parties dispute whether the HSD would have sought recoupment without Dr. Kuriyan's notice, they agree that "no findings of fact are required in order to resolve" Dr. Kuriyan's Motion.  See MCO Reply at 1.  Instead, they seek to shoehorn their factual dispute into a legal dispute over the meaning of "alternate remedy."  31 U.S.C. § 3730(c)(5); N.M.S.A. § 44-9-6(H).

The United States contends that this question is a simple one of statutory interpretation.  See Government Response at 2.  The United States and New Mexico argue that the "plain language of the alternate remedy provisions" reveals that the "alternate remedy" must be an "alternate *fraud* remedy."  Government Response at 2 (emphasis in original).  The United States and New Mexico suggest that the Court should follow the Tenth Circuit's guidance, and "begin with the plain language of the law."  United States v. Morgan, 922 F.2d 1495, 1496 (10th Cir. 1991).  According to the United States and New Mexico, 31 U.S.C. § 3730(c)(5)'s plain language reveals that HSD's recoupment was not an "alternate remedy," because it is "contemplated by the terms of the Contract and -- importantly -- began prior to Relator's disclosures to the Government or the initiation of his *qui tam* action, and was complete months before the Government declined to intervene."  Government Response at 9 (emphasis in original).   The United States and New Mexico are incorrect.  Section 3730(c)(5)'s plain language does not state that a factual dispute over what motivated the Government to seek a remedy after a potential relator's disclosure means the Government pursued recoupment for reasons unrelated to fraud.  In fact, the plain language counsels in favor of concluding that, to decide if a government's remedy is a "claim" for 31 U.S.C. § 3730(c)(5) purposes, a court first must determine whether the claim is "one that otherwise could be prosecuted through a *qui tam* suit under" 31 U.S.C. § 3730(b).  United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 55.

Because the Court concludes that the reasoning of the Honorable Patricia Millett, United States Circuit Judge for the United States Court of Appeals for the D.C. Circuit, is persuasive, Dr. Kuriyan can succeed only if HSD's remedy was the "type of false or fraudulent claims that the False Claims Act recognizes and for which a *qui tam* action could have been litigated." United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58. In United States ex rel. Kennedy v. Novo A/C, Judge Millett did not consider, however, what "the consequences (if any) would be were the government to use a relator's information in a separate proceeding without fairly compensating the relator in the *qui tam* action." United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58. Although the Court agrees with Judge Millett's reasoning and conclusion in United States ex rel. Kennedy v. Novo A/S, Judge Millett creates work for district courts. To decide if a Government's remedy is an "alternate remedy" for 31 U.S.C. § 3730(c)(5)'s purposes, a court must make a judgment about the remedy's substance. A court must decide if it if is a false or fraudulent claim that could fall within the FCA's scope. If a court already has resolved the factual disputes, the analysis is straightforward. If, however, as here, the Government already has recovered without compensating the relator -- and the parties dispute whether the Government relied on the relator's information to recover but disclaim a factual dispute -- then a court must decide whether surviving a motion to dismiss under rule 12(b)(6) means that the action is a false or fraudulent claim that could fall within the FCA's scope, and, therefore, that the relator is entitled to a share of the recovery. This task equates a rule 12(b)(6) and a summary-judgment motion -- it means that pleading sufficiently a claim upon which relief can be granted amounts to determining that there are no genuine disputes of material fact that the recoupment was because of fraud. See Fed. R. Civ. P. 56(a).

Concluding that Dr. Kuriyan cannot recover even though, as Judge Parker concluded, Dr. Kuriyan "pled a plausible claim that Defendants violated the FCA, the NMFATA, and the NM[M]FCA," 2nd MTD MOO at 20, 2020 WL 8079811, at *11, and "has alleged facts that support a reasonable inference that when Defendants submitted their 2014 data at or around June 2015, Defendants knew or had reason to know that the State had overpaid them under the Contract," would thwart the FCA's purposes.  2nd MTD MOO at 17, 2020 WL 8079811, at *9. The Court agrees with the Sixth Circuit's reasoning that,

> were an "alternate remedy" construed to allow the government to settle a qui tam suit without intervening, then "the government could decline to intervene in a qui tam suit, then settle that suit's claims separately and deny the relator his or her share of the settlement proceeds simply because the government had not formally intervened in the qui tam action."

United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 522 (6th Cir. 2007)(quoting United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d at 648-49).  Construing "alternate remedy" to allow the Government to settle a qui tam action without intervening would frustrate the FCA's animating principles.  Moreover, the Court concludes that the FCA does not support an interpretation which would allow any potential relator to bring frivolous information to the Government's attention only to cry foul and recover if the government later recouped for wholly unrelated reasons.  Judge Millett's reasoning in United States ex rel. Kennedy v. Novo A/S allows the FCA's incentives to remain undisturbed, because it does nothing more than limit the scope of a relator's recovery to actions within the FCA's scope.  United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58.  Nevertheless, the FCA does not easily account for the scenario where there is insufficient information to conclude whether the Government has already recouped, but no determination whether the remedy was the "type[] of false or fraudulent claim that the False Claims Act recognized and for which a *qui tam* action could have been litigated."  United States ex rel.

Kennedy v. Novo A/S, 5 F.4th at 58 (emphasis in original).  The Court sees no language in the FCA to suggest that a relator plausibly pleading a claim for which relief can be granted means that the relator's version of the facts is correct and is, therefore, entitled to an alternate-remedy award.

Similarly, the Court sees no language in the NMFATA that suggests that a relator plausibly pleading a claim for which relief can be granted means that the relator's version of the facts is correct and, therefore, that the relator is entitled to an alternate-remedy award.  There is very little caselaw on NMFATA, and even less on its alternate-remedy provision.  See N.M.S.A. § 44-9-6(H).  As far as the Court can tell, New Mexico State courts have interpreted NMFATA only six times in published opinions.[19]  Only two offer any insight on the alternate-remedy provision.  First, in New Mexico State Inv. Council v. Weinstein, the Court of Appeals of New Mexico concluded that NMFATA's alternate-remedy provision "contemplates the disposal of claims in a qui tam action by decision rendered in an alternate remedy proceeding."[20]  New Mexico State Inv. Council

_____

[19]The cases include: (i) State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2015-NMSC-025 ¶¶ 16, 335 P.3d 1; (ii) State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2013-NMSC-043, 297 P.3d 357; (iii) State ex rel. Foy v. Vanderbilt Capitol Advisors, LLC, -- P.3d --, 2020 WL 4188180 (N.M. Ct. App. 2020); (iv) State ex rel. Foy v. Oppenheimer & Co., 2019-NMCA-045, 447 P.3d 1159; (v) New Mexico State Inv. Council v. Weinstein, 2016-NMCA-069, 382 P.3d 923; and (vi) State ex rel. Peterson v. Aramark Corr. Servs., LLC, 2014-NMCA-036, 321 P.3d 128.

[20]In New Mexico State Inv. Council v. Weinstein, 2016-NMCA-069, 382 P.3d 923, the Court of Appeals of New Mexico considered whether NMFATA permits settlements between New Mexico State Investment Council ("NMSIC") and three sets of defendants for alleged misconduct related to the NMSIC's management of two public permanent funds.  See 2016-NMCA-069 ¶¶ 1-5, 382 P.3d 923, 928.  The Court of Appeals of New Mexico concluded that NMFATA authorizes the settlements, because "they have been approved by NMSIC at a public meeting."  2016-NMCA-069 ¶ 95, 382 P.3d 923, 947.  The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's conclusion in New Mexico State Inv. Council v. Weinstein, because it relies on Supreme Court of New Mexico dictates about NMFATA's similarity to the FCA.  See 2016-NMCA-069 ¶¶ 43-45, 382 P.3d 923, 936.  Although the Court of Appeals of New Mexico cites briefly the alternate-remedy provision, it offers little guidance on N.M.S.A. § 44-9-6(H)'s alternate-remedy provision.

v. Weinstein, 2016-NMCA-069 ¶ 36, 382 P.3d 923, 934.  Moreover, in New Mexico State Inv.

Council v. Weinstein, the parties agreed that the "present suit is an 'alternate remedy' under

FATA."  2016-NMCA-069 ¶ 14, 382 P.3d 923, 930 (quoting N.M.S.A. § 44-9-6(H)).  The Court

of Appeals of New Mexico did not, therefore, spend time elaborating on N.M.S.A. § 44-9-6(H)'s

alternate-remedy provision.  Second, in State ex rel. Foy v. Vanderbilt Capitol Advisors, LLC, the

Court of Appeals of New Mexico assumed that the State Attorney General's settlement with the

defendants constituted an alternate remedy under N.M.S.A. § 44-9-6(H).[21]  -- P.3d --, 2020 WL

4188180, at *7-12 (N.M. Ct. App. 2020).  Moreover, as the Court observed in 2013, "no court has

determined the extent of frauds covered under" NMFATA.  Hunt v. Central Consol. School Dist.,

951 F. Supp. 2d 1136, 1245 (D.N.M. 2013)(Browning, J.).

The Court has explained that its task when applying State law is to" look first to the words

of the State supreme court."  Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M.

2015)(Browning, J.).[22]  If the Court finds only an opinion from the State Court of Appeals, while

---

[21]In State ex rel. Foy v. Vanderbilt Capitol Advisors, LLC, -- P.3d --, 2020 WL 4188180,
the Court of Appeals of New Mexico concluded that a qui tam relator's action should be dismissed
under NMFATA, because the New Mexico Attorney General's alternate remedy recovered "tens
of millions of dollars," and the qui tam plaintiffs' NMFATA claims were "not progressing well."
2020 WL 4188180, at *11.  The Court predicts that the Supreme Court of New Mexico would
agree with the Court of Appeals of New Mexico's conclusion in State ex rel. Foy v. Vanderbilt
Capitol Advisors, LLC, because the Court of Appeals of New Mexico, relying on Supreme Court
of New Mexico decisions, reviewed the district court's determination for abuse of discretion, and,
finding little case law on the issue, saw no abuse.  See 2020 WL 4188180, at *6 (citing N.M. Right
to Choose/NARAL v. Johnson, 1999-NMSC-028 ¶ 7, 127 N.M. 654, 986, P.2d 450).  Although
the Court of Appeals of New Mexico cites briefly the alternate-remedy provision, it offers little
guidance on N.M.S.A. § 44-9-6(H)'s alternate-remedy provision, because the parties agreed that
the Attorney General's recovery was an alternate remedy, so the Court of Appeals of New Mexico
did not elaborate beyond appearing to assume that the settlement is an alternate remedy.  See 2020
WL 4188180, at *5.

[22]In Peña v. Greffet, the Court used this approach to predict what the Supreme Court of
New Mexico would say about imposing vicarious liability under the aided-in-agency theory in the
prison-guard inmate context, and predicted that the Supreme Court of New Mexico would say: "If

"certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."  Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[23]  Ultimately, "the Court's task is to predict what the state supreme court would

---

an inmate can establish that a prison official with corporal authority over the inmate committed a tort against the inmate, and that the official's position of authority aided the official in the commission of that tort, then the official's employer is vicariously liable for all injuries that the tort inflicts."  Peña v. Greffet, 110 F. Supp. 3d at 1131.  Then, in Spurlock v. Townes, 2016-NMSC-014, 368 P.3d 1213, the Supreme Court of New Mexico agreed with the Court's prediction, quoting extensively from the Peña v. Greffet opinion.  See Spurlock v. Townes, 2016-NMSC-014, ¶¶ 11, 17-20, 368 P.3d at 1216-19.

[23]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord. Mosley v. Titus, 762 F. Supp. 2d at

1332 (quoting Wade v. EMCASCO Ins., 483 F.3d at 665-66); Rimbert v. Eli Lilly & Co., 577

F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins., 483

F.3d at 665-66). See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab.

Litig., 288 F. Supp. 3d 1087, 1161-67 (D.N.M. 2017)(Browning, J.).

Here, the Supreme Court of New Mexico states that the FCA is the NMFATA's "analogue"

and that the cases construing the FCA are, therefore, "helpful in understanding the context and

purpose of" NMFATA. State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2015-NMSC-025 ¶¶ 16,

---

. . . .

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts,] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed.1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

25, 355 P.3d 1, 7.  The Court concludes, therefore, that the Supreme Court of New Mexico would find the federal courts' FCA interpretations instructive and would conclude that, for the same reasons that apply to the FCA, a relator is not entitled to an alternate-remedy award under the NMFATA unless the Government's recoupment was the "type[] of false or fraudulent claim that the False Claims Act recognized and for which a *qui tam* action could have been litigated."  <u>United States ex rel. Kennedy v. Novo A/S</u>, 5 F.4th at 58 (emphasis in original).  Here, the parties dispute whether HSD recouped funds from the Defendant MCOs after Dr. Kuriyan alerted HSD that the Defendant MCOs were acting fraudulently, or whether the Defendant MCOs did not act fraudulently and HSD recouped funds pursuant to their contract.  As a result, because the Court sees no language in either the FCA or in the NMFATA to suggest that a relator, like Dr. Kuriyan, pleading plausibly a claim for which relief can be granted means that the relator's version of the facts is correct, the Court will deny the Motion.

   **IT IS ORDERED** that: (i) the United States' and New Mexico's Motion to File a Sur-Reply to Third Motion For Award From Alternative Remedy at 1, filed April 2, 201 (Doc. 198), is granted; and (ii) the Plaintiff/Relator's Opposed Third Motion for Award from Alternate Remedy, filed February 5, 2021 (Doc. 173), is denied.

                                                    _____
                                                    UNITED STATES DISTRICT JUDGE

*Counsel:*

Bryan J. Davis
Davis & Gilchrist, P.C.
Albuquerque, New Mexico

-- and --

- 111 -

Sam Bregman
Bregman & Loman, P.C.
Albuquerque, New Mexico

-- and --

Joel Androphy
Janis G. Gorton
Berg & Androphy
Houston, Texas

-- and --

Robert L. Lieff
San Francisco, California

*Attorneys for the Plaintiff*

Fred J. Federici
  Acting United States Attorney
Ruth F. Keegan
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the United States of America*

Hector H. Balderas
  New Mexico Attorney General
Zachary Shandler
  Assistant Attorney General
New Mexico Office of the Attorney General

*Attorneys for the State of New Mexico*

Benjamin E. Thomas
Christina M. Gooch
Sutin, Thayer & Browne
Albuquerque, New Mexico

-- and --

Edwin E. Brooks
Kathryn A. Campbell
Sarah I. Rasid

McGuire Woods, LLP
Chicago, Illinois

-- and --

Steven Hamilton
Jason T. Mayer
Reed Smith, LLP
Chicago, Illinois

*Attorneys for Defendant HCSC d/b/a Blue Cross & Blue Shield of New Mexico*

Gregory Marshall
Neanne Y Sohn
Snell & Wilmer L.L.P.
Albuquerque, New Mexico

-- and --

Sandra A. Brown
Snell & Wilmer L.L.P.
Phoenix, Arizona

-- and --

Steven Paul Ragland
Julia L. Allen
Simona Agnolucci
Maya Perelman
Keker, Van Nest & Peters, LLP
San Francisco, California

*Attorneys for Defendant Molina Healthcare of New Mexico, Inc.*

Kimberly N. Bell
Presbyterian Healthcare Services
Albuquerque, New Mexico

-- and --

Charles K. Purcell
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

*Attorneys for Defendant Presbyterian Health Plan, Inc.*

Robert E. Hanson
Matthew Eric Jackson
Peifer, Hanson, Mullins & Baker, P.A.
Albuquerque, New Mexico

-- and --

Mark T. Calloway
Michael R. Hoernlein
Alston & Bird, LLP
Charlotte, North Carolina

*Attorneys for Defendant UnitedHealthcare of New Mexico, Inc.*