# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA and
STATE OF NEW MEXICO *ex rel*.
JACOB KURIYAN,

      Plaintiffs,

v.                                                                    No. 16-cv-1148 JB-KK

MOLINA HEALTHCARE OF NEW MEXICO, INC.,
PRESBYTERIAN HEALTH PLAN, INC.,
UNITEDHEALTHCARE OF NEW MEXICO, INC.,
and HCSC INSURANCE SERVICES CO. *dba*
BLUE CROSS & BLUE SHIELD OF NEW MEXICO,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Relator Jacob Kuriyan alleges that Defendants—four Medicaid Managed Healthcare Organizations ("MCOs")—failed to meet a requirement under their contracts with the New Mexico Human Services Department ("HSD") to provide benefits to Medicaid recipients, falsely certified to HSD that the requirement had been met, and fraudulently retained millions of dollars in payments that they should have returned to HSD. (Docs. 1; 142 (Third Amended Complaint (the "TAC").) Relator brings claims against the MCOs on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and on behalf of the State of New Mexico under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 through 44-9-14 ("NMFATA"), and the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 through 27-14-15 ("NMMFCA"). (Doc. 142.)

Before the Court are two motions filed by the United States and the State of New Mexico (collectively, the "Government"):[1] (i) the Motion to Dismiss Relator's *Qui Tam* Action under the Public Disclosure Bar (the "Public Disclosure Motion") (Doc. 303) and (ii) the Motion for Summary Judgment on Relator's Demand for an Alternate Remedy (the "Alternate Remedy Motion"). (Doc. 305.) The Honorable James O. Browning held a hearing on October 28, 2022, (Doc. 389) and granted both Motions in an interlocutory order entered on March 22, 2023 (the "Interlocutory Order"). (Doc. 403.) In the Interlocutory Order, Judge Browning referred the Motions[2] to me to issue proposed findings of fact and a recommended disposition. (*Id*.)

Having reviewed Relator's and the Government's submissions, the transcript of the October 28, 2022, hearing, the record, and the relevant law, I recommend that the Court GRANT the Public Disclosure Motion, enter summary judgment in the Government's favor, and dismiss the TAC. I further recommend that, if the Court grants the Public Disclosure Motion, it DENY the Alternate Remedy Motion as moot. In the alternative, if the Court denies the Public Disclosure Motion, I recommend that the Court GRANT the Alternate Remedy Motion on its merits.

## ANALYSIS

### I. Legal Standards Governing Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation

---

[1] Neither the United States nor the State of New Mexico has intervened and is a party to this matter. "[T]he Government, in a case in which it has declined to intervene in the seal period, is not required to intervene with a showing of good cause under § 3730(c)(3) before moving to dismiss the action under § 3730(c)(2)(A)." *Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 932–35 (10th Cir. 2005)); *see* §§ 44-9-5(C), 44-9-6(B); 27-14-7(B).

[2] Relator, now acting *pro se*, was represented by counsel when the present motions were filed and at the hearing on the motions. (Docs. 303, 305, 389, 399, 402.)

marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a fact is material when it 'might affect the outcome of the suit under the governing substantive law.'" *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017); *Wellington v. Daza*, No. 21-2052, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant will bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of his claim. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986)). If the movant meets this initial burden, "the burden then shifts to the nonmovant to 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250).

When a movant moves for summary judgment "to test an affirmative defense," in turn, it must first "demonstrate that no disputed material fact exists regarding the affirmative defense

asserted." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011) (quoting *Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir.1997)). "Once the defendant makes this initial showing, 'the plaintiff must then demonstrate with specificity the existence of a disputed material fact.'" *Helm,* 656 F.3d at 1284 (quoting *Hutchinson*, 105 F.3d at 564). If the plaintiff does not do so, "the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment as a matter of law." *Id.* Ultimately, where the movant will bear the burden of proof at trial on an affirmative defense, it "must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant [summary] judgment in [its] favor." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986)).

The Court "may not grant summary judgment based on its own perception that one witness is more credible than another[.]" *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1223 n.3 (10th Cir. 2017) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008)). But "where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party, the question is not one of credibility, but rather the absence of evidence creating a triable issue of fact." *Id.* Thus, nonmoving parties "must present [their] own affirmative evidence" to contradict the testimony presented by the movant. *Id.* In addition, under Local Rule 56(b), "[a]ll material facts set forth [by the movant] will be deemed undisputed unless specifically controverted." D.N.M.L.R.-Civ. 56.1(b).

Finally, Local Civil Rule 7.1 provides that "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ. 7.1(b). "Implicit in that rule is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument." *Lewis v. XL Catlin*, 542 F. Supp. 3d 1159, 1168 n.6 (D.N.M. 2021),

*appeal dismissed*, 2021 WL 6197126 (10th Cir. Sept. 27, 2021); s*ee also Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. Aug. 28, 2001) (holding that plaintiff abandoned claim by failing to respond to summary judgment arguments about it); *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (holding that plaintiff's failure to challenge defendants' summary judgment arguments was "fatal").

## II.  Legal Standards Governing FCA, NMMFCA, and NMFATA Claims

The FCA "allows for the recovery of civil penalties and treble damages from anyone who defrauds the [federal] government by submitting fraudulent claims for payment." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 735–36 (10th Cir. 2019); § 3729(a)(i)(A). "Liability also attaches to anyone who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *Reed*, 923 F.3d at 736 (quoting § 3729(a)(1)(B)). In addition, the FCA imposes liability for attempts to reduce an obligation owed to the government. *Id*. at 736; § 3729(a)(1)(G). Thus, "an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money.'" *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194–95 (10th Cir. 2006) (quoting S.Rep. No. 99–345, at 18, 1986 U.S.C.C.A.N. at 5283). "To enforce its provisions, the Act empowers individuals to file suits on behalf of the government alleging that a third party made a fraudulent claim for payment to the government." *Reed*, 923 F.3d at 736; § 3730(b)(1). "These suits are known as '*qui tam*' suits, and the individual plaintiffs are called 'relators.'" *Reed*, 923 F.3d at 736.

Like the FCA with respect to the federal government, the NMMFCA and NMFATA permit a relator to bring an action on behalf of the State of New Mexico for false or fraudulent claims. *See* § 27-14-7(B); § 44-9-5. In relevant part, the NMMFCA imposes liability on one who:  1) "presents, or causes to be presented, to the state a claim for payment under the [M]edicaid program

knowing that such claim is false or fraudulent"; 2) "makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the [M]edicaid program paid for or approved by the state knowing such record or statement is false"; or, 3) "makes, uses, or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the [M]edicaid program, knowing that such record or statement is false." § 27-14-4(A), (C), (E).

Similarly, the NMFATA provides, in relevant part, that a person shall not: 1) "knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision … a false or fraudulent claim for payment or approval"; 2) "knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim"; or, 3) "knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision[.]" § 44-9-3(A)(1), (2), (8). Courts look to FCA case law to construe the NMMFCA and NMFATA. *State ex rel. Foy v. Austin Capital Management, Ltd.*, 2015-NMSC-025, ¶ 25, 355 P.3d 1, 9 (stating that NMFATA "closely tracks the longstanding federal" FCA); *United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1240 (D.N.M. 2018) ("New Mexico state courts have also looked to federal precedent construing the FCA to provide guidance on the [NM]MFCA."); *State ex rel. King v. Behavioral Home Care, Inc.*, 2015-NMCA-035, ¶ 17, 346 P.3d 377, 384, *cert. dismissed*, 348 P.3d 695 (Apr. 3, 2015) (same).

The FCA, NMFATA, and NMMFCA bar a relator's claim if the claim is based on or substantially the same as publicly disclosed allegations or transactions. § 3730(e)(4)(A); § 27-14-10(C); § 44-9-9(D). If the "public disclosure bar" applies, NMFATA claims may be dismissed.

§ 44-9-9(D). On the other hand, the FCA and NMMFCA provide that, even if the public disclosure bar applies, a relator may proceed with a qui tam claim if the relator is an "original source" of the allegations in the complaint. § 3730(e)(4)(A), (B); § 27-14-10(C).

If a relator's claims are not barred, the FCA and NMFATA provide for an award to the relator, under certain circumstances, if the government obtains an award through an "alternate remedy." § 3730(c)(5); § 44-9-6(H); *see generally United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.*, Civ. No. 16-1148 JB/KK, 2021 WL 5998603, at *18–21 (D.N.M. Dec. 20, 2021) ("*Kuriyan I*") (discussing FCA, NMFATA, and NMMFCA). The NMMFCA does not provide for an award to relators based on an alternate remedy. *Id.*; § 27-14-9.

## III. Facts

The Court presumes that the parties and the Government are familiar with this matter's factual and procedural background, which has been detailed in prior Orders and is not repeated here. *See, e.g.*, *Kuriyan I*, 2021 WL 5998603, at *2–6. In addition to the materials in the record and attached to the motions and responses and replies thereto, I have reviewed the papers Relator submitted after briefing was closed, as well as the Government's responses to those papers. (S*ee* Docs. 392, 394, 395, 397,[3] 405, 407, 408.) Consistent with Judge Browning's ruling at the October 28, 2022, hearing, I consider the papers only as supplemental responses to the Motions because they are not sworn statements. (*See* Doc. 402 at 79:22-24.) The following facts are undisputed except as noted.

---

[3] In Document 397, Relator, acting *pro se*, asks the Court to appoint an arbitrator and refer this matter to binding arbitration. (Doc. 397.) The Government opposes this request. (Doc. 398.) In light of the recommended disposition of the present Motions, I recommend denying Relator's request.

### A.  The Contracts

In February 2013, HSD contracted with the MCOs to provide healthcare services to New Mexico Medicaid beneficiaries (the "Contracts"). (Docs. 303 at 6; 303-2 at 2.) In relevant part, each Defendant's Contract is identical. (Docs. 303 at 6; 303-2 at 2; 330 at 2.) The Contracts covered services for individuals who were newly eligible for Medicaid benefits starting in January 2014 pursuant to the Affordable Care Act's Medicaid Expansion Program as well as those eligible for Medicaid coverage before the 2014 expansion of benefits. (Doc. 303 at 6; 303-2 at 2.) The Contracts refer to the individuals newly eligible for Medicaid in 2014 as the "Other Adult Group" or "OAG" and the previously eligible individuals as the "non-Other Adult Group" or "legacy population." (Docs. 303 at 7–8; 303-2 at 2, 4; 330 at 2).

1.  Capitated Payments and Adjustments

The Contracts required HSD to make monthly fixed capitated payments[4] to the MCOs, including payments for the OAG based on predicted medical costs, and provided for several types of retroactive adjustments to the payments. (Doc. 303-2 at 2.) One such adjustment was the "retroactive reconciliation," which pertained to adjustments to the payments for patients who were enrolled for partial months. (Docs. 303-2 at 6; 329-3 at 3.) Another adjustment, called the "risk corridor," protected the MCOs from excessive losses if they were paid too little for the OAG while also ensuring that HSD did not pay too much, because it was difficult to predict the medical care costs, and therefore the appropriate capitated payments, for the OAG. (Docs. 142-2 at 50; 111-2 at 2; 111-3 at 5; 303-2 at 2–3; 305 at 4; 330 at 2.) Relator and the Government dispute several aspects of the risk corridor calculations but agree that they involve a comparison of the medical

---

[4] In this context, a capitated payment is a "set per member per month" payment that a State Medicaid agency makes to an MCO to deliver managed Medicaid care. *See* https://www.medicaid.gov/medicaid/managed-care/index.html (last visited Aug. 24, 2023).

component of the capitated payment (which was calculated based on predicted medical costs) and the MCOs' actual medical costs. (Docs. 330 at 2–3; 349 at 3; 303-2 at 3.) The parties to the Contracts anticipated that HSD would make retroactive adjustments to the capitated payments based on final patient encounter data for 2014. (Docs. 303 at 7; 330 at 3; 111-2 at 2; 303-2 at 4.)

A third adjustment was based on the MCOs' "underwriting gain" from payments received for the legacy population. (Docs. 142-2 at 36 (Section 7.2.1); 305 at 5; 330 at 4.) Under this adjustment, the MCOs were required to share equally with HSD any net income, as defined in the Contracts, over three percent of "net capitation revenue." (*Id.*) The Contracts provided that HSD would determine the underwriting gain after the close of the calendar year. (*Id.*).

2.  The 85% MLR Requirement

The Contracts required the MCOs to "spend no less than eighty-five percent (85%) of net Medicaid line of business Net Capitation Revenue, defined in" the Contracts "on direct medical expenses defined in [the Contracts] on an annual basis." (Docs. 305 at 5; 330 at 4; 142-2 at 37 (Section 7.2.7).) This requirement is referred to as a medical loss ratio or "MLR." (Docs. 305 at 5; 330 at 4.) Relator and the Government dispute whether the MCOs were obligated to return any monies if they did not meet the MLR.[5] (Docs. 305 at 6; 330 at 5.) Relator and the Government also dispute whether HSD in fact recovered any monies based on the MCOs' 2014 MLR, but do not dispute that HSD attributed the recoupments[6] it made after meeting with Relator to risk corridor and underwriting gain adjustments, not to the MLR. (Docs. 305 at 6; 330 at 5, 19; 303-2 at 5.)

---

[5] Relator's and the Government's dispute on this seemingly foundational issue does not preclude summary judgment because for the reasons explained below, even if Relator is correct that the MCOs were obligated to repay funds to HSD for failing to meet the MLR, he has not met his burden to demonstrate that a trial is necessary on whether the public disclosure bar applies, whether he is an original source, or whether he is entitled to an award from an alternate remedy pursued by the Government.

[6] I use Relator's and the Government's term "recoupments" to refer to monies that HSD obtained from the MCOs by offsetting monies it owed to the MCOs through "accounting adjustments." (*See, e.g.*, Docs. 303 at 7; 330 at 1.)

**B.  The Legislative Finance Committee Report**

On June 24, 2015, the Legislative Finance Committee ("LFC"), a committee of the New Mexico Legislature, published a report[7] entitled "Human Services Department - Centennial Care Waiver and Medicaid Managed Care Costs" (the "LFC Report"). (Doc. 150 at 55, 140); https://www.nmlegis.gov/Entity/LFC/Program_Evaluation_Unit_Reports; *see also* N.M. Stat. Ann. §§ 2-5-1 to -7 (establishing the LFC and stating its duties). The LFC Report documented the results of the LFC Program Evaluation Unit's evaluation of "Centennial Care," which "combine[d] separate Medicaid managed care programs into a single program" beginning on January 1, 2014. (Doc. 150 at 55, 66.) The purpose of the evaluation was "to examine cost management components and goals of Centennial Care, assess the rate setting process for managed care, and review HSD's oversight of managed care organization fiscal requirements for Centennial Care." (*Id*. at 55.)

The LFC Report addressed the MLR and the MCOs' compliance with it, the risk corridor, and the MCOs' profits and financial reporting. It included a table showing each MCO's total MLR in 2014. According to the table, each MCO had exceeded the MLR. (*Id*. at 88.) However, the Report also stated that at least "one MCO did not meet the contractual MLR requirement spending fewer than 85 percent on direct medical costs" for one program. (*Id*.) In addition, it noted that the 2014 figures "were still subject to reconciliations." (*Id*.) The Report pointed out that "pre-Centennial Care MCOs were also required to spend 85 percent of capitation on direct medical expense, under spending the MLR requirement by $79.3 million between FY 10 and FY14" and that data from FY10 through FY14 showed "consistent under spending of the MLR requirement[.]" (*Id*.) The Report referred to potential repayment of funds if the MLR was not met

---

[7] Relator and the Government referenced the LFC Report in their briefing and directed the Court to the full report available online. (Docs. 303 at 10; 329 at 6 n.5.) Furthermore, Relator attached the Report to his disclosure statement. (Doc. 150.) I therefore consider the contents of the entire report. Fed. R. Civ. P. 56(c).

and recommended that "HSD . . . continue to monitor the proportion of expenditures dedicated to medical services as financial data becomes finalized." (*Id*.)

The LFC Report also discussed the risk corridor and the difficulty in calculating capitation rates for the OAG. (*Id*. at 110.) In addition, in HSD's response to the Report (which was incorporated into the published Report), it explained the difficulty in setting the capitation payments and how the Contracts included methods for retroactive adjustments of those payments, including for the OAG. (*Id*. at 125.)

Finally, the LFC Report noted that "HSD requires MCOs [to] report audited profit and loss data related specifically to Medicaid" and that "for CY13 and CY14, profit data reported by MCOs does not match what is reported in annual financial statements," although not all the MCOs were required to submit financial statements to the Office of the Superintendent of Insurance (the "OSI"). (*Id*. at 114.) The Report recommended that HSD "incorporate profit margin analysis into [the] rate setting process on an annual basis" and that the OSI "amend rules to require all MCOs with interests in New Mexico [to] submit financial statements annually for review and publication on the OSI website." (*Id*. at 116.)

**C.  Timeline of HSD's Recoupments and Relator's Disclosures and Complaint**

Relator's and the Government's arguments depend in part on the following timeline of Relator's disclosures and complaint in relation to HSD's recoupment requests and accounting adjustments.

To enable HSD to calculate retroactive adjustments and assess MLR compliance, the Contracts required the MCOs to submit encounter data for 2014. (Doc. 111-2 at 2.) Mercer, an actuary company retained by HSD, calculated the various reconciliations required by the Contracts and the MCOs' MLR for 2014. (Docs. 111-2 at 2; 303 at 7; 303-1 at 20:3–25; 303-2 at 3; 305 at 4; 330 at 3.) HSD "eased" the deadlines for the encounter data because of various difficulties in

gathering and submitting the data to Mercer. (Docs. 329-7 at 98:3–18; 111-2 at 2.) Mercer began its work on the reconciliations in August 2015. (Docs. 111-2 at 2; 349 at 4; 303-2 at 3, 4.)

An "Accounting Transaction Request" dated December 2, 2015, shows an HSD request for $4,909,279 from UnitedHealthcare. (Doc. 329-5 at 2.) On the Request, there is a typed notation stating, "CY 14 OSI – MLR Recoupment" next to a checked box entitled "MCO Recoupment." (*Id*.) Handwritten above the typed notation is "(applied to Cy14 OAG Risk Corridor)." (*Id*.) Relator and the Government dispute whether the Accounting Transaction Request establishes that HSD recouped over $4.9 million for the MCO's alleged failure to comply with the MLR requirement. (Docs. 305 at 6; 330 at 5.)

In March 2016, HSD emailed each of the MCOs about recoupments. (Docs. 330 at 7; 349 at 8; 329-6.) In the email, HSD referenced the "retro period reconciliation" and stated, "2014 incurred data should be complete in the encounter system however HSD is only recouping 95% in anticipation of a small amount of encounters that may be submitted in Q1-2016 for CY2014 dates of service." (Doc. 329-6 at 2–9.) HSD also stated that the MCOs could submit questions to HSD after review of the attached documents. (*Id*.) Attachments to each email included a document entitled "Centennial Care CY2014 Retroactive Reconciliation Summary – Interim." (Doc. 329-6 (the "Reconciliation Summaries").) The Reconciliation Summaries are marked "Draft and Confidential" and "For Discussion Purposes Only." (*Id*.) In addition to sending the Reconciliation Summaries to the MCOs, HSD stated in the emails that "the detailed member level revenue and encounter information that supports the" Reconciliation Summaries was available to the MCOs for review. (*Id*.)

On May 25, 2016, Relator met with HSD regarding his analysis of the 2014 encounter data and informed HSD that he thought the MCOs may not have met the MLR required by the

Contracts. (Docs. 305 at 6; 330 at 5.) The following day he sent HSD an email about his analysis. (Docs. 142-1; 305 at 6; 330 at 5.)

On October 13, 2016, Relator sent his Disclosure Statement to the United States and the State of New Mexico. (Docs. 150; 303 at 9; 329.) Relator does not allege that he made any other pre-litigation disclosures to HSD, the State of New Mexico, or the United States. (Docs. 303 at 9; 329.) On October 18, 2016, Relator filed his original complaint. (Doc 1.)

In December 2016, HSD emailed the MCOs about "[s]cheduled payment & recoupments." (Docs. 329-9 at 2–5; 330 at 8; 349 at 9.) In the email to each MCO, HSD stated, "[the] Medical Assistance Division will process . . . payment and recoupments on December 19, 2016" and listed the "final payment and recoupment amounts" for the "CY14 Retroactive Period Reconciliation" for both OAG and legacy populations. (Doc. 329-9.)

In January 2017, HSD notified the MCOs that it would process "payment and/or recoupment" for "OAG Risk Corridor Reconciliation CY14" (Docs. 329-10; 305 at 5; 330 at 8) and made accounting adjustments attributed to the risk corridor calculations. (Docs. 305 at 5; 329-10; 330 at 8; 349 at 9; 111-2 at 3; 303-2 at 3; 173 at 7.)

In August 2017, HSD made accounting adjustments attributed to the underwriting gain calculations. (Docs. 305 at 5; 330 at 4; 173 at 7; 173-1 at 29-32; 303-2 at 4.)

In his Response to the Alternate Remedy Motion, Relator asserts that, before the May 2016 meeting, HSD had requested recoupments totaling $160,757,186 and that, after the meeting, HSD recouped $233,117,316. (Doc. 330 at 8.) The Government does not dispute these figures. (Doc. 349.)

## IV. Allegations in the TAC and Relator's Motion for Alternate Remedy

The TAC, filed in October 2020, is the operative complaint. (Doc. 142.) In the TAC, Relator states that the "essence of [the alleged] fraudulent scheme" is that the "MCOs had not met

the 85% minimum MLR" and "illegally retained overpayments, in violation of federal regulations and their contracts with HSD." (Doc. 142 at 9.) He further alleges that "premiums paid to [the] MCOs—and consequently, [the MCOs'] profits—had jumped considerably between 2013 and 2014, even though patients' medical needs remained the same" and that the "'jump' could not be explained in any way other than overpayments to" the MCOs, which indicated to Relator that the MCOs were knowingly "retaining overpayments in excess of the time period permitted by law." (*Id*. at 8–9.) He finally alleges that, despite reviewing Mercer's "MLR and [risk corridor] audit results" before they were sent to HSD, the MCOs "had made no effort to inform HSD of overpayments," and had falsely certified their compliance with the Contracts, "which confirmed [their] fraudulent scheme[.]" (*Id*. at 9, 19, 30–32.) Relator asserts that the MCOs are therefore liable for falsely certifying that they had not been overpaid and for failing to return excess payments within the period required by law. (Doc. 142 at 30–34); *see* § 3729(a)(1)(A), (B), (G); § 27-14-4(E); § 44-9-3(A)(8).

In February 2021, Relator filed his Opposed Third Motion for Award from Alternate Remedy, seeking

> a 30% share of the overpayments that the United States and the State of New Mexico recouped from [the MCOs] for calendar year 2014. This consists of:
>
> (a)  30% of $133,147,133.00[], plus interest accruing since the date those overpayments were recouped, totaling $39,944,139.90 plus interest; and
> (b)  30% of any other 2014 overpayment recoupments that overlap with his allegations, in an amount yet to be determined, plus interest accruing since the date of recoupment.

(Doc. 173 at 27.)

## V.  The Public Disclosure Motion

In its Public Disclosure Motion, the Government asserts that Relator's claims are barred because the essential elements or transactions underlying the TAC were publicly disclosed before

Relator's May 2016 meeting with HSD, and Relator was not an original source of the information underlying his allegations. (Doc. 303.) Relator disagrees. (Doc. 330.) For the following reasons, I find as a matter of law that the FCA's, NMMFCA's, and NMFATA's public disclosure bars apply to Relator's claims, and that Relator has not presented evidence from which a reasonable jury could conclude that he was an original source. The public disclosure bars therefore bar Relator's claims, and the Government's motion should be granted.

## A.  The FCA's Public Disclosure Bar

The FCA provides that a court "shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" either: (i) in a "Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "from the news media." § 3730(e)(4)(A). However, the FCA relieves a private person who is "an original source of the information" from the effect of public disclosure bar. § 3730(e)(4)(A), (B).

Before the 2010 amendments to the FCA, a federal court did not have jurisdiction over FCA claims if the public disclosure bar applied. *Reed*, 923 F.3d at 737 n.1. However, the 2010 amendments removed the provision's jurisdictional language; as amended, the provision simply instructs courts to "dismiss an action" if the public disclosure bar applies. *Id.*; § 3730(e)(4)(A). The Tenth Circuit Court of Appeals has not ruled on the impact of this amendment. *Reed*, 923 F.3d at 737 n.1.

Nevertheless, the federal courts of appeal that have considered the issue have unanimously concluded that the public disclosure bar no longer deprives a court of jurisdiction but rather provides defendants and the Government with an affirmative defense. *Id.* (collecting cases). I find the reasoning in those cases persuasive. Generally, courts presume that changes in statutory

language are intended to change the statute's meaning. *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1247 (10th Cir. 2012). In addition, unless "Congress has 'clearly state[d]' that [a statutory provision] is jurisdictional . . . 'courts should treat the [provision] as nonjurisdictional in character.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (quoting *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 515–16 (2006)). I therefore agree that Congress made it "'clear that the public-disclosure bar is no longer a jurisdiction-removing provision'" by deleting the "'jurisdiction-removing language . . . and replac[ing] it with a generic, not-obviously-jurisdictional phrase.'" *U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016) (quoting *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013)).

Because the public disclosure bar is an affirmative defense, the Government bears the burden to show that it applies. *Leone*, 810 F.3d at 1153. However, under Tenth Circuit law, Relator bears the burden to show that he falls within the "original source" exception to the bar. *Bahrani*, 465 F.3d at 1207 ("The burden is on [the relator] to show that he is an original source.").[8]

To determine whether the public disclosure bar requires dismissal of a relator's claims, the Court first determines whether the bar applies to each claim by examining whether the claim involves "substantially the same allegations or transactions" as the publicly disclosed information and whether the disclosures at issue were made public in one of the FCA's specified sources. § 3730(4)(A); *see Reed*, 923 F.3d at 743–744; *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1042 (10th Cir. 2004). The public disclosure bar applies if each of these questions is answered in the affirmative. *Reed*, 923 F.3d at 743 n.5. If the public disclosure bar applies, the court then

---

[8] Although *Bahrani* predates the 2010 amendments to the FCA, these amendments did not change the phrasing of the original source exception to the public disclosure bar. *Compare U.S. ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797 n.3 (10th Cir. 2002) (setting forth text of 31 U.S.C. § 3730(e)(4)(A) before 2010 amendments) *with* 31 U.S.C. § 3730(e)(4)(A). Thus, in the Court's view, the 2010 amendments did not affect *Bahrani*'s holding that the relator bears the burden of proving that he falls within the original source exception.

determines whether the relator falls within the "original source" exception. *Reed*, 923 F.3d at 743 n.5.

A relator's allegations are "substantially the same" as publicly disclosed allegations or transactions if the public disclosure was "sufficient to set the government 'on the trail of the alleged fraud without [the relator's] assistance.'" *Id.* at 744 (quoting *U.S. ex rel. Fine v. Sandia Corp.,* 70 F.3d 568, 571 (10th Cir. 1995)). In other words, a public disclosure will meet the "substantially-the-same" standard if it provides "enough information" to permit the government "to infer that the defendant knowingly violated the" FCA. *Reed*, 923 F.3d at 745 n.10 (quoting *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017)). Under this standard, "direct allegations of fraud" are not necessary; rather, a public disclosure "need only disclose 'the material elements of the [allegedly] fraudulent transaction.'" *Reed*, 923 F.3d at 745 (quoting *Fine*, 70 F.3d at 572). "[T]he phrase 'allegations or transactions' in § 3730(e)(4)(A) . . . suggests a wide-reaching public disclosure bar" and the term "transaction" is "recognized as having a broad meaning." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408 (2011); *see, e.g., Moore v. New York Cotton Exchange,* 270 U.S. 593, 610 (1926) ("'Transaction' is a word of flexible meaning."); *Hamilton v. United Healthcare of La., Inc.,* 310 F.3d 385, 391 (5th Cir. 2002) ("[T]he ordinary meaning of the term 'transaction' is a broad reference to many different types of business dealings between parties[.]").

A qualifying public disclosure need not mirror every allegation in the relator's complaint. "'Substantially the same' . . . requires only the *essentials* of the relator's allegations to be identical to or of an identical type as those disclosed publicly." *Reed*, 923 F.3d at 748 n.12. In comparing a relator's allegations to a public disclosure, courts must neither consider the allegations at the "highest level of generality" nor adopt a "hyper-specific reading that requires near-complete

identity of allegations." *Id*. Also, the relator "'need not have learned of the basis for the *qui tam* action from the public disclosure' to trigger the public disclosure bar." *Reed*, 923 F.3d at 745 (quoting *Kennard*, 363 F.3d at 1044).

The Court's "substantially-the-same" analysis must begin with Relator's allegations. *See generally id.* In the TAC, Relator states that the "essence of [the alleged] fraudulent scheme" is that the "MCOs had not met the 85% minimum MLR, meaning that they had illegally retained overpayments, in violation of federal regulations and their contracts with HSD." (Doc. 142 at 9.) He further alleges that "premiums paid to [the] MCOs—and consequently, [the MCOs'] profits— had jumped considerably between 2013 and 2014, even though patients' medical needs remained the same" and that the "'jump' could not be explained in any way other than overpayments to" the MCOs, which indicated to Relator that the MCOs were knowingly "retaining overpayments in excess of the time period permitted by law." (*Id*. at 8–9.) He alleges that, despite reviewing Mercer's "MLR and [risk corridor] audit results" before they were sent to HSD, the MCOs "had made no effort to inform HSD of overpayments, which confirmed [their] fraudulent scheme[.]" (*Id*. at 9, 19, 30–32.) Accordingly, Relator alleges that the MCOs both fraudulently retained funds after they should have been returned to HSD and falsely certified that the audit results were correct.

The Government has shown that the transactions alleged in the TAC are substantially the same as transactions disclosed in the LFC Report. In the Report, the LFC noted that the MCOs were required to spend at least 85% of "capitation revenue on direct medical expenses on an annual basis," that in 2014, at least "one MCO did not meet [this] contractual MLR requirement," and that before 2014, MCOs had fallen well short of meeting the requirement. (Docs. 329-1 at 5, 6; 303 at 10; 329; 150 at 88.) It further noted that "CY14 figures are still subject to reconciliations," (Docs. 303 at 10; 329-1 at 6; 150 at 88), and referred to potential repayment of funds if the MLR

is not met. (Doc. 150 at 38, 92.) In other words, the Report 1) identified the MCOs and contracts, 2) stated the MLR requirement, 3) highlighted a historical problem with MLR compliance and underspending on direct medical expenses in the past, 4) noted that at least one MCO had failed to meet the MLR requirement in 2014, and 5) referenced potential repayment of funds based on the MLR. Thus, the Report "identified the problem—[underspending on direct medical expenses]—and traced that problem to an easily identifiable group of probable offenders"—the MCOs. *Reed*, 923 F.3d at 749. This is the same problem, and the same group of probable offenders, alleged in the TAC.

Relator's evidence does not create a genuine factual dispute on this issue. Relator argues that his allegations are not substantially the same as the disclosures in the LFC Report because the LFC's discussion of pre-2014 underspending is irrelevant to performance under Centennial Care contracts. (Doc. 329 at 6.) But on the contrary, the LFC's reference to historical underspending to the tune of nearly $80 million highlights potential underspending in 2014 and implies that the 2014 data, which was still being reconciled, may reveal similar underspending. Hence, rather than being irrelevant, that discussion in fact would have helped to set HSD on the trail of any allegedly fraudulent MLR noncompliance in 2014.

Relator also argues that the Report's discussion of MLR noncompliance would not "set the Government on a trail of fraud" because it does not address the MCOs' knowing retention of funds beyond a permissible time or their certifications on reports to HSD, which are the crux of Relator's FCA allegations. (*Id.*) But the public disclosure bar does not require a "hyper-specific reading that requires near-complete identity of allegations," as Relator would have it. *Reed*, 923 F.3d at 748 n.12. Again, the Report publicized the pertinent elements of the Contracts, the names of the MCOs, the MLR requirement, MCOs' historical failure to meet that requirement, and the fact that at least

one MCO had not met that requirement in 2014, and referenced continued reconciliations and potential repayment. Whether the MCOs knowingly retained funds they should have returned because they had not met the MLR requirement, and whether they falsely certified their compliance with it, are simply a few inexorable steps further along the same "trail of alleged fraud." *See United States v. United Behav. Health, Inc.*, Civ. No. 15-1164 KWR/JHR, 2023 WL 1817380, at *9 (D.N.M. Feb. 8, 2023) (holding that, even though public hearings did not address "specific allegations of fraud," the "material elements of the alleged fraudulent transaction [were] disclosed sufficiently to put the government on the trail of the alleged fraud" where the government "was aware that the contractor had failed to perform the contract requirements" and "could have followed the trail to determine if fraud had caused the contract violation"). In these circumstances, the Government's "nose for fraud" would have been "sensitive enough to pick up the scent" using the information in the LFC Report. *Reed*, 923 F.3d at 745. I therefore find that the Government has met its burden to show beyond peradventure that the LFC Report publicized transactions and elements that are substantially the same as those forming the basis of Relator's claims.

The next question is whether the LFC Report qualifies as one of the public disclosure sources enumerated in the FCA. § 3730(4)(A); *Reed*, 923 F.3d at 743–44; *Kennard*, 363 F.3d at 1042. This inquiry depends on the facts of the case. *United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh, Pennsylvania*, 728 F. App'x 101, 104 (3d Cir. 2018) ("The question[] of whether there has been a 'public disclosure' within the meaning of the FCA … [is a] matter[] of fact."); *United States ex rel. Lovato v. Kindred Healthcare, Inc.*, Civ. No. 15-2759 CMA/NYW, 2020 WL 9160872, at *7 (D. Colo. Dec. 14, 2020) (noting that the "public disclosure bar implicate[s] fact-intensive analyses"), *report and recommendation adopted sub nom. Colorado v.*

*Kindred Healthcare, Inc.*, Civ. No. 15-2759 CMA/NYW, 2021 WL 1085423 (D. Colo. Mar. 22, 2021).

I find that there is no genuine factual dispute regarding whether the LFC Report is a qualifying public disclosure "from the news media." 31 U.S.C. § 3730(e)(4)(A). Although the FCA does not define "news media," "the . . . sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides 'a broad[] sweep.'" *Schindler Elevator Corp.,* 563 U.S. at 408 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010)). Construing "news media" broadly, courts have held that websites may qualify as "news media" under certain circumstances. *See, e.g.*, *Beauchamp*, 816 F.3d at 43 n.6 ("Courts have unanimously construed the term 'public disclosure' to include websites and online articles."); *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 813 (11th Cir. 2015) (concluding that newspapers and publicly available websites qualified as "news media").

To determine whether information on a website is a disclosure "from the news media," courts consider whether and how long the information was readily available to the public and whether the information was "newsworthy." *United States ex rel. Berkley v. Ocean State, LLC*, No. CV 20-538-JJM-PAS, 2023 WL 3203641, at *4 (D.R.I. May 2, 2023); *United States v. Valley Campus Pharmacy, Inc.*, No. 216CV04777MCSPLA, 2021 WL 4816648, at *8 (C.D. Cal. June 23, 2021); *U.S. ex rel. Green v. Serv. Cont. Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 33 (D.D.C. 2012). Other considerations are whether the entity operating the website intended to "disseminate information widely, as opposed to only to a few individuals" and whether dissemination of the information at issue was the website's "primary purpose . . . or whether the dissemination [was] merely ancillary to some other purpose." *United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, Civ. No. 17-1694 PSG (SSX), 2019 WL 3282619,

at *14–15 (C.D. Cal. July 16, 2019), *rev'd on other grounds and remanded sub nom. Integra Med Analytics LLC v. Providence Health & Servs.*, 854 F. App'x 840 (9th Cir. 2021). Some courts have also considered the extent to which the publishing entity "curated" the website's content. *Id*. at 14; *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 36 ITRD 697, 10 (E.D. Pa. 2014); *but see, e.g.*, *Berkley*, 2023 WL 3203641, at *4 ("[R]eading the FCA in accordance with its plain meaning, the [c]ourt finds that there is no requirement that [a] website must curate the information or exercise editorial judgment on the information the website re-posts in order to be considered a public disclosure under the statutory language.").

I find that, undisputedly and indeed indisputably, the New Mexico Legislature's website qualifies as a news media outlet and that the LFC Report was publicly disclosed when it was posted on that website. The New Mexico Legislature's website disseminates legislative affairs information to the public. *See* https://www.nmlegis.gov/. In essence, it serves as a news source for information about legislation in New Mexico and the work of public bodies like the LFC. *See* (Doc. 150 at 140 (stating that LFC Report is a "matter of public record")); §§ 2-5-1 to -7 (establishing LFC and stating its duties); *see, e.g.*, §§ 2-3-19, 2-15-8(C) (requiring publication of information on legislature's website); *cf. U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014) (holding that website publishing information related to public utilities functioned "as a news organization for public utilities and consumers in Missouri"); *Rosenberg v. JPMorgan Chase & Co.*, 169 N.E.3d 445, 460–61 (2021) (holding that website functioning as the "official repository for information on all municipal bonds" fell within "news media" in state false claims act because "'news media' is broad enough to encompass the many ways in which people in the modern world obtain financial news, including from publicly available websites on the Internet"). The LFC Report is readily available to the public through a

22

"Publications" link on the legislature's website and is newsworthy because it addresses significant changes to the management of Medicaid funding in New Mexico and their impact on New Mexicans' health care and the state budget. For these reasons, I conclude that as a matter of law, the public disclosure bar applies to Relator's FCA claims because 1) the LFC Report is a qualifying public disclosure from an enumerated source that 2) disclosed information about transactions and elements that are substantially the same as those underlying Relator's claims.

The next step is to assess whether Relator may nevertheless proceed under the "original source" exception to the bar.[9] § 3730(e)(4)(B); *Reed*, 923 F.3d at 755. Relator argues that he is an "original source" under (B)(2) of this exception, which permits qui tam actions to proceed despite the public disclosure bar where the relator had 1) information "independent of" the information in the public disclosure that 2) "materially add[s]" to the public disclosure and 3) voluntarily disclosed that information to the Government before filing an action under the FCA. § 3730(e)(4)(B)(2); *Reed,* 923 F.3d at 755. In other words, to be an original source under this provision, a "relator must bring something to the table that would add value for the government." *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 527 (6th Cir. 2020). In addition, "a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained . . . independent knowledge of the fraudulent acts alleged in the

_____

[9] An "original source" is an individual who either

(i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or

[ii] who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).

complaint and support those allegations with competent proof." *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc* ., 190 F.3d 1156, 1162 (10th Cir. 1999).

Relator argues that he qualifies as an "original source that the [MCOs] were fraudulently retaining overpayments which were owed *based on the MLR calculation*"[10] because they "knew that the initial recoupments requested by HSD were insufficient." (Doc. 329 at 14–15 (emphasis added).) First, Relator *argues* that he provided information that was "independent of" the information in the LFC Report because he discovered "anomalies through his patented chronic disease modeling[.]" (Doc. 329 at 13–15.) But he submits no evidence in support, and at the summary judgment stage, such conclusory statements, without competent proof, do not meet his burden. *Hafte*r, 190 F.3d at 1163 (holding that "[a] mere assertion of knowledge, without adequate basis in fact and unsupported by competent proof is insufficient to establish" original source status).

Moreover, Relator does not point to record evidence raising a triable issue of fact as to whether his information materially added to the information in the LFC Report. Relator argues that his inference that the MCOs had knowingly retained overpayments beyond the permitted time materially added to the information in the LFC Report because the "LFC Report lacks any indication of a misrepresented state of facts—i.e., fraudulently retained overpayments[.]" (Doc. 329 at 8, 15; *see also* 142 at 8–9.)

"[A] relator who discloses new information that is sufficiently significant or important that it would be capable of 'influenc[ing] the behavior of the recipient'—i.e., the government—ordinarily will satisfy the materially-adds standard." *Reed*, 923 F.3d at 757. "On the other hand, a

---

[10] Relator does not argue that he is an original source of information about overpayments based on the risk corridor or underwriting gain calculations. (Doc. 329 at 14–15.) Hence, to the extent the TAC asserts claims resting on overpayments based on those calculations, Relator has not met his summary judgment burden as to those claims. (*See* Doc. 303 at 13.)

relator who merely adds background information or details about a known fraudulent scheme typically will be found not to have materially added to the publicly disclosed information." *Id.* "[F]urnishing information that a particular defendant is acting 'knowingly' (as opposed to negligently) sometimes may suffice as a material addition to information already publicly disclosed." *Reed,* 923 F.3d at 761 (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 213 (1st Cir. 2016)). For example, in *Reed*, the Tenth Circuit found that the relator's allegations "that [the defendant's employees] tried to *knowingly* cover up" violations of regulations "amplif[ied] the materiality of the underlying allegations of" fraud because they "provide[d] direct evidence of [the defendant's] scienter" that was not "available via the public disclosures." 923 F.3d at 760–61. The relator's allegations included "pages of details describing how [the defendant's] managers knowingly schemed to defraud the government by covering up systemic violations of" the regulations. *Id.* at 761–62. The *Reed* court held that these allegations, together with the relator's allegations related to a "new scheme to defraud the government" not mentioned in the public disclosures, materially added to the public disclosures, and rendered the relator an original source.[11] *Id.* at 763.

Here, unlike in *Reed*, Relator did not provide direct evidence that the MCOs knowingly submitted false certifications to HSD or retained funds they knew they owed to HSD. *See id.* at 760. Rather, Relator's allegations regarding the MCOs' scienter were based on inferences drawn from their reported profits. Also, Relator's scienter allegations are inextricably tied to his allegations about the MCOs' failure to meet the MLR—not to a "new scheme" as in *Reed*. Thus, *Reed* is distinguishable from the present matter because, unlike the relator in that case, here Relator merely "add[ed] a few more breadcrumbs on an existing trail" instead of "blaz[ing] a new" one.

---

[11] However, the *Reed* court declined to "opine on whether" the relator's allegations regarding scienter or the new scheme, "standing alone, would be sufficient to satisfy the materially-adds standard." 923 F.3d at 763.

*Id.* at 763; *cf. United States ex rel. Mitchell v. CIT Bank, N.A.*, Civ. No. 14-833, 2022 WL 135438, at *9 (E.D. Tex. Jan. 13, 2022) (holding that relator's information materially added to public disclosures because it "detail[ed] specific instances that indicate [the defendant's] actions were taken knowingly to evade the requirements of the [federal] program and to defraud the government").

Additionally, Relator's inferences based on increases in the MCOs' profits do not materially add to the LFC Report because the LFC Report noted increases in profits reported by the MCOs from 2013 to 2014, just as Relator did. It stated, "New Mexico's Medicaid program has been generally profitable for MCOs in CY13 and CY14," and included a table showing that some of the MCOs reported substantial increases in Medicaid program profits from CY13 to CY14. (Doc. 150 at 114–115.) The LFC Report also discussed the MCOs' profit reports and financial statements and recommended that the OSI "require all MCOs with interests in New Mexico submit financial statements annually for review and publication on the OSI website." (*Id.* at 115–116.) And significantly, the LFC Report noted that the MCOs' financial reports to HSD were inconsistent with other financial reports, thereby flagging potential false certifications. (*Id.* at 115.) In short, considering the analyses in the LFC Report, Relator's inferences based on profit increases were not "sufficiently significant or important" that they were "capable of" influencing HSD's behavior. *Reed*, 923 F.3d at 757; *see United States ex rel. Lisitza v. Par Pharm. Companies, Inc.*, No. 06 C 06131, 2017 WL 3531678, at *17 (N.D. Ill. Aug. 17, 2017) ("Suspicions are not facts; they are not 'essential information'; and they are not 'critical elements' of fraud.").

Relator next argues that his analysis materially added to the LFC Report "because he alerted the Government to at least $233,117,316 in overpayments which the Government had not located." (Doc. 329 at 15.) As evidence, he points to the timing of the recoupments that occurred

after his disclosure. (*Id.*) But the timing of the recoupments does not show that his disclosures about the MLR materially added to the information in the LFC Report, particularly where, at the time of his disclosures, HSD had undisputedly already initiated reconciliation and recoupment processes for the year 2014 and the Government's unrebutted evidence shows these processes were ongoing, as further discussed below. Nor has Relator presented any competent evidence that HSD and/or Mercer in fact changed their conduct based on his allegations, as also discussed in more detail below.

Having found that Relator has not met his burden to show a genuine factual dispute regarding whether his information was independent of and materially added to the information in the LFC Report, I need not address whether his information was "voluntarily disclosed" to the Government. § 3730(e)(4)(B). In sum, I find the Government has shown beyond peradventure that the public disclosure bar applies to Relator's claims, and Relator has neither shown nor presented evidence creating a genuine factual dispute as to whether he is an original source under the FCA. As such, I recommend that the Court grant the Government's Public Disclosure Motion and enter summary judgment on Relator's FCA claims.

## B.  The NMMFCA's and NMFATA's Public Disclosure Bars

The NMMFCA provides that the courts "shall not have jurisdiction over an action based upon the public disclosure of allegations or actions in a criminal, civil or administrative hearing or from the news media, unless . . . the person bringing the action is an original source of the information." § 27-14-10(C). Similarly, the NMFATA provides that "a court may, in its discretion, dismiss an [NMFATA] action . . . if the elements of the alleged false or fraudulent claim have been publicly disclosed in the news media or in a publicly disseminated governmental report[12] at the

---

[12] I do not decide here whether the LFC Report would qualify as a "governmental report" under the NMFATA because neither Relator nor the Government has addressed that issue. (Docs. 303 at 9–10; 330.) However, it seems

time the complaint is filed." § 44-9-9(D). As previously noted, however, the NMFATA does not include an original source exception to its public disclosure bar. *See generally id.*

Because Relator did not respond to the Government's argument that the NMFATA and NMMFCA public disclosure bars should be construed in accordance with caselaw applying the FCA, he has consented to the Public Disclosure Motion as to that issue. (Doc. 303 at 11; 329); D.N.M.LR-Civ. 7.1(b); *Lewis*, 542 F. Supp. 3d at 1168 n.6. Moreover, while the New Mexico courts have not construed these provisions, they have generally "looked to federal precedent construing the FCA to provide guidance on the [NM]MFCA" and NMFATA, and I see no reason to deviate from this practice here. *Dental Dreams, LLC*, 307 F. Supp. 3d at 1240; *King*, 2015-NMCA-035, ¶ 17, 346 P.3d at 384; *Foy*, 2015-NMSC-025, ¶ 25, 355 P.3d at 9. I therefore find that the NMFATA and NMMFCA public disclosure bars apply to Relator's claims for the same reasons the FCA's public disclosure bar applies.

However, the NMMFCA's original source exception requires a slightly different analysis. Like the FCA, the NMMFCA relieves relators from the effect of the public disclosure bar if they are "original sources." § 27-14-10(C). However, the NMMFCA's definition of an original source echoes the FCA before it was amended in 2010, rather than the current FCA. *Id.* Specifically, under the NMMFCA, an original source is one who "has independent knowledge, including knowledge based on the person's own investigation of the defendant's conduct, of the information on which the allegations are based[.]" *Id*. Like the pre-2010 FCA, the NMMFCA does not specify that the relator's "independent knowledge" must be "independent of" the information in a qualifying public disclosure, as opposed to "all information readily available in the public domain." *Id.; U.S.*

likely the LFC Report would so qualify, because the report was prepared by a committee of the New Mexico Legislature and published on the Legislature's website; and, unlike the FCA, the NMFATA does not limit qualifying governmental reports to those issued by a federal entity.

*ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 305 (3d Cir. 2016) (discussing differences in pre- and post-amendment FCA original source exceptions). Further, it does not require relators to show that their information materially added to the information in the qualifying public disclosure. § 27-14-10(C); § 3730(e)(4)(B)(2) (2006); *Moore & Co., P.A.*, 812 F.3d at 305 n.10.

Both Relator and the Government have equated the NMMFCA with the current FCA. (Docs. 329 at 13 (addressing only the FCA's definition of "original source"); 303 at 11, 12; *see also* Doc. 142 at 11–12 (equating the FCA and NMMFCA "original source" provisions)). By failing to respond to the Government's argument that he is not an original source under either statute, Relator has consented to summary judgment on his NMMFCA claim as to this issue. *See Cloud v. Wormuth*, Civ. No. 20-4 EFM, 2023 WL 4745730, at *10 (E.D. Okla. July 24, 2023) ("Courts may presume that a party abandons its claims by failing to substantively address it when opposing summary judgment."); *Hinsdale*, 19 F. App'x at 768-69; *Lewis*, 542 F. Supp. 3d at 1168 n.6; *Coffey*, 955 F.2d at 1393.

Moreover, even if Relator had not abandoned the issue, he has not met his burden to show a genuine factual dispute regarding whether he is an original source under the NMMFCA. Under the pre-2010 FCA, knowledge is "independent" if it is "marked by the absence of an intervening agency," and "unmediated by anything but the relator's own labor." *In re Nat. Gas Royalties,* 562 F.3d 1032, 1045 (10th Cir. 2009). "Secondhand information, speculation, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge." *Id.*; *Hafter*, 190 F.3d at 1162. A relator's "unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is also insufficient." *In re Nat. Gas Royalties*, 562 F.3d at 1045. When a relator relies on public sources, courts must consider the "degree and

character of" the relator's reliance on those sources, including "the availability of the information and the amount of labor and deduction required to construct the [relator's] claim." *Kennard*, 363 F.3d at 1045–46. Similarly, when the allegations in a relator's complaint are based on both "independent research and investigation" and information obtained from other sources, the court must consider the importance of each type to the complaint. *See Hafter*, 190 F.3d at 1163.

In the TAC, Relator *alleges* that he is an original source because his patented "model showed that [the MCOs] had not complied with the 85% MLR in 2014" and that he "considered his model's analysis alongside [the MCOs'] unexplained increase in profits, HSD's unawareness of overpayments, and his own knowledge of law and regulations, and concluded that [the MCOs] were fraudulently retaining overpayments." (Doc. 142 at 12.)[13] He also *alleges* that his "calculations and allegations are not based on public [LFC] reports or profit and loss statements, but his own engineered and patent-protected analysis." (*Id*. at 11.) But again, Relator has failed to present an affidavit, deposition testimony, or other competent evidence to support these allegations. *See Helget*, 844 F.3d at 1223 n.3 (nonmoving party who would bear burden of proof at trial must present affirmative evidence to contradict testimony offered by moving party supporting entry of summary judgment). Accordingly, I recommend that the Court grant the Government's Public Disclosure Motion and enter summary judgment in the Government's favor as to Relator's NMMFCA and NMFATA claims, as well as his FCA claims.

## VI. The Alternate Remedy Motion

Both the FCA and the NMFATA provide that the government "may elect to pursue" its claims "through any alternate remedy available[.]" § 3730(c)(5); § 44-9-6(H). If the government pursues an alternate remedy in a separate proceeding, relators have the same rights in that

---

[13] I note that, in his Disclosure Statement, Relator stated that his allegations were "corroborate[d]" by the MCOs' "Medicaid P&L statements" and the LFC Report. (Doc. 150 at 5–7.)

proceeding as they would have had if their action had continued under the FCA or NMFATA, including a right to a share of the recovery obtained through that proceeding. § 3730(c)(5); § 44-9-6(H). In his Opposed Third Motion for Award from Alternate Remedy, Relator argues that he is entitled to a portion of HSD's recoupments made after his May 2016 disclosure because HSD's "recovery of overpayments from [the MCOs] is an alternate remedy under" the FCA and NMFATA. (Doc. 173 at 2.) The Government, conversely, contends Relator is not entitled to any award. (Doc. 305.)

I recommend that the Court either 1) deny the Alternate Remedy Motion as moot because Relator is not entitled to an award from any alternate remedy due to the application of the public disclosure bars or, alternatively, 2) grant the Motion on its merits because the recoupments HSD made after May 2016 were not for the type of false claims addressed by the FCA or NMFATA and Relator's analysis did not trigger or influence the recoupments.

First, the Alternate Remedy Motion is moot because Relator has no right to recover a portion of any alternate remedy because, as discussed above, the public disclosure bars in the FCA, NMMFCA, and NMFATA bar his claims. A

> relator is not entitled to a share in the proceeds of an alternate remedy when the relator's *qui tam* action under § 3729 is invalid: As § 3730(c)(5) provides, a relator's rights in an alternate remedy proceeding are the 'same rights' that the relator would have had if the action had proceeded under the FCA.

*U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 112 (3d Cir. 2007); *see* § 44-9-6(H). The FCA "evinces no intent to compensate relators who bring unfounded § 3729 claims, whether the claims are legally or factually unfounded." *Id*.; *see United States v. Sprint Commc'ns, Inc.*, 855 F.3d 985, 995 (9th Cir. 2017) ("[The relator's] failure to meet the original source requirement is . . . preclusive of any judgment in his favor. Because of that failure, dismissal of [the relator's] claim for monetary recovery was mandatory." (footnote omitted)). "This rule

follows from a commonsense reading of the federal FCA: if there is no valid qui tam action for the government to take over, then any remedial option that the government might pursue is not, in fact, an 'alternate' to taking over a qui tam action." *New York ex rel. Khurana v. Spherion Corp.*, 246 F. Supp. 3d 995, 1000 (S.D.N.Y. 2017).

Alternatively, the Alternate Remedy Motion is well-taken on its merits and the Court should grant the Government summary judgment on Relator's alternate remedy claims. To be entitled to an award from the recoupments HSD obtained, Relator must show two things. First, he must show the recoupments were, in fact, an alternate remedy for or to prevent "the same type of fraud or falsity that the FCA and the NMFATA recognize." *United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.*, Civ. No. 16-1148 JB/KK, 2022 WL 704130, at *3 (D.N.M. Mar. 9, 2022) ("*Kuriyan II*"); see *United States v. Novo A/S*, 5 F.4th 47, 56 (D.C. Cir. 2021). Second, Relator must show "that [HSD] used [his] information to recoup the funds at issue from the . . . MCOs." *Kuriyan II* at *3. Both prongs of the analysis must be satisfied for Relator to obtain an award from the recoupments. *Id*. Yet Relator has not demonstrated a genuine dispute of fact regarding either.

As to the first prong, it is undisputed that the Contracts contemplated retroactive reconciliation, risk corridor, and underwriting gain recoupments and that the MCOs' obligation to pay these recoupments did not depend on whether they had knowingly made a false statement or improperly avoided a financial obligation to HSD. In addition, it is undisputed that HSD did not find the MCOs owed the recoupments because they knowingly made false certifications or improperly retained payments and did not impose any penalties on the MCOs for improper conduct related to those recoupments. (Doc. 305 at 4, 5, 7; 330 at 7; 303-2 at 3–7.) Where

> the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by subsection 3730(c)(5) because it is not "alternate" to the [FCA] *qui tam* remedy. It is a different legal claim altogether, arising beyond the [FCA's] borders.

*Novo A/S*, 5 F.4th at 56; *Kuriyan II*, 2022 WL 704130, at *2. Thus, those recoupments were not "remedies" for conduct actionable under the FCA or NMFATA.[14]

Relator does not demonstrate a genuine factual dispute on this issue. Significantly, Relator does not argue that he could have brought an FCA claim related to the retroactive reconciliations, risk corridor, or underwriting gain, nor does he dispute that the Contracts provided for these adjustments or that HSD was entitled to recoup funds based on them. Yet, after conceding that "the reconciliations received after [his] revelations were conducted using separate calculations from the MLR," he argues that 1) HSD recouped those funds only because he "alerted [HSD] to overpayments" or 2) HSD recouped funds based on MLR violations but "obscure[d] the source of this alternate remedy by pursuing it through other reconciliation methods, including the 'risk corridor[.]'" (Doc. 330 at 7, 18–19.) In support, he asserts that Mercer did not have a method for calculating the risk corridor recoupments until 2017 and, therefore, the post-May 2016, pre-2017 recoupments, although attributed to the risk corridor, had to have been based on MCOs' failure to meet the MLR. (*Id.*; Doc. 330 at 6, 18.) However, the testimony he cites does not support this assertion; in both cases the witness in question was not discussing risk corridor calculations, but rather how to calculate the MLR for each MCO. (*See* Docs. 329-7 at 28:1–29:10 and 329-17

---

[14] Relator argues that the recoupments were alternate remedies because FCA liability can arise from breach of contract. (Doc. 330 at 14–15.) This statement misses the point: even where a contract creates an "obligation" under the FCA, an FCA violation requires not merely a failure to meet the obligation but also a knowing and improper effort to avoid it. *See, e.g.*, § 3729(a)(1)(G) (creating liability against a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government"). The cases cited by Relator, rather than supporting his argument, confirm this principle. *See, e.g.*, *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, Civ. No. 11-560 14-1381, 2018 WL 3518518, at *2 (E.D. Wis. July 20, 2018) (government stated FCA claim where it alleged contract limited contractor's profits and contractor submitted false inflated invoices); *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1224–1225 (11th Cir. 2012) (FCA claim requires both obligation to pay and knowing statement made to avoid that obligation); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir. 1999) (government stated FCA claim where it alleged that contractor failed to return property and falsified records to avoid doing so); *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1008 (5th Cir. 1972) (finding FCA liability based on "deliberate mislabeling" of parts "coupled with the fact that the parts delivered did not actually meet the specifications of the contract").

at 22:21 to 23:19.) Thus, Relator has not presented evidence from which a reasonable factfinder could infer that any of HSD's post-disclosure recoupments were in fact a remedy for a claim that could have been brought under the FCA or NMFATA.

I also find that Relator has not shown a triable issue of fact as to the second prong—whether HSD actually used his information to recoup funds from the MCOs. The Government has presented evidence that, at the time HSD met with Relator in May 2016, it had the MCOs' final encounter data, it "was working on the reconciliations required by the Contracts" (Docs. 305 at 6; 303-2 at 6; 330 at 6), and its work on the reconciliations and recoupments continued into 2017. (Doc. 303-2 at 3, 6.) The Government has also presented competent evidence that neither HSD nor Mercer relied on Relator's information in any way, "[t]here were no changes made to the path [Mercer was] on and the methodology [it was] following to calculate rates or perform financial reconciliation calculations" after Relator met with HSD, (Doc. 303-1 at 66:14–20, 67:2–6), and HSD "did not use the information that Relator provided" and "did not ask Mercer to do anything differently regarding the reconciliation calculations based on [Relator's] information." (Docs. 305 at 6; 330 at 6; 303 at 7–9; 329; 303-2, 6–7.).

In response, Relator argues that, even if HSD and Mercer did not rely on his information to calculate the recoupments, his information triggered new calculations that resulted in additional recoupments. (Doc. 330 at 6, 10, 17.) Crucial to Relator's argument is his contention that HSD had finalized its MLR analysis and requests for recoupments before meeting with Relator and that it "reopened" its calculations after the meeting. (*Id.*) But as explained below, Relator has presented insufficient evidence on this point to rebut the Government's evidence and create a genuine issue of material fact.

34

Relator argues that two documents create a factual dispute as to whether HSD had, as he claims, finalized its recoupments before May 2016. First, he argues that the March 2016 Reconciliation Summaries represented HSD's "final recoupments" because "interim recoupments would have been communicated verbally to the MCOs while final recoupments would have been documented." (Doc. 330 at 6.) But the witness on whom Relator relies testified that *Mercer* would have presented interim MLR calculations *to HSD* "in conversations" during "regular meetings," whereas he "believe[d]" *Mercer* would have presented final calculations *to HSD* in "documents." (Docs. 330 at 6; 330-8 at 45:15–46:2.) The witness did not address how *HSD* would have presented recoupment requests *to the MCOs* in the cited testimony, nor did he address the Reconciliation Summaries. (*Id*.) Thus, even construed in the light most favorable to Relator, this somewhat speculative testimony is insufficient to create a genuine issue of material fact regarding whether the Reconciliation Summaries constituted HSD's final recoupment requests merely because they were provided to the MCOs in writing.

Furthermore, the March 2016 emails and Reconciliation Summaries themselves expressly indicate that they were not final requests. The titles of the Reconciliation Summaries include the word "Interim," and they are marked "Draft" and "For Discussion Purposes Only." (Doc. 329-6 at 2–9.) A draft document is, by definition, not final, and a document designated "for discussion purposes only" explicitly indicates that discussion of its contents is expected before finalization. *See* Black's Law Dictionary (11th ed. 2019) (defining "draft" as "[a]n initial or preliminary version; a piece of writing not yet in its finished form"). Additionally, in the March 2016 emails, HSD invited the MCOs to submit questions to HSD after review, proffered the underlying data on which the Reconciliation Summaries were based, and stated that the "2014 incurred data should

be complete in the encounter system" but that some additional data was anticipated. (Doc. 329-6 at 2–9.)

In the face of these features, the testimony on which Relator relies is wholly inadequate to allow a reasonable factfinder to conclude that the Reconciliation Summaries in fact represented HSD's final recoupment requests. *See Bird*, 832 F.3d at 1199 (stating that a "dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party"). On the contrary, it is plain that they were *not* final requests; and consequently, the mere fact that HSD continued to recoup monies from the MCOs after meeting with Relator does not show that HSD or Mercer "reopened" their reconciliation and recoupment process or relied on Relator's information to do so.

Second, Relator relies on the December 2015 Accounting Transaction Request to argue that, before meeting with him in May 2016, HSD had "obtained only $4,909,279 in overpayments—and stopped." (Doc. 330 at 6, 17, 19.) But nothing in the document shows that it was intended to be HSD's last request. (*See* Doc. 329-5 at 2.) In addition, testimony that accounting transaction requests reflect the total recoupment amount known to HSD at a given time—on which Relator also relies—merely establishes that the amount in the December 2015 Request was the amount known to be owed by one MCO at that time. (Docs. 330 at 6; 330-8 at 54:23–55:10.) It does not address whether HSD and Mercer were continuing to reconcile the data or when HSD was done making requests to the MCOs. (*Id.*) And of course, the December 2015 Accounting Transaction Request was followed by the March 2016 Reconciliation Summaries discussed above. Thus, the request does not create a genuine dispute as to whether HSD was still working on reconciliations when it met with Relator in May 2016.

In sum, Relator has failed to present sufficient evidence to allow a reasonable juror to find that HSD's reconciliation and recoupment processes had been completed by the time he presented his MLR analysis, that his MLR analysis had an impact on HSD's or Mercer's calculations or processes, or that HSD or Mercer recouped monies based on his MLR analysis but hid that fact by attributing the recoupments to the risk corridor or other calculations. He has therefore failed to rebut the Government's evidence to the contrary or show a triable issue of fact. *See Tesone*, 942 F.3d at 994 (nonmovant who would bear burden of persuasion at trial must adduce evidence creating question of fact to overcome movant's evidence negating an essential element of nonmovant's claim). I therefore recommend that, if it finds the Government's Alternate Remedy Motion is not moot, the Court grant the Motion on its merits and enter summary judgment in the Government's favor on Relator's alternate remedy claims.[15]

## VII.   RECOMMENDATION

Based on the foregoing analyses, I **RECOMMEND** that the Court grant the Government's Public Disclosure Motion (Doc. 303), enter summary judgment in the Government's favor, and dismiss Relator's claims with prejudice. I further **RECOMMEND** that, if the Court grants the

---

[15] Were the Court to deny the Public Disclosure Motion and allow some or all of Relator's claims to proceed, the TAC should be dismissed without prejudice unless Relator timely retains counsel. In pursuing claims under the FCA, NMMFCA, and NMFATA, a relator acts on the government's behalf. *U.S. ex rel. Ridenour v. Kaiser-Hill Co.*, 174 F. Supp. 2d 1147, 1167 (D. Colo. 2001) ("[T]he Government, not the relators, is the real-party-in-interest in a qui tam action."), *aff'd sub nom. Ridenour*, 397 F.3d 925; *Foy*, 2015-NMSC-025, ¶ 25, 355 P.3d at 9 ("Like the [FCA], [NM]FATA allows . . . a qui tam plaintiff, on behalf of the State, to bring a civil action for violation of the Act."); § 44-9-5(A) (authorizing a person to "bring a civil action for a violation of [NMFATA] on behalf of the person *and the state or political subdivision*") (emphasis added); § 27-14-7(B) (authorizing an "affected person" to bring civil action under NMMFCA "on behalf of the person bringing suit *and for the state*") (emphasis added). But "[a] lay person is not qualified to represent the [government] in a *qui tam* action." *U.S. ex rel. Morgan v. Sci. Applications Int'l Co.*, 604 F. Supp. 2d 245, 249 (D.D.C. 2009). Hence, Relator may not proceed on behalf of the Government in this matter without counsel. *United States ex rel. May v. United States*, 839 F. App'x 214, 217 (10th Cir. 2020) ("A pro se litigant may not bring a *qui tam* action.") (citing *Wojcicki v. SCANA/SCE&G*, 947 F.3d 240, 245–46 (4th Cir. 2020) (stating, "there is no indication that [Congress intended the FCA] to abrogate the general rule that a person may not represent another person or entity pro se"); *United States ex rel. Tracy v. Emigration Improvement Dist.*, 717 F. App'x 778, 782 (10th Cir. 2017) (noting that the plaintiff's inability to retain replacement counsel would "preclude him from pursuing his qui tam claim"); *accord Timson v. Sampson*, 518 F.3d 870, 873–74 (11th Cir. 2008).

Government's Public Disclosure Motion, the Court deny the Government's Alternate Remedy

Motion (Doc. 305) as moot. Alternatively, should the Court deny the Public Disclosure Motion, I

**RECOMMEND** that Court grant the Alternate Remedy Motion on its merits and enter summary

judgment in the Government's favor on Relator's alternate remedy claims.

_Kirtan Khalsa_

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---