IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA and
STATE OF NEW MEXICO ex rel.
JACOB KURIYAN,

       Plaintiffs,

vs.                                                                                    No. CIV 16-1148 JB/KK

MOLINA HEALTHCARE OF NEW MEXICO,
INC.; PRESBYTERIAN HEALTH PLAN,
INC.; UNITEDHEALTHCARE OF NEW
MEXICO, INC., and HCSC INSURANCE
SERVICES CO. dba BLUE CROSS & BLUE
SHIELD OF NEW MEXICO,

       Defendants.

## MEMORANDUM OPINION AND ORDER ADOPTING THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on: (i) the Magistrate Judge's Proposed Findings and Recommended Disposition, filed August 28, 2023 (Doc. 409)("PFRD"); (ii) Relator Jacob Kuriyan's Corrected Objections to Magistrate Judge's Proposed Findings and Recommended Disposition, filed September 11, 2023 (Doc. 414)("Relator's Objections"); (iii) the United States' and State of New Mexico's Objections/Response to the Magistrate Judge's Proposed Findings of Fact and Recommended Disposition, filed on September 11, 2023 (Doc. 413)("Governments' Objections"); and (iv) the Joint Statement Regarding the United States' Response to the Magistrate Judge's Proposed Findings and Recommended Disposition, filed on September 25, 2023, by Defendants HCSC Insurance Services Company, Molina Healthcare of New Mexico, Inc., Presbyterian Health Plan, Inc., and United HealthCare of New Mexico, Inc. (Doc. 417)("MCOs' Request"). The issues are whether: (i) the Court should adopt the results that the Honorable Kirtan Khalsa, United States Magistrate Judge for the United States District Court for the District of New

Mexico, recommends in the PFRD that the Court grant the Motion for Summary Judgment on Relator's Demand for an Alternate Remedy, filed July 7, 2022 (Doc. 305)("Alternate Remedy Motion"); and (ii) whether the Court should adopt the PFRD's recommendation that the Court grant the United States', the State of New Mexico's and New Mexico Human Services Department's Motion to Dismiss Relator's *Qui Tam* Action Under the Public Disclosure Bar, filed July 7, 2022 (Doc. 303)("Public Disclosure Motion").   The Court concludes: (i) the Court will adopt the PFRD's recommendation that the Court grant the Alternate Remedy Motion; but (ii) it will not adopt the PFRD's recommendation on the Public Disclosure Motion, and instead the Court will grant in part and deny in part the Public Disclosure Motion.   Accordingly, the Court will overrule the Relator's Objections in part and sustain them in part, sustain in part and deny in part the Governments' Objections, and deny the MCOs' Request.   Accordingly, the Court will adopt the PFRD in part, grant the Alternate Remedy Motion, and grant in part and deny in part the Public Disclosure Motion.   Because Kuriyan has represented that he only actively pursues an alternate remedy claim under 31 U.S.C. § 3730(b)(5), a claim which the Court here dismisses with prejudice, the Court will enter Final Judgment.

### LAW REGARDING OBJECTIONS TO <br> PROPOSED FINDINGS AND RECOMMENDATIONS

District courts may refer dispositive motions to a Magistrate Judge for a recommended disposition.  See Fed. R. Civ. P. 72(b)(1) ("A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense or a prisoner petition challenging the conditions of confinement.").   "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."   Fed. R. Civ. P. 72(b)(2).  When resolving objections to a Magistrate Judge's proposal, "[t]he district judge must

determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).  Similarly, 28 U.S.C. § 636 provides:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1)(C).[1]

As the United States Court of Appeals for the Tenth Circuit has noted, "the filing of objections advances the interests that underlie the Magistrate's Act, including judicial efficiency." United States v. One Parcel of Real Property, With Buildings, Appurtenances, Improvements, and Contents, Known As: 2121 East 30th Street, Tulsa Okla., 73 F.3d 1057, 1059 (10th Cir. 1996) ("One Parcel")(citing Niehaus v. Kansas Bar Ass'n, 793 F.2d 1159, 1165 (10th Cir. 1986); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)).  A party's "objections to a magistrate's report enable[] the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute."  One Parcel, 73 F.3d at 1059 (quoting Thomas v. Arn, 474 U.S. 140, 147 (1985)("Thomas")).

"To further advance the policies behind the Magistrate's Act, [the Tenth Circuit], like numerous other circuits, ha[s] adopted 'a firm waiver rule' that 'provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions.'"  One Parcel, 73 F.3d at 1059 (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)("Moore")).  In One Parcel, the Tenth Circuit, in accord with other

---

[1]Congress enacted the Federal Magistrates Act, 28 U.S.C. §§ 631-39, in 1968.

Courts of Appeals, expanded the waiver rule to cover objections that are timely but too general. See One Parcel, 73 F.3d at 1060 ("[O]nly an objection that is sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute will advance the policies behind the Magistrate's Act . . . ."). Thus, a "party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." One Parcel, 73 F.3d at 1060.

In addition to requiring specificity in objections, the Tenth Circuit has stated that "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996). See United States v. Garfinkle, 261 F.3d 1030, 1031 (10th Cir. 2001)("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived."); Pevehouse v. Scibana, 229 Fed.Appx. 795, 796 (10th Cir. 2007)(unpublished)("[T]he district court correctly held that [a plaintiff] had waived [an] argument by failing to raise it before the magistrate.").[2]

The Supreme Court of the United States -- in the course of approving the United States Court of Appeals for the Sixth Circuit's use of the waiver rule -- has noted:

---

[2]Pevehouse v. Scibana, 229 F. App'x 795, 796 (10th Cir. 2007), is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, ... and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Pevehouse v. Scibana has persuasive value with respect to a material issue and will assist the Court in its disposition of this Memorandum Opinion and Order.

It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings. The House and Senate Reports accompanying the 1976 amendments do not expressly consider what sort of review the district court should perform when no party objects to the magistrate's report. *See* S. Rep. No. 94-625, pp. 9-10 (1976)(hereinafter Senate Report); H.R. Rep. No. 94-1609, p. 11 (1976), U.S. Code Cong. & Admin. News 1976, p. 6162 (hereinafter House Report). There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate. Moreover, the Subcommittee that drafted and held hearings on the 1976 amendments had before it the guidelines of the Administrative Office of the United States Courts concerning the efficient use of magistrates. Those guidelines recommended to the district courts that "[w]here a magistrate makes a finding or ruling on a motion or an issue, his determination should become that of the district court, unless specific objection is filed within a reasonable time." *See* Jurisdiction of United States Magistrates, Hearings on S. 1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975)(emphasis added)(hereinafter Senate Hearings). The Committee also heard Judge Metzner of the Southern District of New York, the chairman of a Judicial Conference Committee on the administration of the magistrate system, testify that he personally followed that practice. *See id.*, at 11 ("If any objections come in, . . . I review [the record] and decide it. If no objections come in, I merely sign the magistrate's order."). The Judicial Conference of the United States, which supported the *de novo* standard of review eventually incorporated in § 636(b)(1)(C), opined that in most instances no party would object to the magistrate's recommendation, and the litigation would terminate with the judge's adoption of the magistrate's report. *See* Senate Hearings, at 35, 37. Congress apparently assumed, therefore, that any party who was dissatisfied for any reason with the magistrate's report would file objections, and those objections would trigger district court review. There is no indication that Congress, in enacting § 636(b)(1)(C) ), intended to require a district judge to review a magistrate's report to which no objections are filed. It did not preclude treating the failure to object as a procedural default, waiving the right to further consideration of any sort. We thus find nothing in the statute or the legislative history that convinces us that Congress intended to forbid a rule such as the one adopted by the Sixth Circuit.

Thomas, 474 U.S. at 150-52 (footnotes omitted).

The Tenth Circuit also has noted, "however, that '[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate.'"  One Parcel, 73 F.3d at 1060 (quoting

Moore, 950 F.2d at 659 ("We join those circuits that have declined to apply the waiver rule to a

pro se litigant's failure to object when the magistrate's order does not apprise the pro se litigant of

the consequences of a failure to object to findings and recommendations."). Cf. Thomas, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask. [A failure to object] . . . does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard"). In One Parcel, the Tenth Circuit notes that the district judge had decided sua sponte to conduct a de novo review despite the lack of specificity in the objections, but the Tenth Circuit held that it would deem the issues waived on appeal because it would advance the interests underlying the waiver rule. See 73 F.3d at 1060-61 (citing cases from other Courts of Appeals where district courts elect to address merits despite potential application of waiver rule, but Courts of Appeals opt to enforce waiver rule).

Where a party files timely and specific objections to the Magistrate Judge's PFRD, "on [ ] dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing." United States v. Raddatz, 447 U.S. 667, 674 (1980)("Raddatz"). The Tenth Circuit has stated that a de novo determination, pursuant to 28 U.S.C. § 636(b), "requires the district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation." In re Griego, 64 F.3d 580, 583-84 (10th Cir. 1995). The Supreme Court of the United States has noted that, although a district court must make a de novo determination of the objections to recommendations under 28 USC § 636(b)(1), the district court is not precluded from relying on the Magistrate Judge's PFRD. See Raddatz, 447 U.S. at 676 ("[I]n providing for a 'de novo determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.")(quoting 28 U.S.C. § 636(b)(1)); Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42 of Stephens Cnty., Okla., 8 F.3d 722, 724-25 (10th Cir. 1993)(holding that the district court's adoption of the Magistrate Judge's "particular reasonable hour estimates" is consistent with a de

novo determination, because "the district court 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate . . . [as] 'Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.'")(emphasis in Bratcher, not in quoted material)(quoting 28 U.S.C. § 636(b)(1); Raddatz, 447 U.S. at 676)).

## LAW REGARDING THE FALSE CLAIMS ACT, NEW MEIXICO MEDICAID FALSE CLAIMS ACT, AND NEW MEXICO FRAUD AGAINST TAXPAYERS ACT CLAIMS

The False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), "allows for the recovery of civil penalties and treble damages from anyone who defrauds the [federal] government by submitting fraudulent claims for payment." United States ex rel. Reed v. KeyPoint Gov't Sols., 923 F.3d 729, 735-36 (10th Cir. 2019)("Reed"). See 31 U.S.C. § 3729(a)(i)(A). "Liability also attaches to anyone who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" Reed, 923 F.3d at 736 (quoting § 3729(a)(1)(B)). In addition, the FCA imposes liability for attempts to reduce an obligation owed to the United States. U.S. ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189, 1194-95 (10th Cir. 2006)("Bahrani"); 31 U.S.C. § 3729(a)(1)(G). Thus, "an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money.'" Bahrani, 465 F.3d at 1194-95 (10th Cir. 2006)(quoting S.Rep. No. 99-345, at 18, 1986 U.S.C.C.A.N. at 5283). "To enforce its provisions, the Act empowers individuals to file suits on behalf of the government alleging that a third party made a fraudulent claim for payment to the government." Reed, 923 F.3d at 736. See 31 U.S.C. § 3730(b)(1). "These suits are known as 'qui tam' suits, and the individual plaintiffs are called 'relators.'" Reed, 923 F.3d at 736.

Like the FCA with respect to the federal government, the New Mexico Medicaid False Claims Act, N.M.S.A. §§ 27-14-1 to -15 ("NMMFCA"), and New Mexico Fraud Against Taxpayers Act, N.M.S.A. §§ 44-9-1 to -14 ("NMFATA"), permit a relator to bring an action on the State of New Mexico's behalf for false or fraudulent claims. See N.M.S.A. § 27-14-7(B); id. § 44-9-5. In relevant part, the NMMFCA imposes liability on one who: (i) "presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that such claim is false or fraudulent"; (ii) "makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false"; or, (iii) "makes, uses, or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing that such record or statement is false." N.M.S.A. § 27-14-4(A), (C), (E).

Similarly, the NMFATA provides, in relevant part, that a person shall not: (i) "knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision . . . a false or fraudulent claim for payment or approval"; (ii) "knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim"; or, (iii) "knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision[.]" N.M.S.A. § 44-9-3(A)(1), (2), (8). Courts look to FCA case law to construe the NMMFCA and NMFATA. See State ex rel. Foy v. Austin Capital Management, Ltd., 2015-NMSC-025, ¶ 25, 355 P.3d 1, 9 (stating that the NMFATA "closely tracks the longstanding federal" FCA); United States v. Dental Dreams, LLC, 307 F. Supp. 3d 1224, 1240 (D.N.M.

2018)(Herrera, J.)("New Mexico state courts have also looked to federal precedent construing the FCA to provide guidance on the [NM]MFCA."); State ex rel. King v. Behavioral Home Care, Inc., 2015-NMCA-035, ¶ 17, 346 P.3d 377, 384, cert. dismissed, 2015-NMCERT-004, 348 P.3d 695 (Apr. 3, 2015)(same).

The FCA, NMFATA, and NMMFCA bar a relator's claim if the claim is based on or substantially the same as publicly disclosed allegations or transactions. See 31 U.S.C. § 3730(e)(4)(A); N.M.S.A. § 27-14-10(C); id. § 44-9-9(D). If the "public disclosure bar" applies, NMFATA claims may be dismissed. N.M.S.A. § 44-9-9(D). On the other hand, the FCA and NMMFCA provide that, even if the public disclosure bar applies, a relator may proceed with a qui tam claim if the relator is an "original source" of the allegations in the complaint. 31 U.S.C. § 3730(e)(4)(A), (B). See N.M.S.A. § 27-14-10(C).

If a relator's claims are not barred, the FCA and NMFATA provide for an award to the relator, under certain circumstances, if the State of New Mexico obtains an award through an "alternate remedy." N.M.S.A. § 3730(c)(5); id. § 44-9-6(H). See generally United States ex rel. Kuriyan v. HCSC Ins. Servs. Co., No. CIV. 16-1148, 2021 WL 5998603, at *18-21 (D.N.M. Dec. 20, 2021)(Browning, J.)("Kuriyan I")(discussing FCA, NMFATA, and NMMFCA). The NMMFCA does not provide for an award to relators based on an alternate remedy. See N.M.S.A. § 3730; id. § 27-14-9. See United States ex rel. Kuriyan v. HCSC Ins. Servs. Co., No. CIV 16-1148, 2022 WL 704130, at *1-3 (D.N.M. Mar. 9, 2022)("Kuriyan II")(discussing FCA, NMFATA, and NMMFCA).

## LAW REGARDING THE FALSE CLAIMS ACT

The FCA "imposes significant penalties on those who defraud the government," Universal Health Servs., Inc. v. United States, 579 U.S. 176, 136 S. Ct. 1989, 1995 (2016), and imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval," Universal Health Servs. v. United States ex rel. Escobar, 136 S. Ct. at 1999 (quoting 31 U.S.C. § 3729(a)).  The FCA's purpose is "encourag[ing] 'whistleblowers to act as private attorneys-general' in bringing suits for the common good." Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir. 2005)(quoting United States ex rel. Taxpayers Against Fraud v. GE., 41 F.3d 1032, 1041-42 (6th Cir. 1994)).  The FCA "limit[s] . . . the court's power to hear certain duplicative qui tam suits."  United States ex rel. Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276 (10th Cir. 2004).  The FCA also recognizes the need "to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud."  Walburn v. Lockheed Martin Corp., 431 F.3d at 970.  See United States ex rel. Grynberg, 390 F.3d at 1278 (noting that the FCA's "qui tam provisions are designed to encourage private citizens to expose fraud but to avoid actions by opportunists seeking to capitalize on public information."); Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d 1228, 1242 (D.N.M. 2011)(Browning, J.).

An FCA action may be commenced in one of two ways.  First, the United States itself may bring an action against an alleged false claimant.  See 31 U.S.C. § 3730(a).  Second, a private person -- known as a relator -- may bring a qui tam action against the alleged false claimant "for the person and for the United States Government," and "in the name of the Government."  31 U.S.C. § 3730(b).  "Qui tam" is short for the Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which translates to "who pursues this action on our Lord the King's behalf as well as his own."  Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 769, n.1 (2000).  Qui tam actions "appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions to the royal courts on both their own and the Crown's behalf."  Vermont Agency of Nat. Res. v. United States

ex rel. Stevens, 529 U.S. at 774.  Although the Attorney General may bring suit for § 3729 violations under § 3730, § 3730 states that a person may bring suit on the United States' behalf and that the qui tam plaintiff is entitled to a portion of the damages if the United states declines to intervene.  See 31 U.S.C. § 3730(d).  Although the United States suffers the injury, a qui tam relator under the FCA has Article III standing to pursue their claim.  See Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 777.  Under the FCA, however, States are not subject to qui tam liability.  See Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. at 783.

Under the FCA, a qui tam relator may not recover if the relator's action relies on public information.  See 31 U.S.C. § 3730(e)(4)(A).  The so-called "public disclosure bar" states that a court "shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in either: (i) a "Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "from the news media." 31 U.S.C. § 3730(e)(4)(A).  The public-disclosure bar does not bar, however, actions that the Attorney General brings or actions that a private person who is "an original source of the information" brings. 31 U.S.C.  § 3730(e)(4)(A).

By its terms, the original-source exception contemplates that some qui tam actions should survive the public-disclosure bar even though their allegations are "substantially the same as publicly disclosed allegations," because they involve information that "materially add[s]" to the publicly disclosed information.  United States ex rel. Reed v. KeyPoint Gov't Sol. 923 F.3d 729, 757 (10th Cir. 2019).  To qualify as an original source, a qui tam relator must demonstrate that:

(i) they have "direct and independent knowledge of the information on which the allegations are based"; and (ii) they "voluntarily provided such information to the government prior to filing suit." United States ex rel. Precision Co. v. Koch Indus., Inc. 871 C.2d 548, 553 (10th Cir. 1992).  In other words, to recover, a qui tam relator must "bring something to the table that would add value for the government."  United States ex rel. Maur v. Hage-Korban, 981 F.3d 516 (6th Cir. 2020). To meet its burden to show that it is an original source, see Kennard v. Comstock Res., Inc., 363 F.3d 1039, 1044 (10th Cir. 2004), a qui tam relator must provide more than "'unsupported, conclusory allegations,'" United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 800 (10th Cir. 2002)(quoting United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1162 (10th Cir. 1999)).  See Kuriyan I, 2021 WL 5998603, at *38-49 (discussing FCA, NMFATA, and NMMFCA); Kuriyan II, 2022 WL 704130, at *1-3 (discussing FCA, NMFATA, and NMMFCA).

## LAW REGARDING THE NMFATA

In 2007, the New Mexico Legislature passed the NMFATA, a false claims act with a qui tam provision.  See N.M.S.A. §§ 44-9-1 to -14.  The NMFATA contains a first-to-file provision, stating: "When a person brings an action pursuant to this section, no person other than the attorney general on behalf of the state may intervene or bring a related action based on the facts underlying the pending action."  N.M.S.A. § 44-9-5E.  The NMFATA also contains the following non-exclusivity clause: "The remedies provided for in the Fraud Against Taxpayers Act are not exclusive and shall be in addition to any other remedies provided for in any other law or available under common law."  N.M.S.A. § 44-9-14.

The federal analog to the NMFATA is the FCA, 31 U.S.C. §§ 3729-33, which has as its purpose "encourag[ing] 'whistleblowers to act as private attorneys-general' in bringing suits for the common good."  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir.

2005)(quoting <u>United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.</u>, 41 F.3d 1032, 1041-42 (6th Cir. 1994)). It acts as a "jurisdictional limit on the court's power to hear certain duplicative qui tam suits." <u>United States ex rel. Grynberg v. Koch Gateway Pipeline Co.</u>, 390 F.3d 1276 (10th Cir. 2004). The FCA also recognizes the need "to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." <u>Walburn v. Lockheed Martin Corp.</u>, 431 F.3d at 970. <u>See</u> <u>United States ex rel. Grynberg</u>, 390 F.3d at 1278 ("The False Claims Act's qui tam provisions are designed to encourage private citizens to expose fraud but to avoid actions by opportunists seeking to capitalize on public information."). A NMFATA violator is liable for three times the actual losses that the State suffered, a civil penalty between $5,000.00 and $10,000.00, the cost to litigate the action, and reasonable attorney's fees. <u>See</u> N.M.S.A. § 44-9-3C. "Up to another thirty percent of the damage award is allocated to reward the qui tam plaintiff for exposing fraud and corruption in state government." <u>State ex rel. Foy v. Austin Capital Mgmt., Ltd.</u>, 2015-NMSC-025 ¶ 40, 355 P.3d 1, 1 (citing N.M.S.A. § 44-9-7(B)). <u>See</u> <u>Kuriyan I</u>, 2021 WL 5998603, at *38-49 (discussing FCA, NMFATA, and NMMFCA); <u>Kuriyan II</u>, 2022 WL 704130, at *1-3 (discussing FCA, NMFATA, and NMMFCA); <u>Hunt v. Cent. Consol. Sch. Dist.</u>, 951 F. Supp. 2d 1136, 1242-46 (D.N.M. 2013)(Browning, J.)(discussing NMFATA's whistleblower protections); <u>Hill v. Vanderbilt Cap. Advisors, LLC</u>, 834 F. Supp. 2d 1228, 1261-62 (D.N.M. 2011)(Browning, J.)(discussing NMFATA's disclosure bars).

## LAW REGARDING THE NEW MEXICO MEDICAID FALSE CLAIMS ACT

The NMMFCA's purpose is to "deter persons from causing or assisting to cause the state to pay medicaid claims that are false and to provide remedies for obtaining treble damages and civil recoveries for the state when money is obtained from the state by reason of a false claim." N.M.S.A. § 27-14-2. The NMMFCA makes it unlawful to present false or fraudulent claims for

payment under the Medicaid program to the State while knowing that the claim is false or fraudulent. See N.M.S.A. § 27-14-4. The NMMFCA also prohibits using records to obtain false or fraudulent Medicaid payments, conspiring to defraud the State of Medicaid payments, receiving another's benefits, making false statements or misrepresenting material facts concerning a healthcare facility's operations so that the facility can qualify for a Medicaid-program certification. See N.M.S.A. § 27-14-4. The NMMFCA authorizes HSD to bring a civil action for NMMFCA violations, and also authorizes a qui tam action by "an affected person" for a NMMFCA violation on both their own and the State's behalf. N.M.S.A. § 27-14-7. If HSD elects to pursue an NMMFCA action, "it shall have the exclusive responsibility for prosecuting the action and shall not be bound by an act of the person bringing the action." N.M.S.A. § 27-14-8. If HSD elects to pursue an action, the qui tam plaintiff remains eligible for a portion of any damages that a court awards. See N.M.S.A. § 27-14-9. Like the FCA, the NMMFCA contains a public-disclosure bar, meaning that the NMMFCA divests courts of jurisdiction over NMMFCA actions that are "based on evidence or information known to the department when the action was brought," N.M.S.A. § 27-14-10(A), or actions "based upon the public disclosure of allegations or actions in a criminal, civil or administrative hearing or from the news media, unless the action is brought by the department or the person bringing the action is an original source of the information," N.M.S.A. § 27-14-10(C). Unlike the FCA and the NMFATA, the NMMFCA does not contain an alternate-remedy provision. The NMMFCA differs from the FCA in that, under the NMMFCA, the relator

> may continue the action only "[i]f the department determined that there is substantial evidence that a violation of the [MFCA] has occurred" and that "[i]f the department determines that there is not substantial evidence that a violation has occurred, the complaint shall be dismissed."

State ex rel. Balderas v. Bristol-Myers Squibb Co., 2019-NMCA-016 ¶ 6, 436 P.3d 724, 727[3]

(quoting N.M.S.A. § 27-14-10(C)).  See Kuriyan I, 2021 WL 5998603, at *38-49 (discussing FCA,

NMFATA, and NMMFCA); Kuriyan II, 2022 WL 704130, at *1-3 (discussing FCA, NMFATA,

and NMMFCA).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's

case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Brown-

ing, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(al-

teration in Herrera v. Santa Fe Pub. Schs., but not in Bacchus Indus., Inc. v. Arvin Indus., Inc.)).

See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the
> moving party must satisfy its burden of production in one of two ways: by putting
> evidence into the record that affirmatively disproves an element of the nonmoving
> party's case, or by directing the court's attention to the fact that the non-moving
> party lacks evidence on an element of its claim, "since a complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily renders
> all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which
> it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings
> and designate specific facts to make a showing sufficient to establish the existence
> of an element essential to his case in order to survive summary judgment."  Cardoso
> v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
> omitted).

---

[3]The Court predicts that the Supreme Court of New Mexico would agree with the Court of
Appeals of New Mexico's reasoning in State ex rel. Balderas v. Bristol-Myers Squibb Co., 2019-
NMCA-016 ¶ 6, 436 P.3d 724, 727, because the Court of Appeals of New Mexico quotes directly
from the NMMFCA.

<u>Plustwik v. Voss of Nor. ASA</u>, No. CIV 11-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  <u>Celotex</u>, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[4]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 324; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)("<u>Liberty Lobby</u>").

In <u>American Mechanical Solutions, LLC v. Northland Piping, Inc.</u>, 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law requires that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  <u>See</u> 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "'an essential element of the nonmoving party's case,'" rendering "'all other facts

---

[4]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in <u>Celotex</u>, this sentence is widely understood to be an accurate statement of the law.  <u>See</u> 10A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

immaterial.'" 184 F. Supp. 3d at 1075 (quoting <u>Plustwik v. Voss of Nor. ASA</u>, 2013 WL 1945082, at *1 (in turn quoting <u>Celotex</u>, 477 U.S. at 323-25)).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence. <u>See</u> <u>Celotex</u>, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); <u>Am. Mech. Sols., LLC v. Northland Piping, Inc.</u>, 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); <u>Morales v. E.D. Entyre & Co.</u>, 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because the plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. <u>See</u> <u>Halley v. Huckaby</u>, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). <u>See also</u> 11 James Wm. Moore et al., <u>Moore's Federal Practice</u> § 56.40(1)(b)(iv) (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990). <u>See</u> <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1539 (10th Cir. 1993)("'However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" (quoting <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d at 1241)). Rule 56(c)(1)

provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979))).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e)); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)). To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could

reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970))).  Fourth, the court cannot decide any credibility issues.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine has developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concludes that summary judgment is appropriate where video evidence clearly contradicts the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explains:

At the summary judgment stage, facts must be viewed in the light most fa-
vorable to the nonmoving party only if there is a "genuine" dispute as to those facts.
Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has
carried its burden under Rule 56(c), its opponent must do more than simply show
that there is some metaphysical doubt as to the material facts . . . .  Where the record
taken as a whole could not lead a rational trier of fact to find for the nonmoving
party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zen-
ith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere exist-
ence of *some* alleged factual dispute between the parties will not defeat an otherwise
properly supported motion for summary judgment; the requirement is that there be
no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at]
247-248 . . . .  When opposing parties tell two different stories, one of which is bla-
tantly contradicted by the record, so that no reasonable jury could believe it, a court
should not adopt that version of the facts for purposes of ruling on a motion for
summary judgment.

That was the case here with regard to the factual issue whether respondent
was driving in such fashion as to endanger human life.  Respondent's version of
events is so utterly discredited by the record that no reasonable jury could have
believed him.  The Court of Appeals should not have relied on such visible fiction;
it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby, and

in Scott v. Harris).  The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584

F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation,
a plaintiff's version of the facts must find support in the record: more specifically,
"[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the
facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511
F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration only in Thomson v. Salt Lake

Cty., third and fourth alterations also in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads*

*v. Miller*, [352 F. App'x 289 (10th Cir. 2009)(unpublished),] explained that the blatant contradic-

tions of the record must be supported by more than other witnesses' testimony."  Lymon v.

Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x

771 (10th Cir. 2012)(unpublished).

Parties may allege new claims in motions for summary judgment.  See Evans v. McDon-

ald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991).  When a party raises a new claim in a motion

for summary judgment, a court treats the motion for summary judgment as a request to amend the

complaint pursuant to rule 15 of the Federal Rules of Civil Procedure.  See Viernow v. Euripides

Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid
> claim just because she did not set forth in the complaint a theory on which she could
> recover, "provided always that a late shift in the thrust of the case will not prejudice
> the other party in maintaining his defense upon the merits."  5 C. Wright & A.
> Miller, *Federal Practice & Procedure* § 1219 at 194 (1990) . . . .

Evans v. McDonald's Corp., 936 F.2d at 1090-91.  While "fact pleading" gives defendants fair

notice of claims against them "without requiring the plaintiff to have every legal theory or fact

developed in detail before the complaint is filed and the parties have opportunity for discovery,"

the plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they

intend to build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.  See Voter Reference

Found., LLC v. Torrez, No. CIV 22-0222, 2024 WL 1347204, at *131-50 (D.N.M. March 29,

2024)(Browning, J.); Bell v. City of Tulsa, No. CIV 21-0061, 2024 WL 1018528, at *39-58 (N.D.

Okla. March 8, 2024)(Browning, J.).

## LAW REGARDING STATUTORY CONSTRUCTION

When interpreting statutes, the Court must start with the plain language.  See, e.g., Been v.

O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory con-

struction de novo, interpret[ing] the words of the statute in light of the purposes Congress sought

to serve.")(internal quotations and citations omitted).  "It is well established that 'when the

statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)).  "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'" United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir. 2000)).  See Public Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)(Seymour, C.J.)("In examining . . . [statutory] language, we assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress' [ ] legislative purpose.").  See, e.g., United States v. Delorme, No. CR 19-2322, 2023 WL 8020262, at *17-20 (D.N.M. Nov. 17, 2023)(Browning, J.); United States v. Teston, No. CR 22-1400, 2023 WL 3390968, at *8-16 (D.N.M. May 5, 2023)(Browning, J.); United States v. Janzad, No. CR 23-0346, 2024 WL 3552404, at *9-24 (D.N.M. July 26, 2024)(Browning, J.).

## **LAW REGARDING DIVERSITY JURISDICTION AND ERIE**

Under Erie, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that, if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law[,] . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25

(D.N.M. 2010)(Browning, J.).  "Just as a court engaging in statutory interpretation must always

begin with the statute's text, a court formulating an Erie prediction should look first to the words

of the state supreme court."  Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Brown-

ing, J.).[5]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while

"certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its deter-

mination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would

be bound by a Supreme Court decision."   Mosley v. Titus, 762 F. Supp. 2d 1298, 1332

(D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of

Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the

Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EM-

CASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state

---

[5]In performing its Erie-mandated duty to predict what a State supreme court would do if
faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may
sometimes contradict the State supreme court's own precedent if the federal court concludes that
the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson
Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.).
Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with State-court
precedent; even if the prediction turns out to be correct, such predictions produce disparate results
between cases filed in State and federal courts, as the old State supreme court precedent usually
binds State trial courts.  The factors to which a federal court should look before making an Erie
prediction that a State supreme court will overrule its prior precedent vary depending upon the
case, but some consistent ones include: (i) the age of the State supreme court decision from which
the federal court is considering departing -- the younger the State case is, the less likely it is that
departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the
State supreme court -- have placed on the State decision from which the federal court is considering
departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially
if the State supreme court explicitly has called an older case's holding into question; (iv) changes
in the composition of the State supreme court, especially if mostly dissenting justices from the
earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability
to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a State supreme
court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by
subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which
does not get much attention or have much application -- and clearly wrong.

decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[6]  The Court may also rely on Tenth Circuit decisions interpreting New Mexico law.

---

[6]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the State's highest court:

> The highest state court is the final authority on state law (Beals v. Hale, 4 How. 37, 54 . . . ; Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 . . . ), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  See Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 209. . . [(1938)].  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 . . . [(1940)], decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court (Erie Railroad Co. v. Hilt, 247 U.S. 97, 100 . . . [(1918)]; Erie Railroad Co. v. Duplak, 286 U.S. 440, 444 . . . [(1932)]), and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

- 24 -

See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30 (D.N.M. 2014)(Browning, J.).[7]  Ultimately, "the Court's task is to predict what the state supreme court would do."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.

---

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by State trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("[F]ederal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently . . . [and] federal courts should give some weight to state trial courts decisions.").

[7]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and State court interpretations of State law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes to a State's law in the ensuing years, then parties litigating State law claims will be subject to a different body of substantive law, depending on whether they litigate in State court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply State court interpretations of State law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according State court decisions issued in the ensuing years more weight.  On the other hand, when the State law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same Circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a State's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects State law -- at least provides consistency at the federal level, so long as federal district judges must follow it.

The Court must decide how to weigh Tenth Circuit case law against more recent State court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the State's highest court, on one end, and independently interpreting the State law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  The Court notes that, in striking this balance, it is generally more concerned about systemic inconsistency between the federal courts and the State courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a

given judge will interpret the State law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the State's common law in making his or her determination -- the same as a State judge would. Systemic inconsistency between the federal courts and State courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting State law, and the State courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the State forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law. Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit typically does not address such issues with the frequency that the State's courts do. Accordingly, Tenth Circuit precedent can lag behind State law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular State's law is wasted. Other than Oklahoma, every State encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one State. It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State than it is for the Tenth Circuit to monitor separate legal developments in eight States. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judges' State law decisions with no controlling State supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying State law with no governing State supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the State law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on State court cases that the Tenth Circuit had available and considered, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive and not prescriptive -- interpretive

and not normative. Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to consider independently the whole body of State law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of State law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

  <u>Erie</u>'s purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or State forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the States' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate State court [decision] is a datum for ascertaining State law which is not to be disregarded by a federal court <u>unless it is convinced by other persuasive data that the highest court of the State would decide otherwise</u>." (quoting <u>West v. Am. Tel. & Tel. Co.</u>, 311 U.S. 223, 237 (1940))(emphasis in <u>Comm'r v. Estate of Bosch</u>)). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in State and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to State procedural rules to determine in which State appellate circuit the suit would have been filed were it not in federal court, and then applies the State law as that State circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the State supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in State court, where only the law of the State circuit in which they filed -- and certainly not nonexistent, speculative State supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of State law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider State appellate and trial court decisions. To the contrary, even influential authors' non-judicial writings, State supreme court justices' statements, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would not inform properly a federal court's analysis of federal law -- validly may come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of State law.

The Erie doctrine results in federal cases that interpret State law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (States must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting State law often become stale.  New State court cases -- even when not rebuking directly the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit says:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  This passage indicates that the Tenth Circuit permits a district court to deviate from its view of State law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the limitation of the Honorable Michael W. McConnell, then-United States Circuit Judge for the Tenth Circuit, in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest State court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or

## ANALYSIS

The Court agrees with Magistrate Judge Khalsa's analysis of the Alternate Remedy Motion and will grant that motion; the Court does not agree entirely, however, with Magistrate Judge Khalsa's analysis of the Public Disclosure Motion, so it will grant the Public Disclosure Motion in part and deny it in part.  Magistrate Judge Khalsa concludes correctly that Kuriyan does not create a genuine issue of fact sufficient to withstand summary judgment on his alternate remedy motion, so he may not share in the Government's recoupment proceeds as an alternative remedy to his qui tam action.  The Court therefore grants the Alternate Remedy Motion.  Magistrate Judge Khalsa concludes incorrectly, however, that Kuriyan's qui tam claim is subject to the FCA's public disclosure bar on the basis that it was disclosed "from the news media,"  31 U.S.C. § 3730(e)(4)(A)(iii), and for the same reason is subject to the NMMFCA's public disclosure bar.  Accordingly, the Court will not grant the Public Disclosure Motion as to Kuriyan's federal, FCA

---

an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.
   Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).
   The Tenth Circuit has set forth a stringent restriction on its district courts' ability to administer independently the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as with its own prior case law.  Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

claims, or his State NMMFCA claims.   A State governmental report disclosed publicly the information in Kuriyan's action, however, which is one of the NMFATA's enumerated sources of public disclosure.  Accordingly, the Court will grant the Public Disclosure Motion as to Kuriyan's NMFATA claims.

Kuriyan objects to the PFRD's analysis both of the Public Disclosure Motion and of the Alternate Remedy Motion.  See Relator's Objections at 1.  The Government objects to the PFRD to the extent that it recommends that the Court deny the Alternate Remedy Motion as moot without making factual findings on the issues underlying the Alternate Remedy Motion, and reasserts its argument that, to be entitled to a portion of the recoupments of New Mexico Human Services Department ("HSD"), the recoupments had to have been recovered based on "the same fraudulent conduct that Relator alleged . . . not for something else."  Governments' Objections at 2-3. Defendants HCSC Insurance Services Company, Molina Healthcare of New Mexico, Inc., Presbyterian Health Plan, Inc., and United HealthCare of New Mexico, Inc. (collectively, the "MCOs"), do not object to the PFRD.  See MCOs' Request at 1.

The Court will overrule in part the Relator's Objections, and sustain in part and deny in part the Governments' Objections.  Accordingly, the Court will adopt the PFRD in part, grant the Alternate Remedy Motion, and grant in part and deny in part the Public Disclosure Motion.

## I.   THE COURT WILL ADOPT MAGISTRATE JUDGE KHALSA'S CONCLUSION THAT KURIYAN IS NOT ENTITLED TO A SHARE OF AN ALTERNATE REMEDY.

In his Opposed Third Motion for Award from Alternate Remedy, Kuriyan argues that he is entitled to a share of HSD's recoupments made after his May 2016 disclosure, because HSD's "recovery of overpayments from [the MCOs] is an alternate remedy under" the FCA and under the NMFATA.  Plaintiff/Relator's Opposed Third Motion for Award from Alternate Remedy at 2, filed February 5, 2021 (Doc. 173).  In its Alternate Remedy Motion, the Government seeks

summary judgment, arguing that Kuriyan is not entitled to a share of the HSD's recoupments, because the retroactive reconciliation, risk corridor, and underwriting gain recoupments were not for the claims that the FCA addresses, and neither HSD nor its actuary used Kuriyan's information to recoup monies from the MCOs. See Alternate Remedy Motion at 1. Kuriyan argues to the contrary that certain documents create a dispute of fact whether the recoupments are a remedy for FCA- and NMFATA-covered conduct and whether HSD or Mercer LLC, HSD's actuary, relied on his information to recoup monies from the MCOs. See Response to Alternate Remedy Motion at 1.

Magistrate Judge Khalsa recommends that the Court either: (i) deny the Alternate Remedy Motion as moot if the Court grants the Public Disclosure Motion, because Kuriyan is not entitled to an alternate remedy award if his claims are barred, see PFRD at 31; or (ii) grant the Alternate Remedy Motion on its merits, because the recoupments that HSD made after May, 2016, were not for the false claims that the FCA or NMFATA addresses by, and because HSD/Mercer LLC did not rely on Kuriyan's information to recoup funds from the MCOs, see PFRD at 31. For the following reasons, the Court overrules Kuriyan's Objections and sustains in part and denies in part the Governments' Objections. As the Court later explains, it denies in part the Public Disclosure Motion so the Alternate Remedy Motion is not moot. The Court will adopt, however, Magistrate Judge Khalsa's recommendation to grant the Alternate Remedy Motion, because Kuriyan does not raise a genuine factual issue that he is entitled to any share of the recoupment proceeds as an alternative remedy to his qui tam action. Accordingly, the Court will adopt the PFRD to the extent it holds that, as a matter of law, Kuriyan is not entitled to a share of an alternate remedy.

Magistrate Judge Khalsa concludes correctly that Kuriyan has not shown that disputes of fact preclude summary judgment on his request for a share of the recoupments. As to whether the

post-May, 2016, recoupments were for the false claims that the FCA or NMFATA address, Magistrate Judge Khalsa concludes that the retroactive reconciliation, risk corridor, and underwriting gain recoupments "were not 'remedies' for conduct actionable under the FCA or NMFATA," because "it is undisputed that the Contracts contemplated retroactive reconciliation, risk corridor, and underwriting gain recoupments and that the MCOs' obligation to pay these recoupments did not depend on whether they had knowingly made a false statement or improperly avoided a financial obligation to HSD." PFRD at 32 (no citation given for quoted material). She also determines that "it is undisputed that HSD did not find the MCOs owed the recoupments because they knowingly made false certifications or improperly retained payments and did not impose any penalties on the MCOs for improper conduct related to those recoupments." PFRD at 32. She concludes that Kuriyan has not demonstrated a genuine factual dispute on this issue:

> Significantly, Relator does not argue that he could have brought an FCA claim related to the retroactive reconciliations, risk corridor, or underwriting gain, nor does he dispute that the Contracts provided for these adjustments or that HSD was entitled to recoup funds based on them. Yet, after conceding that "the reconciliations received after [his] revelations were conducted using separate calculations from the MLR," he argues that 1) HSD recouped those funds only because he "alerted [HSD] to overpayments" or 2) HSD recouped funds based on MLR violations but "obscure[d] the source of this alternate remedy by pursuing it through other reconciliation methods, including the 'risk corridor[.]'" ([Response to Alternate Remedy Motion] at 7, 18-19.) In support, he asserts that Mercer LLC did not have a method for calculating the risk corridor recoupments until 2017 and, therefore, the post-May 2016, pre-2017 recoupments, although attributed to the risk corridor, had to have been based on MCOs' failure to meet the MLR. (*Id.*; [Response to Alternate Remedy Motion] at 6, 18.) However, the testimony he cites does not support this assertion; in both cases the witness in question was not discussing risk corridor calculations, but rather how to calculate the MLR for each MCO. (*See* [Deposition of Jason Sanchez, filed August 18, 2022 (Doc. 329-7)("Sanchez Dep.")] at 28:1-29:10 and [Virtual Remote Video-Recorded Deposition of Jared Nason at 22:21-23:19, filed August 18, 2022 (Doc. 329-17)("Nason Dep.")].) Thus, Relator has not presented evidence from which a reasonable factfinder could infer that any of HSD's post-disclosure recoupments were in fact a remedy for a claim that could have been brought under the FCA or NMFATA.

PFRD at 33.  Magistrate Judge Khalsa also determined "that Relator has not shown a triable issue

of fact as to the second prong -- whether HSD actually used his information to recoup funds from

the MCOs."  PFRD at 34.  She notes that the

> Government has presented evidence that, at the time HSD met with Relator in May
> 2016, it had the MCOs' final encounter data, it 'was working on the reconciliations
> required by the Contracts' ([Alternate Remedy Motion] at 6; [Declaration of Nancy
> Smith-Leslie, filed July 7, 2022 (Doc. 303-2)("Smith-Leslie Decl.")] at 6;
> [Response to Alternate Remedy Motion] at 6), and its work on the reconciliations
> and recoupments continued into 2017. ([Smith-Leslie Decl.] at 3, 6.).

PFRD at 34.  Furthermore, Magistrate Judge Khalsa determines that the Government

> presented competent evidence that neither HSD nor Mercer LLC relied on Relator's
> information in any way, "[t]here were no changes made to the path [Mercer LLC
> was] on and the methodology [it was] following to calculate rates or perform
> financial reconciliation calculations" after Relator met with HSD, ([Virtual Remote
> Recorded Deposition of Jared Nason, filed July 7, 2022 (Doc. 303-1)("Excerpted
> Nason Dep.") at 66:14-20, 67:2-6), and HSD "did not use the information that
> Relator provided" and "did not ask Mercer LLC to do anything differently
> regarding the reconciliation calculations based on [Relator's] information."
> ([Alternate Remedy Motion] at 6; [Response to Alternate Remedy Motion] at 6;
> [Public Disclosure Motion] at 7-9; [Relator's Response]; [Smith-Leslie Decl. at] 6-
> 7.).

PFRD at 34 (the Court's brackets, not the PFRD's brackets).

She further concludes that the two documents on which Kuriyan relies are insufficient to

create a genuine issue of material fact as to whether HSD or the accounting firm Mercer LLC

"reopened" their analyses based on Kuriyan's information.  Specifically, as to the first document,

Kuriyan argues "that the March 2016 Reconciliation Summaries represented HSD's 'final

recoupments' because 'interim recoupments would have been communicated verbally to the

MCOs while final recoupments would have been documented.'"  PFRD at 35 (quoting Response

to Alternate Remedy Motion at 6).  Magistrate Judge Khalsa concludes that

> the witness on whom Relator relies testified that *Mercer LLC* would have presented
> interim MLR calculations *to HSD* "in conversations" during "regular meetings,"
> whereas he "believe[d]" *Mercer LLC* would have presented final calculations *to
> HSD* in "documents." ([Response to Alternate Remedy Motion] at 6; [Deposition

of Jason Sanchez at 45:15-46:2, filed August 19, 2022 (Doc. 330-8)("Excerpted Sanchez Dep.")]) The witness did not address how *HSD* would have presented recoupment requests *to the MCOs* in the cited testimony, nor did he address the Reconciliation Summaries. (*Id.*) Thus, even construed in the light most favorable to Relator, this somewhat speculative testimony is insufficient to create a genuine issue of material fact regarding whether the Reconciliation Summaries constituted HSD's final recoupment requests merely because they were provided to the MCOs in writing.

Furthermore, the March 2016 emails and Reconciliation Summaries themselves expressly indicate that they were not final requests. The titles of the Reconciliation Summaries include the word "Interim," and they are marked "Draft" and "For Discussion Purposes Only." ([Email from Valerie Tapia, N.M. Hum. Servs. Dep't, to Jeanene Kerestes et al. at 2-9, filed August 18, 2022 (Doc. 329-6)("Tapia Correspondence")] A draft document is, by definition, not final, and a document designated "for discussion purposes only" explicitly indicates that discussion of its contents is expected before finalization. *See* Black's Law Dictionary (11th ed. 2019) (defining "draft" as "[a]n initial or preliminary version; a piece of writing not yet in its finished form"). Additionally, in the March 2016 emails, HSD invited the MCOs to submit questions to HSD after review, proffered the underlying data on which the Reconciliation Summaries were based, and stated that the "2014 incurred data should be complete in the encounter system" but that some additional data was anticipated. ([Tapia Correspondence] at 2-9.)

In the face of these features, the testimony on which Relator relies is wholly inadequate to allow a reasonable factfinder to conclude that the Reconciliation Summaries in fact represented HSD's final recoupment requests. *See* [Bird v. W. Valley City, 832 F.3d 1188, 1199 (10th Cir. 2016)](stating that a "dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party"). On the contrary, it is plain that they were *not* final requests; and consequently, the mere fact that HSD continued to recoup monies from the MCOs after meeting with Relator does not show that HSD or Mercer LLC "reopened" their reconciliation and recoupment process or relied on Relator's information to do so.

PFRD at 34-36 (the Court's brackets, not the PFRD's brackets).  Magistrate Judge Khalsa also

concludes that the second document on which Kuriyan relies "does not create a genuine dispute as

to whether HSD was still working on reconciliations when it met with Relator in May 2016"

because

nothing in the document shows that it was intended to be HSD's last request. (*See* [Accounting Transaction Request at 2, filed August 18, 2022 (Doc. 329-5)("Transaction Request")]) In addition, testimony that accounting transaction requests reflect the total recoupment amount known to HSD at a given time -- on

which Relator also relies -- merely establishes that the amount in the December 2015 Request was the amount known to be owed by one MCO at that time. ([Response to Alternate Remedy Motion] at 6; 330-8 at 54:23-55:10.) It does not address whether HSD and Mercer LLC were continuing to reconcile the data or when HSD was done making requests to the MCOs. (*Id.*) And of course, the December 2015 Accounting Transaction Request was followed by the March 2016 Reconciliation Summaries discussed above.

PFRD at 36 (brackets the Court's, not in the PFRD).

### A.   MAGISTRATE JUDGE KHALSA APPLIES THE SUMMARY JUDGMENT STANDARD CORRECTLY.

Kuriyan argues that Magistrate Judge Khalsa does not consider the evidence in the light most favorable to him when she considers the evidence whether HSD or Mercer LLC used Kuriyan's information to recoup funds from the MCOs.  See Relator's Objections at 29 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Kuriyan argues that the "sequence of events, documented in the record, certainly does seem to demonstrate such a dispute[.]"  Relator's Objections at 29 n.40.  See Response to Alternate Remedy Motion at 1.  As Magistrate Judge Khalsa observed, in the face of the Government's affirmative evidence that HSD and Mercer LLC did not use Kuriyan's information, the mere timing of HSD's recoupments alone does not create a genuine dispute of fact on this issue.  See PFRD at 34-37.  Moreover, having examined Kuriyan's evidence relevant to whether HSD or Mercer LLC used Kuriyan's information, the Court concludes that Magistrate Judge Khalsa correctly applied the summary judgment standard.  See PFRD at 34-37.  Even viewed in the light most favorable to him, Kuriyan has not adduced competent evidence rebutting the Government's evidence, or showing a triable issue of fact whether the HSD or Mercer LLC relied on his information.  See Tesone v. Empire Mktg. Strategies, 942 F.3d 979, 994 (10th Cir. 2019)(stating that nonmovant who would bear burden of persuasion at trial must adduce evidence creating question of fact to overcome movant's

evidence negating an essential element of nonmovant's claim).  The Court overrules Kuriyan's Objection on this ground.

**B.      MAGISTRATE  JUDGE  KHALSA  APPLIES  THE  CORRECT STANDARDS FOR DETERMINING WHETHER THE RECOUPMENTS ARE AN ALTERNATE REMEDY.**

Kuriyan asserts that Magistrate Judge Khalsa does not apply the correct standards for determining whether the recoupments were an alternate remedy.  See Relator's Objection's at 32.  First, he argues that Magistrate Judge Khalsa errs in concluding that the recoupments are "not 'for or to prevent the same type of fraud or falsity that the FCA and the NMFATA recognize,'" because, he contends, she should assess whether there is "factual overlap" between the allegations in the Relator Kuriyan's Third Amended Complaint Under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, filed October 1, 2020 (Doc. 142)("TAC"), and the "allegations that led to the recovery he wants to share," and that "the overlap here, of course, is overpayment."  Relator's Objections at 26 (quoting PFRD at 32).

The Court already has rejected Kuriyan's argument that "factual overlap" is sufficient to entitle him to a share of the recoupments. See Kuriyan I, 2021 WL 5998603, at *45 (noting Kuriyan's argument that, "where the relief sought by the government's chosen remedy and the facts on which it is based overlap with relator's qui tam suit, then that remedy is an alternate remedy within the meaning of the" FCA and the NMFATA).  As the Court notes, "[o]n its own, . . . 'factual overlap' between a relator's claim and the Government's later remedy is not enough" and that, "although factual similarity 'can be important,' it is 'not enough to seal the deal.'"  Kuriyan I, 2021 WL 5998603, at *45 (quoting United States ex rel. Kennedy v. Novo A/S, 5 F.4th 47, 58 (D.C. Cir. 2021)("Novo A/S")).  "Subsection 3730(c)(5) limits a relator's recovery from an alternative remedy pursued by the government to those types of false or fraudulent claims that the False Claims Act recognizes and for which a qui tam action could have been litigated."

Kuriyan I, 2021 WL 5998603 at *446 (quoting Novo A/S, 5 F.4th at 58).  The cases on which

Kuriyan relies, Rille v. PricewaterhouseCoopers LLP, 803 F.3d 368, 374 (8th Cir. 2015)("Rille")

and United States ex rel. Bledsoe v. Community Health Systems, 342 F.3d 634, 651 (6th Cir.

2003)("Blesdoe"), do not support his position: "Both [Rille and Bledsoe] state only that factual

overlap is *necessary* for an alternative proceeding to be an 'alternate remedy' within the meaning

of subsection 3730(c)(5).  But neither case holds that factual overlap alone is sufficient to allow a

relator to share in the recovery."  Novo A/S, 5 F.4th at 57 (citing Rille, 803 F.3d at 373; Bledsoe,

342 F.3d at 649)(emphasis in Novo A/S).  See Relator's Objections at 32.

Kuriyan also argues that Magistrate Judge Khalsa errs in "suggest[ing] that because the

Government had a contractual remedy (i.e., 'reconciliations'), therefore, there is no alternat[e]

remedy."  Relator's Objections at 25 n.31.  Kuriyan mischaracterizes Magistrate Judge Khalsa's

conclusion.  Rather than concluding that a contractual remedy can never be an alternate remedy,

she determines that it is "undisputed that the Contracts contemplated retroactive reconciliation,

risk corridor, and underwriting gain recoupments and that the MCOs' obligation to pay these

recoupments did not depend on whether they had knowingly made a false statement or improperly

avoided a financial obligation to HSD."  PFRD at 32.  This conclusion is consistent with the

Court's holding that Kuriyan has to show that the recoupments are "for, or [are] to prevent, the

same type of fraud or falsity that the FCA and the NMFATA recognize . . . ."  United States ex

rel. Kuriyan v. HCSC Ins. Servs. Co., No. CIV 16-1148, 2022 WL 704130, at *3 (D.N.M. Mar. 9,

2022)("Kuriyan II").  Moreover, after examining the evidence, Magistrate Judge Khalsa also found

that HSD/Mercer LLC did not use Kuriyan's information to recoup from the MCOs.  See PFRD

at 34.  Kuriyan's statement that this conclusion is "patently absurd," without citation to the record

or pointing to any specific flaw in her analysis, is too general to raise an objection to this

conclusion.  Relator's Objections at 32 n.44.  See One Parcel, 73 F.3d at 1060 (stating that objections must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute").  The Court overrules these Objections.

In its Objections, the Government states that it files its Objections to "highlight[] a supplemental legal issue on which it wishes to preserve its position for the record."  Governments' Objections at 1.  It maintains that, while Magistrate Judge Khalsa correctly applies the standard that the Court prescribes and concludes that Kuriyan is not entitled to a share of the recoupments, the Court could grant the Alternate Remedy Motion for an alternative reason, which is that the recoupments were not recovered based on "the same fraudulent conduct that Relator alleged (i.e., that the MCOs fraudulently retained payments based on the MLR) . . . ."  Governments' Objections at 2-3.  Thus, the Government agrees with the PFRD, but asserts an alternate ground for its recommendations.  The Court sustains in part the Governments' Objections to the PFRD and overrules them in part.  The Court agrees that the non-MLR justification for the Government's recoupment informs why the recoupment is not an alternative remedy in which Kuriyan may share; nevertheless, the Court disagrees with the Government insofar as the Government suggests that it identifies an independent basis upon which to adopt the PFRD's alternative remedy conclusions.

The Government's aim is to highlight specifically that its recoupment from the MCOs occurred solely on non-MLR bases -- i.e., per the retroactive reconciliation adjustments, the risk corridor adjustments, and the underwriting gain adjustments -- while Kuriyan's TAC's fraud claims were predicated solely on the MLR element of the MCOs' and Government's transactions. See Governments' Objections at 1-2 ("[T]he relevant contracts . . . provided for several reconciliation adjustments. . . . [T]hese various contractual adjustments were distinct from HSD's calculation of the Medical Loss Ratio (MLR), i.e., the sole basis for Relator's fraud allegations

under the FCA's reverse false claim provision.").  The PFRD's two primary alternative remedy conclusions address adequately these issues: (i) that the Government recouped not on the basis of "'the same type of fraud or falsity that the FCA and the NMFATA recognize,'" PFRD at 32 (quoting <u>Kuriyan II</u>, 2022 WL 704130, at *3), because the recoupments occurred pursuant to reconciliations purely contractual in nature, which the contracts provided for ex ante; and (ii) that the Government in no way used Kuriyan's information to recoup moneys.  To the extent, therefore, that the Government suggests that its "supplemental issue" represents a threshold consideration, or independent third factor, that the PFRD should have considered, the Court disagrees with the Government.  <u>Cf.</u> Governments' Objections at 3 ("If the Government did *not* recover funds for the reason Relator alleged, then the Court does not even need to address the alternate remedy provision's additional requirements, *e.g.*, whether the Government's purported recovery was for or to prevent the same type of fraud or falsity for which the FCA permits a relator to file a *qui tam* action, and whether HSD used Relator's information to recover any funds.").  The Government's objection here addresses the same issue which the two-pronged analysis that the Court had prescribed and that the PFRD used, the type-of-fraud inquiry and the information-use inquiry: namely, whether the Government's recoupment remedied in a manner alternative to litigation the "claim" that Kuriyan's qui tam complaint alleges.  31 U.S.C. § 3730(c)(5) ("[T]he Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.").  <u>See</u> 31 U.S.C. § 3730(b) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government.   The action shall be brought in the name of the Government."); <u>id.</u> § 3730(b)(2) ("The Government may elect to intervene and proceed with the [relator's] action within 60 days after it receives both the [relator's] complaint and the material evidence and

information."); id. § 3730(c) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action.").  The two-pronged analysis that the Court prescribed and the PFRD conducts is meant to flesh out the inquiry into whether the Government pursued the same "claim" that Kuriyan advanced, 31 U.S.C. § 3730(c)(5), so that its reconciliation functioned as an alternative remedy, in which Kuriyan is owed a share.  This litigation's history prompted the two-pronged analysis the PFRD employed, so the Court reviews how that two-pronged test arose.  This review suggests why the Government is incorrect that its non-MLR recovery argument represents an analytically distinct basis for the PFRD's conclusions.  Instead, the two-step analysis that the PFRD engaged in is an umbrella in which the Government's argument fits comfortably.

Earlier in this litigation's life, the Honorable James A. Parker, United States District Judge for the United States District Court for the District of New Mexico, ruled on motions to dismiss file against Kuriyan's TAC's claims.  See Motion by All Defendants to Dismiss Relator's Third Amended Complaint (ECF 142), filed November 5, 2020 (Doc. 144); State of New Mexico's Motion to Dismiss, filed December 17, 2020 (Doc. 153); Order, filed January 29, 2021 (Doc. 166)("3rd MTD Order"); United States ex rel. Kuriyan v. HCSC Ins. Servs. Co., No. CIV 16-1148, 2021 WL 5238332 (D.N.M. Jan. 29, 2021)(Parker, J.)("Kuriyan I").  Judge Parker held that Kuriyan's TAC stated valid claims under the FCA.  See 3rd MTD Order at 3-4; Kuriyan I, 2021 WL 5238332, at *2-3.  Judge Parker ruled that Kuriyan stated a valid claim for fraud against the government that the healthcare companies fraudulently retained payments that the companies were not owed.  See 3rd MTD Order at 3-4; Kuriyan I, 2021 WL 5238332, at *2-3.

After Kuriyan's case was reassigned from Judge Parker to the Court, see Notice of Reassignment, filed August 12, 2021 Doc. 206)(text-only entry), the Court ruled, at the summary

judgment stage, on Kuriyan's motion for an alternative remedy, holding that whether the Government's recoupment of millions of dollars from the MCOs constitutes an alternative to litigating through to completion Kuriyan's claim remained a trial issue.  See Plaintiff/Relator's Opposed Third Motion for Award from Alternate Remedy, filed February 5, 2021 (Doc. 173); Kuriyan II, 2021 WL 5998603, at *41-42, 45-49 .  Cf. 31 U.S.C. § 3730(c)(5) ("[T]he Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.").  Although the Court did not disturb Judge Parker's ruling that the TAC stated a valid FCA claim for relief, see Kuriyan II, 2021 WL 5998603, at *41 ("[T]he Court agrees with Judge Parker that Dr. Kuriyan plausibly pleads a claim upon which relief can be granted."), the Court ruled that it remained a triable issue whether the Government's reconciliation process constitutes an alternative to pursuing the claim that Kuriyan's TAC advanced.  See Kuriyan II, 2021 WL 5998603, at *41 ("[T]he Court does not know if HSD's recoupment is an alternate remedy. Dr. Kuriyan mistakenly treats Judge Parker's conclusion that he plausibly pleads a claim upon which relief can be granted as a factual determination that HSD relied on his disclosure and would not have recouped funds from the Defendants MCOs had Dr. Kuriyan not come forward."); id. at *42 ("[B]efore Dr. Kuriyan is entitled to an alternate-remedy award, he must prove that HSD's recoupment was for the same type of fraud that the FCA and the NMFATA recognize.").  The Court held that factual overlap between Kuriyan's claims and the Government's recoupment is insufficient.  See Kuriyan II, 2021 WL 5998603, at *46 ("On its own, however, 'factual overlap' between a relator's claim and the Government's later remedy is not enough." (quoting United States ex rel. Kennedy v. Novo A/S, 5 F.4th at 58)).  The Court, therefore, concluded that solely because Kuriyan's TAC asserted a valid theory of FCA liability, does not mean that the theoretically plausible fraud claim that Kuriyan articulated was true -- i.e.,

because the motion to dismiss orders treated his allegations as true -- nor that the Government's pursuit of his claim, in actuality, formed the basis for the Government's recovery. Accordingly, the Court held that, although Kuriyan stated a claim for relief, he had not demonstrated that his allegations were true, nor had he demonstrated that the Government was "pursui[ng] . . . [the] claim," 31 U.S.C. § 3730(c)(5), that the Government opted to take over from Kuriyan, see 31 U.S.C. 3730(b), when it recouped moneys from the MCOs, such that its recoupment would be an alternate remedy in which Kuriyan could share.

In United States ex rel. Kuriyan v. HCSC Ins. Servs. Co., No. CIV 16-1148, 2022 WL 704130 (D.N.M. Mar. 9, 2022)(Browning, J.)("Kuriyan III"), the Court again considered what Kuriyan must demonstrate to establish an alternate remedy FCA claim. The Court disagreed with the Government and Defendants' arguments that Kuriyan must demonstrate fraud occurred to suc- ceed on his alternate remedy claim, see Kuriyan III, 2022 WL 704130, at *2 ("There is, therefore, no need for Dr. Kuriyan to prove that the Defendant MCOs violated § 3729 to be entitled to an alternate remedy award.");[8] effectively, therefore, the Court concluded that, to obtain an alternate

---

[8]One other district court decision reaches implicitly the opposite conclusion, suggesting that, to succeed on an alternate remedy claim, a relator must demonstrate that the alleged fraud occurred. See United States ex rel. Joest v. Loral Corp., No. CIV 96-5554, 2000 WL 36746901, at *5 (C.D. Cal. May 25, 2000)(Paez, J.)("[P]laintiffs' entitlement to share in DFAS' recovery is based upon a finding that Loral committed fraud. Plaintiffs have not yet established that Loral committed any fraud. Further, their claims of fraud have in no way been . . . resolved. Therefore, plaintiffs are not presently entitled to a portion of the funds recovered . . . ."). The Court disagrees with this position, because a relator need demonstrate only that the government was "pursui[ng] . . . [the] claim," 31 U.S.C. § 3730(c)(5), that the government coopted from the relator and that the alleged "alternate remedy" exists to in fact remedy that claim. That is, what matters is at what precisely the government's alleged alternate remedy was aimed -- redressing conduct that the FCA targets -- but not that the fraud that the relator alleges transpired. Thus, the alternate remedy provision applies to a negotiated resolution with a defendant, where the agreement may explicitly provide that it resolves any pertinent FCA claims, while not providing an admission of guilt or otherwise establishing a factual basis regarding the wrongful conduct, e.g., when the defendant does not admit wrongdoing. Such a resolution -- clearly intended to redress possibly wrongful

remedy share, Kuriyan need not show that his TAC's allegations are true, see Kuriyan III, 2022 WL 704130, at *2 n.2 ("Although Dr. Kuriyan pleads fraud under the FCA and the NMFATA, Dr. Kuriyan does not need to prove that the Defendant MCOs acted fraudulently to be entitled to an award from alternate remedy.").  Instead, the Court devised the two-step analysis the PFRD performed: (i) Kuriyan must show that his claim was one for which the FCA provides, an analysis that restates the Court's conclusion; and (ii) the Government used the information that Kuriyan provided it.  See Kuriyan III, 2022 WL 704130, at * 3 ("Dr. Kuriyan must show that . . . the [HSD's] recoupment was for . . . the same type of fraud or falsity that the FCA and the NMFATA recognize . . . , and that [HSD] used Dr. Kuriyan's information to recoup the funds at issue from the Defendant MCOs.").  In sum, the Court's provision for the two-step analysis that the PFRD performed comprises the analysis whether the Government's recoupment here constitutes an alternate remedy that redressed the "claim," 31 U.S.C. § 3730(c)(5), that the Government took over from Kuriyan, see 31 U.S.C. § 3730(b).  The Court's scansion essentially was whether it was the same "claim" that the TAC advanced that its recoupment recovered for and was meant to redress.

Insofar as this two-step analysis states the whole of how to analyze the FCA's alternate remedy provision, then the Government's "supplemental" basis for adopting the PFRD is not supplemental at all.  Governments' Objections at 3 ("If the Government did *not* recover funds for the reason Relator alleged, then the Court does not even need to address the alternate remedy provision's additional requirements, *e.g.*, whether the Government's purported recovery was for . . . the . . . type of fraud . . . [that] the FCA permits . . . , and whether HSD used Relator's information . . . .").  Instead, the Government's Objection comes within the framework the Court has

---

conduct -- does not fail to constitute a FCA alternate remedy solely on the basis that the agreement does not definitively establish that the alleged wrong occurred.

previously laid out and that the PFRD performed.  The Government's position in its Objections is that the recoupment occurred solely on non-MLR bases, i.e., solely on bases other than those Kuriyan's TAC advanced, and that those bases were entirely contractual in nature, having nothing to do with any theory of liability cognizable under the FCA.  These arguments come within both prongs of the Court's analysis: (i) the contractual nature of the non-MLR reconciliations are further reason that the recoupment was not for "the same type of fraud or falsity that the FCA and the NMFATA recognize," Kuriyan III, 2022 WL 704130, at *3; (ii) and that Kuriyan's information related solely to the MLR, a basis upon which the Government recovered nothing, is further reason that the Government did not "use[] Dr. Kuriyan's information to recoup the funds at issue from the Defendant MCOs," Kuriyan III, 2022 WL 704130, at *3.  Accordingly, the Court sustains the Governments' Objections insofar as they inform the two-prong analysis, but overrules the Governments' Objections insofar as they suggest an analytical category outside the two-pronged analysis the Court has identified.

The Court thus concludes that Magistrate Judge Khalsa correctly applies the standards for deciding whether Kuriyan is entitled to a share of the recoupments to the relevant evidence.  After de novo review, the Court concurs with Magistrate Judge Khalsa's conclusions that Kuriyan is not entitled to a share of the recoupments, either because the public disclosure bars foreclose his claims, or because he has not shown that there are genuine disputes of material fact whether the recoupments are for the false claims that the FCA or NMFATA address and whether HSD/Mercer LLC relied on Kuriyan's information to recoup funds from the MCOs.  The Government, therefore, is entitled to summary judgment as a matter of law.  The Court overrules Relator's Objections,

overrules in part and sustains in part the Governments' Objections, and grants the Alternate Remedy Motion.[9]

## II.    THE COURT WILL NOT ADOPT MAGISTRATE JUDGE KHALSA'S CONCLUSION THAT THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT BASED ON THE PUBLIC DISCLOSURE BARS.

The Court will not adopt Magistrate Judge Khalsa's recommendation that the Court hold that the FCA's public disclosure bar applies, but the Court will adopt her recommendation that the NMMFCA's and the NMFATA's public disclosure bars apply, although on a basis other than she suggests.  See PFRD at 27; Relator's Response in Opposition to the United States and State of

---

[9]The Court will not adopt Judge Khalsa's conclusion that the Court's public disclosure conclusion should moot Kuriyan's alternative remedy claims, because the Court does not adopt Judge Khalsa's recommendation that all three statutes' public disclosure bars foreclose Kuriyan's suit.  Although Judge Khalsa is correct that granting wholesale the Public Disclosure Motion would mean Kuriyan has no right to recover a portion of any alternate remedy, see United States ex rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 112 (3d Cir. 2007)("Hefner")("[A] relator [can]not . . . share in the proceeds of an alternate remedy when the relator's *qui tam* action under § 3729 is invalid: As § 3730(c)(5) provides, a relator's rights in an alternate remedy proceeding are the 'same rights' . . . if the action had proceeded under the FCA."), the Court will not treat as moot his Alternative Remedy Motion, because the Court does not grant the Public Disclosure Motion as to the FCA.  Cf. New York ex rel. Khurana v. Spherion Corp., 246 F. Supp. 3d 995, 1000 (S.D.N.Y. 2017)(Keenan, J.)("[I]f there is no valid qui tam action for the government to take over, then any remedial option that the government might pursue is not, in fact, an 'alternate' to taking over a qui tam action.").  Kuriyan does not address Magistrate Judge Khalsa's mootness conclusions.  See Relator's Objections at 1.  The MCOs agree with Judge Khalsa's mootness conclusion.  See MCOs' Request at 2 ("[A]dopting the PFRD's legal and factual findings regarding the public disclosure bar necessarily disposes of Relator's alternate remedy theory: Relator cannot share in an alleged alternate remedy arising from barred claims.").  The Government argues that, while Magistrate Judge Khalsa is correct in concluding that "relators cannot share in claims that the public disclosure bar forecloses them from bringing," Governments' Objections at 5 n.8, the Court should nevertheless grant the Alternate Remedy Motion or decide the disputed issues, because "the Tenth Circuit would benefit from the Court's inclusion in the record of each of the grounds supporting its entry of judgment," The United States' Reply in Support of Its Objections/Response to the Magistrate Judge's Proposed Findings and Recommended Disposition at 2, filed October 11, 2023 (Doc. 420)("United States Reply").  Because, however, the Court does not grant entirely the Public Disclosure Motion, but only that motion as to the NMMFCA and NMFATA public disclosure bars, the Court will not adopt Judge Khalsa's mootness conclusions.

New Mexico's Motion for Summary Judgment on Relator's Demand for an Alternate Remedy (Doc. 305) and Memorandum in Support, filed August 19, 2022 (Doc. 330)("Response to Alternate Remedy Motion").   Magistrate Judge Khalsa premises her recommendations on the proposition that the substance of Kuriyan's allegations previously were disclosed publicly "from the news media," 31 U.S.C. § 3730(e)(4)(A)(iii), because the LFC Report disclosed substantially the same transactions and the New Mexico Legislature's website made available the LFC Report. Importantly, Magistrate Judge Khalsa holds that the Legislature's website constitutes "news media" under the three laws' public disclosure bars.   The Court will not adopt that reasoning and will not hold that the Legislature's website constitutes news media.   Although the Court agrees with Magistrate Judge Khalsa that the LFC Report contains "substantially the same allegations or transactions as alleged in [Kuriyan's] action," 31 U.S.C. § 3730(e)(4)(A), the Court concludes that the LFC Report is a State report, so it does not come under the FCA's public disclosure bar, which provides for public disclosure only from federal reports.   To hold that the State Legislature website on which the LFC Report was posted constitutes "news media" stretches too far the meaning of the phrase news media, and in this situation, undermines Congress' intent to exclude from the FCA's public disclosure bar reports that State entities produce.   Because Kuriyan's allegations, therefore, were not disclosed publicly from any of the FCA's enumerated sources of disclosure, the FCA's public disclosure bar does not bar his claims.   The Court holds, however, that the NMMFCA and NMFATA's public disclosure bars bar Kuriyan's claims, because the LFC Report comes under those laws' enumerated disclosure sources.   The Court agrees, moreover, with Magistrate Judge Khalsa's original source analysis which remains applicable to the NMMFCA analysis, holding that Kuriyan is not an original, independent source of the LFC Report and did not provide materially new information to the LFC Report.   Accordingly, although the Court does

not adopt Magistrate Judge Khalsa's recommendation that the Court grant the Public Disclosure Motion as to the FCA or the NMMFCA, the Court adopts the recommendation to grant the Public Disclosure Motion as to the NMFATA.

### A.   THE FCA'S PUBLIC DISCLOSURE BAR DOES NOT BAR KURIYAN'S CLAIMS.

The FCA provides that a court "shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" either: (i) in a "Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "from the news media." 31 U.S.C. § 3730(e)(4)(A). The FCA relieves, however, a private person who is "an original source of the information" from the effect of the public disclosure bar. 31 U.S.C. § 3730(e)(4)(A), (B).

Because the public disclosure bar is an affirmative defense, the Government bears the burden to show that it applies. See Leone v. Owsley, 810 F.3d 1149, 1153 (10th Cir. 2015). Under Tenth Circuit law, however, Kuriyan bears the burden to show that he falls within the "original source" exception to the bar. Bahrani, 465 F.3d at 1207 ("The burden is on [the relator] to show that he is an original source.").[10] To decide whether the public disclosure bar requires dismissal of a relator's claims, the Court examines whether the claims in the complaint involve "substantially the same allegations or transactions" as the publicly disclosed information, and whether the disclosures at issue are made public in one of the FCA's specified sources. 31 U.S.C.

---

[10]Although Bahrani predates the 2010 amendments to the FCA, these amendments do not change the phrasing of the original source exception to the public disclosure bar. Compare United States ex rel Stone v. Rockwell Int'l Corp., 282 F.3d 787, 797 n.3 (10th Cir. 2002)(setting forth the text of 31 U.S.C. § 3730(e)(4)(A) before the 2010 amendments), with 31 U.S.C. § 3730(e)(4)(A). Thus, in the Court's view, the 2010 amendments do not affect Bahrani's holding that the relator bears the burden of proving that he or she falls within the original-source exception.

§ 3730(e)(4)(A).  See Reed, 923 F.3d at 743-744; Kennard v. Comstock Res., Inc., 363 F.3d 1039, 1042 (10th Cir. 2004)("Kennard").  The public disclosure bar applies if each of these questions is answered in the affirmative.  See Reed, 923 F.3d at 742 n.5.  If the public disclosure bar applies, the court then determines whether the relator falls within the "original source" exception.  Reed, 923 F.3d at 742 n.5.

The Court concludes that Magistrate Judge Khalsa applies correctly the "substantially the same" test in finding that the transactions that Kuriyan addresses in his qui tam action are substantially the same as those that the LFC Report addresses.  31 U.S.C. § 3730(e)(4)(A).  The Court concludes, however, that Magistrate Judge Khalsa applies incorrectly the FCA's enumerated sources test in concluding that the transactions in the LFC Report were made public through the "news media," 31 U.S.C. § 3730(e)(4)(A)(iii), because the LFC Report was made publicly available on the New Mexico State Legislature's website.  Because the Court concludes that neither the "news media" provision, nor another enumerated source provision in 31 U.S.C. § 3730(e)(4)(A), applies, the Court holds that the FCA's public disclosure bar does not justify dismissing Kuriyan's TAC.  The Court concludes, however, that the NMFATA's public disclosure bar encompasses the LFC Report, because NMFATA's bar provides as an enumerated source reports that governmental entities produce; the NMMFCA's public disclosure, does not encompass the LFC Report, however, because the NMMFCA provides only for news media disclosures and disclosures in hearings, and not for governmental reports disclosures.  Accordingly, the Court concludes that the NMFATA's public disclosure bar applies, but, because a State report is not an enumerated source of the FCA or the NMMFCA, the Court concludes that the FCA's and the NMMFCA's public disclosure bars do not apply.

1.      **Magistrate Judge Khalsa Correctly Applies the "Substantially the Same" Standard and Finds that the Transactions Addressed by the TAC are Substantially the Same as Those which the LFC Report Addresses.**

Magistrate Judge Khalsa concludes that the transactions in the TAC are substantially the same as the transactions in the LFC Report.  See PFRD at 17-20.  A relator's allegations are "substantially the same" as publicly disclosed allegations or transactions if the public disclosure is "sufficient to set the government 'on the trail of the alleged fraud without [the relator's] assistance.'"  Reed, 923 F.3d at 744 (quoting United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir. 1995)("Fine")).   In other words, a public disclosure will meet the "substantially-the-same" standard if it provides "enough information" to permit the United States "to infer that the defendant knowingly violated the" FCA.  Reed, 923 F.3d at 745 n.10 (quoting Bellevue v. Universal Health Servs. of Hartgrove, Inc., 867 F.3d 712, 718 (7th Cir. 2017)).

Magistrate Judge Khalsa compares the TAC and the LFC Report as follows:

> In the TAC, Relator states that the "essence of [the alleged] fraudulent scheme" is that the "MCOs had not met the 85% minimum MLR, meaning that they had illegally retained overpayments, in violation of federal regulations and their contracts with HSD." (Doc. 142 at 9.) . . . . He further alleges that "premiums paid to [the] MCOs -- and consequently, [the MCOs'] profits -- had jumped considerably between 2013 and 2014, even though patients' medical needs remained the same" and that the "'jump' could not be explained in any way other than overpayments to" the MCOs, which indicated to Relator that the MCOs were knowingly "retaining overpayments in excess of the time period permitted by law." (Id. at 8-9.) He alleges that, despite reviewing Mercer LLC's "MLR and [risk corridor] audit results" before they were sent to HSD, the MCOs "had made no effort to inform HSD of overpayments, which confirmed [their] fraudulent scheme[.]" (Id. at 9, 19, 30-32.) Accordingly, Relator alleges that the MCOs both fraudulently retained funds after they should have been returned to HSD and falsely certified that the audit results were correct.
>
> The Government has shown that the transactions alleged in the TAC are substantially the same as transactions disclosed in the LFC Report. In the Report, the LFC noted that the MCOs were required to spend at least 85% of "capitation revenue on direct medical expenses on an annual basis," that in 2014, at least "one MCO did not meet [this] contractual MLR requirement," and that before 2014, MCOs had fallen well short of meeting the requirement. (Docs. 329-1 at 5,6; 303

at 10; 329; 150 at 88.)   It further noted that "CY14 figures are still subject to reconciliations," (Docs. 303 at 10; 329-1 at 6; 150 at 88), and referred to potential repayment of funds if the MLR is not met. (Doc. 150 at 38, 92.)   In other words, the Report 1) identified the MCOs and contracts, 2) stated the MLR requirement, 3) highlighted a historical problem with MLR compliance and underspending on direct medical expenses in the past, 4) noted that at least one MCO had failed to meet the MLR requirement in 2014, and 5) referenced potential repayment of funds based on the MLR. Thus, the Report "identified the problem -- [underspending on direct medical expenses] -- and traced that problem to an easily identifiable group of probable offenders" -- the MCOs.   *Reed*, 923 F.3d at 749.   This is the same problem, and the same group of probable offenders, alleged in the TAC.

PFRD at 18-19 (brackets in PFRD).   Magistrate Judge Khalsa further concludes that "Relator's evidence does not create a genuine factual dispute on this issue."   PFRD at 19.   She considered that evidence, as follows:

> Relator argues that his allegations are not substantially the same as the disclosures in the LFC Report because the LFC's discussion of pre-2014 underspending is irrelevant to performance under Centennial Care contracts. ([Relator's Response] at 6.) But on the contrary, the LFC's reference to historical underspending to the tune of nearly $80 million highlights potential underspending in 2014 and implies that the 2014 data, which was still being reconciled, may reveal similar underspending. Hence, rather than being irrelevant, that discussion in fact would have helped to set HSD on the trail of any allegedly fraudulent MLR noncompliance in 2014.
>
> Relator also argues that the Report's discussion of MLR noncompliance would not "set the Government on a trail of fraud" because it does not address the MCOs' knowing retention of funds beyond a permissible time or their certifications on reports to HSD, which are the crux of Relator's FCA allegations. (*Id*.) But the public disclosure bar does not require a "hyper-specific reading that requires near-complete identity of allegations," as Relator would have it. *Reed*, 923 F.3d at 748 n.12. Again, the Report publicized the pertinent elements of the Contracts, the names of the MCOs, the MLR requirement, MCOs' historical failure to meet that requirement, and the fact that at least one MCO had not met that requirement in 2014, and referenced continued reconciliations and potential repayment. Whether the MCOs knowingly retained funds they should have returned because they had not met the MLR requirement, and whether they falsely certified their compliance with it, are simply a few inexorable steps further along the same "trail of alleged fraud." *See United States v. United Behav. Health, Inc.*, Civ. No. 15-1164 KWR/JHR, 2023 WL 1817380, at *9 (D.N.M. Feb. 8, 2023)(holding that, even though public hearings did not address "specific allegations of fraud," the "material elements of the alleged fraudulent transaction [were] disclosed sufficiently to put the government on the trail of the alleged fraud" where the government "was aware that the contractor had failed to perform the contract requirements" and "could have

followed the trail to determine if fraud had caused the contract violation"). In these circumstances, the Government's "nose for fraud" would have been "sensitive enough to pick up the scent" using the information in the LFC Report. *Reed*, 923 F.3d at 745.

PFRD at 19-20.

Kuriyan argues that Magistrate Judge Khalsa errs in concluding that the TAC and LFC Report are substantially the same, because: (i) there is no evidence that the LFC Report "set the government on the trail of the alleged fraud without the relator's assistance" or that the Government in fact learned of the alleged fraud through the LFC Report, Relator's Objection's at 14, 15; and (ii) the LFC Report is not "substantially the same" as the TAC, because it does not allege any fraud or false claims by the MCOs, Relator's Objection's at 16.

Kuriyan misstates the "substantially the same" standard.  As Magistrate Judge Khalsa correctly applies it, the test is whether the allegations or transactions in the LFC Report could have set the Government on the trail and not whether they set the Government on the trail.  See United States ex rel. Maur v. Hage-Korban, 981 F.3d 516, 524 (6th Cir. 2020)("Maur")("[T]he 'operative question' . . . is whether the *public disclosures* would themselves be 'sufficient to set the government on the trail . . . without the relator's assistance.' If so, then regardless [] what the government knows or how [it] behaves, the relator's allegations are 'substantially the same' as those contained in the disclosures." (quoting Reed, 923 F.3d at 744)(emphasis in Maur, not in Reed)).  Furthermore, the "public disclosures need not allege any False Claims Act violations or even 'any wrongdoing'[.]"  Reed, 923 F.3d at 745 (quoting Fine, 70 F.3d at 572).  Rather, the public disclosure "need only disclose 'the material elements of the fraudulent transaction.'"  Reed, 923 F.3d at 745 (quoting Fine, 70 F.3d at 572).

Kuriyan's also argues cursorily that Magistrate Judge Khalsa "never consider[ed] whether, instead of [his] claims being 'substantially the same as' the [LFC Report], . . . they were 'based

primarily on' the public disclosure, which would only cap the [Kuriyan's] share at 10%." Relator's

Objection's at 9.  Kuriyan relies on § 3730(d)(1), which provides:

> If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, [but w]here the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions . . . from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation.

31 U.S.C. § 3730(d)(1) (emphasis added).  The Court will overrule this Objection for three

reasons.  First, Kuriyan did not make this argument in his response to the Public Disclosure

Motion, and it, therefore, is waived.  See Relator's Response at 1.  Second, § 3730(d)(1) does not

apply here because the Government has not intervened to proceed with Kuriyan's claims. Third,

even if the Government had intervened, § 3730(d)(1) does not operate to lift the public disclosure

bar to Kuriyan's claims.  Section 3730(e)(4) "compels" courts to dismiss a claim when the public

disclosure bar applies.  Reed, 923 F.3d at 737.  Kuriyan's interpretation of § 3730(d)(1) would

permit an "end run" around the public disclosure bar when the government intervenes to proceed

with a relator's claims that are "based primarily on" public information.  31 U.S.C. § 3730(d)(1).

The Tenth Circuit has rejected this interpretation.  See United States ex rel Stone v. Rockwell Int'l

Corp., 282 F.3d 787, 798 (10th Cir. 2002).  Accord United States ex rel. Merena v. SmithKline

Beecham Corp., 205 F.3d 97, 105 (3d Cir. 2000), as amended (April 21, 2000)(stating that a

"relator whose claim is subject to dismissal under [§] 3730(e)(4) may not receive any share of the

proceeds attributable to that claim" under § 3730(d)(1)); Fed. Recovery Servs., Inc. v. United

States, 72 F.3d 447, 452 (5th Cir. 1995)(stating that Congress intends § 3730(d)(1) to permit the

relator's recovery when the public disclosure bar does not apply because the relator qualifies as an original source).

As the PFRD shows, Magistrate Judge Khalsa carefully compares the TAC's allegations with the transactions that the LFC Report address.  See PFRD at 18-20.  Having compared the TAC and the LFC Report de novo, the Court concludes that the transactions disclosed in the LFC Report are substantially the same as the transactions addressed in the TAC.  The Court therefore overrules Kuriyan's Objections as to this issue.

> **2.**     **Magistrate Judge Khalsa Incorrectly Concludes That the LFC Report's Contents Are Disclosed Publicly "From the News Media".**

The Court will not adopt Magistrate Judge Khalsa's recommendation on the FCA's enumerated sources analysis, because the Court concludes that the transactions that the LFC Report contains were not disclosed "from the news media."  31 U.S.C. § 3730(e)(4)(A)(iii).  The Court sustains Kuriyan's Objection to the PFRD that Magistrate Judge Kuriyan erred in concluding that the LFC Report was publicly disclosed through the "news media," 31 U.S.C. § 3730(e)(4)(A)(iii), insofar as the New Mexico Legislature's website made publicly available the LFC Report.  The Court agrees with Kuriyan that the phrase "news media" in the qui tam statute does not include a State governmental entity's online presence, specifically its repository of press releases and research reports available for download.  See Relator's Objection's at 9; PFRD at 20-23.  Neither the New Mexico legislature nor its website is, under any ordinary meaning of the phrase, a "news media" entity.  31 U.S.C. § 3730(e)(4)(A)(iii).  The Court recognizes that some precedent supports Magistrate Judge Khalsa's expansive reading of that phrase, but -- there being no binding precedent on the subject from the United States Court of Appeals for the Tenth Circuit -- the Court declines to adopt what the Court holds is an excessively broad approach that caselaw takes to the "news media" question.  As the Court concludes later, moreover, the LFC

Report is, by all accounts, a State-produced report, which is excluded from the FCA's list of enumerated sources; reading the State legislature website carrying the LFC Report as a "news media" entity for FCA purposes undermines Congressional intent to exclude State reports from the FCA public disclosure bar's purview.  31 U.S.C. § 3730(e)(4)(A)(iii).

Disclosures made in the LFC Report, posted to the New Mexico Legislature's website, is not disclosure "from the news media."  Although "news media" has a broad sweep, see United States ex rel. Kraxberger v. Kansas City Power & Light Co., 756 F.3d 1075, 1078-79 (8th Cir. 2014)("Kraxberger")("'News media' is not defined in the FCA, though the Supreme Court has acknowledged the term has a 'broad sweep.'" (quoting Schindler, 463 U.S. at 410-11)), it has limits.  Those terms imply an entity whose primary function it is to gather information for informing the public, as dictionary definitions provide.   "News" is "a report of recent events," "previously unknown information," "something having a specified influence or effect," "material reported in a newspaper or news periodical or on a newscast," "matter that is newsworthy," or a "newscast."  News, Merriam-Webster, https://www.merriam-webster.com/dictionary/news (last visited Dec. 30, 2023).  "Media" is "forms or systems of communication designed to reach a large number of people," Media, Merriam-Webster, https://www.merriam-webster.com/dictionary/media (last visited Dec. 30, 2023), while "mass media" is "a medium of communication (as newspapers, radio, or television) that is designed to reach many people," Mass Media, Merriam-Webster, https://www.merriam-webster.com/dictionary/mass%20media#kidsdictionary   (last visited Dec. 30, 2023).  Notably, the definition for the FOIA statute of "a representative of the news media" offers the narrower view: "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."  5 U.S.C. § 552.  The Court finds persuasive the

analysis of the Honorable Philip S. Gutierrez, United States District Judge for the United States District Court for the Central District of California, whose scansion of the "news media" provision suggests that an organization's self-promotion sources do not constitute "news media" for the FCA's purposes.  United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs., No. CIV 17-1694, 2019 WL 3282619, at *13 (C.D. Cal. July 16, 2019)(Gutierrez, J.)("Integra"), rev'd on other grounds and remanded sub nom. Integra Med Analytics LLC v. Providence Health & Servs., 854 F. App'x 840 (9th Cir. 2021).  Judge Gutierrez offers five considerations whether a particular communicative entity is a "news media" entity so as to trigger the public disclosure bar:

> (i) "[T]he extent to which the information typically conveyed by a source would be considered newsworthy"; (ii) the extent to which there is "editorial independence, or at least some separation, between the original source of information and the medium that conveys it"; (iii) the extent to which the source intends "to disseminate information widely, as opposed to only to a few individuals"; (iv) the extent to which the source "functions like [a] traditional news outlet[ ]" (i.e., a newspaper, radio, or television station); and (v) the extent to which the source "could reasonably be described as 'news media' as at least some people would that term in everyday speech" which is "the most important consideration."

Integra, 2019 WL 3282619, at *13.  In a sense, the newsman's activity involves a creative act: the identification of information worth conveying, the information's synthesis into a digestible form, and its dissemination to an identifiable audience.

Many businesses, governmental entities, and other organizations have on their websites what variously may be titled a newsroom, media center, or press center, where the organization posts online press releases about its own activities: such disclosures are not disclosures "from the news media" in the Court's view.  Were the presence alone sufficient of a so-called newsroom or media center tab on a website sufficient to render information that the website discloses information disclosed "from the news media," then governmental officials would be news media entities.  See, e.g., Newsroom, Martin Heinrich, https://www.heinrich.senate.gov/newsroom (last

visited August 6, 2024)(featuring press releases from United States Senator Martin Heinrich). Taking the New York Times' well-known motto "all the news that's fit to print" as inspiration, that an organization or figure deems its own goings-on newsworthy does not make the entity publishing that information a news media source.

Moreover, treating as a news media entity any website that includes a link to a report or hearing that, in turn, contains disclosures substantially the same as those in a qui tam relator's complaint would render superfluous those first two enumerated sources in the FCA public disclosure bar. Cf. 31 U.S.C. § 3730(e)(4)(A) (listing as public disclosure bar triggers those disclosures made "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"). It would render superfluous clauses (i) and (ii), if clause (iii) applies whenever a hearing's transcript or a federal report is made publicly available online: because most resources like hearing transcripts or federal reports are available online, that would render surplusage in most situations the hearing- and report-specific enumerated source provisions. Canons of statutory interpretation militate against that conclusion, particularly when a broad reading of one statutory provision renders its immediate neighbors nugatory. See Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013)("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). All these considerations argue against reading as disclosed "from the news media" the information in a report made available for download on a governmental entity's publicly accessible website. 31 U.S.C. § 3730(e)(4)(A)(iii).

In this situation, moreover, reading the New Mexico Legislature's website as a "news media" entity would be contrary to the FCA's intent to exclude State reports from its enumerated

sources list.  The LFC Report is a State report, and accordingly is not an FCA enumerated source.

The FCA provides that one category of enumerated source is reports that federal entities produce.

See 31 U.S.C. § 3730(e)(4)(A)(ii) ("The court shall dismiss an action or claim under this section

. . . if substantially the same allegations or transactions as alleged in the action or claim were

publicly disclosed . . . in a congressional, Government Accountability Office, or other Federal

report, hearing, audit, or investigation. . . .").   The New Mexico's Legislature's Legislative

Finance Committee produced the LFC Report to aid the Human Services Department.  See LFC

Report at 3.  To the extent that the NMMFCA and the NMFATA follow the FCA, see United

States v. Dental Dreams, LLC, 307 F. Supp. 3d at 1240 ("'FATA closely tracks the longstanding

federal False Claims Act.'  New Mexico state courts have also looked to federal precedent

construing the FCA to provide guidance on the [NM]MFCA." (quoting State ex rel. Foy v. Austin

Capital Management, Ltd., 2015-NMSC-025, ¶ 25, 355 P.3d 1, 9)), then the LFC Report is a report

under the NMFATA's public disclosure bars, see N.M.S.A. § 44-9-9(D) ("[A] court may, in its

discretion, dismiss an action . . . if the elements of the alleged false or fraudulent claim have been

publicly disclosed . . . in a publicly disseminated governmental report at the time the complaint is

filed."), although the NMMFCA does not have a report as its enumerated source list, which instead

has only public hearings and news media sources, see N.M.S.A. § 27-14-10(C) ("A court shall not

have jurisdiction over an action . . . substantially based upon the public disclosure of allegations

or actions in a criminal, civil or administrative hearing or from the news media . . . .").  Magistrate

Judge Khalsa's PFRD suggests but does not decide that the LFC Report constitutes a State report

under the NMMFCA and the NMFATA:

> I do not decide here whether the LFC Report would qualify as a
> 'governmental report' under the NMFATA because neither Relator nor the
> Government has addressed that issue.  However, it seems likely the LFC Report
> would so qualify, because the report was prepared by a committee of the New

> Mexico Legislature and published on the Legislature's website; and, unlike the FCA, the NMFATA does not limit qualifying governmental reports to those issued by a federal entity.

PFRD at 27-28 n.12.  The Court agrees with Magistrate Judge Khalsa's suggestion: the LFC Report is a report, but it is not a federal report.  What constitutes a report is broad: the Supreme Court interprets very broadly that term, to include even memoranda and information that an agency produces in response to a Freedom of Information Act, 5 U.S.C. § 552 et seq. ("FOIA"), request.  See Kraxberger, 756 F.3d at 1078-79 ("Public disclosure may be through a 'Federal report, hearing, audit, or investigation.'  A 'written agency response to a FOIA request falls within the ordinary meaning of "report."'" (quoting Schindler Elevator Corp. v. United States ex rel. Kirk, 563 U.S. 401, 410-411 (2011)("Such an agency response plainly is 'something that gives information,' a 'notification,' and an 'official or formal statement of facts.'" (no citation given for quoted language)))).  Accordingly, the LFC Report is a "report" within the NMFATA's meaning.  Importantly, however, that report is not a federal report.  Cf. 31 U.S.C. § 3730(e)(4)(A)(ii) ("The court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation.").  This choice is one that Congress purposefully made: federal reports trigger the FCA's public disclosure bar, but State reports do not trigger the FCA's public disclosure bar.  A Supreme Court decision previously interpreted State reports' allegations to trigger the FCA's public disclosure bar -- for example, a State or municipal agricultural entity report.  See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 283 (2010)("Graham Cnty.")("The question before us is whether the reference to 'administrative' reports, audits, and investigations in [the FCA's public disclosure] provision encompasses disclosures made in state

and local sources as well as federal sources.  We hold that it does.").  A subsequent amendment to

the FCA report replaces the language whose ambiguity the Supreme Court read to encompass State

and municipal reports to make clear that the FCA public disclosure bar encompasses only federal

reports, and not State reports:

> [T]he 2010 amendments significantly changed the scope of the public-disclosure bar. Under the prior version of the statute, disclosures in federal *and* state trials and hearings qualify as public disclosures, *see, e.g., McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.,* 501 F.3d 1244, 1252 (11th Cir.2007), and disclosures in federal *and* state reports, audits, or investigations likewise constitute public disclosures, *see Graham Cnty.,* 559 U.S. at 301 . . . . After the amendments, however, only disclosures in *federal* trials and hearings and in *federal* reports and investigations qualify as public disclosures. *See* 31 U.S.C. §§ 3730(e)(4)(A)(i) & (ii) (2010). The 2010 amendments thus substantially narrowed the class of disclosures that can trigger the public-disclosure bar. By the same token, the amendments expand the number of private plaintiffs entitled to bring *qui tam* actions by including plaintiffs who learn of the underlying fraud through disclosures in state proceedings or reports.

United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 917 (4th Cir. 2013)("May").

Courts thus recognize that the amendment overruled the Supreme Court's interpretation of the

FCA, so that now the FCA predicates the public disclosure bar solely on federal, and not on State

reports.  See May, 737 F.3d at 917.

The LFC Report is a report, but not a federal report sufficient to trigger the FCA's public

disclosure bar.  Reading, therefore, the New Mexico Legislature's website as a "news media"

disclosure source within the meaning of the FCA's public disclosure bar would upset Congress'

intent that only federal reports and not State reports trigger the FCA's public disclosure bar:  not

all public disclosures trigger the FCA's public disclosure bar; only those enumerated sources

trigger the bar.   See Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 414

(2011)("Schindler")("By its plain terms, the public disclosure bar applies to some methods of

public disclosure and not to others. . . . '[T]he FCA's public disclosure bar . . . deprives courts of

jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through *certain channels*.'" (quoting Graham Cnty., 559 U.S. at 285)(emphasis in Schindler, but not in Graham Cnty.)(first ellipses the Court's, second ellipses in Schindler, but not in Graham Cnty.))).  Recognizing the LFC Report's status as a State report that does not trigger the FCA's public disclosure bar provides reason not to read as a "news media" source the State Legislature website on which the report was posted: if this "news media" reading were possible, it would override in almost all cases the FCA's purposeful exclusion of State reports from the FCA's public disclosure bar, see May, 737 F.3d at 917, given that most State reports are posted online and made available to the public through a State website.  Although some State and federal decisions have adopted this approach -- treating State governmental websites as "news media" sources -- the Tenth Circuit has not adopted this stance, and the Court concludes it is misguided to the extent it effectively negates Congress' purposeful exclusion of State sources in the FCA's public disclosure bar.  Cf. Kraxberger, 756 F.3d at 1079 ("[T]he PSC functions as a news organization for public utilities and consumers in Missouri. The PSC maintains a 'media center' hosting press releases, webcasts of public meetings, and the 'PSConnection Magazine' . . . . The 2006 and 2008 hearing testimony, publicly available on the website of the PSC, qualify as disclosure through the news media."); Rosenberg v. JPMorgan Chase & Co., 487 Mass. 403, 416-18, 169 N.E.3d 445, 460-61 (Mass. 2021)(holding that website functioning as the "official repository for information on all municipal bonds" fell within State false claims "news media" bar, because "'news media' is broad enough to encompass the many ways in which people in the modern world obtain financial news, including from publicly available websites on the Internet").  While the situation may be different if a properly described "news media" source independent of the New Mexico Legislature -- a newspaper, television report, or even blog post -- had in turn digested and reported on the content

of the LFC Report, its availability alone on the New Mexico Legislature's website does not constitute a disclosure from the news media.  The conclusion that Magistrate Judge Khalsa declined to reach that the LFC Report is a State report for purposes of the NMFATA, see PFRD at 27-28 n.12, suggests why, under the FCA, the New Mexico Legislature's website is not a "news media" source.  Accordingly, the FCA's public disclosure bar does not apply, so the Court will not adopt Magistrate Judge Khalsa's report on this subject.[11]

_____

[11]If one of the enumerated sources in the FCA's public disclosure bar applied, then the Court agrees with Judge Khalsa that Kuriyan would not constitute an "original source" of the information in the public disclosure.  31 U.S.C. § 3730(e)(4)(B).  A relator may be an "original source" if the relator "prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and . . . has voluntarily provided the information to the Government before filing an action under this section."  31 U.S.C. § 3730(e)(4)(B).  In Kuriyan's Objections, he argues that he is an original source under § 3730(e)(4)(B)'s first prong.  See Relator's Objections at 18.  In his Response to the Public Disclosure Motion, however, Kuriyan argues only that he is an original source under the second prong.  See Relator's Response at 14.  Cf. Standing Akimbo, LLC v. United States through Internal Revenue Serv., 955 F.3d 1146, 1154 (10th Cir. 2020)(holding that the objecting party "waived . . . argument by not raising it until objecting to the magistrate judge's recommendation")("Standing Akimbo").

Magistrate Judge Khalsa concludes that, while "[Kuriyan] argues that he provided information that was 'independent of' the information in the LFC Report because he discovered 'anomalies through his patented chronic disease modeling[,]'" he "submits no evidence in support, and at the summary judgment stage, such conclusory statements, without competent proof, do not meet his burden."  PFRD at 24.  See United States ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1163 (10th Cir. 1999)(holding that "[a] mere assertion of knowledge, without adequate basis in fact and unsupported by competent proof is insufficient to establish" original source status).  She further concludes that the "Relator does not point to record evidence raising a triable issue of fact as to whether his information materially added to the information in the LFC Report."  PFRD at 24.  Moreover, Magistrate Judge Khalsa notes that "Relator did not argue that he is an original source of information about overpayments based on the risk corridor or underwriting gain calculations" and concludes that, "to the extent the TAC asserts claims resting on overpayments based on those calculations, Relator has not met his summary judgment burden as to those claims."  PFRD at 24 n.10.

On de novo review, the Court concludes, as did Magistrate Judge Khalsa, that Kuriyan does not demonstrate a question of fact precluding summary judgment.  Kuriyan argues that his information materially adds to the LFC Report, because he provides evidence of the MCOs' alleged knowledge that they were withholding monies owed to HSD.  Relator's Response at 8, 15.  As Magistrate Judge Khalsa concludes, however, Kuriyan's information is based on inferences he

**B.    THE NMMFCA'S PUBLIC DISCLOSURE BAR DOES NOT FORECLOSE KURIYAN'S CLAIMS, BUT THE NMFATA'S PUBLIC DISCLOSURE BAR FORECLOSES KURIYAN'S CLAIMS.**

The Court will not adopt Magistrate Judge Khalsa's recommendation that the NMMFCA's public disclosure bar applies, because it is predicated on the incorrect analysis of the "news media" carveout discussed above; the Court grants, however, the Public Disclosure Motion as to the NMFATA, because that law contains as an enumerated source State reports, which the disclosures in the LFC Report are. Both the NMMFCA and the NMFATA contain as an enumerated public disclosure source news media disclosures, but the NMMFCA provides additionally for disclosures in governmental hearings, while the NMFATA provides for disclosures in governmental reports. Compare N.M.S.A. § 27-14-10(C) ("[Courts] shall not have jurisdiction over an action based upon the public disclosure of allegations or actions in a criminal, civil or administrative hearing or from the news media, unless . . . the person bringing the action is an original source of the information."),

---

draws from the MCOs reported profits vis-à-vis their compliance with the MLR requirement. See PFRD at 25. The LFC Report also discusses the MCOs' profits and their compliance with the MLR requirement. In light of the information in the LFC Report, Kuriyan's inferences do not rise to material additions to the information that the LFC Report publicly discloses.

Finally, Magistrate Judge Khalsa correctly concludes that the timing of the recoupments alone is insufficient to show that Kuriyan's information materially added to the information in the LFC Report. See PFRD at 27. "[A] relator who discloses new information that is sufficiently significant or important that it would be capable of 'influencing the behavior of the recipient' -- i.e., the government -- ordinarily will satisfy the materially-adds standard." Reed, 923 F.3d at 757 (quoting United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 211 (1st Cir. 2016)). Viewed in his favor, evidence that HSD recouped monies from the MCOs after Kuriyan shared his information does not establish that his information was "capable of influencing the behavior" or influenced HSD's behavior. Redd, 848 F.3d at 906 (holding that the Court will not draw "unreasonable inferences that are unsupported by the record"). Accordingly, while the Court does not agree with Magistrate Judge Khalsa on the enumerated sources-triggering issue, i.e., the "news media" issue, the Court agrees with Magistrate Judge Khalsa that Kuriyan is not an original source of that information.

<u>with</u> N.M.S.A. § 44-9-9(D) ("[A] court may, in its discretion, dismiss an [NMFATA] action . . . if the elements of the alleged false or fraudulent claim have been publicly disclosed in the news media or in a publicly disseminated governmental report at the time the complaint is filed.").  The NMFATA does not have an original source exception to its public disclosure bar.  <u>See</u> N.M.S.A. § 44-4-9(D).

As discussed above, the LFC Report was not disclosed through the "news media" on the basis that the New Mexico Legislature's website made the LFC Report available for download.  Reading that governmental website as a "news media" source is inappropriate, for all the reasons discussed above: it renders surplusage other language in the NMMFCA, because hearings posted to the Legislature's website would be redundant as already disclosed through the news media.  <u>See</u> N.M.S.A. § 27-14-10(C).  To the extent that New Mexico law tracks similar provisions in the FCA, <u>see</u> <u>United States v. Dental Dreams, LLC</u>, 307 F. Supp. 3d 1224, 1240 (D.N.M. 2018)("'[The NM]FATA closely tracks the longstanding federal False Claims Act.'  New Mexico state courts have also looked to federal precedent construing the FCA to provide guidance on the [NM]MFCA." (<u>State ex rel. Foy v. Austin Capital Management, Ltd.</u>, 2015-NMSC-025, ¶ 25, 355 P.3d 1, 9)), then the New Mexico Legislature's website is not a "news media" entity under the NMMFCA as it is not under the federal FCA.  Only the LFC Report is proffered as a basis for the Public Disclosure Motion's NMMFCA analysis -- and not some other hearings that might trigger the NMMFCA's public disclosure bar -- so the Court concludes the NMMFCA's public disclosure bar does not apply.

As noted above, however, the NMFATA's public disclosure bar applies, because substantially the same allegations as in Kuriyan's lawsuit appear in the LFC Report, which is a "governmental report" for purposes of the NMFATA's public disclosure bar.  N.M.S.A. § 44-9-

9(D).   Accordingly, the Court agrees with Magistrate Judge Khalsa's suggestion that the NMFATA's public disclosure bar applies on this basis.  See PFRD at 27-28 n.12.  The NMFATA's public disclosure bar lacks an original source carveout, so -- even if the Court concludes that Kuriyan is an original source, see n.11 supra, at 53-54 -- that conclusion would not save Kuriyan from the NMFATA's public disclosure bar.

The Court therefore will grant the Public Disclosure Motion as to the NMFATA claims, but not as to the FCA claims or the NMMFCA claims.  Accordingly, the Court, on the Public Disclosure Motion, will dismiss only those claims in the TAC that related to the NMFATA claims, but the Court will not dismiss the FCA or the NMMFCA claims on the Public Disclosure Motion.

The Court notes, however, that, although it does not dismiss Kuriyan's FCA and NMMFCA claims on the basis of the Public Disclosure Motion, Kuriyan has represented that he does not intend to proceed to trial with these claims independent of his alternative remedy claims. See, e.g., Plaintiff/Relator Jacob Kuriyan's Response to Defendants' Motion to Dismiss Relator's 3rd Amended Complaint [ECF 144] at 1, filed November 19, 2020 (Doc. 145)("As a preliminary matter, Relator does not intend to seek further damages against Defendants once his alternate remedy dispute with the United States and State of New Mexico (collectively, 'the Government') has been resolved.").  That is, at this point, Kuriyan seeks only to share in the monies from the reconciliation process on the basis that this process represents an alternative remedy to his fraud claims.  Because the Court grants the Defendants' Alternative Remedy Motion, this litigation has concluded, because Kuriyan has represented that the alternative remedy claim represents his sole pursuit.  It therefore is appropriate for the Court to enter Final Judgment, so that Kuriyan can pursue an appeal of the Court's ruling on the alternative remedy issues.

**IT IS THEREFORE ORDERED** that: (i) the Relator's Objections in Relator Jacob Kuriyan's Corrected Objections to Magistrate Judge's Proposed Findings and Recommended Disposition, filed September 11, 2023 (Doc. 414)("Relator's Objections"), are overruled in part and sustained in part; (ii) the Governments' Objections in the United States' and State of New Mexico's Objections/Response to the Magistrate Judge's Proposed Findings of Fact and Recommended Disposition, filed on September 11, 2023 (Doc. 413)("Governments' Objections"), are overruled in part and sustained in part; (iii) the MCOs' Request  in the Joint Statement Regarding the United States' Response to the Magistrate Judge's Proposed Findings and Recommended Disposition, filed on September 25, 2023, by Defendants HCSC Insurance Services Company, Molina Healthcare of New Mexico, Inc., Presbyterian Health Plan, Inc., and United HealthCare of New Mexico, Inc. (Doc. 417), is denied, (iv) the Magistrate Judge's Proposed Findings and Recommended Disposition, filed August 28, 2023 (Doc. 409), is adopted to the extent it recommends granting the Alternative Remedy Motion and not adopted to the extent it recommends granting the Public Disclosure Motion; (v) the United States', the State of New Mexico's and New Mexico Human Services Department's Motion to Dismiss Relator's Qui Tam Action Under the Public Disclosure Bar, filed July 7, 2022 (Doc. 303), is granted in part and denied in part; (vi) the Motion for Summary Judgment on Relator's Demand for an Alternate Remedy, filed July 7, 2022 (Doc. 305)("Alternate Remedy Motion"), is granted; (vii) the Relator's alternate remedy claim is dismissed with prejudice; (viii) the Relator's claims under the New Mexico Fraud Against Taxpayers Act, N.M.S.A. § 44-9-1 et seq., are dismissed with prejudice; (ix) the Relator's claims under the False Claims Act, 31 U.S.C. § 3729 et seq., and under the New Mexico Medicaid False Claims Act, N.M.S.A. § 27-14-1 et seq., are dismissed without prejudice; (x) the

Plaintiff/Relator Jacob Kuriyan's Third Amended Complaint, filed October 1, 2020 (Doc. 142), is

dismissed; and (xi) Final Judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alan Grayson
Alan Grayson, Esq.
Indialantic, Florida

  *Attorney for the Plaintiff/Relator*

Michael R. Hoernlein
Alston & Bird LLP
Charlotte, North Carolina

-- and --

Matthew E. Jackson
Robert E. Hanson
Peifer, Hanson, Mullins, & Baker P.A.
Albuquerque, New Mexico

  *Attorneys for Defendant UnitedHealthcare of New Mexico, Inc.*

Tina M. Gooch
Sutin, Thayer & Browne
Albuquerque, New Mexico

-- and --

Jarrad Lucian Wood
Reed Smith LLP
Los Angeles, California

-- and --

Steven Hamilton
Jason T. Mayer
Reed Smith LLP
Chicago, Illinois

    *Attorneys for Defendant HCSC Insurance Services Co.*

Julia L. Allen
Steven Ragland
Keker, Van Nest & Peters LLP
San Francisco, California

-- and --

Gregory Marshall
Jeanne Y. Sohn
Snell & Wilmer LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Molina Healthcare of New Mexico, Inc.*

Winston Y. Chan
Charles J. Stevens
Gibson, Dunn & Crutcher LLP
San Francisco, California

-- and --

Charles K. Purcell
Rodey, Dickason, Sloan, Akin & Robb, P.A
Albuquerque, New Mexico

    *Attorneys for Defendant Presbyterian Health Plan, Inc.*

Alexander M. M. Uballez
  United States Attorney
Ruth Fuess Keegan
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

David W. Tyler
Carol Wallack
Civil Division
United States Department of Justice
Washington, District of Columbia

    *Attorneys for Interested Party the United States of America*

Zachary Asher Shandler
New Mexico Office of the Attorney General
Santa Fe, New Mexico

    *Attorneys for Interested Party the State of New Mexico*